# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 506 | **DATE** | 11/6/2003 |
| **CASE TITLE** | United States of America vs. Lawrence E. Warner | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    Enter Memorandum Opinion and Order. Warner's Motion to Dismiss or Strike the charges that he defrauded the public of his honest services (78-1, 78-2) is granted. Warner's Motions to Dismiss or Strike the money laundering charges (82-1, 82-2), the extortion charges (80-1, 80-2), and the RICO charges (86-1, 86-2) are all denied. Warner's Motion to Strike portions of the preamble (84-1) is entered and continued.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | NOV 13 2003 | | |
| | Docketing to mail notices. | | date docketed | | 107 |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | | |
| | | | 11/6/2003 | | |
| ETV | courtroom deputy's initials | | date mailed notice | | |
| | | | ETV | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 CR 506 |
| | ) | |
| LAWRENCE E. WARNER, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Lawrence Warner has been charged in a 10-count superseding indictment with extortion under the Hobbs Act, 18 U.S.C. § 1951, mail fraud, 18 U.S.C. §§ 1341, 1346, money laundering, 18 U.S.C. § 1956 (a)(1)(B)(i), racketeering under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), and aiding and abetting public officials and employees in the commission of these crimes, 18 U.S.C. § 2. He now asks the court to strike or dismiss Count I, Racketeering Acts 1-7 and 9-12, and Counts II, III, IV, V, VIII, IX and X. He also asks the court to strike certain portions of the preamble to Count I. For the reasons set forth here, the motion is granted in part and denied in part.

## BACKGROUND

Warner was a close confidant of a high-ranking Illinois Secretary of State ("SOS") Office official ("SOS Official A"). Between January 1991 and January 1999, he participated in official SOS office matters, including (1) serving on the SOS Office Transition Team, a team of individuals designated in late 1990 by the Secretary of State to review the practices and procedures of the SOS Office and make recommendations for changes and improvements; (2) attending SOS Office meetings, including retreats; (3) directing and advising SOS Office personnel, including department directors; (4) determining the content of SOS communications and contract specifications; and (5)

advising SOS personnel on matters related to the issuance of leases of real property. (Superseding Indictment, ¶¶ 1(R), (U).)

The superseding indictment alleges that Warner controlled the operations of a RICO enterprise consisting of Warner himself, two businesses operated by Warner (National Consulting Company and Omega Consulting Group Ltd.), the Office of the Secretary of State, and co-Defendant Donald Udstuen, who served as the Associate Executive Administrator of a medical professionals lobbyist group and as the Chief Operating Officer for the Illinois State Medical Insurance Exchange. (*Id.* ¶¶ 1(V), 2.) The enterprise's means and methods, the government alleges, include extortion, money laundering, and defrauding the people of the State of Illinois, the State of Illinois, and the SOS Office of their "intangible right to the honest services" of SOS officials. (*Id.* ¶ 5.) The specific allegations are detailed below.

Over a period of several years, Warner pressured employees of the manufacturer of a "metallic security mark" for bribes in exchange for his efforts to ensure that the contract specifications for SOS vehicle registration validation stickers would continue to require inclusion of that security mark. When an SOS Office official ("SOS Official B") directed that the security mark requirement be removed, Warner arranged for SOS Official A to intervene and reverse that decision. Between 1991 and 1998, Warner collected $332,000 from the security mark vendor (Vendor 1) for deposit in the National Consulting Company account. With the knowledge and agreement of SOS Official A, he then paid approximately one-third of the proceeds to Udstuen, routing the money through another co-Defendant, Alan Drazek, and Drazek's business, American Management Resources. (*Id.* ¶¶ 1(K), 12-27.)

In 1991, Warner helped Vendor 1 win the SOS vehicle title laminates contract over the vendor (Vendor 2) that previously held the contract. He did so by enlisting the assistance of SOS Official B to make draft specifications for the contract available in advance of their public disclosure, and then arranging for changes to be made to those specifications which favored Vendor 1. In

2

exchange for his help, Warner received $67,000 from Vendor 1. Again, Warner shared a portion of the bribe with Udstuen, routing the funds through Drazek and Warner's own firm, National Consulting Company. (*Id.* ¶¶ 1(L), 28-34.)

Also in 1991, Warner solicited bribes from a third vendor (Vendor 3) in return for his promises to ensure that the vendor would retain its contract to maintain the SOS office computer system. When Vendor 3 declined to pay the bribe, Warner and Udstuen arranged for the hiring of an SOS official they knew would support conversion to a new computer system provided by a fourth vendor (Vendor 4). Thereafter, in March 1993, Warner entered into a contract with Vendor 4 for payment to Warner of a percentage of revenues that Vendor 4 earned from all SOS contracts. From 1992 through 1998, Warner used his influence in the SOS office to cause the computer system contract and other computer services contracts to be awarded to Vendor 4. Warner received $991,000 in this arrangement and again paid a one-third share to Udstuen through Drazek, this time writing Drazek's checks on the account of another Warner business, the Omega Consulting Group Ltd. After Vendor 4 insisted that Warner file lobbyist registration statements and reports as required by the Illinois Lobbyist Registration Act, 25 ILCS 170/1 *et seq.*, Warner demanded and received an additional monthly payment from Vendor 4. The reports he did file from 1995 through 1999 were inaccurate in that they did not reflect Udstuen's involvement. (*Id.* ¶¶ 35-48.)

Warner solicited a fifth vendor (Vendor 5) in 1991 to provide consulting services regarding the design and installation of the automated heating and cooling system for certain government offices in Springfield. After using his influence to ensure that Vendor 5 would be awarded an SOS contract for this work, Warner demanded and received a monthly payment for his services, amounting to $8,240 from June 1992 through October 1994. (*Id.* ¶¶ 51-55.) In July 1991, he approached representatives of yet another vendor (Vendor 7), a business that leased photocopiers to the SOS Office, and proposed that in exchange for monthly payments of $2,000, Warner would

guarantee that Vendor 7 would be awarded additional business with the SOS Office. (*Id.* ¶¶ 49-50.)

In August 1996, Warner learned about the efforts of another vendor, Vendor 6, to obtain a contract for adoption of a "digital licensing" system for the SOS Office. Warner entered into a contract with Vendor 6 to assist it in obtaining the digital licensing contract. To conceal his involvement with Vendor 6, Warner kept his own name off that contract, instead using a nominee. In exchange for Warner's assistance, Warner and the nominee were to receive a commission of 5% of all revenues received by Vendor 6 in connection with the digital licensing contract. Vendor 6 did win the digital licensing contract and Warner recovered approximately $677,000 in revenues, but he failed to file lobbyist registration statements and reports regarding this relationship. (*Id.* ¶¶ 72-77.)

According to the superseding indictment, Warner told Udstuen that SOS Official A knew about and supported Warner's payments to Udstuen in connection with the vendor contracts. Warner also told Udstuen that he would give SOS Official A a portion of the proceeds that Warner obtained from these outside vendors. From approximately 1991 through 1999, Warner gave money, property, and other items of value to SOS Official A, family members of SOS Official A, and other SOS Office officials and employees "to influence and reward SOS Official A and other SOS Office officials, employees, and agents in the performance of their official duties." (*Id.* ¶¶ 8, 9, 11.)

The superseding indictment also charges Warner with influencing SOS leasing and purchasing of real property for his personal gain. In April 1991, Warner arranged for a six-year lease on property at 17 North State Street in Chicago, telling the property manager that he was acting as a broker on behalf of the SOS Office. Using a third-party nominee who had no involvement in the property, Warner collected a 6% per month commission on that property, a total of $233,550. (*Id.* ¶¶ 56-61.) In 1992, Warner took an ownership interest in a building in Bellwood, Illinois, concealing that interest by using a nominee. He then used his influence to cause the SOS

4

Office to enter into a five-year lease for that property and recovered $171,000 in profits on that lease. (*Id.* ¶¶ 62-66.) A similar transaction in 1994 involving a building in Joliet, Illinois, resulted in $387,500 in profit for Warner. (*Id.* ¶¶ 67-71.)

The superseding indictment charges that Warner's conduct in connection with the SOS Office vendors constitutes racketeering acts of extortion, mail fraud, and money laundering. Racketeering Acts #1 and 2 charge Warner with extortion, mail fraud and money laundering in connection with the validation stickers contract; specifically, 1(a) and 2(a) charge extortion; 1(b) and 2(b) charge mail fraud relating to SOS Office checks in the amounts of $232,888 and $298,115.18 paid to Vendor 1; and 1(c) and 2(c) charge money laundering relating to checks payable to American Management Resources in the amounts of $666.67 and $1,666.67. Racketeering Act #3 charges Warner with attempted extortion in connection with his inducement of payments from Vendor 1. Racketeering Act #4 charges mail fraud and money laundering with respect to a check for $11,166.66 paid to American Management Resources and relating to the title laminates contract.

In Racketeering Act #5, Warner is charged with attempted extortion relating to Vendors 3 and 4 and the SOS Office computer contract. Racketeering Act #6 charges mail fraud in connection with a check from Vendor 4 in the amount of $130,359.31 and money laundering in connection with a check in the amount of $43,453 paid to American Management Resources relating to the SOS Office computer contract. Racketeering Act #7 charges extortion and mail fraud in connection with a $12,000 check payable to Vendor 5 relating to the contract to install an automated heating and cooling system for certain government offices in Springfield. Racketeering Act #8 charges mail fraud in connection with a check for $829.96 from Vendor 6 payable to National Consulting Company and relating to the digital licensing system contract. Racketeering Act #9 charges attempted extortion of Vendor 7 in connection with contracts for leases of photocopiers to the SOS Office.

5

Racketeering Acts #10, 11, and 12, charge mail fraud relating to SOS real property leases: #10 involves a check for $66,053.50 to the lessor of 17 North State; #11 involves a check for $21,735 relating to the Bellwood lease; and #12 involves a check for $36,085.16 relating to the Joliet lease.

Counts II through X are substantive counts, charging Warner with misconduct identical to the racketeering allegations. All of the counts reference the accountability statute, 18 U.S.C. § 2, but none of them includes specific allegations that Warner "aided and abetted" SOS Office officials, employees, or others in the commission of any crimes.

Warner now moves to dismiss or strike all but two of the allegations of mail fraud (excluding Count I, Racketeering Act #8 relating to the digital licensing contract and Count VI relating to the SOS Office computer system), and all of the money laundering and extortion charges. He also seeks to dismiss or strike the RICO Count and to strike several allegations in the preamble to the superseding indictment. The court addresses each argument in turn.

## DISCUSSION

Warner argues that the charges against him fail to state claims under the various statutes. His primary argument against the mail fraud charges is that as a private citizen, he did not owe a duty of honest services to the people of Illinois or to the SOS Office. He objects to the money laundering charges because they allege that he conducted prohibited financial transactions with gross as opposed to net proceeds of his activities. Warner again raises his status as a private citizen in arguing that he cannot be charged with using color of official right to commit extortion. He also insists that fear of economic harm is not sufficient to sustain an extortion charge. As for the RICO charge, Warner argues that a RICO victim cannot be part of the alleged enterprise, and that the statute is unconstitutionally vague in any event.

6

## A. Mail Fraud

The mail fraud statute provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341. Section 1346 of the statute further states that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

Warner argues that he cannot be charged with defrauding the public of its intangible right to his honest services because he was at all times a private citizen and did not owe the public any fiduciary duty. Alternatively, he argues that these charges cannot stand absent a showing of economic harm to the state and that, in any event, the honest services provision of the statute is unconstitutionally vague both on its face and as applied to his case. In addition, Warner challenges the traditional mail fraud charges, claiming that the named victims were not economically harmed by the alleged scheme.

### 1. Intangible Right

#### a. Warner's Honest Services

The superseding indictment charges Warner with mail fraud in violation of 18 U.S.C. § 1346, which prohibits "a scheme or artifice to deprive another of the intangible right of honest services." Specifically, the government charges that Warner schemed to defraud the people of Illinois, the State of Illinois and the SOS Office of the intangible right to the honest services of agents, officials, and employees of the SOS Office, including SOS Official A and Warner himself.

7

(Superseding Indictment ¶ 6.) Warner argues that he was not an agent of the SOS Office and did not owe the public a duty of honest services because he acted solely as a private citizen and businessman, operating a fire insurance adjustment business, a maintenance and supervision business, and two other consulting businesses. None of Warner's businesses was a public entity or received public funds, and Warner himself was not a public officer, nor was he employed by the State of Illinois. (Warner Motion, at 2.) The government contends that Warner nevertheless owed a fiduciary duty to the people of Illinois and to the SOS Office because of what the government calls his "direct and substantial participation in SOS Office affairs" – i.e., Warner's attendance at SOS Office meetings; his direction or advice to SOS Office personnel regarding contracts; his control over the content of official SOS documents, including bid proposals; and his direction and advice to SOS staff relating to office leases.

According to Warner, the notion that a fiduciary duty arises from Warner's "substantial participation" in SOS Office matters rests on the majority opinion in *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982). The defendant in that case was the Republican Party chairman of New York's Nassau County and the Town of Hempstead who allegedly exercised a "vise-like grip over" and "stranglehold on" government functions, dictating everything relating to hiring, salaries and promotions. He also had control over lucrative insurance matters. *Id.* at 116-18, 122. Margiotta was accused of converting this control into a scheme to defraud relating to municipal insurance activities. Specifically, he arranged to have an insurance agency owned by a close political associate named Broker of Record for the Town. The agency, in turn, agreed to set aside 50% of its commissions for distribution to Margiotta's political allies. "Through his control over the appointment process and other aspects of municipal government, Margiotta had thus generated a 'slush fund,' the proceeds of which could be distributed to purchase party loyalty, to assist friends, or, for purposes he designated, in his words, 'whenever the spirit moved (him).'" *Id.* at 118.

Margiotta was convicted of, among other things, mail fraud under 18 U.S.C. § 1341, which prohibits use of the mails to execute any "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . ." A panel of the Second Circuit upheld Margiotta's mail fraud conviction, 2-1. The majority acknowledged that prosecuting an individual who does not hold public office for breach of fiduciary duty threatens to criminalize legitimate political activity, but nevertheless refused to draw a bright line distinction between public and private conduct, opting instead for a reliance and "de facto control" test. In the majority's view, the mail fraud statute can "embrace a theory of fiduciary fraud by one . . . who has de facto control over the processes of government and is relied upon by others in the rendering of essential governmental decisions." *Id.* at 122-23. The majority declined to address Margiotta's argument regarding the potential federalism concerns of applying the federal mail fraud statute to state and local political participants without reference to a state law fiduciary duty, finding that New York election law did create such a duty to the public in that case. *Id.* at 124-25.

Five years later, the United States Supreme Court concluded that § 1341 applies only to conduct that defrauded citizens of money or property and does not criminalize a scheme to defraud "the intangible right of the citizenry to good government." *McNally v. United States*, 483 U.S. 350, 359 (1987). Defendant McNally, a private citizen; defendant James Gray, a public official; and Howard P. "Sonny" Hunt, chairman of the state Democratic Party, were all politically active in the Democratic Party in the Commonwealth of Kentucky in the 1970's. In 1974, Hunt was given *de facto* control over selecting insurance agencies from which the Commonwealth would purchase its policies. In 1975, he agreed to give the Wombwell Insurance Company a continued agency relationship in exchange for its agreement to share resulting commissions in excess of $50,000 a year with other insurance agencies specified by Hunt. *Id.* at 352. One of the recipients of these payments was a company owned by Hunt and Gray and nominally owned and operated by

9

McNally, which was established for the sole purpose of sharing in the commissions distributed by Wombwell. *Id.* at 353.

Hunt was charged with and pleaded guilty to mail and tax fraud. Gray and McNally were charged with conspiracy and seven counts of mail fraud, only one of which survived to the time of trial. Both men were convicted on that count, which alleged, in part, that Gray and McNally devised a scheme to defraud the citizens and government of Kentucky of their right to have the Commonwealth's affairs conducted honestly. *Id.* at 353. The Court of Appeals affirmed the convictions, but the Supreme Court reversed. The Court began with the language of the mail fraud statute prohibiting schemes or artifices "to defraud" or "for obtaining money or property by means of false or fraudulent pretenses, representation, or promises . . ." Courts of Appeals had read this language in the disjunctive to prohibit schemes to deprive individuals, the people, or the government of intangible rights, such as the right to honest services, in addition to money or property. The Court took issue with this construction: "the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Id.* at 358 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)). Thus, the Court "read § 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has." *Id.* at 360.

Congress responded to *McNally* in 1988 by enacting 18 U.S.C. § 1346, which defines "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services." Courts are now left to determine whether a *Margiotta* theory of mail fraud remains viable and, if so, how far it extends. *Compare United States v. Frost*, 125 F.3d 346, 364 (6th Cir. 1997) (noting in discussion of honest services charges that "§ 1346 has restored the mail fraud statute to its pre-*McNally* scope"), with *United States v. Brumley*, 116 F.3d 728 (5th Cir. 1997) (stating in honest services fraud case that "Congress could not have intended to bless each and

10

every pre-*McNally* lower court 'honest services' opinion"). Complicating this issue is the fact that the "honest services" doctrine was originally judge-made law which has developed in an "uneven" way. *See United States v. Handakas*, 286 F.3d 92, 101-03 (2d Cir. 2002) (collecting cases); *United States v. Farley*, No. 97 CR 0441, 1997 WL 695680, at *4 (N.D. Ill. Oct. 31, 1997) ("there was not a uniform body of law defining the honest services doctrine").

Relying on *Handakas*, the government argues that Warner's status as an agent of the SOS Office derives from basic principles of agency found at common law and in the Restatement. (Gov't Response, at 14-16.) Handakas owned a construction company hired by the New York City School Construction Authority ("SCA"). The SCA required all successful contract bidders to pay project workers "prevailing rate of wages." Handakas submitted certified payroll records that reflected compliance with this requirement but actually paid his workers substantially less than half the prevailing wage. 286 F.3d at 95-96. Using a series of shell corporations and the assistance of two subcontractors, he also funneled large transfers, disguised as subcontractor payments, to himself for personal expenses and to family members in Greece. *Id.* at 96-97.

Handakas was convicted on several charges, including a count of conspiracy to commit mail fraud by depriving the SCA of honest services. Specifically, the government claimed that "'[t]he SCA had a right to determine how its contracts would be fulfilled,' and that Handakas 'took away that right.'" *Id.* at 97, 100. At trial, the government argued only that Handakas committed mail fraud by violating his non-fiduciary contractual obligation to pay his workers the prevailing rate of wages. *Id.* at 108. On appeal, the Second Circuit found that conviction under the "honest services" provision of the mail fraud statute could not be based solely on a breach of contract: "[i]f the 'honest services' clause can be used to punish a failure to honor the SCA's insistence on the payment of prevailing rate of wages, it could make a criminal out of anyone who breaches any contractual representation." *Id.* To avoid reversal, the government advanced a new theory that Handakas had an agency relationship with the SCA that established a fiduciary duty of honest services to the

11

SCA. The *Handakas* court nevertheless overturned the mail fraud conviction, observing that the agency theory of honest services mail fraud was "improved" from the fiduciary contractual obligation theory but did not support Handakas' conviction because it was raised for the first time on appeal. *Id.* at 109.

In this case, the court recognizes that the government has alleged facts to support its claim that Warner was an agent of the SOS Office by virtue of his activities there. The court is not persuaded, however, that such general agency principles are sufficient to charge Warner, a private individual, with defrauding the public of his "honest services."

The Third Circuit recently expressed similar concerns in *United States v. Murphy*, 323 F.3d 102 (3d Cir. 2003). Murphy, the former chairman of the Republican Party in Passaic County, New Jersey was charged with organizing a contracts-for-payments scheme by "using his considerable influence over Passaic County officials to procure contracts." *Id.* at 104. Murphy did not hold any formal public position and was not on the state or county payroll. Nevertheless, he was able to control public contracting by influencing the Board of Freeholders, whose seven elected members – all Republican during the relevant time period – had ultimate legislative and administrative responsibility for the County. *Id.* at 105-06. Specifically, Murphy had an active role in determining the agenda of Freeholder meetings, including making suggestions about how to vote on resolutions, the selection of contract vendors, and the employment of County personnel. *Id.* at 106.

The government's mail fraud case against Murphy included a *Margiotta*-type allegation that Murphy deprived the County of its right to his honest services. In reversing Murphy's conviction, the Third Circuit found that *Margiotta* "extends the mail fraud statute beyond any reasonable bounds." *Id.* The court acknowledged that § 1346 permits "the prosecution of state and local officials and public employees for depriving the citizens they serve of their right to honest services." *Id.* at 111. The court characterized the prosecution of a private party official as "a horse of another color," however, and agreed with Judge Winter's dissent in *Margiotta* that there is no "logical

12

rationale for treating private party officials in the same manner as public officials since such a loose interpretation of the mail fraud statute creates 'a catch-all political crime which has no use but misuse.'" *Id.* at 111, 117-18 (quoting *Margiotta*, 688 F.2d at 144).

In reaching its conclusion, the court declined to resolve whether a violation of a state-law created fiduciary duty is required for honest services mail fraud and the government did not argue that general agency principles may create such a duty. The court concluded, however, that the government failed to establish any fiduciary duty or legal relationship between Murphy and the County or its citizens under federal law or under the New Jersey Bribery Act, a purported source for a duty of honest services that the government raised for the first time on appeal. *Id.* at 114-17. "Without any legal basis for determining whether Passaic County or its citizens had a right to Murphy's honest services, we conclude that it was improper for the District Court to allow the jury to conjure such a duty out of a fog of assumptions." *Id.* at 117.

The Seventh Circuit has also expressed "doubts" that an intangible rights theory of mail fraud applies to cases of breach of fiduciary duty "with nothing more." *United States v. Hausmann*, 345 F.3d 952, 956 (7th Cir. 2003). The court nevertheless upheld defendant's conviction on mail fraud charges where the indictment alleged that in his capacity as an attorney, he defrauded his clients in violation of the Wisconsin Supreme Court Rules of Professional Conduct for Attorneys. "A valid indictment need only allege . . . that a defendant used the interstate mails or wire communications system in furtherance of a scheme to misuse his fiduciary relationship for gain at the expense of the party to whom the fiduciary duty was owed." *Id. See also United States v. O'Hagan*, 521 U.S. 642, 654 (1997) (in securities fraud case, attorney who misappropriated information from his law firm and a client violated a fiduciary duty and committed fraud "akin to embezzlement"); *United States v. Genova*, 333 F.3d 750, (7th Cir. 2003) (upholding mail fraud convictions of city mayor and city prosecutor who engaged in kickback scheme involving payments by the city for legal services provided by prosecutor's law firm). In upholding Hausmann's

conviction, the court relied on *United States v. Bloom*, 149 F.3d 649, 655 (7th Cir. 1998), which noted that "[i]n almost all of the intangible rights cases this circuit has decided (before *McNally* or since § 1346), the defendant used his office for private gain, as by accepting a bribe in exchange for official action." *See also United States v. Montani*, 204 F.3d 761, 768-69 (7th Cir. 2000) (employee convicted of depriving employer of its intangible right to honest services); *Carpenter v. United States*, 484 U.S. 19, 27 (1987) ("an employee has a fiduciary obligation to protect confidential information obtained during the course of his employment"). Each of these cases involved abuse of an attorney/client relationship or of the fiduciary duty owed by a public official or employee.

The government acknowledges that Warner was never an official or employee of the SOS Office but argues that a fiduciary relationship can arise even in the absence of actual employment or compensation. (Gov't Response, at 17-20.) Certainly, an agency relationship may be established at common law without these elements. *See* Restatement (Second) of Agency § 16 ("[a]gency may result . . with or without an understanding that the other is to receive compensation for his services if he does act"); *Hastings v. Fidelity Mortgage Decisions Corp.*, 984 F. Supp. 600, 614 (N.D. Ill. 1997) (quoting Restatement (Second) of Agency § 1)) (agency "depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking"). In this court's view, however, this argument begs the question, as it assumes that common law agency principles suffice to establish a federal fiduciary duty of "honest services." The court is unwilling to adopt a construction of the mail fraud statute so expansive as to require a jury to decide whether a private individual acted enough like a government official to make him criminally liable under § 1346. *See Murphy*, 323 F.3d at 104, 114 (endorsing court decisions that interpreted § 1346 "more stringently" and noting that "the idea

of allowing a jury to determine whether a party official acted enough like a government official is itself enough to give us pause").

The court also has serious doubts about the government's assertion that Warner's brief membership on the SOS Office Transition Team, together with continued "engage[ment] in SOS Office management duties," suffices to establish the requisite federal duty. (Gov't Response, at 12-13.) The Transition Team issued its final report on March 1, 1991, just two months after Warner's eight-year scheme allegedly began, (*Id.* at 13; Superseding Indictment ¶1(U)), and Warner's membership on the Team, even with continued, unofficial involvement in management activities, is not, in this court's view, comparable to the employment and attorney-client relationships found to create a fiduciary duty in cases such as *Hausmann* and *Montani*.

Nor is the court persuaded that Warner owed a fiduciary duty of honest services because he allegedly received confidential information from SOS Office officials and employees. (Gov't Response, at 21-22.) The mere receipt of confidential information cannot be the basis for federal criminal liability where the individual had no duty to protect the information in the first place. Warner arguably owed a fiduciary duty to the SOS Office to maintain the secrecy of any information he obtained as a member of the Transition Team. That team issued its final report in March 1991, however, just two months after Warner's alleged scheme began, and he had no lawful basis for receiving any confidential information after that time. Significantly, the government does not distinguish between the confidential information Warner obtained as a Transition Team member and the confidential information he obtained later. If anyone breached a fiduciary duty of honest services on these facts, it was the unnamed SOS Office officials who gave Warner free access to confidential information, and not Warner himself.

All of this is not to say that any fiduciary duty of honest services must have its source in state law. The Fifth Circuit has imposed such a requirement, fearing that a contrary finding would result in the creation of a class of federal common law crimes. *Brumley*, 116 F.3d at 734-35

(upholding mail fraud conviction of employee of Texas Industrial Accident Board who violated Texas criminal statute by "[u]sing his office to pursue his own account and not that of his employer"). The Seventh Circuit declined to address the issue in *United States v. Martin*, 195 F.3d 961 (7th Cir. 1999), because the parties did not properly develop it on appeal. Judge Posner, writing for the court, did offer the following observation, however:

> It can be argued that tying the concept of fraud in the mail fraud statute to state law and to federal statutes expressly creating fiduciary duties would allay the persistent concerns about the breadth and vagueness of the statute. Against this it can be argued that a uniform albeit judge-made federal concept of fiduciary duty might do the trick as well or better – but the riposte is that a century of interpretation of the statute has failed to still the doubts of those who think it dangerously vague.

*Id.* at 967 (affirming mail fraud convictions of government contractor and the government employee he bribed because the government employer was deprived of its right to the employee's honest services). Significantly, Brumley was a state official and Martin was a government contractor. The vagueness concerns cited by both courts are arguably even more pronounced where, as here, the defendant is not a public officer or employee and does not own a public company or receive any public funds.

Perhaps most problematic are the potential constitutional concerns raised by a holding that a private individual owes state government a fiduciary duty of honest services under general agency principles. To be sure, Warner has not identified any cases that have held the "honest services" provision of the mail fraud statute unconstitutionally vague on its face. *C.f., Handakas*, 286 F.3d at 104 ("[i]f we were the first panel attempting to discern the meaning of the phrase 'honest services' . . . we would likely find that part of the statute so vague as to be unconstitutional on its face"); *United States v. Sawyer*, 85 F.3d 713, 724 (1st Cir. 1996) (stating only that the "concept of governmental 'honest services' . . . eludes easy definition"). *Compare United States v. Frost*, 125 F.3d 346, 371 (6th Cir. 1997) (upholding conviction of professors in scheme to deprive the university of their honest services, the court found "[t]he countours of § 1346 . . . sufficiently

clear for us to conclude that the statute is not unconstitutionally vague on its face"). And courts have routinely rejected vagueness challenges to the application of "honest services" fraud. *See United States v. Fawell*, No. 02 CR 310, 2003 WL 21544239, at *3 (N.D. Ill. July 9, 2003) (collecting cases).

Nevertheless, in this case it is not clear that Warner had fair warning that his conduct as a purported common law agent violated § 1346. *See United States v. Lanier*, 520 U.S. 259, 265 (1997) ("no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed") (internal quotations omitted); *Genova*, 333 F.3d at 757-58 ("[a]lthough we understand the temptation to dilute criminal statutes so that corrupt officials get their comeuppance, people are entitled to clear notice of what the criminal law forbids, and courts must take care not to enlarge the scope of illegality"). Congress has never defined the term "honest services" and with the exception of the Second Circuit's 1982 *Margiotta* decision, which has been roundly criticized and arguably is no longer good law, no case has found that a private individual who does not hold public office or employment and whose private company does not receive any public funds can have a fiduciary duty to provide honest services to the public. This court declines to reach such a conclusion here. Warner obviously believed that his alleged conduct was improper; indeed, he purportedly took careful measures to cover his trail. But that does not mean that Warner was on notice that he could be charged with depriving the citizens of Illinois and the SOS Office of his honest services.

Given the concerns expressed in this and other circuits regarding the statute's vagueness, the court reluctantly concludes that Warner cannot be charged with defrauding the public of his own honest services because he was a private citizen who did not owe such a fiduciary duty to the citizens of Illinois or to the SOS Office. The court recognizes that its interpretation permits a private citizen to act like a public official and manage government operations without any corresponding fiduciary duty to provide honest services. Indeed, the public officials who did owe such a duty to

17

the State, but ceded control of SOS contracts to Warner, opened the door to his abusive activity. Nevertheless, the court finds that there is insufficient basis for treating public and private individuals the same way for purposes of "honest services" mail fraud. Warner's Motion to Dismiss or Strike Count I, Racketeering Acts 1(b), 2(b), 4(a), 6(a), 7(b), 10, 11, and 12, and Counts II, V, VIII, IX and X is granted to the extent they charge Warner with depriving the people of Illinois, the State of Illinois and the SOS Office of his own honest services.

Given the significance of this determination to the indictment that has been returned, the court will entertain a motion for certification of this ruling for an immediate appeal.

> **b.    Harm to the Victim and Definition of "Another"**

Recognizing that reasonable minds could differ concerning the "honest services" issue discussed above, the court will reach two additional arguments Warner has advanced, neither of which is persuasive. He first claims that a § 1346 charge must include an allegation of "harm to the victim" – i.e., a defendant must obtain or attempt to obtain money or property from the victim. (Warner Motion, at 18-21.) Warner acknowledges that the Seventh Circuit rejected such an argument in *United States v. Fernandez*, 282 F.3d 500, 506-07 (7th Cir. 2002) ("the government did not have to prove a contemplated harm to a victim" as part of a "scheme to defraud"). He contends, however, that the Supreme Court's recent pronouncement in *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003), militates a contrary finding.

*Scheidler* involved a claim that certain anti-abortion groups and individuals used or threatened to use force, violence, or fear to cause the National Organization for Women and two health care centers "to give up . . . a woman's right to seek medical services from a clinic . . ." *Id.* at 400. The Court held that the defendants did not commit extortion because they did not obtain or attempt to obtain property from the victims. *Id.* at 408-09. The defendants "neither pursued nor received 'something of value from' [plaintiffs] that they could exercise, transfer, or sell." *Id.* at 405.

Warner argues that "*Scheidler's* analysis has utility in the mail fraud context since the mail fraud statute, like the Hobbs Act, includes the word 'obtain.'" (Warner Motion, at 20.) In this court's view, however, the mere fact that the mail fraud and extortion statutes both contain the same word, without more, is not enough to overturn case law not at issue in or addressed by *Scheidler*, which was not even a criminal case. At this stage of the proceedings, *Fernandez* is still controlling law as to the mail fraud statute and dismissal on this basis is not appropriate.

For similar reasons, the court rejects Warner's argument that the term "another" in § 1346 does not include citizens of a state, a state, or a state agency. (Warner Motion, at 29.) The dissent in *Brumley* advanced this position, 116 F.3d at 740-41, but it has not been accepted in this jurisdiction and does not provide additional support for striking or dismissing the mail fraud charges. *See, e.g., Farley*, 1997 WL 695680, at *3 ("[t]his court is unwilling to infer that Congress intended to foreclose prosecution of schemes to deprive government agencies or citizens in their collective capacity of the intangible right to honest services based [on] a strained interpretation of 'another'"); *United States v. Fawell*, No. 02 CR 310, 2003 WL 21544239, at *4 (N.D. Ill. July 9, 2003).

### 2. Money and Property

Warner also argues that the mail fraud charges alleging a scheme to obtain money and property are deficient because the named victims did not suffer any economic harm. (Warner Motion, at 16-18.) Relying on *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993), he claims that absent some allegation that the extorted vendors inflated their billings or provided unnecessary services to Illinois or to the SOS Office, Warner did not deprive the State or the SOS Office of any money or property. *Id.* at 1227 (sports agent who planned to profit from scheme to recruit college athletes and take a percentage of their professional incomes did not defraud universities that continued to pay scholarship funds to ineligible players because those payments were a byproduct of the agent's scheme and not the source of the agent's profits).

19

Warner concedes that this argument applies only to the charges relating to the validation stickers, title laminates and computer system contracts, and not to the charges relating to the SOS Office's lease of photocopier equipment and office space. (Warner Motion, at 18 n. 7.) But this appears to be a distinction without a difference. A vendor paying bribes to Warner for the privilege of doing business with the State presumably could have reduced the price it charged the State by the same amount it was willing to pay Warner. Thus, to the extent a vendor's price factored in payments made to Warner on the side, the State overpaid for that vendor's services. And unlike the sports agent in *Walters*, who expected to be paid by the athletes and not by the duped universities, Warner was arguably compensated with money that was overpaid by the State itself. Thus, Warner's Motion to Dismiss or Strike the traditional mail fraud charges in Count I, Racketeering Acts 1(b), 2(b), 4(a), 6(a), 7(b) and 8, and in Counts II and V is denied.

In light of this conclusion, the court need not reach the government's argument that Warner defrauded the State, the SOS Office, and the public by misuse of the SOS Office's confidential information. Specifically, the government urges that the "property" at issue in this case is the confidential information Warner obtained through his connections with the SOS Office, not the vendor payments. (Gov't Response, at 27) (citing *Carpenter*, 484 U.S. at 26) (employee defrauded employer by misappropriating confidential business information, which "has long been recognized as property"). Warner claims that *Carpenter* does not apply here because he did not hold any state office or position that created a fiduciary duty to protect any confidential information. (Warner Reply, at 10-11.) For reasons related to those discussed above, the court agrees.

The superseding indictment alleges that Warner obtained confidential information not generally known to the public by virtue of his service as a member of the Transition Team and his personal contacts in the SOS Office. According to the indictment, Warner then used that information to benefit financially from SOS Office contracts. (Superseding Indictment ¶¶ 1(R), (U), 7.) Warner arguably owed a fiduciary duty to the SOS Office to maintain the secrecy of any

20

information he obtained through the Transition Team. As noted, however, that team issued its final report in March 1991, just two months after Warner's alleged scheme began. The indictment does not distinguish between confidential information Warner obtained as a Transition Team member and the confidential information he obtained later. In addition, the mere fact that Warner continued to receive confidential information from SOS Office officials does not support the contention that he had a fiduciary duty to protect the information's secrecy. Warner himself was not an SOS Office official or employee and had no lawful basis for receiving the information in the first place. Absent a fiduciary duty to guard the confidential information, there is no basis for charging Warner with defrauding the public by using it.

## B.    Money Laundering

Warner is charged with engaging in financial transactions involving the proceeds of crime and designed to conceal the nature, location, source, or control of those proceeds. 18 U.S.C. § 1956(a)(1)(B)(i). Specifically, he is charged with laundering money through payments to Udstuen and Drazek in connection with the SOS Office validation stickers, title laminates, and computer system contracts. Warner argues that these charges against him are defective because they fail to allege that he conducted prohibited financial transactions with net as opposed to gross proceeds of his misconduct. (Warner Motion, at 3.)

In support of this position, Warner relies on *United States v. Scialabba*, 282 F.3d 475, 476 (7th Cir. 2002), a case involving gambling, which is unlawful in Illinois unless licensed by the state. The defendants provided unlicenced video poker machines to bars, taverns, and restaurants. Patrons would insert coins into the machines and receive on-screen "credits" if they won. The credits could be used lawfully to continue playing, or unlawfully as the basis of cash payouts. When the defendants emptied the coins from the machines, they gave the bar or tavern owner a portion of the money to cover payments to customers and as compensation for their role in the

21

business, and kept the rest as compensation for the machines. *Id.* at 475-76. The defendants were convicted of, among other things, "laundering" the coin box money they gave to the bar and tavern owners and the money they used to meet the expenses of the business, such as leasing the poker machines and obtaining state licenses. *Id.* at 476.

In overturning the money laundering convictions, the Seventh Circuit held that "at least when the crime entails voluntary, business-like operations, 'proceeds' must be net income; otherwise the predicate crime merges into money laundering (for no business can be carried on without expenses) and the word 'proceeds' loses operational significance." *Id.* at 475. The court rejected the government's argument that "[d]ivvying up income with tavern owners is a 'financial transaction which involves the proceeds'" of unlawful activity. *Id.* at 477. Those payments were a cost of doing business and, as such, did not constitute distributions of net income. *Id.* at 476. *See also Genova*, 333 F.3d at 761 (to support money laundering charges, there must be "profits net of the costs of the criminal business"). Significantly, in paying the bar and tavern owners the defendants were not attempting to "hide or invest profits in order to evade detection, the normal understanding of money laundering." *Id.* Nor were they charged with "reinvestment in seemingly legitimate businesses or other means to whitewash (='launder') the funds." *Id. See also United States v. Esterman*, 324 F.3d 565, 570 (7th Cir. 2003) ("a conviction for money laundering . . . is valid only where there is concrete evidence of intent to disguise or conceal transactions").

Warner focuses on the court's discussion of net versus gross proceeds, arguing that the payments he made to Drazek for disbursement to Udstuen consisted of gross proceeds "akin to the split of profit transactions in *Scialabba*." (Warner Motion, at 4; Warner Reply, at 15.) The government focuses on the fact that Warner tried to hide the destination of the payments to Udstuen, assuming without explanation that the payments stemmed from net profits. "[T]he payments made to Drazek's company . . . were classic money laundering designed to conceal the distribution of net proceeds of the scheme." (Gov't Response, at 42.)

22

At this stage of the proceedings, the court finds that the superseding indictment sufficiently alleges a money laundering scheme to withstand dismissal. Unlike in *Scialabba*, where the defendants made no effort to conceal their payments to the bar and tavern owners, Warner is charged with attempting to "conceal the flow of proceeds from Warner to Udstuen." Specifically, Warner allegedly wrote checks payable to Drazek's company and mailed them to Udstuen who then gave the checks to Drazek, who in turn deposited them in accounts associated with his personal company and paid Udstuen his share in cash. (Superseding Indictment ¶ 10.) By funneling money through Drazek's company, Warner was arguably investing profits to evade detection and hiding the true destination of the funds (i.e., Udstuen's pocket). *See Esterman*, 324 F.3d at 570 ("the mere transfer and spending of funds is not enough to sweep conduct within the money laundering statute [but] subsequent transactions . . . specifically designed 'to hide the provenance of the funds involved'" is enough).

Also distinct from *Scialabba* is the fact that none of Warner's payments to Udstuen and Drazek covered legitimate business-like expenses. In *Scialabba*, the bar owners presumably were entitled to charge rent for placement of the poker machines in their establishments. In this case, conversely, Udstuen and Drazek did not provide any legal services in exchange for their payments from Warner. On a motion to dismiss, the indictment sufficiently charges a distinct transaction and deliberate concealment of net profits for purposes of the money laundering statute. Warner's motion to strike or dismiss the money laundering charges is denied.

## C. Extortion

The Hobbs Act prohibits extortion, which is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Warner is charged with violating the Act using both fear and color of official right. He seeks dismissal of these allegations, alleging that as

a private citizen, he cannot be charged with using color of official right to commit extortion. In *United States v. McClain*, 934 F.2d 822 (7th Cir. 1991), the court stated that "as a general matter and with caveats as suggested here, an 'official right' theory is inappropriate [against a private citizen] under the literal and historical meaning of the Hobbs Act, irrespective of the actual 'control' that citizen purports to maintain over governmental activity." *Id.* at 831. Among the caveats suggested was that a private person is not immune from official right suits when he actually masquerades as a public official or acts in coordination with public officers. *Id.* at 830. *See also United States v. Stillo*, No. 91 CR 795-1-2, 1992 WL 297388, at *5 (N.D. Ill. Oct. 7, 1992) (denying motion to dismiss extortion charge where defendant allegedly acted in coordination with public officials); *United States v. Marcy*, 777 F. Supp. 1398, 1399-1400 (N.D. Ill. 1991) (same).

This case appears to fall easily within the exception identified in *McClain*. The indictment alleges that Warner caused SOS Office officials to provide him with confidential information, to award, cancel or maintain contracts, and to delay competitive bidding on contracts, all to help Warner obtain financial payment from certain vendors. (Superseding Indictment ¶¶ 13-15, 28-31, 35-41.) The indictment also alleges generally that Warner used his influence in the SOS Office to cause the award of business to certain vendors in exchange for payment. (*Id.* ¶¶ 49-55.) These allegations are sufficient to sustain the Hobbs Act charges, as well as the corresponding aiding and abetting charges.

Warner asserts that the exception is unavailable absent some indication that a public official's actions were "indispensable elements" in the extortion. (Warner Motion, at 5) (citing *Margiotta*, 688 F.2d at 132). Warner cites no case in this circuit to support such a theory; in any event, in this court's reading, the indictment is consistent with a finding that the actions of the SOS Office officials were prerequisites to Warner's completion of his extortionate activities.

Finally, as for Warner's claim that fear of economic harm is insufficient to sustain an extortion charge, that is concededly not the law in this circuit. *See United States v. Sturman*, 49

24

F.3d 1275, 1281 ("[f]ear of economic harm is an acceptable form of fear under Section 1951");

(Warner Motion, at 9.) Thus, Warner's motion to dismiss or strike the extortion charges in Count

I, Racketeering Acts 1(a), 2(a), 3, 5, 7(a) and 9, and Count III is denied.

## D.    RICO

Count I of the superseding indictment charges Warner with a substantive RICO violation.

The alleged "enterprise" consists of Warner, National Consulting Company, Omega Consulting

Group Ltd., Udstuen, the SOS Office and "others known and unknown." (Superseding Indictment

¶ 2.) As noted, the indictment also alleges that the enterprise defrauded "the people of the State

of Illinois, the State of Illinois, and the SOS Office" of money, property and the intangible right to

honest services. (*Id.* ¶ 5(b).) Warner argues that the RICO charges fail because a RICO victim

cannot be part of the alleged enterprise. (Warner Motion, at 1-3.)

The court recently rejected this argument in *Fawell*, which also alleged a dual

victim/enterprise role for the SOS Office. 2003 WL 21544239, at *1. The court recognized that

the case law is unsettled on this issue but, following Judge Kocoras's rationale in *Shapo v. Engle*,

No. 98 C 7909, 1999 WL 1045086, at *8-9 (N.D. Ill. Nov. 12, 1999), declined to find that an

indictment fails merely because it names the same entity as both a victim and a part of the

enterprise. For the same reasons, the court concludes that dismissal on this basis is inappropriate

here.

Also unavailing is Warner's argument that the RICO statute is unconstitutionally vague.

"RICO is a remedial statute only. It does not make criminal activity that is otherwise legal; it only

increases the sanction for engaging in activity that is already forbidden." *United States v. Korando*,

29 F.3d 1114, 1119 (7th Cir. 1994). So long as the statutes criminalizing the predicate acts are not

unconstitutionally vague, defendants are on adequate notice that their conduct is criminal. Warner

argues that "the predicate acts themselves are based upon a strained theory that intangible rights

25

mail fraud and 'official right' Hobbs Act violations can be committed by a private citizen with no specified role in government." (Warner Motion, at 4.) As explained earlier, however, there is no basis for dismissing the money laundering or extortion charges against Warner, and these readily suffice as the predicate acts under RICO. 18 U.S.C. § 1961(1) (listing extortion and money laundering as "acts of racketeering" under the statute); *United States v. Torres*, 191 F.3d 799, 806 (7th Cir. 1999) (RICO "requires an allegation of 'at least two acts of racketeering activity' within ten years"). Thus, Warner's motion to dismiss or strike the RICO charge is denied.

## E.    Preamble

In his last motion, Warner seeks to strike various paragraphs from the preamble to Count I of the superseding indictment. As neither party objects, the court will enter and continue this motion to the time of trial. (Gov't Response, at 47; Warner Reply, at 16.) The court will at that time entertain a request that the version of the indictment submitted to the jury be streamlined or shortened.

**CONCLUSION**

For the reasons stated above, Warner's Motion to Dismiss or Strike the charges that he defrauded the public of his honest services (78-1, 78-2) is granted. Warner's Motions to Dismiss or Strike the money laundering charges (82-1, 82-2), the extortion charges (80-1, 80-2), and the RICO charges (86-1, 86-2) are all denied. Warner's Motion to Strike portions of the preamble (84-1) is entered and continued.

ENTER:

Dated:  November 6, 2003

REBECCA R. PALLMEYER
United States District Judge