# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 506 - 1, 4 | **DATE** | 8/11/2004 |
| **CASE TITLE** | USA vs. Lawrence Warner, George H. Ryan, Sr. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendants' pretrial motions (142, 160-1, 138-1, 150-1, 167-1, 140-1, 84-1, 144-1, 159-1, 146-1, 166-1, 158-1, 157-1, 156-1, 156-2, 58-1, 155-1, 154-1, 153-1, 152-1, 151-1, 149-1, 148-1 and 171-1) are granted in part and denied in part.

(11) ■ [For further detail see order on the reverse side of the original minute order.] order attached to the original minute

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | AUG 1 2 2004 |
| | Docketing to mail notices. | date docketed |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | 8/11/2004 |
| ETV | courtroom deputy's initials | date mailed notice |
| | | ETV |
| | | mailing deputy initials |

Document Number

182

U.S. DISTRICT COURT

2004 AUG 11 PM 4: 16

Date/time received in central Clerk's Office

## ORDER

Enter Memorandum Opinion and Order. Defendants' motions to dismiss the RICO conspiracy charge (Docket No. 142-1, 160-1) and their motions to sever (Docket No. 138-1, 150-1) are all denied. Ryan's motion to dismiss the mail fraud charges against him (Docket No. 167-1) is denied. Warner's related motion to dismiss all charges on Speedy Trial grounds (Docket No. 140-1) is also denied. Defendants' motions to strike (Docket No. 84-1, 144-1, 159-1) are denied without prejudice; their motions for a bill of particulars (Docket No. 146-1, 166-1) are granted in part and denied in part as stated in this opinion.

Ryan's motion for immediate disclosure of favorable evidence (Docket No. 158-1) is granted. Ryan's motions for timely disclosure of impeachment evidence (Docket No. 157-1), motion for pretrial production of *Jencks* material and a witness list (Docket No. 156-1, 156-2), and motion for an order requiring the government to make a *Santiago* proffer (Docket No. 58-1, 155-1) are granted in part and denied in part. Ryan's motion for disclosure of 404(b) evidence (Docket No. 154-1) is granted. Ryan's motions for immediate production of statements made by him (Docket No. 153-1) and for an order requiring the government to affirm or deny the occurrence and legality of any electronic or video surveillance and to produce same (Docket No. 152-1) are denied as moot. The government is directed to produce the original handwritten notes of law enforcement agents who interviewed Ryan, together with the relevant typewritten reports, to the court for *in camera* review by August 20, 2004. Ryan's motion for production of the notes (Docket No. 151-1) is denied without prejudice pending that review.

Warner's motion to adopt the pretrial motions filed by Ryan (Docket No. 149-1) and his motion to reassert motions filed prior to the return of the second superseding indictment (Docket No. 148-1) are both granted, as is the corresponding request to renew its previous responses to those motions. Finally, the government's request for reciprocal discovery (Docket No. 171-1) is granted.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 CR 506 |
| | ) | |
| LAWRENCE E. WARNER and | ) | Judge Rebecca R. Pallmeyer |
| GEORGE H. RYAN, SR., | ) | |
| | ) | |
| Defendants. | ) | |

**DOCKETED**

AUG 1 2 2004

## MEMORANDUM OPINION AND ORDER

Defendants Lawrence E. Warner and George H. Ryan, Sr. have been charged in a 22-count second superseding indictment with (1) conspiring to use the resources of the State of Illinois for their personal and financial benefit and for the benefit of Ryan's family members, the Citizens For Ryan political campaign committee, and various political and business associates, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(d); and (2) devising a scheme to defraud the people of the State of Illinois and the State of Illinois of money, property, and the right to the honest services of Ryan and other State of Illinois officials, in violation of the federal mail fraud statute, 18 U.S.C. §§ 1341, 1346. Ryan is separately charged with making materially false, fictitious, and fraudulent statements during several FBI interviews in violation of 18 U.S.C. § 1001(a)(2); obstructing and endeavoring to obstruct the Internal Revenue Service in the correct reporting of income and the collection of taxes in violation of 26 U.S.C. § 7212(a); and filing materially false tax returns in violation of 26 U.S.C. § 7206(1). Warner is separately charged with extortion under the Hobbs Act, 18 U.S.C. § 1951, money laundering, 18 U.S.C. § 1956 (a)(1)(B)(i), and structuring currency transactions in violation of 31 U.S.C. §§ 5324(a)(3) and (d)(2).

Ryan and Warner both seek to dismiss the RICO conspiracy charge; to sever certain counts from the indictment and/or to sever both co-defendants from each other; to strike certain language and allegations from the indictment; and to obtain a bill of particulars. Ryan additionally asks the

182

court to dismiss the mail fraud charges against him and seeks immediate disclosure of favorable evidence; timely disclosure of impeachment evidence; an order requiring the government to give immediate notice of its intent to offer Rule 404(b) evidence against him at trial; pretrial production of *Jencks* material and a witness list; immediate production of statements made by him; an order requiring the government to affirm or deny the occurrence and legality of any electronic or video surveillance and to produce same; an order directing the government to preserve and produce agent notes; and an order requiring the government to make a *Santiago* proffer. Warner has separately moved for an order permitting him to adopt the pretrial motions filed by Ryan; to reassert motions filed prior to the return of the second superseding indictment; and to dismiss all charges on Speedy Trial grounds. The government, in turn, has filed a motion for reciprocal discovery. For the reasons set forth here, the motions are granted in part and denied in part.

## BACKGROUND

### A. The Parties

#### 1. Ryan

Ryan was elected by the voters of the State of Illinois to serve as Secretary of State from January 1991 through early January 1999. In November 1998, he was elected Governor of Illinois and served in that capacity from January 1999 through early January 2003. (Second Superseding Indictment ("SSI"), Count 1 ¶ 1G.) In his capacity as Secretary of State and Governor, Ryan was prohibited from receiving, retaining, or agreeing to accept "any property or personal advantage which he [wa]s not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function" of his public office. 720 ILCS 5/33-1(d). (*See also* SSI, Count 1 ¶ 2C.) He was also prohibited from committing the following acts in his official capacity: (1) performing an act "in excess of his lawful authority" with intent to "obtain a personal advantage for

2

himself or another"; or (2) "[s]olicit[ing] or knowingly accept[ing] for the performance of any act a fee or reward which he knows is not authorized by law." 720 ILCS 5/33-3(c) and (d). (*See also* SSI, Count 1 ¶ 2D.)

Pursuant to 50 ILCS 105/3, Ryan was not permitted to be "in any manner financially interested directly in his own name or indirectly in the name of any other . . . in any contract or the performance of any work in the making or letting of which [he] may be called upon to act or vote." (*See* SSI, Count 1 ¶ 2E.) In addition, Ryan was obligated under the Illinois Governmental Ethics Act to file annually a Statement of Economic Interests with the State of Illinois disclosing, among other things, (1) the name of any entity doing business in the State of Illinois from which he derived income during the preceding calendar year in excess of $1,200 (that is, income other than for specified professional services); (2) the identity of any compensated lobbyist with whom he maintained a close economic association; and (3) the name of any entity from which a gift or gifts valued singly or in the aggregate in excess of $500 was received during the preceding calendar year. 5 ILCS 420/4A-101; 5 ILCS 420/4A-102(a)(1), (5) and (b)(3). (*See also* SSI, Count 1 ¶ 2F.) If Ryan constructively controlled the interest of a spouse or any other party as described in (1) or (3) above, he was obligated to disclose the interest as if it were his own. *Id.*

Under the Illinois Gift Ban Act, 5 ILCS 425/10, Ryan, in his capacity as Governor, was prohibited from soliciting or accepting gifts from any "prohibited sources," including a person who was registered or required to be registered with the Secretary of State under the Illinois Lobbyist Registration Act, 25 ILCS 170/1 *et seq.*[1] (*See* SSI, Count 1 ¶ 2G.) In addition, a written Secretary of State ("SOS") Office policy memorandum effective no later than August 26, 1997 prohibited SOS Office employees, including Ryan, from accepting any gifts, meals, or entertainment valued at $50

---

[1]    The Gift Ban Act was repealed effective December 9, 2003. *See* P.A. 93-617 § 85. Legislation to enact a new version of the statute is currently pending in the Illinois legislature. *See, e.g.,* 2003 IL H.B. 638 (SN).

or more in a given year from any single "prohibited source," defined as "any person or entity who sought official action, did business or sought to do business with the SOS Office, conducted activities regulated by the SOS Office or had interests that could be substantially affected by the performance or non-performance of the employee's official duties." From at least August 1997 through 2002, Ryan also had a stated personal policy of not accepting personal gifts with a value exceeding $50. (*Id*. Count 1 ¶ 2J.)

Finally, political activity by SOS Office employees was at all relevant times limited in the following respects: (1) no person was permitted to induce or persuade, or attempt to induce or persuade, particular categories of state employees to violate the restrictions against performing political activity during regular working hours, 5 ILCS 320/4[2]; (2) no public funds could be used "to urge any elector to vote for or against any candidate or proposition, or be appropriated for political or campaign purposes to any candidate or political organization," 10 ILCS 5/9-25.1; and (3) SOS Office employees were prohibited from using state working time for personal gain or for any reason other than performing their governmental duties, or from participating in any political campaigning or activity while on duty. (SSI, Count 1 ¶ 2I.)

## 2. Warner

Warner owned and operated several businesses, including two entities named National Consulting Company and Omega Consulting Group Ltd. (*Id*. Count 1 ¶ 1H.) In or about November 1990, then-Secretary of State Ryan appointed Warner as a member of the SOS Office Transition Team, a team of individuals designated to review the practices and procedures of the SOS Office and make recommendations for changes and improvements. Warner attended internal SOS Office meetings, including policy meetings and staff retreats; occasionally performed private work inside Ryan's governmental offices; directed and advised SOS Office personnel, including one or more

---

[2]        This statute was repealed effective November 19, 2003. *See* P.A. 93-615, Art. 90, § 90-6.

4

department directors, regarding matters related to the award of SOS Office contracts and real property leases; and assisted in determining the content of official SOS Office communications and contract specifications. (*Id.* Count 2 ¶ 2C.) Warner was never an official or employee of the State and did not draw a state salary or consulting fees.

Pursuant to the criminal laws of the State of Illinois, Warner was prohibited from promising or tendering to a public official, with intent to influence the performance of any official act, any property or personal advantage which the public officer would not be authorized by law to accept. 720 ILCS 5/33-1(c). (*See also* SSI, Count 1 ¶ 3A.) In addition, the Illinois Lobbyist Registration Act, effective in January 1994, required that Warner register with the SOS Office as a lobbyist if he qualified under either of the following definitions: "(1) Any person who, for compensation or otherwise, either individually or as an employee or contractual employee of another person, undertakes to influence executive, legislative or administrative action"; or "(2) Any person who employs another person for the purposes of influencing executive, legislative or administrative action." 25 ILCS 170/3. (*See also* SSI, Count 1 ¶ 3B.) The same Act required Warner to disclose in annual statements filed with the SOS Office all expenditures related to lobbying, and to itemize any expenditures over $100 made on behalf of, or benefits given to, any legislative or executive branch official, including gifts and travel and entertainment expenses. 25 ILCS 170/6. (*See also* SSI, Count 1 ¶ 3C.)

### 3. Others

Donald Udstuen conducted lobbying activities for medical professionals in Illinois and served as the Chief Operating Officer for the Illinois State Medical Insurance Exchange, a company that provides malpractice insurance to Illinois physicians. *See* http://www.ismie.com. Ryan appointed him co-chairman of the SOS Office Transition Team, and at times during Ryan's political career, Udstuen served as an advisor and fundraiser for Ryan's political campaigns. (SSI, Count

5

1 ¶ I, Count 2 ¶ 2B.) "Associate 1" was a lobbyist and consultant representing individuals and entities before the Illinois legislature and executive offices, including the SOS Office and the Governor's Office, from approximately 1973 through December 2002. In that capacity, Associate 1 met with Ryan and other Illinois government officials to promote and advance the positions of his clients. (Id. Count 1 ¶ 1J.) Scott Fawell served as Ryan's Chief of Staff from February 1992 to January 1999, making personnel, policy, strategic, and business decisions binding the SOS Office. He was also a principal operating officer, advisor, and decisionmaker for Citizens For Ryan, a private, state-wide political campaign committee established to support Ryan's campaign efforts. (Id. Count 1 ¶¶ 1K, L.) Associate 2 owned a commercial building in South Holland, Illinois which was leased to the SOS Office in May 1997. Through an entity called Seven Seas Villa, Associate 2 also co-owned a vacation home in Jamaica and personally owned a home in Palm Springs, California. (Id. Count 1 ¶ 1N.)

The second superseding indictment alleges that Ryan performed and authorized official actions to benefit his own financial interests and those of Warner, Associate 1, Associate 2, and "certain Associates and designated third parties, including Ryan family members and Citizens For Ryan." (Id. Count 2 ¶ 4.) Ryan and certain third parties affiliated with him allegedly received personal benefits from Warner, Associate 1, and certain other Associates, which Ryan understood were provided to influence and reward him in the performance of official acts. In addition, from the early 1990s to at least 2002, Ryan, Warner, and certain Associates concealed their financial relationships with each other. (Id. Count 2 ¶¶ 5, 6.) The specific allegations are detailed below.

## B. Official Actions Related to Warner and Udstuen

According to the second superseding indictment, Ryan gave Warner and Udstuen access to material non-public information relating to government decisions, which enabled them to engage in transactions for their personal benefit. In early 1991, Warner told Udstuen that, as a reward for

Udstuen's past service to Ryan, Ryan had approved of a plan to provide Udstuen with one-third of the proceeds that Warner obtained from certain vendors doing business with the SOS Office (American Decal Manufacturing ("ADM") and International Business Machines ("IBM")). To conceal the flow of proceeds from Warner to Udstuen, the two agreed that Warner would use American Management Resources ("AMR"), a company owned by Udstuen's personal associate Alan Drazek, as "a conduit for the purpose of passing payments from Warner to Udstuen relating to ADM and IBM." Warner issued checks to Drazek who, in turn, gave a substantial portion of the proceeds back to Udstuen in the form of cash. (*Id.* Count 2 ¶¶ 7-10.)

## 1.    Validation Stickers Contract

Up to and including 1991, ADM held the contract to manufacture and print vehicle registration validation stickers for the State of Illinois. As of 1991, the contract required that validation stickers bear a "metallic security mark," a product created and manufactured by ADM. (*Id.* Count 2 ¶ 14.) In July 1991 and continuing thereafter, Warner made unsolicited contacts with officials of ADM and pressured them to make monthly payments to him in exchange for his assurance that the metallic security mark would remain a requirement for the validation stickers contract. (*Id.* Count 2 ¶¶ 15, 16.) In 1993, a committee of the SOS Office Vehicle Services Department unanimously recommended to a high-ranking official of the Department ("SOS Official A") that the metallic security mark requirement be removed from the specifications for the validation stickers contract. SOS Official A did in fact remove that requirement but at some point Warner directed that it be reinstated. In an effort to assist Warner in his efforts on behalf of ADM, Ryan also instructed SOS Official A in April 1993 to put the metallic security mark requirement back in the contract specifications. (*Id.* Count 2 ¶¶ 17, 20-22.) Between 1991 and 2000, Warner received approximately $332,000 in payments from ADM and, with Ryan's approval, gave one-third

7

of the proceeds to Udstuen through payments made to American Management Resources. (*Id.* Count 2 ¶ 23.)

## 2. Title Laminates Contract

In August 1991, Warner told an official of ADM that in exchange for $67,000, he would cause the SOS Office title laminates contract, then held by 3M, to be awarded to ADM. At Warner's direction, and with the understanding that Warner was acting with Ryan's authority, SOS Official A "took official actions to materially benefit ADM and to the competitive disadvantage of 3M." As a result, ADM was awarded the title laminates contract between 1991 and September 1998. (*Id.* Count 2 ¶¶ 25-27.)

## 3. Computer Contracts

Also in 1991, Warner and Udstuen learned information pertaining to the SOS Office's mainframe computer upgrade contract. That summer, they and Associate 1 met with representatives of Honeywell/Bull ("Honeywell"), which held the existing computer contract, and conveyed to them that in exchange for total payments of up to $1,000,000, Honeywell "would be awarded one or more computer-related contracts with the SOS Office, including the prospective mainframe computer upgrade contract." (*Id.* Count 2 ¶¶ 28-30.) Honeywell managers declined to make the payments and on September 24, 1991, reported the solicitation activities to Ryan, who said that he would "get to the bottom of it." Instead, Ryan authorized Warner and Udstuen to assist in hiring a Director of the SOS Office Information Systems Services Department who would be responsible, in part, for helping in the selection and implementation of the computer upgrade contract. (*Id.* Count 2 ¶¶ 2A, 31-33.)

In or about February 1992, Warner and Udstuen learned that SOS Official B would support selecting IBM for the mainframe computer upgrade contract and recommended that Ryan hire Official B for the Director position. Ryan did so and in March 1993, Warner entered into a written

8

contract with IBM, retroactive to July 1, 1992, in which IBM agreed to pay Warner a percentage of all revenues, up to $1,000,000, received in connection with SOS Office contracts. Based in part on the actions taken by Warner, Ryan awarded the mainframe computer upgrade contract to IBM. (*Id.* Count 2 ¶¶ 34-38.)

In 1995, the SOS Office considered a pilot project that would use computerized kiosks within certain SOS license facilities to allow citizens to renew vehicle registration, obtain validation stickers, and perform other vehicle titling and registration operations. On April 24, 1995, a high-ranking SOS Office official who supported the use of kiosks ("SOS Official C") notified Ryan and Fawell in writing that the SOS Office could view kiosk demonstrations by several vendors at an upcoming event in Columbus, Ohio. (*Id.* Count 2 ¶ 39.) The next day, Ryan, Warner, Fawell, SOS Official B, and SOS Official C traveled to Columbus to view the demonstrations, including ones by IBM and a competing vendor. Upon their return to Illinois, SOS Official C recommended to other SOS Office officials that the kiosk project be awarded to IBM's competitor. In response, Warner instructed Udstuen to direct SOS Official C to drop his opposition to IBM's selection. "Understanding that Warner and Udstuen acted with the authority of defendant Ryan, SOS Official C did as Udstuen advised." (*Id.* Count 2 ¶¶ 40-42.) In January 1996, Ryan selected IBM for the kiosk project contract. (*Id.* Count 2 ¶ 43.)

Between 1993 and early 1999, Warner received approximately $1,000,000 in payments under his contract with IBM, principally related to the mainframe computer upgrade contract. Per their agreement, Warner directed one-third of the proceeds to Udstuen, routing the funds through American Management Resources. Warner "filed false and misleading lobbyist registration statements relating to IBM and failed to disclose all of his Ryan-related expenditures." (*Id.* Count 2 ¶¶ 44, 46.)

9

## 4. Digital Licensing Contract

In 1996, the SOS Office began an initiative to switch to a "digital licensing" system such that all State of Illinois automobile and truck drivers' licenses would be created and maintained through digital technology. Warner learned about the digital licensing system initiative in August 1996. Around the same time, Warner learned that a high-ranking SOS Office official who would have a role in implementing the system ("SOS Official D") preferred Viisage Technologies, a Massachusetts-based company that provides "advanced technology identity solutions," as a vendor for the system. (*Id.* Count 2 ¶¶ 47, 48.) (*See also* http://www.viisage.com.) In October 1996, Warner and Viisage entered into a lobbying contract. Pursuant to that contract, Warner agreed to assist Viisage in its efforts to obtain the digital licensing contract; in exchange, Viisage agreed to pay Warner a percentage of all gross revenues received by Viisage if it won the digital licensing contract. To conceal his involvement with Viisage, Warner kept his own name off the lobbying contract, presumably to avoid the reporting and registration requirements of the Illinois Lobbyist Registration Act, 25 ILCS 170/3, 170/6. (*Id.* Count 1 ¶ 3B and C; Count 2 ¶¶ 49, 50.)

In December 1996, before the SOS Office began the bidding process on the digital licensing contract, Warner guaranteed Associate 1 payments totaling $36,000 in 1997 if Associate 1 agreed to assist Warner on behalf of Viisage. Warner also purchased Viisage stock and advised another SOS Office employee to do the same. On June 2, 1997, Ryan awarded the digital licensing contract to Viisage through approximately 2004 and, shortly thereafter, Warner "caused the financial interest in the lobbying contract with Viisage to be assigned explicitly to Warner's business."[3] Between 1999 and November 2002, Warner received approximately $800,000 in revenues related to the lobbying contract. In addition, beginning in 1999, Warner paid Associate

---

[3]     The second superseding indictment does not specify which of Warner's businesses was assigned the financial interest in Viisage.

10

1 $36,000 from Warner's Viisage proceeds. Neither Warner nor Associate 1 registered as lobbyists for Viisage. (*Id.* Count 2 ¶¶ 47B, 51-56.)

### 5. Automated System Consulting Contract

In 1991, the SOS Office decided to install a heating and cooling system for certain State Capitol Complex buildings in Springfield, Illinois. Between early 1992 and October 1994, the SOS Office "sought to award a series of engineering consulting contracts for assistance with preparing the specifications and consultations with regard to the contractual process related to the automated heating and cooling system." (*Id.* Count 2 ¶ 57.) Warner learned about the automated system consulting contract and, in December 1991, solicited a Northbrook-based company, Affordable Temperature Control ("ATC"), to provide the consulting services. Warner then told a high-ranking SOS Office official in the Physical Services Department ("SOS Official E") that ATC was to receive the automated system consulting contract. SOS Official E followed Warner's instruction, understanding him to be acting with Ryan's authority. (*Id.* Count 2 ¶¶ 58-60.) Thereafter, Warner notified ATC that he expected to recover 8% of ATC's revenues under the automated system consulting contract. Between June 1992 and October 1994, Warner received approximately $8,240 from ATC. Warner was identified as the company's "sponsor" on Fawell's "master list" of official acts performed on behalf of, or relating to, particular "sponsors." (*Id.* Count 2 ¶¶ 62-64.)

### 6. Photocopier Leases

The SOS Office had leases with one or more vendors for the use and service of photocopier machines. In mid-1991, Warner learned that Modern Business Systems, Inc., which held several of the photocopier leases, was attempting to win future additional leases with the SOS Office. On July 16, 1991, Warner, representing that he was an agent of the SOS Office, solicited Modern Business Systems to pay him $2,000 per month in return for his guarantee that the company would

be awarded additional business with the SOS Office. An official with Modern Business Systems declined. (*Id*. Count 2 ¶¶ 65-67.)

## 7. Real Property Leases

The second superseding indictment also charges Ryan and Warner with influencing SOS Office leasing and purchasing of real property for personal gain. In 1991, Warner learned that the SOS Office was seeking to relocate certain of its administrative office facilities then located at 188 West Randolph Street in Chicago. In April, Warner "caused a contract to be entered into" with an individual associated with property at 17 North State Street in Chicago ("Property Manager 1"). The contract, executed by a third party to conceal Warner's involvement, gave Warner a 6% commission interest in any SOS Office lease relating to 17 North State Street. (*Id*. Count 2 ¶¶ 69-72.) On October 22, 1991, Ryan and Warner arranged for a six-year lease on the 17 North State Street property, which was renewed for an additional six-year term in 1998, again with a 6% commission for Warner. Between October 1991 and at least October 2001, Warner received approximately $383,276 in commission payments relating to the 17 North State Street lease. He was also identified on Fawell's "master list" as the lease's "sponsor." (*Id*. Count 2 ¶¶ 73-76.)

On October 15, 1992, Warner obtained an ownership interest in a building at 405 North Mannheim Road in Bellwood, Illinois, concealing the interest through a third-party nominee. On December 15, 1992, Ryan authorized the SOS Office to enter a five-year lease of the Bellwood facility and to renew the lease in March 1998 for another five-year term. Between December 1992 and March 2003, Warner received approximately $171,000 in proceeds related to the Bellwood lease. (*Id*. Count 2 ¶¶ 80-82.) On October 31, 1994, Warner also obtained a substantial ownership interest in a building at 605 Maple Road in Joliet, Illinois, again concealing his interest by using a third-party nominee. On January 1, 1995, Ryan, who had instructed a high-ranking SOS Office official to help Warner find a building for the new lease, authorized the SOS Office to enter a four-

12

year lease of the Joliet facility. Between January 1995 and March 1999, Warner received approximately $387,500 in proceeds relating to that lease. (Id. Count 2 ¶¶ 84, 86-88.)

## C.  Lease Involving Associate 2

Between 1993 and at least 2002, Associate 2 provided personal and financial benefits to Ryan, including "annual vacation-related benefits." (Id. Count 2 ¶ 89.) Specifically, Ryan received free lodging each year at Associate 2's Jamaican vacation home and, on at least two occasions, at Associate 2's Palm Springs, California home. All told, Associate 2 gave Ryan $1,000 - $2,000 in lodging benefits each year. (Id.) Fawell received similar lodging benefits from Associate 2 between 1994 and 1998. (Id. Count 2 ¶ 90.) To conceal these benefits, Ryan would tender a check to Associate 2 in the amount of the lodging benefit and Associate 2 would give him back an equal amount in cash.[4] (Id. Count 2 ¶ 95.)

In 1997, Ryan contacted Associate 2 and proposed that the SOS Office lease a commercial building located in South Holland, Illinois which was owned by an entity controlled by Associate 2. Ryan was directly involved in negotiating the lease, and both he and Fawell approved final terms and conditions that were not standard in SOS Office leases but which benefitted Associate 2. (Id. Count 2 ¶¶ 91-93.) Between May 1997 and June 2002, Associate 2 received approximately $600,000 in lease payments from the SOS Office. (Id. Count 2 ¶ 94.) Between August 26, 1997 and January 2002, Ryan and Fawell continued to receive free lodging benefits from Associate 2, which Ryan intentionally concealed by (1) failing to disclose them as gifts and financial benefits "as required by law," and (2) making false and misleading statements to federal investigators when they asked him about "financial arrangements involving his vacations with Associate 2" during a January 2000 interview. (Id. Count 2 ¶¶ 96-97.)

---

[4]     The second superseding indictment does not specify whether Fawell engaged in a similar "tender-back" arrangement.

**D.    Official Acts Relating to Associate 1**

According to the second superseding indictment, Associate 1 also provided personal and financial benefits to Ryan and his family members between mid-1990 and 2002. These included "[m]onetary payments and gifts on multiple occasions to defendant Ryan which payments and gifts exceeded the $50 threshold" allowed by SOS Office policy (*Id.* Count 1 ¶ 2J); "[v]acation benefits to defendant Ryan, including benefits associated with a 1995 trip to Cancun, Mexico"; and "[g]ifts and personal service benefits to Ryan's family members, including a $2,200 vacation benefit to a Ryan daughter's family in 1999." (*Id.* Count 2 ¶ 98.) In exchange for these benefits, Ryan allegedly took official action to benefit Associate 1, described below.

In 1995 and again in 1997, Ryan authorized the SOS Office to enter into leases of certain property in Springfield, Illinois, with commission payments exceeding $38,000 going to Associate 1. (*Id.* Count 2 ¶ 101.) In addition, in late 2000, the Governor's Office, together with the Illinois Department of Corrections ("IDOC"), began searching for a location to construct a maximum security prison. On February 23, 2001, Ryan chose the town of Grayville, Illinois as the prison site. He did not notify the public but did inform Associate 1. Shortly thereafter, Associate 1 entered into an agreement with a representative of a business group affiliated with Grayville to lobby for the selection of Grayville as the prison site in exchange for $50,000 in lobbying fees. Ryan announced the Grayville site selection at a public ceremony on April 12, 2001. (*Id.* Count 2 ¶¶ 102-07.)

In mid-1999, Wisconsin Energy was seeking to hire a lobbyist in Illinois to handle various regulatory and governmental issues in connection with a proposed project in the state. An "intermediary" acting on behalf of Wisconsin Energy solicited Udstuen's recommendation for an Illinois lobbyist. Udstuen conferred with Ryan, who agreed that Udstuen should recommend Associate 1. After Associate 1 was hired as Wisconsin Energy's lobbyist, he gave Udstuen a

$4,000 cash payment while in the men's bathroom of a Chicago restaurant. Associate 1 told Udstuen that he was also "taking care" of Ryan. (*Id.* Count 2 ¶¶ 108-12.)

Finally, in 1999, Ryan directed that Associate 1 be hired as a lobbyist for the Metropolitan Pier and Exposition Authority ("MPEA"), an entity that received annual public funding and had officers and directors that were jointly appointed by the Governor and the Mayor of the City of Chicago. MPEA and its principal lobbying firm ("Firm A") were not looking for additional lobbyists at the time. Nevertheless, on January 1, 2000, Firm A hired Associate 1 as a "sub-lobbyist" with an annual retainer of $60,000. This relationship continued for three years until December 31, 2002. (*Id.* Count 2 ¶¶ 113-15.)

## E.    Awarding of Low Digit Plates

The SOS Office was responsible for issuing license plates to qualifying individuals, including certain low-digit or specialty license plates that were not generally available to the public. From January 1991 to January 1999, Ryan personally approved the award of the most coveted low-digit plates. For example, in October 1990, shortly before Ryan's election as Secretary of State in November, Ryan solicited a $75,000 loan from "an individual known to Ryan" ("Individual 3"). Individual 3 arranged for such a loan to be paid to Citizens For Ryan through a friend of his; the loan was repaid in full within two weeks, with no interest charges.[5] In early 1991, Ryan awarded both Individual 3 and his friend low-digit plates as a reward for their efforts in securing the loan. (*Id.* Count 2 ¶¶ 116-18.)

From March 1996 through December 1998, Ryan also awarded Individual 1 a number of low-digit plates "while receiving, annually, at least $500 or more in personal checks from Individual 1." (*Id.* Count 2 ¶ 121.) On September 5, 1997, Individual 1 spoke to Ryan at a Chicago social event and expressed an interest in contributing $2,000 to his gubernatorial campaign. To conceal

---

[5]    The second superseding indictment does not explain why Citizens For Ryan needed a $75,000 loan for only a two-week period.

15

the contribution, Individual 1 made out four $500 checks to Ryan and certain Ryan family members. As a result, Ryan avoided his obligation under the Illinois Governmental Ethics Act to disclose gifts from any entity valued singly or in the aggregate in excess of $500. 5 ILCS 420/4A-102. (*See also* SSI, Count 1 ¶ 2F.) Ryan also accepted gifts from Individual 1 in December 1997 and December 1998 in violation of SOS Office policy. He failed to disclose the financial benefits he received from Individual 1 until after federal investigators questioned him on October 16, 2000. (*Id.* Count 2 ¶¶ 122-24.)

According to the second superseding indictment, Warner was also involved in awarding low-digit plates to friends and associates in exchange for political favors. In early 1991, he advised Ryan to "keep close track of how low digit plates were issued" and to use the plates as a "plum." (*Id.* Count 2 ¶ 125.) From the early 1990s through late 1998, Ryan approved Warner's requests for low-digit plates for Warner's business associates and clients, and employees of his private business. Warner then solicited some of the individuals who received low-digit plates to make campaign contributions to Citizens For Ryan. (*Id.* Count 2 ¶¶ 126, 127.) All told, Ryan awarded more than 90 low-digit license plates to Warner and to third parties acting through Warner. (*Id.* Count 2 ¶ 129.)

## F.  Reorganization of the Inspector General Department

From 1991 through at least 1998, Citizens For Ryan sponsored annual political fundraising events that "relied upon SOS Office personnel selling political fundraising tickets." (*Id.* Count 2 ¶ 130A.) As SOS Office chief of staff, Fawell mandated political fundraising "goals" for SOS Office departments. Aware of these goals, certain SOS Office employees, including supervisory employees in the Driver Services Department and Vehicle Services Department, individually sold thousands of dollars in fundraising tickets on behalf of Citizens For Ryan. Each year, Ryan rewarded SOS Office employees who had sold substantial numbers of political fundraising tickets

by attending special ceremonies to acknowledge top ticket sellers and by having his picture taken with them. (*Id.* Count 2 ¶¶ 130B, 130C.)

According to the second superseding indictment, Ryan and Fawell knew by December 1994 that agents of the Inspector General ("IG") Department were investigating alleged official misconduct by employees of the Drivers Services Department and the Vehicle Services Department relating to the sale and distribution of fundraising tickets for Citizens For Ryan. Specifically, in March 1993, the IG Department had investigated SOS Office employees of the Libertyville driver's license facility and seized a briefcase containing cash and fundraising tickets from the governmental office of an employee suspected of criminal activity. On March 9, 1993, the Inspector General told Ryan that IG Investigators "had located fundraising-related evidence in the SOS Office employee's governmental office." In late March 1994, the IG Department had investigated allegations, "aired on local television," that an SOS Office employee had solicited an auto parts dealer who was regulated by the SOS Office for fundraising tickets during state working hours. Those allegations were allegedly communicated to Ryan.[6] In April 1994, the IG Department had investigated official misconduct[7] by an employee in the SOS Office's Naperville licensing facility. On April 26, 1994, an IG Investigator called Ryan and told him that the Naperville employee's alleged misconduct "may have been motivated by sales of Citizens For Ryan fundraising tickets." Finally, in November 1994, IG Investigators had learned that a driver involved in a widely-publicized fatal traffic incident may have obtained his commercial driver's license illegally at the McCook driver's license facility. The Inspector General allegedly notified high-ranking SOS Office officials of these allegations. (*Id.* Count 2 ¶ 130D.)

---

[6]     The second superseding indictment does not indicate who communicated the allegations to Ryan or when that allegedly occurred.

[7]     The second superseding indictment does not describe the exact nature of the "official misconduct."

In a December 1994 internal memorandum not intended for public disclosure, Fawell recommended to Ryan that certain IG Investigators be terminated and reassigned to discourage further investigations into improper political fundraising activities. Ryan agreed and Fawell drafted written memoranda falsely justifying the decision based on budgetary cutbacks. From February through June 1995, most of the IG Investigators were in fact terminated or reassigned. As a result, Ryan and Fawell disabled the IG Department and "substantially hindered it from fulfilling its duties to, among other things, investigate all allegations of SOS Office misconduct, including allegations linked to fundraising efforts of Citizens For Ryan." (*Id.* Count 2 ¶¶ 131-35.)

## G.    Diversion of State Resources to Benefit Ryan

Between 1992 and 1998, Ryan, Fawell, and others allegedly authorized the diversion of SOS Office resources to benefit Ryan personally and Citizens For Ryan. For example, Ryan, Fawell, and another high-ranking SOS Office official, Richard Juliano, participated in the campaign effort of then-Texas Senator Phil Gramm, who was running for president of the United States in 1995-96. Ryan proposed that certain individuals receive "consulting" payments related to the Gramm campaign in Illinois, with Ryan, Fawell, and Juliano splitting the money. Fawell and Udstuen helped Ryan recruit Alan Drazek to participate in the Gramm campaign and used Drazek's company (AMR) as a conduit to funnel the consulting payments to Ryan, Fawell, and Juliano. (*Id.* Count 2 ¶¶ 136-40.) In addition, Fawell, Juliano, and other SOS Office employees working at the direction of Fawell and Juliano performed campaign work on state time and using state resources, such as participating in campaign meetings, phone conferences, political fundraisers, organizational meetings, strategy sessions, and public appearances with Gramm. Ryan allegedly knew about and authorized these activities. (*Id.* Count 2 ¶ 141.)

Between September 1995 and March 1996, the indictment claims, Ryan, Fawell, and Juliano caused over $32,000 in payments to be made from the Gramm campaign through AMR to

individuals and entities designated by them. Ryan directed his share of the "consulting" payments to certain family members who had not performed any bona fide services for the Gramm campaign. (*Id.* Count 2 ¶ 142.) Ryan concealed the benefits he received from the Gramm campaign by omitting the income from his 1995 and 1996 Statement of Economic Interest forms and tax returns. (*Id.* Count 2 ¶ 143.)

## H.    Obstructing the Grand Jury Investigation

The second superseding indictment also charges Ryan with concealing misconduct and obstructing a Grand Jury Investigation into allegations of misconduct, corruption, and fraudulent conduct relating to the SOS Office, the Governor's Office, and related entities and individuals. (*Id.* Count 1 ¶ 4.) In September 1998, after learning about the Grand Jury Investigation, Fawell directed SOS Office employees, including William Mack, to "clean up" Citizens For Ryan-related documents on SOS Office premises. Ryan was present when Fawell gave this instruction. (*Id.* Count 2 ¶ 145.) Mack gathered a number of SOS Office employees and directed them to shred "voluminous amounts of material," filling numerous garbage bags that were subsequently transported out of the office. Afterwards, Mack contacted Ryan and Fawell to inform them that the SOS Office had indeed been "cleaned up." (*Id.* Count 2 ¶¶ 146, 147.)

In addition to this shredding incident, Ryan is charged with making material false statements in three interviews with law enforcement agents from the Federal Bureau of Investigations ("FBI") who were conducting the Grand Jury Investigation. In a January 5, 2000 interview, Ryan allegedly made false material statements about the vacation benefits he received from Associate 2; the lease of Associate 2's property in South Holland, Illinois; the Joliet lease involving Warner's property; his decision to appoint Warner to the McPier board[8]; and the Libertyville raid regarding the fundraising tickets. (*Id.* Count 2 ¶ 148A.) In an October 16, 2000 interview, Ryan allegedly made false

---

[8]    The second superseding indictment does not provide any information regarding the McPier board, its purpose, or its membership.

material statements by claiming that he had no personal knowledge of Warner's interest in the Joliet lease; that he had no idea how Warner had advance knowledge that the SOS Office was looking to lease property in Joliet; and that he had no personal financial relationship with Warner. (*Id.* Count 2 ¶ 148B.) In a February 5, 2001 interview, Ryan allegedly made false material statements with respect to a conversation he had on a boat trip with Individual 1, which led to his receiving four $500 checks. Specifically, Ryan falsely claimed that he did not give Individual 1 the name and address of his son and daughter-in law, who were identified as payees on certain of the checks. (*Id.* Count 2 ¶ 148C.)

## I.   The Criminal Charges

Count One of the second superseding indictment charges Ryan, Warner, and "others known and unknown to the Grand Jury" with conspiring to commit a pattern of racketeering activity involving multiple acts of mail fraud, money laundering, extortion, obstruction of justice, and bribery, as set forth above. (*Id.* Count 1 ¶ 8.) As part of the conspiracy, Warner and other Associates allegedly provided personal and financial benefits to Ryan, his family, and Citizens For Ryan in exchange for Ryan's exercising his official authority to benefit Warner and the Associates. (*Id.* Count 1 ¶¶ 9-12.) Defendants improperly concealed these actions by structuring cash withdrawals to avoid the filing of currency transaction reports; paying funds to third parties who acted as conduits and nominees; and paying cash and writing checks to cash. (*Id.* Count 1 ¶ 13.) Counts Two through Five and Seven through Nine charge that, by their actions described above, Ryan and Warner schemed to defraud the people of the State of Illinois and the State of Illinois of money, property, and the honest services of Ryan and other state officials in violation of the mail fraud statute, 18 U.S.C. §§ 1341, 1346. Counts Six and Ten charge Ryan with two additional counts of mail fraud.

In counts Eleven through Thirteen, Ryan is charged with making materially false, fictitious, and fraudulent statements during interviews with the FBI on January 5, 2000, October 16, 2000, and February 5, 2001. Count Fourteen charges Warner with extortion by knowingly attempting to obtain payments from American Decal Manufacturing under color of official right using threats of economic harm. 18 U.S.C. § 1951. Counts Fifteen and Sixteen charge Warner with money laundering by funneling illegal proceeds from the validation stickers contract and computer-related contracts through Drazek's company, AMR. 18 U.S.C. § 1956 (a)(1)(B)(i). Count Seventeen charges Warner with structuring currency transactions in violation of 31 U.S.C. §§ 5324(a)(3) and (d)(2). Specifically, to avoid the reporting requirements of 31 U.S.C. § 5313(a), Warner allegedly structured the withdrawal of $14,000 from his Omega Consulting Group Ltd. checking account into two separate transactions – one in the amount of $9,000 on August 4, 1997, and a second in the amount of $5,000 on August 5, 1997 – at different branches of the North Community Bank.

Count Eighteen charges that Ryan attempted to, and did in fact obstruct the IRS in the correct reporting of income and the assessment and collection of taxes. Specifically, Ryan allegedly (1) used Citizens For Ryan funds to pay his and certain family members' personal expenses and to provide personal gifts, such as payments for travel expenses, for the benefit of third parties (SSI, Count 18 ¶ 4); (2) caused income that he was receiving from Citizens For Ryan and third parties to be diverted to others, thereby depriving the IRS of accurate information regarding his income (*Id.* Count 18 ¶ 5); (3) concealed benefits he received from the Gramm campaign (*Id.* Count 18 ¶¶ 14-20); and (4) received money from political supporters, which he used for personal expenses but failed to report as income. (*Id.* Count 18 ¶¶ 23, 24.) Counts Nineteen through Twenty-Two charge Ryan with filing false tax returns and amended returns that understated his gross income.

Ryan and Warner have filed 20 separate motions seeking, among other things, dismissal of the RICO conspiracy and mail fraud charges. The court addresses each motion in turn.

## A. Defendants' Motions to Dismiss RICO Charge

Ryan and Warner have separately moved to dismiss the RICO conspiracy charge against them. Ryan claims that the State of Illinois is not a proper "enterprise" under the statute; that the government has failed to allege a single enterprise; that the government has improperly alleged multiple conspiracies; and that the State cannot be both the RICO "enterprise" and "victim." Warner argues that the RICO charge is deficient because it fails to specify the predicate racketeering acts agreed upon by Defendants in furtherance of the conspiracy.

### 1. The State as a RICO Enterprise

To plead a RICO conspiracy under 18 U.S.C. § 1962(d), an indictment must allege that (1) the defendants agreed to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendants further agreed that someone would commit at least two predicate acts to accomplish those goals. *Slaney v. International Amateur Athletic Federation*, 244 F.3d 580, 600 (7th Cir. 2001). The definition of enterprise in the RICO statute is broad, including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 256-57 (1994) (quoting 18 U.S.C. § 1961(4)).

The second superseding indictment alleges that the RICO "enterprise" is the State of Illinois. (SSI, Count 1 ¶ 5.) Ryan argues that a sovereign state cannot be an enterprise under the statute, directing the court to *United States v. Mandel*, 415 F. Supp. 997 (D. Md. 1976). In *Mandel*, the former governor of Maryland was charged with, among other things, engaging in patterns of racketeering activity and mail fraud by conducting and participating in the affairs of the State of Maryland in a manner that personally benefitted himself and his co-defendants. *Id.* at 1018. The defendants objected to the indictment on several grounds, including that the State of Maryland

22

could not be a RICO enterprise. *Id.* at 1020. The court first noted that the legislative history of RICO is silent as to whether public entities such as governments and states may be considered "enterprises," and that there is no indication that Congress was concerned about the use of violent and criminal tactics to subvert states or governments. *Id.* The court next concluded that applying the statutory remedies to public entities "would clearly result in what could only be characterized as a startling departure from the traditional understanding of federal-state relationships." *Id.* at 1021. As an example, the court considered a scenario in which "a private citizen of a state, aggrieved by the 'racketeering acts' of an official in conducting the state, could bring a treble damage action against that official and require forfeiture of office and dissolution of the state government." *Id.* The court further explained that because "States have their own adequate resources to combat threats to their integrity leveled by organized crime," it is "simply untenable to argue that Congress, without saying so, intended to federalize crimes involving the acts of a public official in conducting the government of a state." *Id.* Having concluded that the State of Maryland was not an enterprise, the court dismissed the RICO count of the indictment. *Id.* at 1022.

The parties in *Mandel* never appealed the court's ruling that public entities cannot be RICO enterprises and, technically, the case remains good law. The reasoning behind that decision, however, has been roundly criticized by other courts. In *United States v. Long*, 651 F.2d 239 (4th Cir. 1981), for example, the Fourth Circuit, which hears appeals from the District of Maryland, expressed its "disapproval" of *Mandel* and held that a South Carolina State Senator's legislative seat constituted a RICO enterprise. In concluding that enterprise "should be construed to include public entities," the court noted that the definition of that term in § 1961(4) does not differentiate between public and private individuals or entities, and emphasized that the congressional statement of purpose and findings in the statute "denounces racketeering activities because, among other evils, they 'subvert and corrupt our democratic processes.'" *Id.* at 241 (citing *United States v. Altomare*, 625 F.2d 5 (4th Cir. 1980) (state prosecutor's office constitutes an enterprise)). In the

Fourth Circuit's view, nothing in the Act "threatens the discretion state officials must exercise in the discharge of their duties." *See also United States v. Angelilli*, 660 F.2d 23, 31 and 33 n.10 (2d Cir. 1981) (rejecting *Mandel* and finding that the New York City Civil Court was a RICO enterprise); *United States v. Clark*, 646 F.2d 1259 (8th Cir. 1981) (rejecting *Mandel* and finding that the office of county judge and the government of Craighead County, Arkansas was a RICO enterprise); *United States v. Frumento*, 563 F.2d 1083, 1090 (3d Cir. 1977) (rejecting *Mandel* and finding that Pennsylvania Bureau of Cigarette and Beverage Taxes was a RICO enterprise).

Other courts similarly agree that governmental and public entities do in fact qualify as enterprises under the racketeering statutes. *See United States v. Conn*, 769 F.2d 420, 424-25 (7th Cir. 1985) (jury fairly concluded that defendant "conducted the affairs of the enterprise[, the Cook County Circuit Court,] through racketeering"); *United States v. Kovic*, 684 F.2d 512, 516 (7th Cir. 1982) ("governmental or public entities [such as the Chicago Police Department] fit within the definition of 'enterprise' for purposes of RICO"); *Evans v. City of Chicago*, No. 00 C 7222, 2001 WL 1028401, at *8 (N.D. Ill. Sept. 6, 2001) (indictment sufficiently alleged that defendants used the Chicago Police Department as the vehicle through which they carried out their agreement to intimidate and retaliate against the plaintiff); *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) (jury "could have reasonably found that the Town of Delaware was a 'passive instrument' through which the defendants wielded power for their personal benefit and, accordingly, was a RICO enterprise"); *United States v. Brown*, 555 F.2d 407, 415-16 (5th Cir. 1977) (Macon police department was an enterprise).

Ryan concedes the "broad proposition" that "enterprise" is not limited to private entities but argues that it does not extend to entire states. (Ryan RICO Mem., at 6-7.)[9] He first claims that identifying the State of Illinois as the RICO enterprise "'needlessly cast[s] unfair reflection upon

---

[9]     Defendant Ryan's Memorandum of Law in Support of his Motion to Dismiss the RICO Charge is cited as "Ryan RICO Mem., at __."

innocent individuals,' namely, the People of the State of Illinois." (*Id.* at 7) (quoting *United States v. Thompson*, 685 F.2d 993, 1000 (6th Cir. 1982)). To the extent that an enterprise is merely the vehicle through which defendants conducted alleged illegal activity, this argument has no merit. "A major purpose of the RICO statute was to protect *legitimate* enterprises by attacking and removing those who had infiltrated them for unlawful purposes." *United States v. McDade*, 28 F.3d 283, 296 (3d Cir. 1994) (emphasis in original) (citing *Russello v. United States*, 464 U.S. 16, 28 (1983)) ("Congress viewed the RICO statute in large part as a response to organized crime's infiltration of legitimate enterprises"). Consistent with this goal, the government is seeking to prove that Ryan and Warner infiltrated legitimate state government and defrauded the citizens of Illinois. The mere fact that other State employees may somehow be cast in a negative light – a potential side-effect of any case involving a governmental enterprise – in no way establishes that the definition of enterprise does not include a State.

Ryan next argues that the plain language of the statute and its legislative history demonstrate that Congress never intended for a state to be deemed an enterprise. (Ryan RICO Mem., at 8.) Much of this argument follows the rationale of *Mandel* which, as noted, has been criticized. For example, Ryan notes that the statutory definition of "enterprise" does not include States or other sovereign governments, instead setting forth "a number of the 'common legal forms in which business entities and labor groups fashion themselves to carry out their private functions.'" *Id.* (quoting *Mandel*, 415 F. Supp. at 1021). These legal forms include partnerships, corporations, associations, and "other legal entit[ies]." 18 U.S.C. § 1961(4). Relying on the doctrine of *ejusdem generis*, which presumes that all items named are of the same type and class, Ryan insists that "[t]he more general reference[] to 'any legal entity' . . . must be construed to be limited to the same type and class of entities which preceded it in the statutory definition." (Ryan RICO Mem., at 8) (quoting *Mandel*, 415 F. Supp. at 1021). From there, Ryan argues that, "constru[ing] the broad in light of the narrow," § 1961(4) does not encompass the State of Illinois. *Id.*

25

The problem with this argument is that courts have uniformly held that Congress intended RICO to apply to activities that corrupt public or governmental entities, making resort to *ejusdem generis* unnecessary. *See, e.g., Angelilli*, 660 F.2d at 33 n.10 (rejecting application of *ejusdem generis* to limit RICO enterprises to private entities where "we believe the congressional intent appears clearly to the contrary"); *Frumento*, 563 F.2d at 1090 (quoting *State of Texas v. United States*, 292 U.S. 522, 534 (1934)) ("[t]he rule of 'ejusdem generis' is applied as an aid in ascertaining the intention of the legislature, not to subvert it when ascertained"). Ryan urges that the legislative history of RICO nonetheless evidences an intent that Title I of the statute, which sets forth procedures for special grand juries, "would serve as the primary vehicle for fighting political corruption," not Title IX as charged in the second superseding indictment. (Ryan RICO Mem., at 9-10.) This theory similarly ignores clear precedent to the contrary. *See Conn*, 769 F.2d at 424-25 (Cook County Circuit Court was enterprise for purposes of charge under 18 U.S.C. § 1962(c)); *United States v. Ambrose*, 740 F.2d 505, 512 (7th Cir. 1984) (Chicago Police Department was enterprise in § 1962(c) case); *McDade*, 28 F.3d at 295-96 (Congressman McDade and his Congressional offices in Washington, D.C., and in the 10th Congressional District of Pennsylvania constituted an enterprise in § 1962(c) case).

Ryan next posits that reading § 1961(4) to include states would lead to "absurd and anomalous results" because the civil and criminal RICO remedial provisions authorize courts to dissolve or reorganize an enterprise. In Ryan's view, "[i]t would truly be absurd to suppose that Congress intended to give federal courts the authority to dissolve or reorganize a sovereign State." (Ryan RICO Mem., at 10-11.) As the Supreme Court explained in *United States v. Turkette*, 452 U.S. 576 (1981), however, "even if one or more of the civil remedies might be inapplicable to a particular illegitimate enterprise, this fact would not serve to limit the enterprise concept. Congress has provided civil remedies for use when the circumstances so warrant. It is untenable to argue that their existence limits the scope of the criminal provisions." *Id.* at 585. Ryan objects that the

mere existence of these "drastic remedies" suggests that "the statute's drafters never intended to encompass sovereign States within the statutory definition of enterprise." (Ryan RICO Reply, at 6.)[10] The same argument could be made, however, with respect to other governmental entities, such as governor's offices and cities, but courts have readily found that the statute applies to them. See, e.g., United States v. Powell, No. 87 CR 872-4, 1988 WL 40864, at *4 (N.D. Ill. Feb. 23, 1988) (Nordberg, J.) (City of Chicago was an enterprise).

In a final challenge to the State of Illinois' status as a RICO enterprise, Ryan argues that such a designation is "contrary to the basic notions of federalism and unnecessarily strains state-federal relations." (Ryan RICO Mem., at 11.) He claims that absent a clear Congressional statement that RICO applies to State "enterprises," there is no authority for treating them as such. (Id. at 12-13.) In support of this argument, Ryan notes that federal courts must "exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." (Ryan RICO Reply, at 7-8) (quoting Burford v. Sun Oil Co., 319 U.S. 315, 318 (1943)). As explained earlier, the fact that RICO does not expressly define "enterprise" to include public and governmental entities does not establish that the statute only applies to private entities.

The court recognizes the importance of state sovereignty and the significance of this decision, which has no direct controlling precedent. In other contexts, however, the Seventh Circuit has noted that "the legislative history [of RICO] manifests a serious concern by Congress not merely with a profusion of racketeering activities within private businesses and labor organizations . . . but with the potentially devastating effects of organized crime on the nation's political and economic system as a whole." United States v. Grzywacz, 603 F.2d 682, 687 (7th Cir. 1979) (emphasis added). As reflected in the cases already cited here, courts have found that cities and

---

[10]        Defendant Ryan's Reply in Support of his Motion to Dismiss the RICO Charge is cited as "Ryan RICO Reply, at __."

towns can constitute RICO enterprises and, even with due respect to the states' unique role in our system of federalism, the court is unable to identify a principled distinction between states and other public bodies in this context. In short, Ryan has not established to this court's satisfaction that an entire state cannot, in appropriate circumstances, also serve as a vehicle for the type of corruption RICO seeks to eradicate. Thus, Ryan's motion to dismiss the RICO charge on this basis is denied.

## 2. Allegations of a Single Enterprise

Ryan also seeks dismissal of the RICO conspiracy charges for failure to properly allege a single enterprise. To prove a single RICO conspiracy, the government must show that the defendants "agreed to conduct the affairs of the enterprise through the commission of two predicate acts." *United States v. Maloney*, 71 F.3d 645, 664 (7th Cir. 1995). A series of agreements may be tried as a single "enterprise" conspiracy if the defendants have agreed to commit a substantive RICO offense. *Id.* "'So long as the alleged RICO co-conspirators have agreed to participate in the affairs of the same enterprise, the mere fact that they do not conspire directly with each other' does not convert the agreement to conduct the enterprise's affairs through a pattern of racketeering activity into multiple conspiracies." *Id.* (quoting *United States v. Friedman*, 854 F.2d 535, 562 (2d Cir. 1988)).

Ryan argues that even if the State of Illinois can generally constitute an enterprise, the government cannot use that entity "for the sole purpose of encompassing multiple, unrelated conspiracies within a single RICO charge." (Ryan RICO Mem., at 14.) In Ryan's view, the second superseding indictment alleges two separate conspiracies relating to two different enterprises. The first involves criminal acts that occurred while Ryan was Secretary of State (the "SOS Office conspiracy"); the second involves criminal acts that occurred while Ryan was Governor of Illinois (the "Governor's Office conspiracy"). (Ryan RICO Mem., at 13.) The SOS Office conspiracy, Ryan

says, consisted of three separate schemes: (1) one by Ryan, Warner, and Udstuen involving contracts and leases with the SOS Office; (2) one by Ryan, Warner, and others relating to low-digit license plates; and (3) one by Ryan, Fawell, and others engaged in various activities relating to the SOS Office. (*Id.* at 14-15.) The Governor's Office conspiracy allegedly consisted of Ryan, Associate 1, and Udstuen and involved (1) Associate 1's efforts in lobbying for Grayville as the site of a new prison after that site, unbeknownst to the public, had already been selected; (2) lobbying contracts for Associate 1 related to Wisconsin Energy; and (3) Associate 1's hiring as a lobbyist for the Metropolitan Pier and Exposition Authority. (*Id.* at 14.)

Ryan directs the court to prior indictments in related cases as evidence that there is no single enterprise conspiracy here. In the first superseding indictment against Warner, for example, the core allegation was that Warner and others engaged in a scheme to defraud the people of the State of Illinois, the State of Illinois, and the SOS Office of the honest services of "SOS Official A." The alleged enterprise consisted of Warner, two of his businesses, the Office of the Secretary of State, and Udstuen. (First Superseding Indictment, ¶¶ 1(V), 2.) The second superseding indictment similarly charges Ryan and Warner with scheming to defraud the people of the State of Illinois and the State of Illinois of money, property, and the honest services of Ryan, but the enterprise is now the State of Illinois. (Ryan RICO Mem., at 15.) In *United States v. Fawell*, No. 02 CR 310, Fawell was charged with using SOS Office resources for political purposes and reorganizing the Inspector General's office, much like the allegations in this case. (Fawell Indictment, ¶¶ 136-44, 130-35.) The RICO enterprise in *Fawell*, however, consisted of an association in fact between Fawell, Citizens For Ryan, the SOS Office, and others. (*Id.* ¶ 2.)

In this court's view, Ryan's argument is basically another challenge to the viability of a RICO enterprise consisting of the State of Illinois. It is true that the second superseding indictment alleges a pattern of racketeering activity that covers conduct from the time Ryan was Secretary of State through his service as Governor of Illinois. The mere fact that Ryan changed elected offices,

29

however, does not require a finding that he and his co-defendants acted through more than one enterprise. Nor is the court persuaded that the government is constrained by allegations set forth in earlier indictments. At this stage of the proceedings, the court cannot say that no reasonable jury could conclude that Defendants conspired to commit predicate acts of racketeering through the State of Illinois.

### 3. Multiple Conspiracies

Ryan next asserts that the indictment improperly combines multiple, unrelated conspiracies into a single conspiracy without the necessary interrelationship between the alleged wrongdoing. (Ryan RICO Mem., at 18.) "Multiple conspiracies exist when there are separate agreements to effectuate distinct purposes," whereas a single conspiracy exists when "the evidence, viewed in the light most favorable to the government, establishes that the co-conspirators joined to effectuate a common design or purpose." *United States v. Ceballos*, 302 F.3d 679, 688 (7th Cir. 2002). "So long as the evidence demonstrates that the co-conspirators embraced a common criminal objective, a single conspiracy exists, even if the parties do not know one or another and do not participate in every aspect of the scheme." *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001).

Ryan claims that there is no interrelationship between the "various SOS Office conspiracies" and the Governor's Office conspiracy. As described earlier, the former includes: (1) the conspiracy between Ryan and Warner to have Ryan act in his official capacity to personally benefit himself, Warner, and other Associates (SSI, Count 1 ¶¶ 11-13); (2) the conspiracy between Warner and unnamed "others" to extort vendors and prospective vendors of the SOS Office (*Id.* Count 1 ¶ 14); and (3) the conspiracy between Ryan, Fawell, and agents of Citizens For Ryan to use SOS Office resources for their personal benefit. (*Id.* Count 1 ¶¶ 15-17.) The latter consists of the conspiracy between Ryan, Associate 1, and Udstuen to have Ryan act in his official capacity to personally

30

benefit himself, Associate 1, and Udstuen. (*Id.* Count 1 ¶¶ 11-12, Count 2 ¶¶ 102-15; Ryan RICO Mem., at 18.) According to Ryan, "it is far from evident from the face of the Indictment that the alleged conspirators engaged in the requisite 'agreement' to a single, unitary objective broad enough to encompass these disparate alleged acts." (*Id.*)

Ryan is correct that the second superseding indictment describes a variety of activities and objectives; nevertheless, in the court's view, the alleged conspiracies do not so easily separate into distinct groupings. For example, Udstuen was involved in the validation stickers contract and the computer contracts for the SOS Office while Ryan was Secretary of State, but he was also involved in the Wisconsin Energy lobbying scheme with Ryan and Associate 1 during the Governor years. Similarly, Associate 1 was involved in the digital licensing contract for the SOS Office, but he was also the beneficiary of the Grayville Prison, Wisconsin Energy, and Metropolitan Pier and Exposition Authority schemes while Ryan was Governor. In addition, several of Warner's and Ryan's alleged schemes that began in the Illinois SOS Office continued after Ryan became Governor. Specifically, Warner and Udstuen received payments relating to the validation stickers contract until 2000; Warner and Associate 1 received payments relating to the digital licensing contract through November 2002; and Warner received payments relating to the 17 North State Street, Bellwood, and Joliet leases until at least October 2001, March 2003, and March 1999, respectively. The court is satisfied that the second superseding indictment sufficiently alleges an ongoing conspiracy to use state resources for personal gain. *See, e.g., United States v. Magana*, 118 F.3d 1173, 1190 (7th Cir. 1997) ("ongoing drug distribution conspiracy . . . involving core members who bought from and sold to various suppliers and dealers" constituted a single conspiracy rather than a series of smaller, separate conspiracies); *United States v. Stern*, 858 F.2d 1241, 1249 (7th Cir. 1988) (substitution of "players" in ongoing prostitution enterprise "did not alter the continuing nature of the single conspiracy"). Ryan's motion to dismiss the RICO charge for alleging multiple conspiracies is therefore denied.

### 4.  The State as RICO Enterprise and Victim

Ryan finally argues that the State of Illinois cannot be both a RICO victim and part of the alleged enterprise.  The court has twice rejected this same argument, first in *United States v. Fawell*, No. 02 CR 310, 2003 WL 21544239, at *1 (N.D. Ill. July 9, 2003), and again in this case prior to Ryan's addition as a defendant.  *United States v. Warner*, 292 F. Supp. 2d 1051, 1067 (N.D. Ill. 2003).  The court continues to recognize that the case law is unsettled on this issue but, following Judge Kocoras's rationale in *Shapo v. Engle*, No. 98 C 7909, 1999 WL 1045086, at *8-9 (N.D. Ill. Nov. 12, 1999), declines to find that an indictment fails merely because it names the same entity as both a victim and a part of the enterprise.

### 5.  Failure to Specify the Predicate Racketeering Acts

Warner additionally objects to the RICO charge on the theory that the indictment fails to "specifically identify the predicate racketeering acts that the defendants allegedly agreed would be committed in the conduct of the enterprise's affairs."  (Warner RICO Mem., at 1.)[11]  The government responds that under *United States v. Glecier*, 923 F.2d 496 (7th Cir. 1991), such specificity is not required.  In *Glecier*, the defendants were charged with fifteen counts of conspiracy, mail fraud, and tax violations.  *Id.* at 498.  Glecier was not charged in the indictment with personally committing any predicate acts of racketeering and he claimed that such omission violated his fifth and sixth amendment rights.  *Id.* at 499.  The court disagreed, reasoning that

> [i]f the government were required to identify, in indictments charging violation only of section 1962(d), specific predicate acts in which the defendant was involved, then a 1962(d) charge would have all of the elements necessary for a substantive RICO charge.  Section 1962(d) would thus become a nullity, as it would criminalize no conduct not already covered by sections 1962(a) through (c).  Such a result, quite obviously, would violate the statutory scheme in which conspiracy to engage in the conduct described in sections 1962(a) through (c) is itself a separate crime.

---

[11]  Warner's Memorandum of Law in Support of Motion to Dismiss RICO Conspiracy Charge is cited as "Warner RICO Mem., at __."

Id. at 501. By alleging all essential elements of a RICO conspiracy, specifying the time period during which the conspiracy operated, the locations and principal actors in the conspiracy, the specific types of predicate acts that were committed, and the *modus operandi* of the conspiracy, the indictment sufficiently (1) stated the elements of the offense charged, (2) informed Glecier of the nature of the charge so he could prepare a defense, and (3) enabled him to evaluate any possible double jeopardy problems. Id. at 499, 500.

The second superseding indictment similarly sets forth the elements of the conspiracy and provides sufficient detail to allow Defendants to prepare a defense and evaluate any double jeopardy concerns. The indictment identifies the RICO enterprise, the purposes of the conspiracy, the types of racketeering acts involved (mail fraud, money laundering, extortion, and obstruction of justice), and the means and methods of the conspiracy. (Gov't Resp., at 21; SSI, Count 1 ¶¶ 5-17.)[12] It also provides details regarding the time period during which the conspiracy operated and the principal actors. In light of the government's representation that it will "request that the jury be instructed that in order to convict a defendant of the RICO conspiracy offense, the jury's verdict must be unanimous as to which *type* or types of racketeering activity the defendant agreed would be committed," the foregoing allegations are adequate to allege a RICO conspiracy. (Id. at 21-22) (emphasis in original).

Warner also claims that Count One improperly charges an agreement to violate Illinois' official misconduct statute, 720 ILCS 5/33-3(d). He notes that official misconduct can only serve as a predicate act under RICO if it amounts to the generic equivalent of bribery, and argues that "absent the RICO conspiracy charge describing the underlying bribery or official misconduct activity, this Court cannot determine whether the alleged agreements to commit official misconduct were tantamount to bribery." (Warner RICO Mem., at 4, 5) (citing *United States v. Genova*, 333

---

[12]     The Government's Consolidated Response to Defendants' Pretrial Motions and Government's Motion for Reciprocal Discovery is cited as "Gov't Resp., at __."

F.3d 750, 758-59 (7th Cir. 2003)). The *Genova* court did hold that "§ 5/33-3(c) does not read like a definition of bribery and therefore may not be used as a predicate offense under RICO." 333 F.3d at 758-59. Section 5/33-3(d), however, which the government relies on in this case, does "define[] a species of bribery." *Id.* at 758 (citing *United States v. Garner*, 837 F.2d 1404, 1417-19 (7th Cir. 1987)). (*See also* SSI, Count 1 ¶ 8D) (charging Warner and Ryan with conspiring to engage in a pattern of racketeering activity involving, among other things, "multiple acts involving bribery chargeable under the following provisions of state law: 720 ILCS 5/33-1(c) and (d); and 5/33-3(d).) Thus, official misconduct under § 5/33-3(d) may serve as a predicate act of racketeering. Warner's motion to dismiss the RICO conspiracy charge is denied.

## B.    Ryan's Motion to Dismiss Mail Fraud Charges

Ryan seeks to dismiss the mail fraud charges against him on two theories: (1) the second superseding indictment improperly alleges "multiple schemes with different characteristics, different participants, and no legally sufficient nexus between them"; and (2) the intangible right of "honest services," 18 U.S.C. § 1346, is unconstitutionally vague on its face and as applied. The court addresses each argument in turn.

### 1.    Multiple Schemes to Defraud

Ryan first claims that Count Two of the second superseding indictment is duplicitous because it combines multiple, unrelated schemes. "Duplicity" – i.e., "the joining of two or more offenses in a single count" – is prohibited by FED. R. CRIM. P. 8, which requires "a separate count for each offense." *United States v. Buchmeier*, 255 F.3d 415, 421 (7th Cir. 2001). As the *Buchmeier* court explained,

> [t]he overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or both. Additionally, we have explained that a duplicitous indictment may expose a defendant to other adverse effects including improper notice of the charges against him, prejudice in the shaping of evidentiary rulings, in sentencing, in limiting review on appeal, in exposure to double jeopardy,

34

and of course the danger that a conviction will result from less than a unanimous verdict as to each separate offense.

*Id.* at 425 (internal quotations and citations omitted). *See also United States v. Caputo*, 288 F. Supp. 2d 912, 917 (N.D. Ill. 2003).

Ryan claims that the factual scenarios in Count Two demonstrate that there are "schemes of differing nature." For example, Ryan allegedly (1) authorized the SOS Office to enter into leases for properties owned by Warner, Ryan, and Associate 1; (2) gave confidential information to Associate 1 in connection with the construction of a maximum security prison in Grayville; and (3) authorized the termination of an Inspector General investigation into political fundraising by SOS employees on behalf of Citizens For Ryan. (Ryan Mail Fraud Mem., at 6.)[13] In Ryan's view, these schemes have no relation to each other except for his involvement in them. (*Id.*) Ryan also attempts to characterize the allegations as separate schemes to defraud the people of the State of Illinois of Ryan's honest services as the Secretary of State on the one hand, and as Governor on the other. (*Id.* at 7-8.)

The government responds that it has alleged just one scheme – to deprive the people of the State of Illinois and the State of Illinois of money, property, and their right to the honest services of Ryan and other state employees – that was merely executed in different ways. (Gov't Resp., at 27.) One method of execution was that Ryan, in exchange for gifts and benefits for himself and his family, allegedly gave friends and associates, including Warner, access to non-public information that enabled them to benefit from government leases, contracts, and projects. Another method was that Ryan allegedly used state resources to further his political career, such as having state employees sell fundraising tickets for his political campaign and providing certain "plum" benefits (e.g., low-digit plates) in exchange for campaign assistance and contributions. (*Id.*) Ryan,

---

[13]     Defendant Ryan's Memorandum of Law in Support of his Motion to Dismiss the Mail Fraud Charges is cited as "Ryan Mail Fraud Mem., at __."

Warner, and their associates also allegedly took deliberate actions to cover their trail, such as lying to FBI agents, destroying documents, and funneling illegal proceeds through Alan Drazek's company.

The court believes that the second superseding indictment sufficiently alleges a common scheme to defraud to avoid dismissal on grounds of duplicity. "[A]n indictment charging multiple acts in the same count, each of which could be charged as a separate offense, may not be duplicitous where these acts comprise a continuing course of conduct that constitutes a single offense." *Buchmeier*, 255 F.3d at 421. Ryan and Warner are charged with misusing State of Illinois resources for their personal gain, a scheme they carried out in a variety of ways, such as using non-public information to manipulate SOS Office contracts and leases, awarding low-digit plates in exchange for political contributions, and providing financial and job opportunities to associates in exchange for vacation and other personal benefits. The mere fact that these activities involved different individuals and entities does not render the charges duplicitous. *See United States v. Dumeisi*, No. 03 CR 664-1, 2003 WL 22757747, at *2 (N.D. Ill. Nov. 20, 2003) (citing *United States v. Folks*, 236 F.3d 384, 391 (7th Cir. 2001)) ("an indictment may properly include multiple factual scenarios to establish a single charged offense").

Ryan finds it significant that though earlier indictments encompass many of the same individuals and conduct referenced in the second superseding indictment, the government never before suggested a link between them. The first superseding indictment against Warner, for example, alleged the same misconduct relating to SOS Office contracts and leases as set forth in Count Two of the second superseding indictment. The *Fawell* and *Bauer*[14] indictments included allegations now found in Count Two regarding use of the SOS Office for political gain and reorganization of the Inspector General's Office. According to Ryan, "[n]owhere in the Warner and

---

[14]     *See United States v. Bauer*, No. 00 CR 81.

Fawell/Bauer indictments does the government allege any connection between these two alleged schemes." (Ryan Mail Fraud Mem., at 7.) The government responds that the prior indictments were "steps along the way to the government's uncovering the full scheme. Each indictment led to more evidence which filled in a more complete picture of the overarching fraud on the public." (Gov't Resp., at 28.)

The court agrees that the government is not bound by the earlier indictments and is free to expand and refine charges consistent with available evidence. Ryan objects that the government's "improper joining of multiple schemes into a single scheme also creates problems of ambiguous and, ultimately, improper jury findings." (Ryan Mail Fraud Reply, at 3.)[15] To be sure, drafting appropriate jury instructions and verdict forms in this complicated case will require particular care and attention. The court does not agree, however, that the complications dictate dismissal of the mail fraud charges. Such concerns may properly be addressed with jury instructions at trial. *See United States v. Adeniji*, No. 96 CR 259, 1997 WL 97725, at *2 (N.D. Ill. Feb. 27, 1997) (citing *United States v. Nava-Salazar*, 30 F.3d 788, 795 (7th Cir. 1994)) ("if it is warranted by the facts at trial, a jury instruction on the question of single and multiple schemes may be appropriate"). The second superseding indictment does not combine "isolated facts" nor allege a "series of disconnected swindles or of frauds that may have had merely a common actor or stage." *United States v. Reicin*, 497 F.2d 563, 570 (7th Cir. 1974); *United States v. Swinton*, 75 F.3d 374, 378 (8th Cir. 1996). Ryan's motion to dismiss the mail fraud charges is therefore denied.

### 2. Intangible Right of Honest Services

Section 1346 of the mail fraud statute prohibits "a scheme or artifice to deprive another of the intangible right of honest services." Ryan claims that this provision is unconstitutionally vague on its face and as applied; creates an impermissible common law crime; violates separation of

---

[15] Defendant Ryan's Reply in Support of his Motion to Dismiss the Mail Fraud Charges is cited as "Ryan Mail Fraud Reply, at __."

powers; and violates core federalism principles. Courts, including this one, however, have routinely rejected such challenges to the application of "honest services" fraud. *See Fawell*, 2003 WL 21544239, at *3 (collecting cases that declined to find unconstitutional vagueness); *United States v. Genova*, 167 F. Supp. 2d 1021, 1037 (N.D. III. 2001) (citing *United States v. Bloom*, 149 F.3d 649, 655-56 (7th Cir. 1998)) ("misuse of a public position for private gain is the line that separates run of the mill violations of state law fiduciary duty from federal crime"). Absent contrary direction from the Seventh Circuit, the court declines to dismiss the mail fraud charges on these grounds.

Several other motions may be addressed more summarily.

## C.     Defendants' Motions to Sever

In an earlier ruling in this case, the court noted its history; Defendant Warner was indicted in 2002 and was prepared, after several delays, to proceed to trial in February of this year. Instead, as 2003 came to a close, the government filed a Second Superseding Indictment, asserting a number of additional charges and naming George H. Ryan as a second Defendant in the case. Mr. Ryan was not prepared to proceed to trial at that time. *See United States v. Warner*, No. 02 CR 506, 2004 WL 144125 (N.D. III. Jan. 16, 2004). In that earlier opinion, the court reviewed the standards for charging more than one defendant together under FED. R. CRIM. P. 8 and concluded that the standards of that Rule were satisfied here, where Warner and Ryan are charged with engaging together in a racketeering conspiracy and scheme to defraud. With grave reluctance, the court set a very long trial date, finding no other way to accommodate Ryan's need for sufficient time to prepare for trial, each Defendant's choice of counsel, the possible prejudice to either Defendant from serial trials, and the interest of the court, the government, and many trial witnesses in a single proceeding. The court's own preference was and remains to proceed to trial with respect to both Defendants as early as September of this year.

Although Warner did not raise substantive objections to a joint trial at the time of the second superseding indictment, he does, as noted, do so now. Warner argues that the counts in which he and Ryan are both named are not sufficiently connected to those in which Ryan alone is named. He argues, in addition, that certain allegations in the false statement counts against Ryan give rise to *Bruton* violations, and, in the alternative, that the court should grant a severance under Rule 14. Ryan, too, moves for severance, arguing that the false statement counts (Counts Eleven through Thirteen) and tax counts (Counts Eighteen through Twenty-Two) are insufficiently connected to the remaining counts of the indictment, which allege RICO violations and mail fraud.

As misjoinder appears to be the most significant objection, the court begins there. Both Defendants argue that there is an insufficient relationship between the counts against Ryan alone and those in which both Defendants are named. The court is uncertain that Ryan has any standing to raise this challenge; there is little question that the counts against him "are connected with or constitute parts of a common scheme or plan" within the meaning of Rule 8(a). The cases Ryan cites in support of his motion address the right of the defendant not named in certain charges (in this case, Warner) to seek severance. *See United States v. Schweihs*, 971 F.2d 1302, 1321-22 (7th Cir. 1992) (characterizing the question as "whether [Rules 8(a) and 8(b)] can be combined" to allow joinder of charges against movant Daddino with charges against Schweihs alone); *United States v. Velasquez*, 772 F.2d 1348, 1353 (7th Cir. 1985) (finding no prejudice from denial of a severance motion and observing that heroin charges could have been joined with other charges against the defendant charged with heroin trafficking alone). In any case, as the government points out, joinder of tax evasion counts with conspiracy charges is proper where the counts allege failure to report income received by the fraudulent scheme. *United States v. Shelton*, 669 F.2d 446, 460 (7th Cir. 1982); *United States v. Emond*, 935 F.2d 1511 (7th Cir. 1991).

Warner has a more colorable argument on this score. He notes that Ryan is the sole Defendant named in nine of the 22 counts of the indictment. Two of the nine (Counts Six and Ten)

are mail fraud counts involving state contracts of a nature similar to those in which Warner was allegedly involved. Although Warner had no alleged involvement in either of these contract awards, the court concludes that they are similar enough to matters in which he was allegedly involved that joinder is proper here, and that any prejudice to Warner can be addressed by way of an appropriate instruction to the jury.

The remaining seven assertedly misjoined counts are charges of false statements and tax claims. The alleged conduct was that of Ryan alone. The government notes that several Seventh Circuit cases have upheld the joinder of tax evasion charges against one defendant with RICO charges against others. *See, e.g., United States v. Anderson*, 809 F.2d 1281, 1288 (7th Cir. 1987). There might well be no abuse of discretion in denying joinder in these circumstances, particularly if the evidence on these seven counts is relatively brief. If it is not, the court believes prejudice to Warner could be eliminated if the government were directed to present evidence on these charges only after evidence on all other counts has been presented to the jury. Alternatively, the court will consider bifurcating the evidence on these counts from the remainder of the indictment, with these counts to be tried to the same jury only after they have returned a verdict on the counts that relate to Warner and Ryan jointly, and to the South Holland lease and Grayville prison counts (Counts Six and Ten).

Such a procedure would address Warner's *Bruton* concerns, to the extent they are valid. In *Bruton v. United States*, 391 U.S. 123 (1968), the Court recognized that when a defendant will be faced with a co-defendant's accusatory statements, the non-declarant is entitled to a severance. As Warner himself recognizes, for *Bruton* to apply, the co-defendant's statements "not only must be powerfully incriminating, but also facially incriminating of the non-declarant defendant." (Warner's Memorandum of Law in Support of Motion for Severance, at 10) (citing *Richardson v. Marsh*, 481 U.S. 200, 207-08 (1987)). As this court understands them, none of Ryan's statements at issue in this case are incriminating: Specifically, Ryan allegedly stated that he appointed Warner

40

to the McPier board on a resigning board member's recommendation; that he never discussed the Joliet lease or SOS Office leases with Warner and had no personal knowledge that Warner profited from the Joliet lease; that he had no idea of the source of Warner's information concerning those leases; and that he had no personal financial relationship with Warner. Simply put, nothing about any of these statements suggests improper conduct on Warner's part.

Finally, Warner asks the court for severance under Rule 14, which permits the court to order severance to prevent prejudice. In support of this request, Warner asks the court "not to slight reality," but instead to be sensitive to the enormous negative publicity Ryan has endured, not only as a result of the "Licenses for Bribes" investigation, but also because of Ryan's controversial decision, the last days of his tenure as Governor, to commute the death sentences of every Illinois inmate on death row. (Warner's Memorandum of Law in Support of Motion for Severance, at 15.) The court is indeed sensitive to these matters and understands the difficulty that the court and the parties will face in jury selection and in the day-to-day trial process. Realistically, however, severing Warner's trial from that of Ryan will not eliminate these difficulties.[16] A trial of Warner by himself will necessarily implicate Ryan in a variety of ways and will generate extensive press attention even if Ryan is not a party.

## D.    Warner's Motion to Dismiss for Speedy Trial Act Violation

Defendant Warner seeks dismissal of the charges against him based on violation of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* He argues that the Speedy Trial Act "clock" should tick during periods of time for preparation of pretrial motions under § 3161(h)(1)(F). Warner acknowledges that the Seventh Circuit has ruled against his position on this issue, however, and the court concludes that the government's calculations of the days that have elapsed are accurate.

---

[16]    As the parties are well aware, this court conducted the trial of Ryan's associate, Scott Fawell, months ago. Ryan himself was not a party to that trial, but every potential juror was questioned about his or her views concerning Ryan and whether he/she could put positive or negative views aside in making a decision based on the evidence.

As noted earlier, the court remains concerned by the delay that the joinder of Ryan has caused for Warner. Although Warner is not in custody, his personal and professional life are certainly in turmoil as a result of these pending charges. Further, although the court does not recognize a qualitative difference between the delay in this case and the delay in others cited by the government, the number of months between his original indictment and the scheduled trial is large. The court therefore remains willing to try this case at the parties' earliest possible convenience and stands ready to alter its trial schedule and begin at the very first day that Ryan's attorneys are ready.

The motion for dismissal on Speedy Trial grounds is denied.

## E.    Defendants' Motions to Strike

Both Ryan and Warner have moved to strike language from the second superseding indictment. Rule 7(d) authorizes the court to strike from an indictment allegations that are "immaterial, irrelevant or prejudicial." As the government points out in response, the case law reflects that such motions are not often granted. See United States v. Stoecker, 920 F. Supp. 867, 887 (N.D. Ill. 1996) (motion to strike should be granted only if the allegations are "'clearly not relevant to the charge and are inflammatory and prejudicial'") (citations omitted); United States v. Marshall, 985 F.2d 901, 905-06 (7th Cir. 1993) (declining to grant such a motion and observing that the "language of the indictment can hardly be characterized as immaterial since it delineates with great specificity the numerous charges alleged by the government against each defendant"). In United States v. Lavin, 504 F. Supp. 1356 (N.D. Ill. 1981), Judge Moran observed that "language in the indictment which covers information which the government, in good faith, intends to prove at trial cannot be stricken as surplusage, no matter how prejudicial it may be." Id. at 1362. The court granted the motion to strike in Lavin, where defendant property tax commissioners were charged with taking bribes in return for reductions in property assessments. Specifically, the court

struck an allegation "that property assessments were corruptly reduced in over two thousand cases" where it was clear that the government intended to offer evidence concerning far fewer incidents of bribery. *Id.*

The court does not understand Warner and Ryan to be arguing that the government does not intend to prove the allegations that Defendants seek to have stricken. To the extent they are making such an argument, the court adopts the government's suggestion that their motions to strike should be entered and continued until the evidence has been presented at trial. (Gov't Resp., at 46-47.)

Defendants do contend that some of the allegations are irrelevant to the charges against them and prejudicial. Although relevance and prejudice are often most readily addressed in the context of trial, the court is prepared to address at least some of the matters that are targets of these motions at this point.

### 1. 18 U.S.C. § 1512

First, with respect to 18 U.S.C. § 1512, Defendant Ryan is correct that the second superseding indictment makes no direct reference to witness tampering; but as the government notes, § 1512 prohibits not only witness tampering, but also alteration or destruction of records or documents so as to render them unavailable in an official proceeding. 18 U.S.C. § 1512(c). The indictment alleges that, in Defendant Ryan's presence, after learning about a grand jury investigation of campaign activities in the Secretary of State's office, Ryan's subordinate Scott Fawell directed an SOS employee to "clean up" documents relating to Citizens For Ryan. If the government fails to offer evidence of a violation of § 1512, the court will strike that reference.

### 2. Preamble

Both Defendants object to the 11-page preamble to the indictment as "irrelevant and prejudicial monologue." They cite *United States v. Vastola*, 670 F. Supp. 1244, 1255 (D.N.J. 1987),

43

where the court granted a motion to strike a preamble that contained an irrelevant narrative and potentially suggested that certain defendants not charged with RICO violations were in fact guilty of such violations. During the course of the trial, this court will entertain proposed revisions to the preamble to the extent that information set forth therein is irrelevant and prejudicial. The court notes, however, that at least some of the state statutes and regulations cited there are indeed relevant and necessary to explain conduct alleged in specific counts. For example, the jury may well need some explanation of the reasons that Warner allegedly kept his name off certain lobbying agreements. Further, without some information concerning Illinois statutes banning public officials from accepting gifts from persons doing business with the state, the jury is unlikely to understand the reasons Ryan allegedly engaged in sham transactions to conceal his acceptance of free lodging from a business associate. If the evidence at trial demonstrates that any of the statutes cited is irrelevant to the charges, the court will grant Defendants' motion to strike the reference.

### 3. References to Third Parties

Defendants object to such expressions as "others known and unknown," "nominee" and "conduit." With respect to "others," the government asserts that listing every person involved in each event alleged in the indictment would be cumbersome and overly detailed, but that it "has every intention of presenting evidence at trial of the known people who are referenced" in the indictment as "others." (Gov't Resp., at 51.) On the strength of that representation, the motion to strike this expression is denied without prejudice. The court also overrules Warner's objection to the terms "conduit" and "nominee." Warner contends these terms are argumentative and prejudicial, but in the court's view they convey more information than Warner's preferred substitute expression, "third party." If the evidence at trial does not establish that the individuals at issue acted as conduits or nominees for the receipt or exchange of funds, the court will direct appropriate amendments to the indictment.

### 4. Events that are not the Subject of Specific Mailings

Both Defendants object to references in Count Two to circumstances they claim are unrelated to the mail fraud charges in Counts Two through Ten. The episodes described in Count Two include the award of a title laminates contract to ADM; award of a consulting contract to ATC; the solicitation of Modern Business Systems regarding a photocopier lease; leases on property in Springfield owned by clients of Associate 1; the hiring of Associate 1 as a lobbyist for MPEA; the Wisconsin Energy lobbying referral; Warner's and Ryan's involvement in distribution of low-digit license plates; interference with activities of the Illinois Inspector General; and the shredding of campaign documents. The government insists each of these episodes is a part of the charged scheme to defraud the people and State of Illinois of money, property, and the intangible right to the honest services of Defendant Ryan and other state officials. The government cites *United States v. Lanas*, 324 F.3d 894 (7th Cir. 2003), where a claims adjuster for Alexsis Risk Management assigned surveillance work to six vendors who paid cash kickbacks to him for each job. At the trial on a three-count indictment, the government offered evidence not only of the three charged mailings of money to defendant Lanas and another vendor, but also of several other vendors who paid kickbacks. Defendants argued on appeal that this evidence was at variance with the allegations of the indictment, but the Seventh Circuit rejected their contention that "the scope of a mail fraud scheme is limited by the mailings that are specifically charged in the indictment." *Id.* at 901. The indictment alleged one overarching fraud scheme, in the court's view, and evidence concerning other vendors who paid kickbacks constituted additional proof of that scheme.

The connection between at least some of the episodes alleged in Count Two is arguably a looser one than the evidence presented in the *Lanas* case, where the claims adjuster's manner and method of cheating his employer followed a consistent pattern. The court nevertheless has little difficulty concluding that at least those episodes relating to the solicitation and award of

45

contracts and leases and to lobbying agreements are part of the charged scheme to defraud. Matters involving the distribution of low-digit license plates, the dismantling of the Illinois Inspector General's office, and the shredding of campaign documents are of a slightly different nature, but these matters, too, constitute misuse of state resources for personal or political ends. The motion to strike these allegations is denied without prejudice.

### 5. Paragraphs 11, 52, and 130 of Count Two

Finally, Warner objects to certain paragraphs of Count Two as irrelevant and prejudicial. First, he correctly notes that paragraph 11 of Count Two of the indictment identifies personal and financial benefits Warner supplied to Ryan, but does not allege that the benefits were extended in exchange for official action. The court agrees that extending favors to a governmental official is not necessarily unlawful and that the jury must find a connection between the benefits that Ryan and Warner extended to one another in order to find that the two conspired to deprive the State of Illinois of Ryan's honest services. In the court's view, this is a matter that can be addressed in jury instructions, not by way of striking paragraph 11.

In paragraph 52 of Count Two, the indictment details Warner's purchase of Viisage stock months before the SOS Office awarded a contract to Viisage. The government argues that this evidence will "help the jury understand the circumstances under which Warner operated to enrich himself" with non-public information. (Gov't Resp., at 55.) Warner's purchase of the stock presumably reflects his confidence that the contract would ultimately be awarded to Viisage and may be admissible on that basis. The court shares Warner's concern that the jury not be invited to consider this matter as evidence of some other uncharged wrongdoing, however, and will consider striking this allegation from the indictment or giving an appropriate instruction concerning the matter.

Paragraph 130 refers to "a driver involved in a widely-publicized fatal traffic accident." Warner notes this allegation is unrelated to his own wrongdoing and that evidence of the incident is unfairly prejudicial. The court agrees with the government's characterization of this language as "muted and hardly inflammatory," (*Id.* at 56), as it makes no mention of the number of victims, their age, or other tragic circumstances. The court also agrees that the government has included a reference to this incident as evidence of an act in furtherance of the mail fraud with which Warner is charged. The motion to strike paragraph 130 is denied.

## F. Defendants' Motions for a Bill of Particulars

Both Defendants have moved for a bill of particulars, arguing that without additional information, they are unable to prepare their defense. The government brushes off this concern, insisting that the 91-page indictment is adequate notice of the charges against Defendants, and noting its willingness to provide substantial disclosure well in advance of the scheduled trial date.

Rule 7(f) authorizes the court to order the government to produce a bill of particulars if the allegations of the indictment are inadequate to provide notice of the charges against a defendant. Under Rule 7(f), a court may order a bill of particulars if the indictment fails to provide sufficient notice of the charges to allow the defendant to prepare for trial. *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003) (citing *United States v. Kendall*, 665 F.2d 126, 134 (7th Cir. 1981)). Thus, the test for determining whether a motion for a bill of particulars should be granted is "whether the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges to enable him to prepare for trial." *Fassnacht*, 332 F.3d at 446. Another court has explained that in determining whether to impose the requirement of a bill of particulars, the court may consider "the complexity of the charges, the clarity of the indictment, and the degree of discovery available to the defense . . . ." *United States v. Vasquez-Ruiz*, 136 F. Supp. 2d 941, 942 (N.D. Ill. 2001). A defendant is only entitled to be informed of the charges against him; he is

47

not entitled to know the details of how the government will go about proving its case. *Kendall*, 665 F.2d at 134; *see also United States v. Glecier*, 923 F.2d 496, 502 (7th Cir. 1991). Further, as the *Fassnacht* court noted, a bill of particulars is not required where the defendant is able to obtain information necessary for his defense through other means, for example, pre-trial disclosure by the government of relevant documents. 332 F.3d at 447 n. 2.

In this case, Defendants urge that the length and breadth of the indictment militate in favor of a bill of particulars; the government argues that the charging document does identify the specific incidents on which it will rely to prove the charges. The government notes, further, that it will make or has made a substantial disclosure of relevant documents, either voluntarily or pursuant to this court's order. The court recognizes that this voluminous production of documents by itself does not preclude an order requiring more specifics. *Cf. Vasquez-Ruiz*, 136 F. Supp. 2d at 943 ("[t]he defense should not be left to its own devices and a sifting of the voluminous materials that have been provided in order to divine the particulars of these critical allegations"). For the reasons set forth here, the motions are granted in part and denied in part.

Defendant Warner asks that the government be ordered to provide the "date, place and participant in each agreement or act involved in the alleged 'pattern of racketeering activity.'" (Warner Memorandum in Support of Motion for Bill of Particulars, at 3.) The indictment includes those details with respect to several substantive counts of mail fraud (Counts Two through Ten); extortion (Count Fourteen); money laundering (Counts Fifteen and Sixteen); and structuring currency transactions (Count Seventeen). The court understands those counts to constitute as well the acts involved in the pattern of racketeering activity; if the government expects to present evidence of other specific acts of racketeering, and to ask the jury to make findings on such acts, the government will be required to furnish a bill of particulars on those matters. Similarly, Defendant Warner asks the government to identify the "other officials" and "employees of the State of Illinois" identified in Count 2 ¶ 3. The court understands these as references to Illinois officials

who played a role in decisions concerning leases and contracts in which Warner was involved, but in the context of this indictment, the court does not believe specific identification of each such individual is necessary in order for Warner to prepare his defense. Finally, Warner asserts that he is entitled to a description of "each materially false and fraudulent pretense[], representation[], promise[], and material omission." (Warner Memorandum in Support of Motion for Bill of Particulars, at 3.) The court will generally not require such disclosure, which would in effect constitute the "details of how [the government] plans to prove its case." *Glecier*, 923 F.2d at 502. The court does, however, direct the government to provide detail that supports its allegation that Warner "fixed false and misleading lobbyist registration statements relating to IBM and failed to disclose all of his Ryan-related expenditures." (SSI, Count 2 ¶ 46.)

Defendant Ryan has identified a list of 23 items of information he claims to need in order to prepare his defense. With respect to certain of those items, the court believes his request goes beyond a request to be informed of the charges against him. The court will not require the government to identify specific benefits received by Ryan in exchange for certain acts, or with knowledge that they were provided to influence him (Ryan's Motion for Bill of Particulars, at 8, Particulars Regarding Payments, Benefits, or Income, Items 1-3), though Ryan will be free to argue that benefits received by him were not quid pro quos for official acts. In this court's view, the indictment does apprise Ryan of the benefits that Warner allegedly provided to Ryan or Citizens For Ryan; of the SOS Office resources that Ryan allegedly diverted; and of the benefits Citizens For Ryan received. (*Id.* Items 7, 9, and 10.) The court concludes the indictment adequately identifies the allegedly false and misleading statements and "sham" transactions alleged in Counts Two, Eleven, Twelve, Thirteen, and Eighteen, and that the government is not required to restate the questions asked by law enforcement agents that elicited these statements. (*Id.* Particulars Regarding Fraud/Misstatements, Items 4-6.) The court assumes the statements alleged in those counts are also the bases for the government's assertion that Ryan attempted to obstruct the

49

investigation and that he concealed and hid the acts of the conspiracy, and will order no further particulars concerning those matters. (*Id.* Items 7, 8.)

The court believes the indictment already provides information sufficient to identify the individuals or entities referred to; for example, Ryan Relative One is identified as "the husband of a Ryan Daughter"; Individual 2 as "a caretaker for defendant Ryan's mother-in-law"; Associate Z as an individual who annually furnished Ryan with the use of his vacation home in Jamaica. (SSI, Count 18 ¶¶ 2A, B; Count 2 ¶ 89.) The court will require no further disclosure of this information absent a showing that Ryan in good faith cannot determine who such individuals are. (Ryan's Motion for Bill of Particulars, Particulars Regarding Persons, Items 1, 2.) Finally, Ryan asks for particulars concerning when he "approved a plan" by Warner to share proceeds of payments with Udstuen. (*Id.*, Particulars Regarding Dates, Item 1.) The indictment alleges that in early 1991, Warner told Udstuen that Ryan had approved such a plan. It alleges, further, that payments were made to Udstuen with Ryan's approval, but does not allege that this actually occurred pursuant to a plan, nor does it suggest that Ryan formerly approved a plan at a particular time; the court will require no further particulars concerning this matter.

With respect to certain other items, the court will require some additional disclosure: In Count Eighteen ¶ 6, the indictment alleges that Ryan wrote and caused the writing of "false and misleading notations on [Citizens For Ryan] checks issued to family members," but does not identify which checks bear such allegedly false notations. (Ryan's Motion for Bill of Particulars, at 5.) Ryan asserts that Citizens For Ryan issued thousands of checks per year; the court will direct the government to provide at least several examples of checks on which it contends false notations appear, or a method by which Ryan can easily identify those checks. (*Id.*, Particulars Regarding Fraud/Misstatements, Item 1.) Similarly, the court will direct the government to identify low-digit license plates that Ryan awarded, or a method by which Ryan can determine this information from the documents that have been produced. (*Id.*, Particulars Regarding Payment,

Benefits, or Income, Item 8.) The court will also require the government to identify the payments from the Gramm campaign to individuals that Ryan, Fawell and Juliano designated, or a method by which Ryan can identify those payments. (*Id.*, Particulars Regarding Payments, Benefits of Income, Items 11, 12.) In addition, Ryan notes that the government has not identified the line items within his tax returns that are alleged to be false or what income he is alleged to have failed to disclose. For each of the years in which allegedly false tax returns were filed, the government is directed to identify in a general way what income Ryan improperly failed to report. (*Id.*, Particulars Regarding Fraud/Misstatements, Items 2,3; Particulars Regarding Payments, Benefits, or Income, Items 5, 6.)

## G.    Ryan's Motion for Immediate Disclosure of Favorable Evidence

Ryan has moved for an order requiring disclosure of all evidence favorable to him and within the government's custody. The government has acknowledged its ongoing obligations under *Brady* and other authorities to provide such material as soon as it is identified. The court therefore grants this motion without objection.

## H.    Ryan's Motion for Timely Disclosure of Impeachment Evidence

Defendant Ryan asks for disclosure, no later than 120 days before trial, of any impeachment evidence the government may have concerning the witnesses it intends to call at trial. The government has acknowledged its obligation to produce such evidence under *Giglio v. United States*, 405 U.S. 150 (1972), and expects to do so 60 days in advance of the trial. Ryan argues this is inadequate, and points out that the government has announced its intention to begin trial preparation in August 2004.

At the risk of being accused of arbitrarily splitting the difference, the court concludes that a 90-day disclosure period is most appropriate. In opting for an earlier date than proposed by the government, the court is mindful of the fact that there will be dozens of witnesses called in the trial

of this case. In declining to set the date as early as 120 days before the scheduled trial, the court observes that it is Ryan's own attorneys who insisted on a trial date in March. Ryan's counsel is unavailable in September, this court's preferred date for trial, due to a longstanding prior commitment that, he asserts, will keep him fully occupied until the end of the year. Even recognizing that other lawyers in his firm could presumably begin the process of preparing cross-examination prior to that date, the court believes a disclosure date 90 days prior to trial is adequate for Mr. Ryan to prepare his defense.

## I. Ryan's Motion for an Order Requiring Immediate Notice of 404(b) Evidence

Defendant Ryan has asked that the court order the government to give notice of its intent to offer Rule 404(b) evidence immediately. In its consolidated response to the pre-trial motions, the government has offered to produce such material 60 days before trial. Ryan has accepted that proposal, and it is hereby so ordered.

## J. Ryan's Motion for Pretrial Production of *Jencks* Material and Witness List

Pursuant to 18 U.S.C. § 3500, *Jencks* material must ordinarily be produced at trial. In complex cases such as this one, however, involving dozens of witnesses and many thousands of documents, courts encourage production of such materials well in advance of the trial. The government has offered to produce this material 60 days before trial; Ryan again urges that a production date 120 days in advance is more appropriate. For the reasons stated with respect to the motion for disclosure of impeachment evidence, the court will require disclosure of *Jencks* material 90 days prior to the scheduled trial date.

Ryan also asks the court to order production of a witness list 45 days prior to trial. He argues that relevant factors weigh in favor of this disclosure, including the very large number of witnesses, the complexity of the facts at issue, the absence of any risk that witnesses would be intimidated by the defense, and the fact that the government would not be prejudiced by this

disclosure. The government objects, citing settled case law holding that the prosecution is not required to reveal the names of its witnesses prior to trial. *United States v. Braxton*, 877 F.2d 556, 560 (7th Cir. 1989); *United States v. Napue*, 834 F.2d 1311, 1317 (7th Cir. 1987); *United States v. Bouye*, 688 F.2d 471, 473-74 (7th Cir. 1982). Instead, the government proposes to proceed as it did in the case of *United States v. Fawell*, No. 02 CR 310, i.e., by furnishing the court with a list of names likely to come up at trial, for use in jury selection, and then providing a list of the witnesses it intends to call "on a rolling basis as trial progressed." (Gov't Resp., at 67.)

The court agrees with the government that the procedure adhered to in the *Fawell* prosecution will satisfy due process concerns. First, as a practical matter, it seems likely that all parties will be well aware of the identity of substantially all of the key witnesses well before trial begins, based upon the language of the indictment and the disclosure of impeachment evidence a full 90 days before trial. Also, as a matter of practicality, it will be hard to predict the precise availability of particular witnesses and/or the order in which they can or should be called to testify. The court will expect each side to provide appropriate advance notice of the order in which they expect to call witnesses and believes 48 hours is the minimum amount of advance notice that would be appropriate. Should a more specific direction on this matter be required as the case proceeds, the court will entertain further argument on the matter.

## K.    Ryan's Motion for Immediate Production of Statements

The government recognizes its obligation to produce all statements made by Defendant Ryan and represents that it has already done so. In response, Ryan has withdrawn this motion.

## L.    Ryan's Motion for an Order Concerning Electronic Surveillance Evidence

Ryan asks that the government affirm or deny the occurrence and legality of any electronic or video surveillance conducted as part of the government's investigation of this case, as required by 18 U.S.C. § 3504. The government has furnished an affidavit from AUSA Patrick M. Collins,

stating that government agents are unaware of any electronic surveillance of Defendant Ryan, with the exception of a single recorded telephone conversation in April 2002. The tape recording, and a draft transcript, has been produced, and Ryan accordingly has withdrawn this motion.

## M.    Ryan's Motion for an Order Directing the Government to Produce Agents' Notes

Ryan asks the court to require the prosecution to produce all of the original handwritten notes of law enforcement agents who interviewed him. Rule 16(a)(1)(A) requires the government to disclose the substance of any oral statement made by a defendant to a government agent if the government expects to use the statement at trial. In this case there can be no doubt that the government expects to use certain statements made by Ryan, as it has charged in three counts that certain of those statements were false.

As the government notes, the Seventh Circuit has held that the government satisfies the requirements of Rule 16 without furnishing original handwritten notes, so long as it does produce a written report containing all of the information in those notes. See United States v. Coe, 220 F.3d 573, 582 (7th Cir. 2000); United States v. Muhammad, 120 F.3d 688, 699 (7th Cir. 1997). With respect to any government witness who testifies to what Ryan told him, production of such a report satisfies the government's obligations under the Jencks Act as well. United States v. Bastanipour, 697 F.2d 170 (7th Cir. 1982). To demonstrate its compliance with the requirement that the written reports it has produced are accurate and complete, the government has offered to produce the agents' notes for the court's in camera review. The court adopts this proposal and directs the government to produce agents' handwritten notes, together with the written reports purportedly summarizing those notes. Should the court detect even slight omissions or alterations, it will entertain Ryan's request for production of the original notes.

**N.    Ryan's Motion for an Order Requiring the Government to Make a *Santiago* Proffer**

The government does not object to Ryan's request for a *Santiago* proffer, but the parties again part company on the scheduling of such a disclosure. As before, the court directs a disclosure earlier than the government proposes, but later than Ryan would prefer, i.e., 90 days before trial.

**O.    Warner's Motion to Adopt Pretrial Motions Filed by Ryan**

The government does not object to this motion, and it is granted.

**P.    Warner's Motion to Reassert Prior Motions**

In the months since the original indictment in this case, Ryan has filed several motions; he asks to reassert those motions in response to the superseding indictment. The government has no objection to this motion, but asks the court to consider its previously-filed responses to those motions, as well. Warner's motion is granted, as is the government's request to renew its previous responses.

**Q.    Government's Motion for Reciprocal Discovery**

Citing FED. R. CRIM. P. 16(b)(1)(A), the government asks the court to enter an order requiring Defendants to make various documents available for inspection. Neither Defendant has objected to the request and the motion is granted.

## CONCLUSION

For the reasons stated above, Defendants' motions are granted in part and denied in part. Defendants' motions to dismiss the RICO conspiracy charge (Docket No. 142-1, 160-1) and their motions to sever certain counts from the indictment and/or to sever both co-defendants from each other (Docket No. 138-1, 150-1) are all denied. Ryan's motion to dismiss the mail fraud charges against him (Docket No. 167-1) is denied. Warner's related motion to dismiss all charges on Speedy Trial grounds (Docket No. 140-1) is also denied. Defendants' motions to strike certain

language and allegations from the indictment (Docket No. 84-1, 144-1, 159-1) are denied without prejudice. Defendants' motions for a bill of particulars (Docket No. 146-1, 166-1) are granted in part and denied in part as stated in this opinion.

Ryan's motion for immediate disclosure of favorable evidence (Docket No. 158-1) is granted without objection. Ryan's motions for timely disclosure of impeachment evidence (Docket No. 157-1), motion for pretrial production of *Jencks* material and a witness list (Docket No. 156-1, 156-2), and motion for an order requiring the government to make a *Santiago* proffer (Docket No. 58-1, 155-1) are granted in part and denied in part. Specifically, the government must disclose impeachment evidence, produce *Jencks* material, and make a *Santiago* proffer 90 days before trial, and must produce a witness list in accordance with the procedures set forth in this opinion. The parties have agreed that the government will give notice of its intent to offer Rule 404(b) evidence 60 days before trial, and Ryan's motion for such disclosure (Docket No. 154-1) is granted. Ryan has withdrawn his motion for immediate production of statements made by him (Docket No. 153-1) and his motion for an order requiring the government to affirm or deny the occurrence and legality of any electronic or video surveillance and to produce same (Docket No. 152-1). Both are denied as moot. With respect to the original handwritten notes of law enforcement agents who interviewed Ryan, the government is ordered to produce them, together with the relevant typewritten reports, to the court for *in camera* review by August 20, 2004. Ryan's motion for production of the notes (Docket No. 151-1) is denied without prejudice pending that review.

Warner's motion to adopt the pretrial motions filed by Ryan (Docket No. 149-1) and his motion to reassert motions filed prior to the return of the second superseding indictment (Docket

No. 148-1) are both granted. The government's corresponding request to renew its previous responses to Warner's prior motions is also granted. Finally, the government's request for reciprocal discovery (Docket No. 171-1) is granted.

ENTER:

Dated: August 11, 2004

REBECCA R. PALLMEYER
United States District Judge