

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 CR 506 |
| | ) | |
| LAWRENCE E. WARNER and | ) | Judge Rebecca R. Pallmeyer |
| GEORGE H. RYAN, SR., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Lawrence E. Warner and George H. Ryan, Sr. are charged in a 22-count second superseding indictment with (1) conspiring to use the resources of the State of Illinois for their personal and financial benefit and for the benefit of Ryan's family members, the Citizens For Ryan political campaign committee, and various political and business associates, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(d); and (2) devising a scheme to defraud the people of the State of Illinois and the State of Illinois of money, property, and the right to the honest services of Ryan and other State of Illinois officials, in violation of the federal mail fraud statute, 18 U.S.C. §§ 1341, 1346. Ryan is separately charged with making materially false, fictitious, and fraudulent statements during several FBI interviews in violation of 18 U.S.C. § 1001(a)(2); obstructing and endeavoring to obstruct the Internal Revenue Service in the correct reporting of income and the collection of taxes in violation of 26 U.S.C. § 7212(a); and filing materially false tax returns in violation of 26 U.S.C. § 7206(1). Warner is separately charged with extortion under the Hobbs Act, 18 U.S.C. § 1951; money laundering, 18 U.S.C. § 1956 (a)(1)(B)(i); and structuring currency transactions in violation of 31 U.S.C. §§ 5324(a)(3) and (d)(2).

Currently before the court are the parties' motions in limine and Ryan's and Warner's objections to the government's *Santiago* proffer. For the reasons stated here, the motions are granted in part and denied in part.

## DISCUSSION[1]

### I.    Ryan's Motions

In his motions, Ryan seeks limited closure of voir dire questioning of the jurors; an order directing the government to sentence cooperating witnesses; exclusion of certain "other acts" evidence; and an order barring the jury from reviewing the indictment during deliberations. The court addresses each motion in turn.

### A.    Ryan's Motion for Limited Closure of Voir Dire

Ryan argues that voir dire must be closed in this case to prevent potential jurors from being "inhibited from giving truthful responses to controversial questions . . . by fear of the publicity that will be given to their responses." (Ryan Closure Mem., at 1.)[2] Ryan insists that jurors may be questioned on "[h]ighly sensitive and inflammatory issues," including Ryan's "stance and actions regarding abortion, gay rights, gun control, capital punishment, the criminal justice system and other hot-button political issues." (Id. at 4.) He believes that jurors "may be uncomfortable giving candid answers to questions of a controversial and sensitive nature if they anticipate that their answers will be attributed to them and widely disseminated by the media." (Id.) In Ryan's view, the appropriate remedy is to bar the media from attending individual voir dire, but to provide the press with a transcript of those proceedings, redacted to eliminate the potential jurors' names. (Id. at 5.)

The government disagrees, noting that the Supreme Court has emphasized the value of open trials, including voir dire:

---

[1]    The factual allegations are set forth in detail in this court's August 11, 2004 Memorandum Opinion and Order and will not be repeated here. United States v. Warner, No. 02 CR 506, 2004 WL 1794476, at *1-12 (N.D. Ill. Aug. 11, 2004). This opinion assumes the reader's familiarity with that earlier decision.

[2]    Ryan's Motion for Limited Closure of Voir Dire is cited as "Ryan Closure Mem., at __."

2

> The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known.

(Gov't Ryan Resp., at 2 (quoting *Press-Enterprise Co. v. Superior Court of California, Riverside County*, 464 U.S. 501, 508 (1984).)[3] The government urges that juror privacy can be adequately protected in this case by concealing the identities of the jurors and by closing voir dire to particularly sensitive questions at the request of individual jurors. (Gov't Ryan Resp., at 5.) *See also Press-Enterprise*, 464 U.S. at 512 (endorsing the practice of requiring prospective jurors to make an affirmative request for private questioning so "the trial judge can ensure that there is in fact a valid basis for a belief that disclosure infringes a significant interest in privacy.")

The Chicago Tribune objects to both positions, arguing that there is no basis for closure or for concealing jurors' identities. At least at this time, the court agrees. The presumption of openness in criminal trials may be overcome "only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise*, 464 U.S. at 510. *See also United States v. Peters*, 754 F.2d 753, 760 (7th Cir. 1985). Ryan concedes that closure is not warranted in this case solely because it has generated extensive pretrial publicity. (Ryan Closure Mem., at 4 (citing *ABC, Inc. v. Stewart*, 360 F.3d 90, 102 (2d Cir. 2004)) ("The mere fact that [a] suit has been the subject of intense media coverage is not . . . sufficient to justify closure. To hold otherwise would render the First Amendment right of access meaningless; the very demand for openness would paradoxically defeat its availability.") Nor is the court persuaded that closure is appropriate based on Ryan's conjecture that jurors may feel uncomfortable answering questions truthfully. "[T]he entire voir dire relies on honest and candid

---

[3]     The Government's Consolidated Response to Defendant Ryan's Motions Regarding Trial Issues is cited as "Gov't Ryan Resp., at __."

3

answers to questions of court and counsel," and the court sees no reason to presume dishonesty here. *Peters*, 754 F.2d at 762.

Ryan characterizes the media attention as "extraordinarily hostile" and urges that the media's presence "will have a chilling effect on prospective jurors while they are answering questions on sensitive issues that could be embarrassing or stigmatizing." (Ryan Closure Reply, at 4[4] (citing *United States v. King*, 140 F.3d 76, 82 (2d Cir. 1998).) In *King*, the district court closed voir dire to the media because prospective jurors were going to be questioned regarding their racial attitudes towards the "extremely controversial" defendant, African-American boxing promoter Don King. *Id.* at 79-80. King had been the subject of undeniably hostile media coverage, including an HBO program suggesting he might be a "Villain" or a "Devil," and inflammatory newspaper headlines such as "Move over John Gotti, there's a new 'Teflon Don,'" comparing King to the convicted head of a major crime family who had won earlier acquittals. *Id.* The Second Circuit affirmed the district court's decision, finding that the judge had thoroughly analyzed the matter and had reasonably concluded that closure of voir dire was the proper approach:

> In light of the widespread and largely negative publicity concerning King and the racial tensions heightened by some aspects of that publicity, he [the judge] was entitled to conduct individual juror questioning in the absence of the press.

*Id.* at 82.

Unlike *King*, this case does not involve any "racially charged" issues, nor has the pretrial publicity been so widespread and negative as to raise concerns about juror candor. Media attention to this case arguably waned since the court granted Ryan's request to delay the trial by six months to accommodate his attorney's schedule. More recently, Mr. Ryan himself gave a well-publicized interview to a local television network. Whatever attention flowed from that interview, Ryan could not have expected it would be negative.

---

[4]     Ryan's Reply in Support of his Motion for Limited Closure of Voir Dire is cited as "Ryan Closure Reply, at ___."

The court is satisfied that any chilling effect occasioned by the media presence may be remedied by allowing prospective jurors to be questioned in private upon their own request. *See Press-Enterprise*, 464 U.S. at 512. As for anonymity, there has been no showing of any threats, jury tampering, or "other evils affecting the administration of justice" that justify withholding jurors' identities from the media. *In re Globe Newspaper Co.*, 920 F.2d 88, 97 (1st Cir. 1990). *See also* 28 U.S.C. § 1863(b)(7) (allowing jury lists to be anonymous when "the interests of justice so require.") Ryan's motion for limited closure of voir dire is therefore denied. The court expects to conduct voir dire questioning of potential jurors individually in a smaller (presumably less intimidating) courtroom with the media present. The court will, however, instruct the press not to disclose the jurors' identities until the end of trial; in the court's experience, this is any event the media's standard practice.

### B. Ryan's Motion for an Order Directing the Government to Sentence Cooperating Witnesses

Ryan next seeks an order requiring the government to proceed with the sentencing of some six individuals expected to testify in this case: Andrea Coutretsis, Alan Drazek, Scott R. Fawell,[5] Richard Juliano, Arthur "Ron" Swanson, and Donald Udstuen. Ryan claims that the government is holding a "sword" over each witness's head "to motivate him in his testimony." (Ryan Sentence Reply, at 1.)[6] Specifically, Ryan believes that "[t]he only explanation for the failure to sentence is that the government best exerts pressure in the presentence period when it can use the enticement of a motion for downward departure as ready leverage." (Ryan Sentence Mem., at 6.)[7] As the

---

[5] Fawell was sentenced to 78 months in prison following his March 2003 conviction for acts relating to his work in the SOS office. Fawell still awaits sentencing, however, on charges related to his role as Chief Executive Officer of MPEA, to which he has pleaded guilty.

[6] Ryan's Reply in Support of his Motion for an Order Directing the Government to Proceed with Sentencing of Cooperating Witnesses is cited as "Ryan Sentence Reply, at __."

[7] Ryan's Motion for an Order Directing the Government to Proceed with Sentencing (continued...)

government notes, however, there is nothing unusual about delaying a cooperating witness's sentencing until after he or she testifies at trial. Indeed, Judge Holderman raised, *sua sponte*, the issue of delaying the sentencing of Coutretsis until after the trial in this case so that he could assess "the value that was provided by Ms. Coutretsis in her actions that are the subject of the motion [for downward sentencing departures]." (Ex. A to Gov't Ryan Resp., at 2.) This court has had the unpleasant experience of having imposed a lenient sentence on a defendant from whom the government expected cooperation but who ultimately reneged; because sentence had already been imposed, this defendant obtained a reward he did not earn. *See United States v. George*, No. 00 CR 589, 2002 WL 1727334, *2 (N.D. Ill. July 24, 2002), *aff'd* 363 F.3d 666, 670 (7th Cir. 2004). *See also United States v. Reed*, 227 F.3d 763, 766 (7th Cir. 2000) (noting that a principal witness at the defendant's first trial, which ended in a mistrial, refused to testify at a second trial because he had already been sentenced under his plea agreement).

To be sure, a cooperating witness "often has a greater interest in lying in favor of the prosecution rather than against it, especially if he is still awaiting his own trial or sentencing." *Washington v. Texas*, 388 U.S. 14, 22-23 (1967). The witness's potential bias or motive to lie, however, may be fully explored on cross-examination. *See, e.g., United States v. Nelson*, 39 F.3d 705, 709 (7th Cir. 1994) (through cross-examination, "the jury was made well aware of the witness' bargain and was able to evaluate its impact on the witness' credibility.") The court finds no basis for Ryan's assertion that the government has engaged in "inappropriate and legally unsupported manipulation of the sentencing process," particularly where the trial itself was delayed for several months at Ryan's request. (Ryan Sentence Reply, at 3.) Nor is the court concerned that defense cross-examination will be insufficient to protect Ryan's rights in this case. Ryan's motion for an order directing the government to sentence cooperating witnesses is denied.

---

[7](...continued)
of Cooperating Witnesses is cited as "Ryan Sentence Mem., at __."

6

### C. Ryan's Motion to Bar Admission of "Other Acts" Evidence

Ryan seeks to bar admission of certain "other acts" evidence relating to: (1) the state's lease of a warehouse in Pana, Illinois for use by the Illinois Department of Corrections; and (2) the state's contract with Comguard, a company owned in part by Ryan's brother. The government has not yet submitted a response to this motion and the court therefore reserves ruling at this time.

### D. Motion to Bar the Jury from Taking the Indictment into the Jury Room

Ryan and Warner both ask that the jury not be permitted to review the indictment or take it into the jury room during deliberations. Both Defendants object that the indictment is a one-sided and prejudicial recitation of the government's summary of evidence it intends to introduce at trial. (Ryan Indict. Mem. ¶ 3; Warner Omnibus Mem., at 14.)[8] As such, Defendants argue, the document is "tantamount to having the prosecution re-present closing argument on each and every pattern act and count of the indictment after jury deliberations have begun." (Warner Omnibus Mem., at 14.) In Defendants' view, the parties can draft jury instructions to adequately apprise the jury of the issues it will need to decide. (Ryan Indict. Mem. ¶ 15 (citing *United States v. Palmeri*, 630 F.2d 192, 202 (3d Cir. 1980) ("We think special interrogatories were properly employed to decrease the likelihood of juror confusion and to aid the jury in concentrating on each specific defendant, and the charges against him, rather than incriminating one potentially innocent defendant solely on the basis of his association with the others.")) Defendants insist that this approach has the added benefit of "avoid[ing] the risk that the jury will view facts or allegations unsupported by evidence at trial." (*Id.* ¶ 17; Warner Omnibus Mem., at 16.)

The government argues that in complex cases such as this, courts favor providing a copy of the indictment to the jury to serve as a framework of the charges on which they must decide guilt

---

[8]     Ryan's Motion to Bar the Jury from Reviewing or Taking the Government's Indictment into the Jury Room is cited as "Ryan Indict. Mem. ¶ __." Warner's Omnibus Motion in Limine is cited as "Warner Omnibus Mem., at __."

or innocence. (Gov't Ryan Resp., at 10 (citing *United States v. Scott*, 37 F.3d 1564, 1577 (10th Cir. 1994) ("[c]onsidering the number of overt acts charged and the number of defendants, it seems entirely appropriate that the court not only read the indictment to the jury but allowed the jury to have a copy during its deliberations.")) To the extent the indictment includes allegations not supported by the evidence at trial, the remedy is to redact those portions. (Gov't Ryan Resp., at 10.) Any additional prejudice, the government claims, may be resolved by instructing the jury that the allegations in the indictment are not evidence. (*Id.* at 11-12.) *Cf. United States v. Garcia*, 562 F.2d 411, 417 (7th Cir. 1977) (recognizing that "[t]o the degree an uninstructed jury considers the [indictment], there is a real possibility that a charge leveled by a grand jury composed of its peers will weigh in the petit jury's balance on the side of guilt.")

The court agrees with the government that this complex case involves too many counts (22) to withhold the indictment from the jury in its entirety. That said, the court appreciates Defendants' concerns that the indictment is inflammatory and prejudicial in its present form. Accordingly, the government is directed to prepare redacted version of the indictment that simply sets forth the charges in this case for review by defense counsel. Defendants insist that it is "wishful thinking" to suppose that three sets of lawyers will be able to agree on appropriate language. (Warner Reply, at 12; Ryan Indict. Reply, at 5.)[9] The court is confident, however, that counsel in this case will reach a reasonable agreement on this issue, and is prepared to enter rulings, to the extent the parties are unable to agree.

## II.    Warner's Motions

In addition to his motion to exclude the indictment from the jury during deliberations discussed above, Warner also seeks to bar any references to insider trading; to bar references to

---

[9]    Defendant Warner's Reply to Government Response to Defendant's Motions in Limine is cited as "Warner Reply, at __." Ryan's Reply in Support of his Motion to Bar the Jury from Reviewing or Taking the Indictment into the Jury Room is cited as "Ryan Indict. Reply, at __."

awards of low digit license plates absent evidence of a government quid pro quo; and to bifurcate evidence and/or to sever his trial from that of Defendant Ryan.

## A.    Warner's Motion to Bar References to Insider Trading

In 1996, the Secretary of State's Office (the "SOS Office") began an initiative to switch to a "digital licensing" system such that all State of Illinois automobile and truck drivers' licenses would be created and maintained through digital technology. (Indictment, Count 2 ¶ 47.) The indictment alleges that Warner obtained "material non-public information" that the SOS Office planned to award the digital licensing contract to Viisage Technologies. (*Id.* Count 2 ¶ 52.) Armed with that information, Warner allegedly purchased Viisage stock and advised another SOS Office employee to do the same. (*Id.*) Warner contends that the stock purchase allegations improperly intimate that he committed the uncharged crimes of securities fraud and insider trading. (Warner Omnibus Mem., at 2; Gov't Warner Resp., at 3 (conceding that Warner is not charged with either violation).)[10] *See Manning v. Buchan,* 357 F. Supp. 2d 1036, 1050 (N.D. Ill. 2004) (excluding evidence of uncharged crimes where there was a "distinct danger" that the jury "would unfairly disregard its obligations and find against [the defendant] on the issue of liability based on improper grounds.") He also objects that the government's *Santiago* proffer omits the fact that "Warner's trading activities do[] not correspond with key events for Viisage in terms of obtaining business from the Illinois Secretary of State." (*Id.* at 3.)

The government views Warner's argument as an improper motion to strike paragraph 52 of the indictment. The government also claims that Warner's stock purchase is probative of both (1) the nature and extent of Warner's access to, and participatory status in, Ryan's public office; and (2) Warner's confidence in his ability to influence the award of SOS contracts. (Gov't Warner Resp., at 3.) In the government's view, the fact that Warner purchased Viisage stock before

---

[10]    The Government's Consolidated Response to Defendant Warner's Motions in Limine is cited as "Gov't Warner Resp., at ___."

9

Viisage was awarded the contract demonstrates that he had improper influence in the award of contracts and significant access to Ryan. (*Id.* at 3-4.) Warner disagrees, arguing that "[t]he most the evidence will show is that over the course of an almost 2 year period before and after the award of the Illinois contract to Viisage, Mr. Warner had confidence in the company as reflected in his purchase of company stock." (Warner Reply, at 4.)

The fact that Warner bought stock is not, in and of itself, evidence of Warner's influence in the SOS Office or his access to Ryan and may serve to prejudice the jury. For that reason, the court is inclined to exclude the information, but will reserve a final ruling on that matter until trial. Such evidence would be admitted, if at all, only to establish Warner's knowledge and control of contract placement.

## B.    Warner's Motion to Bar References to Awards of Low Digit Plates

Warner next argues that it is prejudicial and irrelevant for the government to offer evidence regarding every low digit license plate Warner ever obtained for a friend or associate absent evidence that the recipient provided something of value to Ryan. (Warner Omnibus Mem., at 7.) Warner is concerned that though there is nothing inherently improper about requesting and obtaining such plates, "[p]eople may not like the idea that people with connections to government can properly obtain perks such as low digit plates for themselves and for their associates." (*Id.* at 7-8.) Warner thus argues that the government should only be able to present evidence of "a quid pro quo between a low digit plate issued and campaign contribution received by Ryan." (*Id.* at 8.)

The government responds that it does not intend to prove that Warner distributed all of the plates he received from Ryan in return for contributions for the Citizens for Ryan campaign. Rather, the government intends to show that Warner "*procured* the plates from Ryan based on his unique, unprecedented access to Ryan." (Gov't Warner Resp., at 5 (emphasis in original).) In that regard, the government notes that Warner received more plates than any other individual, and that

10

Ryan allowed Warner to maintain a "cash kitty" at the SOS Office which could be used to pay the plate fee in advance. (Id. at 6.)

The court agrees that the government need not produce evidence regarding every single low digit license plate Warner ever obtained, and doubts that this is the government's intent. (See Gov't Null. Reply, at 5 (describing low digit plates as "a topic which takes up a very small portion of the indictment and will likely take up a proportionately small part of the government's case at trial.").)[11] The government may point to Warner's receipt of a high number of plates, as well as his "cash kitty" at the SOS Office, as evidence of his access to Ryan. The government is also free to offer evidence that Warner used the plates as political awards or favors. As for other matters relating to low digit plates, the court will reserve ruling to the time of trial.

### C.    Warner's Motion to Bifurcate Evidence and/or Sever

In his final motion, Warner asks for bifurcation of evidence relating to the nine counts charged against Ryan alone or, in the alternative, for a severance. Invoking his speedy trial rights, Warner first raised the issue of severance in January 2004 after counsel for the newly-indicted Ryan indicated that Ryan would not be prepared to proceed to trial on February 23, 2004, the date set when Warner was the only Defendant. United States v. Warner, No. 02 CR 506, 2004 WL 144125, at *1 (N.D. Ill. Jan. 16, 2004). The court denied Warner's demand for trial or for severance and, "[w]ith grave reluctance," set a very long trial date to March 2005. Id. at *5.

Warner next moved for a severance in February 2004, arguing that there is an insufficient relationship between the counts against Ryan alone and those in which both Defendants are named. Warner, 2004 WL 1794476, at *23. Counts Six and Ten assert mail fraud charges involving state contracts of a nature similar to those in which Warner was allegedly involved. The

---

[11]     The Government's Reply to Defendant Ryan's Response to the Government's Motion in Limine Seeking to Exclude Evidence and Argument Relating to Certain Matters Designed to Elicit Jury Nullification is cited as "Gov't Null. Reply, at ___."

court found that though Warner has no alleged involvement in those contract awards, they are "similar enough to matters in which he was allegedly involved that joinder is proper." *Id.* at *24. The court was satisfied that any prejudice to Warner could be addressed by way of an appropriate instruction to the jury. *Id.*

The remaining seven counts (Eleven, Twelve, Thirteen, Nineteen, Twenty, Twenty-One, and Twenty-Two) involve charges of false statements and tax violations asserted against Ryan alone. The court offered the following observations:

> There might well be no abuse of discretion in denying joinder [sic] in these circumstances, particularly if the evidence on these seven counts is relatively brief. If it is not, the court believes prejudice to Warner could be eliminated if the government were directed to present evidence on these charges only after evidence on all other counts has been presented to the jury. Alternatively, the court will consider bifurcating the evidence on these counts from the remainder of the indictment, with these counts to be tried to the same jury only after they have returned a verdict on the counts that relate to Warner and Ryan jointly, and to the South Holland lease and Grayville prison counts (Counts Six and Ten).[12]

*Id.*

By January 2005, Warner's position with respect to his speedy trial rights had changed dramatically; indeed, he joined Ryan's motion to continue the trial to September 2005. (Minute Order of 1/21/05, Doc. No. 231.) Warner now claims that bifurcation of evidence presented to the jury is necessary to prevent prejudice occasioned by the joinder of claims that do not involve him. Warner begins by asking that the court bifurcate Counts Six and Ten due to "the danger that jurors may draw improper inferences about Mr. Warner's conduct based on allegations that in no way involve him." (Warner Omnibus Mem., at 11.) As noted, this court earlier declined to sever these

---

[12]    The indictment alleges that in 1997, Ryan contacted "Associate 2" and proposed that the SOS Office lease a commercial building located in South Holland, Illinois which was owned by an entity controlled by Associate 2. In return, Ryan and Scott Fawell allegedly received free lodging benefits from Associate 2. *Warner*, 2004 WL 1794476, at *8. The indictment further alleges that in February 2001, Ryan selected the town of Grayville, Illinois as the site of a new maximum security prison. Prior to the formal announcement, however, "Associate 1" lobbied for the selection of Grayville in exchange for $50,000 in lobbying fees. *Id.*

counts on the grounds that they are sufficiently similar to those involving Warner. *Warner*, 2004 WL 1794476, at *24. Warner claims that this "superficial similarity . . . compounds rather than eliminates the risk of prejudice to Mr. Warner from improper joinder." (Warner Omnibus Mem., at 10-11.)

In support of this assertion, Warner cites *United States v. Coleman*, 22 F.3d 126 (7th Cir. 1994), in which the defendant sought to overturn his gun convictions on the basis of misjoinder of offenses under FED. R. CRIM. P. 8(a). *Id.* at 128. The defendant was convicted of four counts of being a felon in possession of a firearm, premised on four separate incidents. The first two were "essentially unconnected" but there was "slightly more than mere temporal proximity linking the [last two] events." *Id.* The court noted, in *dicta*, that it reviews FED. R. CRIM. P. 14 severance decisions for an abuse of discretion, in recognition of the fact that district courts are peculiarly qualified to determine whether joinder will prejudice a party, and not because the court generally disapproves of severance when required in the interests of justice.[13] *Id.* at 134. In that regard, the court commented:

> Indeed, when offenses are joined because of their "same or similar character," the risk of unnecessary unfairness infiltrating the joint trial is elevated. Unlike instances of joinder of offenses based on the same or closely connected acts or transactions, "[t]here is no comparable saving of trial time when offenses that are related only by being of the same type are joined, since the offenses are usually proven by different bodies of evidence [and], when totally unrelated, similar offenses are joined, defendant faces a 'considerable risk' of prejudice." 8 Moore's Federal Practice ¶ 8.05 [4] (citations omitted). In such cases, the district courts should be especially watchful for possible jury confusion, illegitimate cumulation of evidence or other sources of prejudice not worth the reduced efficiency gains of a joint trial.

---

[13]     Rule 14(a) provides:

If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

*Id.* Notwithstanding this observation, the court upheld the joinder of the four felon-in-possession counts under Rule 8(a). The court noted that the four counts all had identical elements and involved virtually identical contested issues – i.e., constructive possession. *Id.* at 134-35. In addition, the evidence as to each was "short and simple," and there was no reason to believe the jury would disregard the court's instruction to consider each count separately. *Id.* at 135.

In addition to seeking bifurcation of Counts Six and Ten along with Counts Eleven, Twelve, Thirteen, Nineteen, Twenty, Twenty-One, and Twenty-Two, Warner also urges the court to impanel a second jury to consider the allegations involving Warner as compared to those involving Ryan alone. In Warner's view, jurors "will be left with a generalized belief and impression, based on numerous individual pieces of testimony and documentary evidence," and there is no guarantee that the jury will consider the Ryan-related allegations separate from the Warner-related ones. (Warner Omnibus Mem., at 12.) Ryan agrees that it is not possible for him to present a meaningful defense merely by segregating the evidence. He notes, for example, that witnesses on the tax charges may be called to testify on other matters as well. He also argues that "one cannot expect a single jury to impartially render successive verdicts on charges involving the same defendant." (Ryan Bifurcate Resp., at 2.)[14] According to Ryan, "[t]he only solution fair to all parties – consistent with each defendant's constitutional right to a fair trial – is to sever the tax, false statement, Grayville prison and South Holland counts and hold those charges over for a separate trial before a different jury." (*Id.* at 3) (noting the method employed by Judge Grady in *United States v. Spano*, No. 01 CR 248.)

The government insists that the bifurcation option proposed by Defendants is "completely unnecessary" and unworkable. (Gov't Warner Resp., at 10.) The government argues that joinder of both Defendants is appropriate under FED. R. CRIM. P. 8(b) because they are alleged to have

---

[14]     Ryan's Response to Warner's Motion on Bifurcating Evidence is cited as "Ryan Bifurcate Resp., at ___."

14

participated in "the same series of acts or transactions, constituting an offense or offenses." Thus, severance is controlled by FED. R. CRIM. P. 14., which "does not require severance even if prejudice is shown; rather, it leaves the tailoring of relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538 (1993). Of primary significance, the government says, is that Warner and Ryan are charged as co-conspirators such that "evidence of the existence and scope of the conspiracy and the fraud scheme, even those items of evidence that bear most directly on Ryan, is admissible against Warner, as well." (Gov't Warner Resp., at 14 (citing ).)

As for the tax counts, the government contends that it intends to call only one IRS revenue agent; several accountants; and a number of witnesses who will testify to the receipt and use of Citizens for Ryan funds by Ryan and his family members. (*Id.* at 15.) The government argues that, "[c]ompared to the large amount of witnesses and evidence that will be presented on the acts and transactions of the conspiracy and fraud scheme," which involve both Warner and Ryan, the evidence relating exclusively to the tax counts will be "relatively brief." (*Id.* at 15-16.) In the government's view, any prejudice to Warner relating to the tax counts can be cured through limiting instructions. *See, e.g., Zafiro*, 506 U.S. at 539 ("less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice"); *United States v. Pulido*, 69 F.3d 192, 208 (7th Cir. 1995) (limiting instructions are "an adequate safeguard against the risk of prejudice in the form of jury confusion, evidentiary spillover and cumulation of evidence") (internal quotations omitted).

With respect to Ryan's alleged false statements to the FBI, the South Holland lease, and the Grayville prison situation, the government believes that each incident is admissible against Warner as evidence in furtherance of the mail fraud scheme.

> The rule is well-settled that when two or more persons have conspired or
> confederated together to commit a criminal offense, everything said or done by one

15

of them, during the existence of the conspiracy or confederation, and in furtherance of the common design, may be admitted in evidence against the others.

(*Id.* at 16 (quoting *Beckwith v. United States*, 367 F.2d 458, 459 (10th Cir. 1966).) Given that the evidence of these transactions is admissible against Warner, there can be no prejudice to him by joining Counts Six, Ten, Eleven, Twelve, or Thirteen. (*Id.* at 16-17.)

That leaves the matter of the South Holland lease and the Grayville prison. At this time, the court sees no basis for bifurcating the evidence relating to those matters. As noted in the earlier decision, the two counts at issue are "similar enough to matters in which [Warner] was allegedly involved that joinder is proper"; i.e., each of the acts and transactions was allegedly performed in furtherance of the overarching mail fraud scheme involving both Warner and Ryan. *Warner*, 2004 WL 1794476, at *24. As for Ryan's concerns of prejudice, the court remains satisfied that a limiting instruction to the jury will suffice.

With respect to Ryan's alleged false statements and tax violations, the court agrees that bifurcation may be appropriate if the evidence relating to these claims is expected to last more than a few days. In that regard, the government has indicated only that evidence relating to the tax fraud counts will be "relatively brief." It is not clear, however, exactly what constitutes a "relatively brief" amount of evidence in a case expected to last some four months. Nor is the court clear, given the great difficulty of scheduling this single trial, precisely when it is that Ryan proposes a second trial would take place. Thus, the court will reserve ruling on this issue pending clarification from the government as to the amount of evidence it intends to introduce on the false statement and tax counts.[15]

III.     **Government's Motions**

---

[15]     The court also reserves ruling on Warner's renewed motion for a severance, addressed below in connection with Warner's response to the government's Santiago proffer.

The government has submitted two motions in limine: one for an order excluding evidence and argument designed to elicit jury nullification, and one for an order excluding evidence and argument relating to Ryan's decisions concerning the death penalty. The court considers each in turn.

## A.    Motion to Exclude Evidence and Argument Designed to Elicit Jury Nullification

The government first seeks to exclude evidence designed to elicit jury nullification. It is generally improper for defendants to suggest that the jury should acquit them even if the government has met its burden of proof. *See, e.g., United States v. Perez,* 86 F.3d 735, 736 (7th Cir. 1996) ("An unreasonable jury verdict, although unreviewable if it is an acquittal, is lawless, and the defendant has no right to invite the jury to act lawlessly. Jury nullification is a fact, because the government cannot appeal an acquittal; it is not a right, either of the jury or of the defendant.") In this case, the government objects to the admission of evidence and argument regarding (1) similar "political" acts engaged in by other public officials; (2) the investigative activities and conduct relating to the "Operation Safe Road" investigation; and (3) the penalties faced by the defendants upon conviction.

### 1.    Similar Political Acts

At a press conference following the return of the Second Superseding Indictment, Ryan's counsel stated that the government had "cobbled together a number of unrelated, innocent acts" which are "nothing more than the fabric of what goes on in Illinois politics and Illinois government." (Gov't Null. Mem., at 3 (citing Video Ex. 1 to Gov't D.P. Mem.)[16] The government argues that evidence regarding the acts or conduct of other Illinois politicians is not relevant to determining

---

[16]    The Government's Motion in Limine for an Order Excluding Evidence and Argument Relating to Certain Matters Designed to Elicit Jury Nullification is cited as "Gov't Null. Mem., at __." The Government's Motion in Limine for an Order Excluding Evidence and Argument Regarding Defendant Ryan's Decisions Concerning the Death Penalty is cited as "Gov't D.P. Mem., at __."

whether these defendants violated the law. Indeed, this court rejected a similar theory of defense pursued in the trial of Scott Fawell. Specifically, Fawell's counsel sought to elicit testimony from a former SOS Office employee that it had been the practice during the administration of former Governor James Thompson to maintain a master or "priority" list similar to the one maintained during Ryan's tenure as Secretary of State. The court found the information irrelevant, observing:

> Whether or not some other administration kept a list identical to, different from or sort of like the master list in this case doesn't inform in any fashion whether anything anybody did with the list was proper or improper. It really doesn't. It may be that everybody does this and every single person has violated RICO. It may be that everybody does it and nobody has violated RICO.
>
> The mere fact that somebody else does it doesn't help a whole lot with anybody determining whether what happened in this case violated the law.

(Tr. of 2/12/03, at 3743-44.)

Defendants argue that evidence regarding the practices of other politicians is relevant to establishing a lack of specific intent. Ryan, for example, notes that as Secretary of State, he "inherited an office with long-established, deeply entrenched practices," and that he "did not believe his predecessors were committing crimes in office, and he believed that the established practices of prior administrations were consistent with the law." (Ryan Null. Resp., at 3-4.)[17] In Ryan's view, in a political corruption case such as this, he should be entitled to discuss how politics works in Illinois: "Far from constituting a ploy for jury nullification, these events and their corresponding impact on Ryan are crucial to Ryan's defense in this case· Ryan acted in good faith, with no specific intent to commit the alleged crimes." (Id. at 5-6.) Warner similarly insists that "[i]nformation about prevalent political practice may, in some instances, have bearing on the issue

---

[17]     Ryan's Response to Government's Motion in Limine Regarding Evidence and Argument to Elicit Jury Nullification is cited as "Ryan Null. Resp., at __."

18

of intent," and asks the court to reserve ruling on this issue to the time of trial. (Warner Null. Resp., at 2.)[18]

The admissibility of evidence regarding the practices of other politicians is best decided as the issue arises at trial. The court can envision circumstances in which such evidence may be relevant to the issue of intent or to providing an innocent explanation for seemingly unlawful conduct. *See, e.g., United States v. Shields*, No. 90 CR 1044, 1991 WL 236492, at *2 (N.D. Ill. Aug. 13, 1991) ("[I]t may be proper for Shields to offer evidence of a customary practice which would cast an innocent explanation upon conduct which the government portrays as evidence of wrongdoing.") For that reason, the court declines to exclude such evidence on a motion in limine. That said, the court cautions Defendants that any attempt to establish their innocence based on the fact that other administrations acted in the same manner would be improper – arguably akin to a driver pulled over for speeding who, unaware of the lawful limit, concludes that 80 m.p.h. is acceptable because she observed other drivers passing her. As noted in the *Fawell* case, "[t]he mere fact that somebody else does it doesn't help a whole lot with anybody determining whether what happened in this case violated the law." (Gov't Null. Mem., at 4 (quoting Tr. of 2/12/03, at 3744.)

## 2. Operation Safe Road

The government next asks that Defendants be barred from criticizing the underlying investigation in this case, known as "Operation Safe Road." Operation Safe Road began in the spring of 1998 as a grand jury investigation into the alleged sale of commercial drivers licenses for bribes in the SOS Office. The investigation charged and ultimately proved widespread bribery within numerous SOS Office facilities, ultimately leading to a series of charges against high-ranking SOS officials, Citizens for Ryan operatives, and Ryan associates. (Gov't Null. Mem., at 7-9.)

---

[18]     Defendant Warner's Response to Government's Motion in Limine is cited as "Warner Null. Resp., at __."

19

Throughout its six-and-a-half year history, Operation Safe Road has charged 79 individuals. Of those, 68 have been convicted and 11 cases remain pending. (*Id.* at 9.)

In statements to the public and to this court, Ryan and his counsel have criticized the length, focus, and cost of Operation Safe Road which, the government says, improperly intimates that Ryan should be acquitted due to government misconduct. *See, e.g., United States v. Griffin*, 867 F. Supp. 1347, 1347 (N.D. Ill. 1994) (noting a "tendency in criminal cases to try some person other than the defendant and some issue other than his guilt" by, for example, arguing "the prosecution was not nice or could have done it better and so the jury ought to acquit, whether or not guilt has been proved beyond reasonable doubt.") The government seeks to exclude any such suggestions. (Gov't Null. Mem., at 6 (citing *Shields*, 1991 WL 236492, at *3 (granting motion in limine to "bar defendants from presenting evidence or making arguments to the jury suggesting that they should be acquitted because the government engaged in misconduct in the course of its investigation.").) The government does not, however, object to Defendants arguing that the investigation did not develop any evidence against them.

Ryan claims that he has a right to question the length and focus of the government's investigation in order to explore the credibility of government witnesses and expose how "the government put Ryan's friends and associates into the grand jury (some on multiple occasions) *for years*, attempting to gather evidence against Ryan." (Ryan Null Resp., at 8-9 (emphasis in original).) In Ryan's view, "[t]he enormous pressure that the government has brought to bear *for years* on these cooperating witnesses *must* be probed on cross-examination." (*Id.* at 10 (emphasis in original).)

Defendants are certainly entitled to inquire as to a witness's possible motivation to testify in order to test his or her credibility. *Nelson*, 39 F.3d at 708 ("The exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.") (internal quotations omitted). Defendants are also entitled to argue that,

20

notwithstanding a thorough investigation, the government failed to produce any evidence against them. In addition, Ryan is free to argue that he would not voluntarily meet with federal investigators and intentionally mislead them knowing that he was the target of a federal investigation. (Ryan Null. Resp., at 10.) All this does not, however, open the door to testimony aimed at criticizing the prosecution's methodology in conducting its investigation. (See, e.g., Ryan Null. Resp., at 9, 10 (describing Ryan as a "predetermined target" and stating that the government "pursued George Ryan with the manpower and resources typically reserved for investigating a terrorist cell or a mob boss.") In that regard, the court presumes that Defendants are unlikely to pursue such an avenue of defense to the extent it could open the door to government evidence regarding its overwhelming conviction rate thus far, as well as Ryan's own early praise of the investigation.

### 3. Penalties Upon Conviction

It is well-established that "the practice of informing juries about the sentencing consequences of their verdicts is strongly disfavored." United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997). The Supreme Court has explained that unless a jury has a role in sentencing, such as in capital sentencing proceedings, jurors should not consider a defendant's potential sentence during deliberations. Shannon v. United States, 512 U.S. 573, 579 (1994) (absent a sentencing function, a jury must "reach its verdict without regard to what sentence might be imposed . . . . Information about the consequences of a verdict are irrelevant to a jury's task.")

Ryan argues that the penalties associated with the charged crimes are relevant because "they lend credence to Ryan's innocent explanations for the conduct alleged and otherwise bolster his claims of good faith, and they are also relevant to evaluating the credibility of the cooperating witnesses – many of whom are charged with crimes similar to Ryan – who by virtue of their plea deals with the government face substantially lighter penalties." (Ryan Null. Resp., at 12.)

According to Ryan, the penalties show that he had everything to lose and nothing to gain by misleading federal investigators. (*Id.* at 13.)

As the government notes, Ryan may test the credibility of government witnesses by exploring the benefits they received in exchange for their testimony, including lighter sentences. (Gov't Null. Reply, at 10.) He may not, however, discuss the potential penalties faced by these Defendants, which are irrelevant to a jury's determination of their guilt or innocence. *United States v. Andreas*, 23 F. Supp. 2d 835 (N.D. Ill. 1998) ("As a matter of law, potential penalties are irrelevant as to guilt and thus are inadmissible.") The court doubts there is any evidence that Ryan, who has pleaded not guilty, at any point consciously considered the potential sentence he faced and weighed it against the benefits of testifying falsely. The motion to exclude evidence relating to the penalties faced by Defendants upon conviction is therefore granted.

**B.    Motion to Exclude Evidence and Argument Regarding the Death Penalty**

In March 2000, Ryan empaneled a commission of citizens accomplished in the field of criminal justice to review Illinois' capital punishment system. (Gov't D.P. Mem., at 5.) Ryan received the commission's report in April 2002. In October 2002, as part of Ryan's death penalty review process, the Illinois Prisoner Review Board held hearings in more than 140 cases involving defendants awaiting execution. On January 11, 2003, two days before leaving office, Ryan ordered a blanket commutation of the sentences of all death row inmates. (*Id.* at 6.)

At a press conference on December 23, 2003, Ryan's counsel made a statement that, in the government's estimation, suggested that a jury will acquit Ryan in part based on his decisions relating to the death penalty. Specifically, counsel stated:

> When the jury sees [Ryan] testify in his own trial, and they realize that he is a man who spent 40 years in public service, in which most recently he has become renowned as the only governor in the history of our nation that has taken it upon himself to fix a broken-down death penalty system that was putting innocent men and women on death row, which are acts of courage which I believe speak the true

22

mark of this man. And when the jury comes to know him at trial, they will agree to that.

(Gov't D.P. Mem., at 4 (citing Video conference of 12/23/03, Ex. 1 to Gov't D.P. Mem.) Ryan's counsel further suggested that Ryan's decisions reveal a character inconsistent with wrongdoing:

> [What Ryan] did in connection with his death penalty activities . . . does speak the mark of who he is and the courage that he's all about. And I don't think that's consistent with someone who would engage in the type of systematic wrongdoing that the government has alleged. And so I believe the jury will come to learn about that. And that those acts of courage will speak of who he is, and I hope the jury, because of who he is combined with the evidence, will realize that a man of his character would not commit these crimes.

(*Id.*)

The government argues that evidence of Ryan's decisions regarding the death penalty is barred by FED. R. EVID. 404(b) and 403. The government also contends that Ryan should be required to provide notice of any "good acts" evidence he intends to introduce at trial. Ryan denies that he should be required to provide notice of "good acts" evidence, and insists that evidence regarding the death penalty is admissible under both FED. R. EVID. 404(b) and 404(a)(1).

### 1. Rule 404

The government argues that Ryan's efforts to "fix a broken-down death penalty system" constitute inadmissible character evidence under Rule 404(b), which provides that "[e]vidence of other . . . acts is not admissible to prove the character of a person in order to show action in conformity therewith." In support of this argument, the government cites *United States v. Hill*, 40 F.3d 164 (7th Cir. 1994), in which a former postal employee was convicted of stealing and cashing a United States treasury check from the mail in violation of 18 U.S.C. §§ 510(a) and 1709. *Id.* at 165. Prior to trial, the district court excluded evidence that while the defendant was under investigation for stealing the treasury check, she properly handled three "test letters" that postal inspectors had placed in her mail tray. *Id.* at 168. The district court found that the fact that defendant did not steal the three "test letters" in October 1991 was irrelevant to her intent to

23

embezzle a check in May 1991. The court noted that by the time the defendant was "tested," she knew that she was under investigation and, thus, "had good reason not to steal the 'test letters.'" *Id.* The court also noted that the "test letters" evidence would have been cumulative because the defendant was allowed to elicit testimony that she had previously turned in misdirected checks, credit cards, or food stamps. *Id.*

The Seventh Circuit upheld the district court's ruling, agreeing that the defendant's knowledge that she was under investigation rendered her non-theft of the "test letters" "only tangentially relevant to whether she intended to embezzle the checks five months earlier." *Id.* at 169. In the court's view, "[t]his evidence was nothing more than classic [inadmissible] character evidence offered to prove that [the defendant] had a good character and acted in conformity therewith." *Id.* at 168. Even assuming the "test letters" evidence was probative of the defendant's claimed character trait for "law-abidingness," the Seventh Circuit stated, the proper method of proof would be by reputation or opinion testimony under Rule 405(a). *Id.* at 169. *See also United States v. Beverly*, 913 F.2d 337, 353 (7th Cir. 1990) (district court properly excluded testimony from witness who claimed that the defendant, on trial for drug trafficking, successfully counseled him to seek help for cocaine addiction and that he never saw the defendant buy or sell cocaine outside of Somons Lounge; such testimony revealed nothing about the defendant's activities inside the lounge, and "proof of an assertion by a negative is inadmissible.")

The government argues that like the defendant in *Hill*, Ryan knew that he was under federal investigation when he decided to commute the sentences of death row defendants. Thus, it does not speak to whether Ryan engaged in the fraudulent activities alleged in the indictment. (Gov't D.P. Mem., at 10.) The government also notes that Ryan's death penalty decisions "did not have anything to do with his practices in awarding public contracts and leases, using state resources in political campaigns, or reporting his income on tax returns, which are the subjects of the charges in this case." (*Id.* at 9-10.)

24

Ryan concedes that his "actual determinations or stands on [various] political questions are beside the point." (Ryan D.P. Resp., at 5.)[19] He insists, instead, that his accomplishments in public life, such as the death penalty, will be offered to show "what Ryan *did* in office: how Ryan spent his time, what issues had his attention, what was important to him, and who were his key policy advisors." (Ryan D.P. Resp., at 5) (emphasis in original). How, Ryan posits, "could Matt Bettenhausen or Bob Newtson – both Ryan's aides named on the government's witness list – be precluded from testifying about how they worked with Ryan night and day on important public policy issues like airport expansion, economic development and capital justice reform?" (*Id.* at 6.) On this issue, the government agrees that Ryan may offer, in a non-inflammatory manner, evidence of a "list of policy issues that comprised his workload as a public official to try to show that he was detached from episodes charged in the indictment." (Gov't D.P. Reply, at 2.)

Though he concedes that the merits of his decisions in public office are irrelevant, Ryan nevertheless urges that such decisions are admissible under Rule 404(b) as acts that are intrinsic to the events charged in the indictment. (Ryan D.P. Resp., at 7 (citing *United States v. Ojomo*, 332 F.3d 485, 488-489 (7th Cir. 2003) (evidence that defendant charged with mail fraud relating to certain individuals had "other means of identification (identifiers) of other persons" was not extrinsic where they "complete[ed] the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they [were] so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of the charged crime.").) The court sees no meaningful relationship between Ryan's decisions regarding the death penalty and the offense conduct with which he is charged here. Ryan's legitimate official acts, such as commuting death sentences, are not alleged to be part of the scheme or conspiracy to commit fraud. Nor are such decisions admissible extrinsic evidence of intent. (Ryan D.P. Resp.,

---

[19]     Ryan's Response to the Government's Motion in Limine Regarding Ryan's Decisions Concerning the Death Penalty is cited as "Ryan D.P. Resp., at __."

25

at 8; FED. R. EVID. 404(b).) Ryan's decision to clear death row in early 2003 is simply not probative of his intent with respect to acts that took place months or years earlier. *See Hill*, 40 F.3d at 169.

Ryan next argues that his "personal integrity and dedication to promoting the common good through public service" constitutes a character trait admissible under Rule 401(a)(1). (Ryan D.P. Resp., at 14.) As Ryan sees it, his possession of these traits "has the tendency to make it less probable that he committed the acts alleged by the government, and therefore they should be considered by the jury." (*Id.*) Once again, the court disagrees. The fact that Ryan considered issues such as the death penalty while in office is relevant to showing where he directed his attention, but his positions on those issues is not relevant. As the government notes, "[i]t simply does not logically follow that decisions made by a public official on policy matters make him more or less honest, truthful, or law-abiding." (Gov't D.P. Reply, at 11.) Ryan was no doubt conducting day-to-day, legitimate activities in his positions as Secretary of State and Governor of Illinois, but may also have engaged in fraudulent activities. Even if Ryan's policy decisions were somehow relevant under Rule 404(a)(1), moreover, the proper form of that evidence would be through reputation or opinion testimony. FED. R. EVID. 405(a) ("In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion.")

In sum, Ryan may not present evidence regarding the merits of his policy decisions in office, including the death penalty. The government's motion to exclude such evidence is granted with the limitations set forth above.

### 2. Good Acts Evidence

The government argues that Ryan should be required to provide advance notice of "good acts" he intends to introduce at trial, even if such evidence does not constitute alibi or expert evidence. *See* FED. R. CRIM. P. 12.1, 16(b)(1)(C). The government claims that such disclosure is

necessary "in order to avoid surprise and possible error" in allowing the introduction of evidence of "doubtful relevance and admissibility." (Gov't D.P. Mem., at 17-18.) Ryan correctly notes, however, that there is no authority supporting the government's request. The court will address any such issues as they arise at trial.

## IV. *Santiago* Proffer

The government filed its *Santiago* proffer on December 23, 2004, setting forth its evidence in support of the admission of various co-conspirator statements. *See* FED. R. EVID. 801(d)(2)(E). In addition to the above motions, Defendants have both raised several objections to the *Santiago* proffer, discussed below.

### A. Ryan's Response

Ryan asks that the government be required to file a supplemental proffer detailing "the specific statements that it will seek to admit against Ryan." (Ryan Sant. Mem., at 2.)[20] Ryan claims that the current proffer is one-sided and inflammatory, and fails to satisfy the rules of evidence. Ryan also raises several specific evidentiary objections.

#### 1. Pretrial Publicity

Ryan first contends that the *Santiago* proffer must be stricken as a "sensational, one-sided advocacy piece that generated highly prejudicial pretrial publicity." (*Id.* at 3.) Ryan claims that the proffer includes "inadmissible and questionable evidence" designed to "generate intense and widespread media attention and otherwise rouse public opinion." (*Id.* at 3, 4.) For example, in May 1992, Ryan allegedly spoke with Assistant States Attorney and Public Integrity Chief Patrick Quinn in the presence of then-Cook County State's Attorney, Jack O'Malley, just prior to a press conference announcing charges in a state corruption case relating to the fraudulent issuance of driver's licenses through the SOS Office's Midlothian facility. When Quinn and O'Malley discussed

---

[20] Ryan's Response to the Santiago Proffer is cited as "Ryan Sant. Resp., at __."

potential additional SOS-related prosecutions with Ryan, Ryan purportedly responded: "Fuck you, Jack, these are my guys." (Proffer, at 87.) Ryan insists that there is no evidentiary basis for such a statement: neither O'Malley nor Quinn is on the government's witness list; neither individual is alleged to be a co-conspirator; and the proffer acknowledges that O'Malley does not recall the statement. (Ryan Sant. Mem., at 4.)

Ryan further objects that a number of statements in the proffer are only admissible through the testimony of witnesses who are not on the government's witness list. The proffer mentions, for example, that in late 1992 or early 1993, Warner had a meeting with 3M representative Steve McQueen about the possibility of 3M's retaining Warner as a lobbyist to help the company obtain the SOS validation stickers contract. Warner allegedly told McQueen that, should 3M get the contract, Warner's fee would be $60,000 per year. (Proffer, at 27 n.15.) McQueen, however, is not on the government's witness list. Neither are John Koepke, Al Ronan, Thomas Benigno, Russell Nisivaco, or Pate Philip, all of whom are identified in the proffer as witnesses to statements made by Ryan or Warner. (Ryan Sant. Mem., at 5; Proffer, at 28, 29, 31, 49, 66, 90.)

The court is aware that the proffer received significant media attention when it was filed on December 23, 2004. The court does not, however, share Ryan's concern that the proffer has "poisoned the jury pool and undermined Ryan's constitutional right to confront witnesses and his right to a fair trial." (Ryan Sant. Mem., at 6.) At Ryan's (and later, Warner's) request, the March 2005 trial date in this case was moved to September 2005. As a result, by the time of trial, more than eight months will have passed since the filing of the *Santiago* proffer. In that time, the media attention devoted to this case has waned as the press has focused on other, more current stories. The court is confident that both Defendants will receive a fair trial, and the media attention to date is not a sufficient basis for striking the government's *Santiago* proffer.

### 2. Evidentiary Rules

28

A hearsay statement made by a co-conspirator may be admitted into evidence against a defendant if the government proves that: (1) a conspiracy existed; (2) both the declarant and the defendant were members of the conspiracy; and (3) the statements were made in the course and in furtherance of the conspiracy. *United States v. Ladd*, 218 F.3d 701, 704 (7th Cir. 2000). Ryan objects that the proffer fails to establish the existence of a conspiracy, much less that Ryan agreed to join any such conspiracy.

Ryan argues that there is "no common thread or interrelationship among many of the transactions recounted in the proffer." (Ryan Sant. Mem., at 8.) In Ryan's view, the proffer merely "suggests multiple schemes involving various individuals – none of whom included Ryan." (*Id.* at 10.) Several of these discrete schemes, Ryan says, related to activities at the SOS Office: (1) contracts and leases involving Warner, Udstuen, and Alan Drazek; (2) low-digit license plates issued to Warner and others by the SOS Office; and (3) fundraising and political activity by Fawell, Richard Juliano, and others. Other schemes related to activities in the Governor's office: (1) the location of the Grayville prison site; and (2) lobbying contracts for Arthur "Ron" Swanson related to Wisconsin Energy and the Metropolitan Pier and Exposition Authority. (*Id.*)

This court rejected just such an argument in denying Ryan's motion to dismiss the indictment, noting that the government had sufficiently alleged a single conspiracy because certain members were involved in multiple schemes that started when Ryan was Secretary of State and continued after he became Governor. *Warner*, 2004 WL 1794476, at *18. Ryan argues that overlapping membership does not establish a single conspiracy for purposes of admitting co-conspirator statements:

> [T]he government must establish that the statements it seeks to admit were in the course and in furtherance of the particular joint venture it has established. It would not suffice in the instant case for the government simply to show that the appellants were all on a joint venture when they were arrested in Springfield. Even if Korenak and Joseph were indeed on a joint venture with Coe, statements Coe made regarding a *different* joint venture with *other* parties for *another* purpose would still be inadmissible. The government must prove by a preponderance of independent

> evidence that the appellants were on a joint venture and that the statements sought to be admitted were in the course and in furtherance of *that* joint venture.

(Ryan Sant. Mem., at 11 (quoting *United States v. Coe*, 718 F.2d 830, 835-36 (7th Cir. 1983) (emphasis in original).)

Ryan further argues that there is no evidence that he was a member of the conspiracy. In Ryan's view, the mere fact that he was associated with the offices of Governor and Secretary of State is not sufficient to establish his involvement in a conspiracy. (Ryan Sant. Mem., at 9-10.) Ryan contends, for example, that the government has not identified any statements showing that he agreed to participate in a conspiracy. (*Id.* at 13.) He further argues:

> That Warner may have received state contracts during Ryan's tenure as Secretary of State (e.g., Proffer at 15), or that Ryan instructed a state employee to return Warner's phone calls (*id.* at 26) is hardly evidence of a criminal conspiracy. Awarding contracts and managing employees is a legitimate–indeed vital–function of the Secretary of State's Office.

(*Id.* at 14.)

For reasons explained in its earlier opinion, the court remains satisfied that the government has alleged a single conspiracy in this case involving Ryan. Unlike the unrelated ventures mentioned in *Coe*, the schemes alleged here involve many of the same individuals all acting for a common purpose: using the resources of the State of Illinois for personal and financial benefit. The proffer also sufficiently alleges Ryan's participation in the conspiracy. The fact that Ryan engaged in legitimate activities to carry out the day-to-day functions of his political offices does not negate the government's showing that Ryan also used those offices for improper personal gain.

Nevertheless, the court does agree with Ryan that the government must identify which witnesses are alleged to be co-conspirators, and provide a representative sample of the statements about which they will testify. (Ryan Sant. Mem., at 14-16.) Reciting summaries of witnesses' 302 memoranda or grand jury testimony is not alone sufficient for purposes of Rule 801(d)(2)(E). The representative sample of statements also should include statements made "during the course and

in furtherance of the conspiracy." *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). *See also United States v. Doerr*, 886 F.2d 944, 951 (7th Cir. 1989) ("statements 'in furtherance' of a conspiracy can take many forms, including statements made to recruit potential coconspirators, statements seeking to control damage to an ongoing conspiracy, statements made to keep coconspirators advised as to the progress of the conspiracy, and statements made in an attempt to conceal the criminal objectives of the conspiracy.") With respect to statements involving persons not on the government's witness list, the court expects the government to explain the basis on which such statements are admissible. As for Ryan's concerns regarding the reliability of statements from cooperating co-conspirators, the court addressed the issue *supra* pp. 6.

### 3. Specific Objections

In addition to the general objections discussed above, Ryan also raises several specific objections to the government's proffer. First, Ryan argues that several statements lack foundation because the speakers have not been identified as co-conspirators, or because the government has not identified any actual "statements" at all. (Ryan Sant. Mem., at 21-22.) This concern should be resolved once the government identifies the co-conspirators and provides a representative sample of statements about which they will testify. Ryan next argues that several statements constitute hearsay within hearsay. By way of example, Ryan notes that the government seeks to admit out-of-court statements regarding Udstuen's "understanding" of Warner's statements (Proffer, at 17, 66); Fawell's "understanding" of Ryan's statements (*id.* at 14); O'Brien's understanding of Covert's statements (*id.* at 22); Cook's impressions and understandings recorded in a memo (*id.* at 41); and Quinn's reaction to Ryan's statement (*id.* at 87-88.) (Ryan Sant. Mem., at 22-23.) On this issue, the court will reserve ruling to the time of trial. There are many possible bases for admitting otherwise hearsay testimony depending on the facts and circumstances that arise at trial.

31

## B. Warner's Response

Warner objects to several aspects of the *Santiago* proffer and moves for a severance in that regard. Two of his arguments require a response from the government and the court will therefore reserve ruling on them at this time. First, Warner claims that he did not agree to or know about certain allegations relating to the South Holland lease; to gifts, payments, and benefits Arthur "Ron" Swanson gave to Ryan and his family in exchange for official action; to low digit license plates awarded to Robert Casey and Anthony DeSantis; to disbanding the Inspector General Department; or to diverting SOS Office resources for various election and reelection campaigns. (Warner Sant. Mem., at 4-7.)[21] In addition, Warner claims that he will be unfairly prejudiced by the admission of testimony regarding incidents in which he was not involved, including (1) the September 1998 document shredding incident; (2) the Fall 1999 destruction of SOS and Citizens for Ryan records; (3) Ryan's allegedly false and misleading statements to the FBI on January 5, 2000, October 16, 2000, and February 5, 2001; and (4) conversations between Udstuen and Drazek. (*Id.* at 8-11.) Both of these issues will be entered and continued pending a response from the government.

Warner's remaining objections are similar to ones raised by Ryan. Specifically, Warner objects to statements made by declarants who were not members of the alleged conspiracy, and to the lack of any statements relating to gifts, payments, and benefits allegedly provided by Warner to Ryan and Ryan's family and staff. (*Id.* at 11-23.) The government is ordered to identify the alleged co-conspirators in this case and to provide a representative sample of statements about

---

[21] Defendant Warner's Response to Santiago Proffer and Motion to Preclude the Admission of Hearsay and Motion for Severance is cited as "Warner Sant. Mem., at __."

which they will testify. The court is confident that the government's disclosure will remedy most, if not all, of these objections.

## CONCLUSION

For the reasons stated, Ryan's motions for limited closure of voir dire (Docket No. 247) and for an order directing the government to sentence cooperating witnesses (Docket No. 246) are denied. Ryan's motion to bar "other acts" evidence (Docket No. 262) is entered and continued pending a response from the government. The motions filed by Ryan and Warner seeking to bar the jurors from reviewing the indictment during deliberations (Docket Nos. 245, 250 Part IV) are granted in part and denied in part. Warner's motions to bar references to insider trading, to bar references to awards of low digit plates, and to bifurcate evidence (Docket No. 250 Parts I, II, and III) are granted in part and denied in part.

The government's motions to exclude evidence designed to elicit jury nullification (Docket No. 248) is granted in part and denied in part. The government's motion to exclude evidence regarding Ryan's decisions on the death penalty (Docket No. 249) is granted as set forth in this opinion. Defendants' responses to the government's *Santiago* proffer (Docket Nos. 260, 261) are granted in part, overruled in part, and entered and continued pending a response from the government.

ENTER:

Dated: August 17, 2005

REBECCA R. PALLMEYER
United States District Judge

33