## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 02 CR 506 |
| | ) |
| LAWRENCE E. WARNER and | ) Judge Rebecca R. Pallmeyer |
| GEORGE H. RYAN, SR., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Defendants Lawrence E. Warner and George H. Ryan, Sr. are charged in a 22-count second superseding indictment with (1) conspiring to use the resources of the State of Illinois for their personal and financial benefit and for the benefit of Ryan's family members, the Citizens For Ryan political campaign committee, and various political and business associates, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(d); and (2) devising a scheme to defraud the people of the State of Illinois and the State of Illinois of money, property, and the right to the honest services of Ryan and other State of Illinois officials, in violation of the federal mail fraud statute, 18 U.S.C. §§ 1341, 1346. Ryan is separately charged with making materially false, fictitious, and fraudulent statements during several FBI interviews in violation of 18 U.S.C. § 1001(a)(2); obstructing and endeavoring to obstruct the Internal Revenue Service in the correct reporting of income and the collection of taxes in violation of 26 U.S.C. § 7212(a); and filing materially false tax returns in violation of 26 U.S.C. § 7206(1). Warner is separately charged with extortion under the Hobbs Act, 18 U.S.C. § 1951; money laundering, 18 U.S.C. § 1956 (a)(1)(B)(i); and structuring currency transactions in violation of 31 U.S.C. §§ 5324(a)(3) and (d)(2).

On August 17, 2005, the court addressed several of the parties' motions in limine, as well as Defendants' objections to the government's *Santiago* proffer. Ryan and the government have since filed some 17 additional motions in limine. In today's ruling, the court grants certain of these

motions and denies others. With respect to still others, the court has reviewed the parties' arguments but is unable to make final rulings without some evidentiary context. To the extent that any motion not disposed of here was filed with an eye toward opening statements, the court directs counsel to make no mention of the challenged evidence during openings.

## DISCUSSION[1]

## I.    Motions in Limine Related to Mail Fraud Allegations

The indictment charges Ryan with performing and authorizing official acts for the financial benefit of himself, Warner, and others. The indictment further charges Ryan with receiving personal and financial benefits from Warner and others knowing that such benefits were intended to influence and reward him in the performance of official acts. (Indictment, Count 2 ¶¶ 4, 5.) The parties appear to agree on the general standard for establishing "honest services" mail fraud: "Misuse of office (more broadly, misuse of position) for private gain is the line that separates run of the mill violations of state-law fiduciary duty . . . from federal crime." *United States v. Bloom*, 149 F.3d 649, 655 (7th Cir. 1998). *See also United States v. Hausmann*, 345 F.3d 952 (7th Cir. 2003) ("under the intangible-rights theory of federal mail or wire fraud liability, a valid indictment need only allege, and a finder of fact need only believe, that a defendant used the interstate mails or wire communications system in furtherance of a scheme to misuse his fiduciary relationship for gain at the expense of the party to whom the fiduciary duty was owed.") *But see United States v. Panarella*, 277 F.3d 678, 694 (3d Cir.) ("[A] public official who conceals a financial interest in violation of state criminal law while taking discretionary action that the official knows will directly benefit that interest commits honest services fraud."), *cert denied*, 537 U.S. 819 (2002). The parties disagree, however, as to the evidence required to support an honest services mail fraud conviction.

---

[1]      The factual allegations are set forth in detail in this court's August 11, 2004 Memorandum Opinion and Order and will not be repeated here. *United States v. Warner*, No. 02 CR 506, 2004 WL 1794476, at *1-12 (N.D. Ill. Aug. 11, 2004). This opinion assumes the reader's familiarity with that earlier decision.

2

Ryan urges that "corrupt dollars" in return for contracts or other "quid pro quo" evidence is a prerequisite to a finding of guilt on the "honest services" mail fraud charges. In Ryan's view, "[i]f a public official misuses his office but in no way personally benefits from that abuse of position, there is no mail fraud." (Ryan Fraud Resp., at 1 (emphasis in original).)[2] Ryan cites *United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997), where the First Circuit reversed the conviction of an IRS official who made numerous unauthorized searches of confidential taxpayer records but did not otherwise use or profit from the confidential data. *Id.* at 1071-72. The court concluded that the defendant's conviction for honest services mail fraud could not stand because he "did not receive, nor can it be found that he intended to receive, any tangible benefit" from his wrongdoing. *Id.* at 1077. As the government notes, however, the Seventh Circuit recently confirmed that so long as there is some gain from the wrongdoing, the government need not establish that the defendant himself received it: "A participant in a scheme to defraud is guilty even if he is an altruist and all the benefits of the fraud accrue to other participants." *United States v. Spano*, __ F.3d __, 2005 WL 2100391, at *1 (7th Cir. 2005). The court explained that "[i]n the case of a successful scheme, the public is deprived of its servants' honest services no matter who receives the proceeds." *Id.* at *2 (affirming mail fraud conviction of town's mayor who received, as a result of the fraud, only reimbursement of medical expenses–reimbursement to which she was entitled as a matter of preexisting practice). Thus, the government may establish a claim for honest services mail fraud without demonstrating that Ryan himself received any personal benefit.

To avoid this result, Ryan maintains that such quid pro quo evidence is nonetheless required where mail fraud charges are predicated on the receipt of campaign contributions. In support of this argument, Ryan cites *United States v. Martin*, 195 F.3d 961 (7th Cir. 1999), in which a contractor with the Department of Public Aid "fairly showered" a Department employee (Ronald

---

2      Ryan's Corrected Response to United States' Motion for Pretrial Ruling on Jury Instructions Related to Mail Fraud Allegations is cited as "Ryan Fraud Resp., at __."

3

Lowder) with gifts in exchange for contract work and "other favoritism." *Id.* at 963-64. Lowder was charged with mail fraud, in part based on his recommendation that the Department adopt a contract that was very favorable to the contractor but that "would cost the Department hundreds of thousands of dollars for no additional benefit." *Id.* at 964. In affirming Lowder's conviction, the Seventh Circuit found "evidence from which [the jury] could infer with the requisite certitude that the government employee had been bribed . . . to engage in acts within the scope of his employment to assist the person who had bribed him to commit those acts, and as a result deprived his employer of the latter's right to the employee's honest services." *Id.* at 966.

In Ryan's view, this language confirms that in any "honest services" mail fraud prosecution, the prosecution must identify a specific government benefit given in exchange for the gift or contribution to a charged public official. Ryan notes that the Supreme Court reached a similar conclusion with respect to the Hobbs Act, finding that an elected official may commit extortion in the course of financing an election campaign if political contributions are "induced by the use of force, violence, or fear," or "if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *McCormick v. United States*, 500 U.S. 257, 273 (1991). *Compare Evans v. United States*, 504 U.S. 255, 268 (1992) (affirming conviction of a county board member who accepted a cash gift from a real estate developer seeking rezoning, the Court observed, "the offense [of extortion] is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts . . . . [T]he Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.")

Ryan emphasizes that "the quid pro quo requirement should apply with equal force to an intangible rights prosecution based on campaign contributions for the same reason it applies to bribery and extortion: without such a requirement, any campaign contribution might constitute a violation of federal criminal law." (Ryan Fraud Resp., at 11.) *Cf. United States v. Allen*, 10 F.3d

4

405, 411 (7th Cir. 1993) ("[A]ccepting a campaign contribution does not equal taking a bribe unless the payment is made in exchange for an explicit promise to perform or not perform an official act. Vague expectations of some future benefit should not be sufficient to make a payment a bribe.") Ryan contends, further, that there is no evidence of a quid pro quo here, and that the issuance of low-digit license plates is not sufficient: "Evidence suggesting that Ryan authorized the issuance of low-digit plates to individuals, *some* of whom were campaign contributors, is no more relevant than evidence that Ryan, for example, championed legislation in favor of educational spending, assuming that pro-education groups supported Ryan's campaign . . . ." (Ryan Quid Pro Quo Mem., at 9[3] (emphasis in original).)

For reasons not obvious to the court, low-digit license plates appear to have a cachet in Illinois. In the court's view, awarding such items of value to specific campaign contributors is not comparable to generally supporting legislation favored by them. The government, in any event, has stressed that evidence concerning low-digit plates will comprise only a small portion of its case, and has not argued that a jury may infer mail fraud solely because legislative decisions end up benefiting campaign donors. As the *Martin* court cautioned:

> It is easy to see how the next step in "intangible rights" thinking would be to argue that an elected official who receives a donation to his campaign fund and afterward fails to prevent the donor from obtaining favorable treatment in dealing with the government is defrauding the government of its right to his loyalty. . . . We are speaking not of a case in which there is either an explicit quid pro quo or even some positive act by the official to assist the donor, but merely of a case in which it can be proved (though this will often be impossible to do with the certitude required in a criminal case) that the official, had he not received the donation, would have taken positive steps to try to prevent the donor from receiving favorable treatment. . . . But the courts have made clear that criminal inducement of a legislator to take particular action cannot be inferred from the legislator's acceptance of campaign contributions from interests urging the action . . . or from his acceptance of lobbyists' hospitality.

195 F.3d at 965-66.

---

[3]    Ryan's Motion in Limine to Preclude Evidence Related to Official Actions Benefiting Campaign Contributors Absent a Quid Pro Quo and to Strike the Allegations Regarding the Same from the Indictment is cited as "Ryan Quid Pro Quo Mem., at ___."

5

Nor does the government dispute that Ryan is free to argue lack of specific quid pro quo evidence with respect to mail fraud allegations that are not tied to the receipt of campaign contributions (for example, allegations that state contracts were awarded in exchange for gifts or favors). The court recognizes, as well, that where there is no evidence of a benefit in exchange for the gift or contribution, there may be no intent to defraud. *See, e.g., United States v. Sawyer*, 85 F.3d 713, 741 (1st Cir. 1996) ("The practice of using hospitality, including lavish hospitality, to cultivate business or political relationships is longstanding and pervasive . . . . It may well be that all such hospitality should be flatly prohibited by law, but if [the defendant] had this limited intent–to cultivate friendship rather than to influence an official act–the federal statutes here involved [bribery and honest services fraud] would not be violated.") The court concludes, however, that the law does not require the government to identify a specific contract, perquisite, or other government benefit given in exchange for each particular gift, so long as the evidence establishes that Ryan accepted gifts or other consideration with the understanding that he would perform or not perform acts in his official capacity in return. *See, e.g. McCormick*, 500 U.S. at 268-69 (limiting its holding to extortion involving campaign contributions); *United States v. Urban*, 404 F.3d 754, (3d Cir. 2005) (to establish extortion "under color of official right" in a non-campaign-contribution case, "the government need not prove that the public official induced the making of the payment, or that the public official acted or refrained from acting as a result of payments made."); *United States v. Antico*, 275 F.3d 245, 257-58 (3d Cir. 2001) (finding an "implicit quid pro quo" sufficient to establish extortion outside the campaign contribution context), *cert denied*, 537 U.S. 821 (2002); *United States v. Brumley*, 116 F.3d 728, 735 (5th Cir. 1997) (upholding the defendant's conviction for "deprivation of honest services" mail fraud where the government had stipulated that it would not try to prove that the defendant had caused others a monetary loss, but rather had taken the position that "the quid pro quo was intangible, such as favoritism or other types of intangible matters.")

The government's motion for pretrial ruling on jury instructions related to mail fraud allegations, and Ryan's motion in limine to preclude evidence related to official actions benefiting campaign contributions absent a quid pro quo are both granted in part and denied in part. Of the 12 mail fraud jury instructions proposed by the government, Ryan specifically objects to five (Nos. 6, 7, 9, 11, and 12) on the grounds that they "would permit a defendant to be convicted of honest [services] mail fraud predicated on the receipt of a gift in the absence of an explicit quid pro quo" and "in the absence of proof of personal gain." (Ryan Mail Fraud Resp., at 15, 16.) As noted, the government need not prove personal gain to establish honest services mail fraud. Nor must the government prove an explicit quid pro quo outside the campaign contribution context.

Aside from these observations, the court reserves ruling on the government's proposed mail fraud jury instructions.

## II. Motions to Exclude Opinion and Belief Testimony

The government moves to preclude Defendants from questioning lay witnesses as to whether they believed their actions or those of Defendants were illegal, improper, wrong, or in violation of any federal statutes. In a related motion, Ryan seeks to exclude testimony by witnesses regarding their speculation as to the beliefs, knowledge, motivations, or understanding of others. The court reviews these issues below, but reserves ruling on both motions.

### A. Lay Witness Opinions

FED. R. EVID. 701 provides that the opinions of non-expert witnesses are admissible if they are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." The government argues that lay witnesses do not have the legal training required to express opinions as to the legality or

illegality of conduct, and that such opinions would thus not be helpful to the trier of fact. (Gov't Witness Mem., at 3-4[4] (citing *United States v. Baskes*, 649 F.2d 471 (7th Cir. 1980).)

In *Baskes*, the Seventh Circuit held that a trial court acted within its discretion in prohibiting defense counsel from cross-examining a key prosecution witness as to whether he "unlawfully, knowingly and willfully conspire[d] to defraud the United States." 649 F.2d at 478.

> When, as here, a witness is asked whether the conduct in issue was "unlawful" or "wilful" or whether the defendants "conspired," terms that demand an understanding of the nature and scope of the criminal law, the trial court may properly conclude that any response would not be helpful to the trier of fact.

*Id.* The court explained that "[t]he witness, unfamiliar with the contours of the criminal law, may feel that the legal standard is either higher or lower than it really is. If either event is true the jury may accord too much weight to such a legal conclusion." *Id.*

In *United States v. Fawell*, this court itself recognized that there are limits to a lay witness's ability to offer opinions as to whether his or her conduct violated the law:

> I do think it's okay to ask questions like: Did you always meet your job responsibilities? Did you during an eight-hour day always devote . . . eight hours of work to your Secretary of State responsibilities? Did you, to the extent that you had political work to do, do that at a time that you understood your regular work was done? or words to that effect. I think all that would be completely admissible and not objectionable. I think questions that ask in effect: Were you breaking the law? or Were you, in fact, defrauding the State of Illinois does call – do call for legal conclusions.

(Tr. of 2/4/03, at 2321, Ex. A to Gov't Witness Mem.) The court further noted:

> . . . . [I]t's fine to ask [the witness] Did you get all your work done? Did you intend to get all your work done? Did you ever put aside your responsibilities for the Secretary of State and instead spend time that you should otherwise have been working on political activity? That sets up this argument . . . without asking them questions like: Did you intend to commit mail fraud? or Did you commit mail fraud? Did you defraud anybody?

(*Id.* at 2326-27.)

---

[4]     The government's Motion in Limine to Preclude Opinion Testimony by Lay Witnesses Regarding Charged Conduct is cited as "Gov't Witness Mem., at __."

8

Defendants characterize the government's motion as an attempt to unfairly shield the government's "star" witness, Scott Fawell, from effective cross-examination. (Ryan Witness Resp., at 1; Warner Witness Resp., at 1.)[5] Defendants argue that "[a]ppreciation for the wrongfulness of alleged conduct can go a long way to establishing the requisite intent in a specific intent crime." (Id. at 2.) They also note the importance of cross-examination in testing a witness's credibility. Indeed, prior to his conviction, Fawell entered a plea of "not guilty" and asserted that he and Ryan were both innocent of any wrongdoing; now, Fawell is being called as a principal witness against Ryan and Warner. (Warner Witness Resp., at 2.)

The court agrees that general assertions by a lay witness that he or she did or did not violate the law likely will not be helpful to the trier of fact. At the same time, a witness's beliefs in that regard may be probative of intent. (See, e.g., Tr. of 1/22/03 ("I think it's fair for the jury to consider, look, you knew what you were doing was wrong. You went on blithely doing it.").) In addition, Defendants are entitled to cross-examine witnesses regarding their prior inconsistent statements and other issues relating to credibility. In particular, Defendants are entitled to probe Fawell regarding any inconsistent statements he may have made about the propriety of his own and others' conduct. Further resolution of this issue requires some evidentiary context and is appropriately left for trial.

## B.    Beliefs of Others

FED. R. EVID. 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Ryan identifies 17 opinions or statements he believes rest on speculation as opposed to any personal knowledge. For example, Ryan objects to anticipated testimony from Donald Udstuen that

---

[5]    Ryan's Response to the Government's Motion in Limine to Preclude Opinion Testimony by Lay Witnesses Regarding Charged Conduct is cited as "Ryan Witness Resp., at __." Warner's Response to Government's Motion in Limine to Preclude Opinion Testimony by Lay Witnesses Regarding Charged Conduct is cited as "Warner Witness Resp., at __."

9

Warner and Arthur "Ron" Swanson, a lobbyist for Wisconsin Energy, both told him that they would "take care" of Ryan. (Ryan Belief Mem., at 2.)[6] In addition, Ryan believes Scott Fawell will testify regarding his unfounded opinions on such matters as the propriety of the SOS Office decision to lease space at the Lincoln Towers office building in Springfield, Illinois; Ryan's role in including the "metallic security mark" specification in the SOS Office's bid for vehicle stickers; the SOS Office decision to move certain departments to 17 North State Street in Chicago, Illinois; distribution of low-digit license plates; Ryan's desire to keep friends "happy"; and other individuals' perceptions of Warner's role in Ryan's administration. (Id. at 3-4.)

Ryan acknowledges that personal knowledge can include inferences and opinions, but insists that the identified statements are "based not on the facts or on the witness's personal observation, but rather on the witness's *interpretation* of various ambiguous, cryptic statements made by another individual." (Id. at 7 (emphasis in original).) See also Visser v. Packer Eng'g Assocs., Inc., 924 F.2d 655, 659 (7th Cir. 1991) ("[T]he inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.") For its part, the government "does not quarrel with the proposition that rampant speculation is not admissible." (Gov't Belief Resp., at 1.)[7] The government urges, however, that the admissibility of particular statements and opinions is "a fact-driven question that rests on the facts and circumstances surrounding the opinion as measured by the standard of Rule 701." (Id. at 1-2.)

---

[6]     Ryan's Motion in Limine to Exclude Testimony Constituting Speculation as to the Alleged Beliefs, Knowledge, Motivations or Understanding of Others is cited as "Ryan Belief Mem., at ___."

[7]     The Government's Response to Defendant's Motion in Limine to Exclude Testimony Constituting Speculation as to the Alleged Beliefs, Knowledge, Motivations or Understanding of Others is cited as "Gov't Belief Resp., at ___."

The court agrees that the opinions of Udstuen, Fawell, Warner, and others may be admissible under certain circumstances. For example, where a participant in a conversation understands words or expressions that may be unclear to the jury, the participant may testify as to his or her understanding of the statements made by another participant. *See, e.g., United States v. Kozinski*, 16 F.3d 795, 809 (7th Cir. 1994) (trial court properly admitted statements by a participant in a conversation who "was testifying about his understanding of the thoughts that were being communicated to him.") Absent some context for the particular statements, the court declines to exclude them prior to trial and therefore reserves ruling on this issue.

## III.    Ryan's Motions

### A.    Motion to Bar Admission of "Other Acts" Evidence

Ryan seeks to preclude the government from presenting evidence relating to two state contracts during Ryan's tenure as governor: (1) the state's lease of a warehouse in Pana, Illinois for use by the Illinois Department of Corrections ("IDOC"); and (2) the state's contract with Comguard, a home detention monitoring company owned in part by Ryan's brother.  The government no longer intends to offer any evidence regarding the Pana warehouse and that portion of Ryan's motion is denied as moot. (Gov't Other Acts Resp., at 3.)[8]  The government has also decided not to offer evidence that shortly after Ryan became Governor, he allegedly asked IDOC Director Donald Snyder why Comguard was not receiving as much business as other more expensive vendors.  (*Id.* at 4.)

That leaves the government's evidence that when Ryan was Secretary of State, he directed SOS staff to contact the Illinois Comptroller's Office to arrange for expedited handling of Comguard payment vouchers by the State of Illinois. (*Santiago* Proffer, at 69.) Ryan argues that this evidence is extrinsic to, and not inextricably intertwined with, the allegations in the indictment, and is

---

[8]      The Government's Response to Defendant Ryan's Motion to Bar Admission of "Other Acts" Evidence is cited as "Gov't Other Acts Resp., at ___."

11

therefore inadmissible propensity evidence under FED. R. EVID. 404(b). Rule 404(b) generally prohibits district courts from admitting evidence concerning a defendant's other uncharged bad acts. *United States v. Thomas*, 321 F.3d 627, 633-34 (7th Cir. 2003). Evidence "concerning the chronological unfolding of events that led to an indictment, or other circumstances surrounding the crime, is not evidence of 'other acts' within the meaning of [Rule] 404(b)." *United States v. Ojomo*, 332 F.3d 485, 489 (7th Cir. 2003) (quoting *United States v. Ramirez*, 45 F.3d 1096, 1102 (7th Cir. 1995)). Acts satisfy this "inextricably intertwined" doctrine" if they "complete the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they are so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of, the charged crime." *Id.* (quoting *United States v. Senffner*, 280 F.3d 755, 764 (7th Cir. 2002)).

The government contends that Ryan's efforts to help expedite payments to Comguard directly relates to the allegation in the indictment that Ryan "supported [Comguard] in its efforts to obtain State of Illinois contracts for electronic monitoring of prisoners." (Indictment, Count 2 ¶ 5(F).) As Ryan notes, however, it is not clear that "arranging for the expedited handling of *payment* vouchers supports the allegation that Ryan helped Comguard *obtain* state contracts." (Ryan Other Acts Reply, at 3[9] (emphasis in original).) The government argues that the evidence is nonetheless inextricably intertwined with the allegations in the indictment because it shows "the extent to which Ryan was willing to use his governmental office to assist Comguard's cash flow." (Gov't Other Acts Resp., at 5.) Without the evidence, the government urges, "the jury would not have a complete picture of Ryan's concern and knowledge about Comguard's financial situation and they, therefore, would be lacking a key component in the evidence that shows that Warner's financial assistance to Comguard [in the form of $145,000 in loans] was a meaningful benefit to Ryan." (*Id.* at 6.)

---

[9]  Ryan's Reply in Support of his Motion to Bar Admission of "Other Acts" Evidence is cited as "Ryan Other Acts Reply, at __."

12

Ryan insists that evidence regarding expedited payment vouchers does nothing to fill a conceptual void in the allegations relating to Warner's loans to Comguard, or to Ryan's efforts to help Comguard obtain state contracts. (Ryan Other Acts Reply, at 3.) According to Ryan, the complete story of Warner's investment in Comguard "requires only two pieces of evidence – that Ryan was related to the owner of Comguard and that Warner invested in the company." (*Id.* at 4.) "Just as simple," Ryan says, "is the allegation that Ryan supported Comguard in obtaining state contracts." (*Id.*)

The court is dubious as to whether the Comguard voucher evidence is inextricably intertwined with the allegations in the indictment. Ryan's efforts to expedite voucher payments on behalf of Comguard do not require the conclusion that he knew of the company's financial situation, or of Warner's role in providing the company with financial assistance. For similar reasons, the court has doubts as to whether the Comguard voucher evidence is otherwise admissible under Rule 404(b) as proof of Ryan's knowledge or intent to defraud the State of Illinois. (Gov't Other Acts Resp., at 6-7.) Nevertheless, in the absence of some evidentiary context, the court is unable to conclude from Ryan's arguments that there are no circumstances under which the evidence may be admissible at trial. For this reason, except as stated here, the court reserves ruling on Ryan's motion to bar admission of "other acts" evidence.

## B.     Motion to Bar "Cash Method" of Proof

Ryan seeks to bar the government from presenting evidence of his cash generation and cash expenditures pursuant to the "cash method" of proving unreported income. The cash method of proof "compares cash expenditures with known cash sources" as follows:

[T]he method first requires that all cash expenditures be determined and added together. Then, taxable and nontaxable cash sources are added together. These sources would include any cash accumulated and on hand at the beginning of the tax period in question that the taxpayer spends during the tax period (often called a "cash hoard"). If cash expenditures exceed cash sources during the period in question, it is inferred that the excess amount is unreported income.

13

*United States v. Toushin*, 899 F.2d 617, 619-20 (7th Cir. 1990). To establish a "cash case," the government must show with "'reasonable certainty' (1) the defendant's opening net worth and cash on hand at the beginning of the period for which he was indicted and (2) defendant's expenditures during the period in question." *United States v. Hogan*, 886 F.2d 1497, 1509 (7th Cir. 1989) (quoting *United States v. Caswell*, 825 F.2d 1228 (8th Cir. 1987)).

Ryan argues that the government cannot establish either of these two requirements. He claims that the government's cash flow analysis does not account for all of his sources of cash, such as cash he received for campaign travel expenses from Citizens for Ryan; cash back from checks to grocery stores and other vendors; and cash from cashing third-party checks such as Social Security checks. (Ryan Cash Mem., at 9.)[10] Ryan also contends that the government has no "hard evidence or quantification of Ryan's actual cash expenditures" during his tenure as Secretary of State and Governor. (*Id.* at 10.)

The government insists that it will use the "specific item method," and not the cash method, to show that Ryan underreported his income. "That is, the government will present direct evidence that Ryan failed to report on his tax return specific items of income that were taxable to him, such as CFR funds that he converted for his personal use when he gave the funds to family members and friends as personal gifts." (Gov't Cash Resp., at 2.)[11] By way of example, the government notes that Ryan gave his son-in-law, Michael Fairman, who was having financial difficulties, a total of $55,000 in CFR funds. Ryan allegedly "caused these payments to be mischaracterized as compensation for campaign consulting work, even though Fairman never consulted on Ryan's campaign, or on any other campaign, in his life." (*Id.*)

---

[10]   Ryan's Motion in Limine to Bar the Government's Attempt to Introduce Evidence Relating to Ryan's Cash Generation and Expenditures Via the "Cash Method" of Proof is cited as "Ryan Cash Mem., at __."

[11]   The Government's Response to Defendant Ryan's Motion in Limine to Bar Evidence Relating to Ryan's Cash Generation is cited as "Gov't Cash Resp., at __."

14

The government contends the evidence at issue is admissible in spite of the fact that it will not pursue the "cash method" of proof. According to the government, Ryan's possession and use of cash is independently relevant to the racketeering conspiracy, fraud, and IRS obstruction claims. In *United States v. Kwitek*, 467 F.2d 1222 (7th Cir. 1972), for example, a bank robbery defendant argued that the trial court improperly admitted prejudicial and irrelevant evidence as to his possession of money after the robbery. *Id.* at 1225. The government presented testimony that, after the robbery, the defendant gave a nightclub dancer $70 to buy clothing for a trip to Las Vegas, paid cash for her airfare, and gave her some $200 in cash for gambling. Another dancer on the Las Vegas trip received a $50 tip from a co-defendant and testified that she saw a suitcase containing a firearm and stacks of $20 and $50 bills in one of the hotel rooms. *Id.* The Seventh Circuit found that the trial court acted within its discretion in admitting the evidence, stating that "[e]xpensive trips, gambling and other instances of free spending and high living may be pertinent in crimes involving a motive of enrichment. Proof of prior impecunity is not necessary." *Id.* at 1225.

The fact that there may be other legitimate sources for the cash, the government contends, goes to the weight, and not the admissibility, of the evidence. (Gov't Cash Resp., at 2 (citing *United States v. Hogan*.) The defendant in *Hogan*, an appointed state judge, was convicted of accepting bribes from lawyers who appeared in his courtroom; failing to report $20,000 in related income on his tax returns; and racketeering. 886 F.2d at 1500-01. In appealing his conviction, the defendant argued, among other things, that the trial court improperly admitted evidence regarding the $20,000 in underreported income for purposes of establishing the bribery charges. *Id.* at 1506. The Seventh Circuit found no error, noting that "evidence of wealth may be admissible to establish that a person engaged in a cash-intensive criminal enterprise, even if there is another explanation for the extra money." *Id.* at 1507. More recently in *United States v. Duran*, 407 F.3d 828 (7th Cir. 2005), the Seventh Circuit upheld a trial court's decision to allow testimony that the defendant's co-defendant was arrested with $20,000 in cash. *Id.* at 837. The court explained:

15

> Even assuming, as Mr. Duran argues, that there is a possibility that the cash was attributable to some activities of [the co-defendant] that were outside the conspiracy with Mr. Duran, we further have explained that the fact that one or both of the co-conspirators "were involved in other criminal activity that may have contributed to the amount of cash goes only to the weight, not the admissibility, of the evidence."

*Id.* at 837-38 (quoting *United States v. Davis*, 838 F.2d 909, 931 (7th Cir. 1988)).

The government argues that as in *Kwitek* and *Hogan*, Ryan's possession of cash figures prominently in the racketeering and fraud charges in this case. For example, Ryan allegedly "received from Harry Klein (to whom Ryan gave governmental benefits) annual free vacations at a posh Jamaican villa, which Ryan tried to hide through a sham paper trail." (Gov't Cash Resp., at 5.) Specifically, Ryan would write Klein a check for $1,000 or $2,000, depending on the length of the vacation, and Klein would give Ryan the same amount in cash. In addition, Ryan allegedly approved an arrangement whereby Warner would share the proceeds of some of his extortions with Donald Udstuen, a long-time Ryan advisor, with Warner "taking care of" Ryan in return. (*Id.*)

While Ryan was engaging in these activities, the government maintains, he "routinely carried wads of cash of considerable thickness and dispensed large amounts of cash (often hundreds of dollars at a time) . . . ." (*Id.* at 6.) Ryan purportedly "placed bets of several hundred dollars during his frequent visits to casinos; he made frequent cash gifts to his children and cash gifts to others; he gave generous tips to wait staff; [and] he made cash purchases." (*Id.*) Notably, however, Ryan and his wife "never once used an automated teller machine, and they withdrew cash from their bank accounts seven times for a total of about $6,700" between 1993 and 2002. (*Id.* at 7.) Co-conspirators Warner and Ron Swanson, in contrast, withdrew "hundreds of thousands of dollars of cash" from their accounts. (Gov't Cash Reply, at 2.)[12] In addition, Ryan reportedly did not carry around much cash prior to becoming Secretary of State and Governor, and was occasionally even short of cash. (*Id.* at 6.)

---

[12]     The Government's Sur-Reply to Defendant Ryan's Motion in Limine to Bar Evidence Relating to Ryan's Cash Generation is cited as "Gov't Cash Reply, at __."

16

Ryan first objects that the government "does not account for the possibility that Ryan's cash expenditures stemmed from the legitimate sources of income offered by Ryan." (Ryan Cash Reply, at 6.)[13] Ryan is correct that the government's evidence does not rule out innocent explanations, but as the *Hogan* court concluded, "evidence of wealth may be admissible to establish that a person engaged in a cash-intensive criminal enterprise, even if there is another explanation for the extra money." 886 F.2d at 1507. The fact that Ryan may have had other cash sources goes to the weight, as opposed to the admissibility, of the evidence. Ryan also argues that the government's wealth evidence is too speculative, consisting of nothing more than general assertions regarding "wads" of cash and "generous" tips. (Ryan Cash Reply, at 6.) The court agrees that possession of unspecified "wads" of cash and payment of "generous" tips, without more, is not sufficient to suggest that a person engaged in lucrative criminal activity. Nevertheless, evidence that Ryan generally began carrying large amounts of cash once he became Secretary of State and Governor may be probative of his involvement in a cash-intensive scheme to defraud, particularly in the absence of any evidence that he regularly utilized standard methods of withdrawing cash such as ATM machines or personal bank withdrawals.

Ryan next insists that evidence of wealth is relevant only where it "tend[s] to bolster direct evidence regarding the criminal enterprise itself." (*Id.* at 9 (citing *United States v. Duran*).) He notes that in *Duran*, for example, the government produced recorded telephone conversations, witness testimony, and physical evidence supporting the drug conspiracy charges. 407 F.3d at 832. The court did not cite these factors as a basis for admitting evidence that Duran's co-defendant was arrested with $20,000 in cash, however, and the court is not prepared to conclude that such circumstances are required as a foundation for admission of the cash evidence.

___

[13]     Ryan's Reply in Support of His Motion to Bar the Government's Attempt to Introduce Evidence Relating to Ryan's Cash Generation and Expenditures Via the "Cash Method" of Proof is cited as "Ryan Cash Reply, at ___."

Nor is the court moved by Ryan's demand for certain other foundation evidence. Specifically, he asserts that wealth evidence is only admissible "as long as other evidence, mainly that the wealth was not derived from legitimate sources, is presented to support the charge." (Ryan Cash Reply, at 7 (quoting United States v. Penny, 60 F.3d 1257, 1263 (7th Cir. 1995).) In Penny, the defendant was convicted of distributing and conspiring to distribute narcotics as part of a "broad-reaching drug distribution scheme." 60 F.3d at 1259. At the trial, the court admitted evidence of the defendant's unexplained wealth, including large cash payments to a housing contractor for extensive remodeling work and cash payments in the amount of $25,000 per year for automobile restoration and racing. Id. at 1259-60. On appeal, the defendant objected to the wealth evidence, arguing that it related to assets he had acquired prior to 1997, the date when he began distributing narcotics. Id. at 1263-64. The Seventh Circuit agreed that wealth evidence "must relate to wealth acquired during the period in which the narcotics trafficking occurred." Id. at 1263. The court found that this requirement was amply met by evidence that the defendant had purchased and sold drugs as early as 1984. Specifically, in 1983 and 1984, the defendant told a colleague and a cell mate that he made a great deal of money selling cocaine and heroin. Id. at 1264.

In this case, the government insists that it has evidence to support the fraud and racketeering charges notwithstanding Ryan's assertion that he obtained large sums of cash from legitimate sources. The court declines to preclude all wealth evidence; such evidence does support these charges to the extent it demonstrates Ryan's involvement in lucrative activities. In so ruling, the court recognizes that the government does not have a sufficient basis for utilizing the cash method of proving that Ryan underreported his income, and understands that it does not intend to do so. Ryan's motion to preclude the cash method of proving unreported income is granted in part and denied in part.

18

## C. Motion to Dismiss or Suppress

Asserting his attorney-client privilege, Ryan moves to dismiss the indictment or, in the alternative, to suppress the grand jury testimony of Roger Bickel, who was employed as General Counsel of the Secretary of State's Office during Ryan's tenure. Ryan concedes that the Seventh Circuit has expressly determined that these communications are not privileged. (Ryan Bickel Mem. ¶¶ 1, 5.) *See also In re Witness Before Special Grand Jury 2000-2,* 288 F.3d 289 (7th Cir. 2002) ("none of the conversations between Bickel and Ryan made in their official capacities as General Counsel and Secretary of State are privileged in the face of a federal grand jury subpoena.") Ryan nonetheless urges the court to disregard this ruling in favor of a recent, conflicting Second Circuit decision, *In re Grand Jury Investigation,* 399 F.3d 527 (2d Cir. 2005) (finding communications between a government attorney and a public official privileged even in the face of a grand jury investigation). The court is unwilling to reject binding precedent or otherwise revisit this issue. Ryan's motion is denied.

## D. Motion to Exclude Witnesses

The parties generally agree that potential witnesses should be excluded from the courtroom during the trial, with the exception of the government's case agent and expert or summary witnesses. FED. R. EVID. 615. The government requests that it be allowed two case agents rather than the customary one, characterizing both as persons whose presence is essential to the presentation of the government's case. *Id.* The court grants this request. In return, Ryan asks that his wife, Lura Lynn Ryan, and his six children be allowed to attend court proceedings even if they may be called as witnesses in this case. Defendant Warner joins the request and asks that his own wife of many years be permitted to remain in the courtroom. The government objects. Neither of the Defendants' wives appear on the government's witness list, but Defendants have not ruled out the possibility that they will be called in Defendants' own case.

Rule 615 requires that "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses . . . ." The court is sensitive to the fact that this is anticipated to be a lengthy trial and that Defendants, both of whom have been married for many years, would like the support of their wives and families. Nevertheless, the government has invoked Rule 615, which mandates the exclusion of potential witnesses. The court suspects that the scope of these witnesses' testimony will be limited and is willing to consider allowing them in the courtroom except during those portions of the proceedings that may bear on their testimony in the case. The court also urges the parties to craft stipulations that would render their testimony unnecessary. Absent such precautions, however, family members who may be called as witnesses will be excluded from the courtroom.

## E.    Miscellaneous Motions in Limine

Ryan seeks to bar the government from referring to a variety of additional matters during trial, including: (1) Winston & Strawn LLP and its current or former attorneys; (2) documents allegedly written and/or signed by Clyde Wilson; (3) evidence of the conviction of Citizens for Ryan; and (4) Edward Genson's prior representation of Scott Fawell. The government does not intend to refer to any of these matters in its opening statement, and has agreed to provide defense counsel with advance notice prior to presenting evidence on, or making references to, such issues during the trial. (Gov't Consolidated Response to Ryan's Motions in Limine, at 1-2.) These motions are therefore denied as moot or premature.

With respect to Ryan's remaining motions in limine—to preclude admission of or reference to a memorandum written by Honeywell Corporation lobbyist Robert E. Cook, and to preclude evidence related to the automobile accident that claimed the lives of six of Scott and Janet Willis's children—the government stated at a September 13, 2005 status hearing before this court that it does not intend to make reference to either of these matters in its opening statement, and would

lfile written responses before raising the issues during the trial. (Tr. 9/13/05, at 19-20.) The motions will be entered and continued at the government's request.

## IV. Government's Motion to Compel Reciprocal Discovery

During the course of these proceedings, Defendants requested disclosure of documents pursuant to FED. R. CRIM. P. 16(a)(1)(E). The government complied with that request, triggering Defendants' reciprocal obligation to "permit the government, upon request, to inspect and to copy or photograph . . . papers . . . [and] documents . . . if: (i) the item is within the defendant's possession, custody, or control; and (ii) the defendant intends to use the item in the defendant's case-in-chief at trial." FED. R. CRIM. P. 16(b)(1)(A). The government has requested that Ryan produce "[a]ny and all documents that reflect or substantiate a legitimate source of cash to defendant Ryan during the course of the time period alleged in the indictment." (Gov't Discovery Mem., at 1 and Ex. 3.)[14] Ryan has declined to produce responsive documents until he makes a final decision to testify, arguing that earlier production would violate his Fifth Amendment right against self-incrimination.

More than once, Ryan has publicly announced his intention to testify in this case. Despite these announcements, he remains free to exercise his Fifth Amendment right to remain silent. Having availed himself of discovery, however, his Fifth Amendment right does not permit him to withhold relevant documents under Rule 16(b)(1)(A) until such time as he affirmatively takes the stand in his own defense. Indeed, a defendant's obligation to provide reciprocal discovery under Rule 16 arises only at the defendant's request. *See, e.g., United States v. Ryan*, 448 F. Supp. 810, 811 (S.D.N.Y.) ("While the refusal to testify is constitutionally protected, the trial strategy determination is not so protected. Since the defendant had availed himself of the strategy to obtain discovery of the government, he must comply with the requirement for reciprocal discovery."), *aff'd,*

---

[14]     The Government's Motion to Compel Compliance with Reciprocal Discovery Orders is cited as "Gov't Discovery Mem., at __."

21

594 F.2d 853 (2d Cir. 1978). Contrary to Ryan's suggestion, moreover, the government cannot use any documents admissible solely through Ryan's own testimony unless he takes the stand.

Accordingly, the government's motion to compel is granted. Ryan has asserted he has already produced all of the documents he will use in his case in chief. The court directs that he confirm that representation, or produce any additional documents he intends to use in his case in chief by September 26, 2005. If Ryan chooses not to produce these documents, he will not be permitted to introduce them at trial. FED. R. CRIM. P. 16(d)(2); *United States v. De La Rosa*, 196 F.3d 712, 715 (7th Cir. 1999).

## CONCLUSION

For the reasons stated above, the government's motion for pretrial ruling on jury instructions related to mail fraud allegations (Docket No. 280), and Ryan's motion in limine to preclude evidence related to official actions benefiting campaign contributions absent a quid pro quo (Docket No. 291) are both granted in part and denied in part. The court reserves ruling on the government's specific mail fraud jury instructions. Except as stated in this opinion, the government's motion to preclude opinion testimony by lay witnesses (Docket No. 282), Ryan's motion to exclude testimony constituting speculation as to the alleged beliefs, knowledge, motivations or understanding of others (Docket No. 294), and Ryan's motion to bar admission of "other acts" evidence (Docket No. 262) are reserved for trial.

Ryan's motion to bar the "cash method" of proof (Docket No. 295) is granted in part and denied in part. Ryan's motion to dismiss or suppress based on the attorney-client privilege (Docket No. 301) is denied. Ryan's motion to exclude witnesses from the courtroom during trial (Docket No. 297) is granted as stated in this opinion. Ryan's motions to bar references to Winston & Strawn LLP and its current or former attorneys (Docket No. 293), to bar reference to documents allegedly written and/or signed by Clyde Wilson (Docket No. 300), to bar evidence of the conviction of Citizens for Ryan (Docket No. 292), and to bar reference of Edward Genson's prior representation

22

of Scott Fawell (Docket No. 299) are all denied as moot. Ryan's motions to preclude admission of or reference to the memorandum written by Robert E. Cook (Docket No. 303), and to preclude evidence related to the Willis accident (Docket No. 296) are both entered and continued.

The government's motion to compel compliance with reciprocal discovery orders (Docket No. 307) is granted. In addition, for the reasons stated in open court, the government's motion to compel compliance with Rule 17 subpoena duces tecum (Docket No. 288) is entered and continued pending an *in camera* review of the pertinent documents. Ryan's motion to preclude evidence of Secretary of State employees' bribes (Docket No. 298) is entered and continued pending a response from the government.

ENTER:

Dated: September 23, 2005

REBECCA R. PALLMEYER
United States District Judge