**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 CR 506-1,4 |
| | ) | |
| LAWRENCE E. WARNER and | ) | Judge Rebecca R. Pallmeyer |
| GEORGE H. RYAN, SR., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Lawrence E. Warner and George H. Ryan, Sr. were charged in a 22-count second superseding indictment with (1) conspiring to use the resources of the State of Illinois for their personal and financial benefit and for the benefit of Ryan's family members, the Citizens For Ryan political campaign committee, and various political and business associates, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d); and (2) devising a scheme to defraud the people of the State of Illinois and the State of Illinois of money, property, and the right to the honest services of Ryan and other State of Illinois officials, in violation of the federal mail fraud statute, 18 U.S.C. §§ 1341, 1346. In addition, Defendant Ryan was separately charged with making materially false, fictitious, and fraudulent statements during several FBI interviews in violation of 18 U.S.C. § 1001(a)(2); obstructing and endeavoring to obstruct the Internal Revenue Service in the correct reporting of income and the collection of taxes in violation of 26 U.S.C. § 7212(a); and filing materially false tax returns in violation of 26 U.S.C. § 7206(1). Defendant Warner was separately charged with extortion under the Hobbs Act, 18 U.S.C. § 1951; money laundering, 18 U.S.C. § 1956 (a)(1)(B)(i); and structuring currency transactions in violation of 31 U.S.C. §§ 5324(a)(3) and (d)(2). On April 17, 2006, following a six-month trial, a jury convicted both Defendants on all counts. Both have moved for a judgment of acquittal or, in the alternative, for a new trial. They argue that the evidence was insufficient to convict them on several

of the charges, that the RICO charges were improper for several reasons, and that jury problems so infected their convictions as to violate due process. Defendant Warner argues, in addition, that he was prejudiced by being tried together with Defendant Ryan and that the court erred by denying his numerous requests for severance. For the reasons set forth in this opinion, the motions are granted with respect to Counts Nine and Ten and otherwise denied.

I.     **The Evidence Supported Defendant Ryan's and Warner's Convictions under Count One**

Defendants Ryan and Warner were each convicted of one count of conspiring to violate RICO in violation of 18 U.S.C. § 1962(d). Ryan contends that the evidence was insufficient to establish that Ryan knew of the alleged conspiracy and intended to join it. Ryan Rule 29 Mot. at 3. In addition, both Defendants Ryan and Warner argue that the Government failed to prove that they knowingly agreed to the single conspiracy charged in the Indictment. *See* Ryan Rule 29 Mot. at 2–4; Warner Rule 29 Mot. at 2–3. Ryan further contends that the alleged conspirators pursued divergent, at times conflicting, goals, which are inconsistent with the single, unitary objective alleged in the Indictment. Ryan Rule 29 Mot. at 3–4. Finally, Ryan argues that the Government failed to prove that the varied criminal conduct alleged in the Indictment was carried out by a single enterprise. Ryan Rule 29 Mot. at 4. Before addressing the Defendants' arguments, the court notes that its review of the jury's findings is extremely deferential. *United States v. Gougis*, 432 F.3d 735, 743–44 (7th Cir. 2005). The court views the evidence in the light most favorable to the government, and defers to the jury's credibility determinations. *Id.* at 743. Only if there is no evidence in the record from which the jury could find guilt beyond a reasonable doubt will the court overturn the jury's verdict. *Id.* at 743–44.

A.     **The Circumstantial Evidence of an Agreement to Violate RICO was Sufficient**

"To prove a RICO conspiracy, the government must show (1) an agreement to conduct or participate in the affairs (2) of an enterprise (3) through a pattern of racketeering activity." *United*

*States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006).  Consistent with general conspiracy law, direct evidence of an agreement is not required to prove a RICO conspiracy; rather, "an agreement can be inferred from the circumstances."  *United States v. Neopolitan*, 791 F.2d 489, 501 (7th Cir. 1986); *see also United States v. Diaz*, 876 F.2d 1344, 1352 (7th Cir. 1989) ("Because conspiracies are carried out in secret, direct proof of agreement is rare.") (citation and quotations omitted).

1.   *The Evidence Supported the Jury's Conclusion that Ryan Knew of and Intended to Join the Conspiracy*

Ryan argues that his conduct during his terms as Secretary of State and Governor was incompatible with that the government's position that he knowingly acted to further the interests of a RICO conspiracy, as he "often acted contrary to his own interests" in serving the interests of the State.  Ryan Rule 29 Mot. at 3.  Several witnesses did testify that, generally, Ryan put policy considerations ahead of politics, *see, e.g.,* Tr. at 4010 (Fawell); Tr. at 13500 (Wright).  There was, however, substantial evidence regarding specific transactions from which the jury could reasonably conclude that Ryan knowingly steered government benefits to his friends and associates.  *See, e.g.*, Tr. at 10461–63 (Sherman) (testifying that Ryan intervened on Warner's behalf with respect to a lease in Joliet, Illinois); Tr. at 10162–65 (Nelson) (testifying that Ryan intervened on Warner's behalf with respect to a lease in Bellwood, Illinois); Tr. at 8143–46 (Covert) (testifying that Ryan insisted that the specifications for validation stickers include a requirement beneficial to Warner's client, American Decal); 6636, 6651 (Chamness) (Ryan asks an SOS employee to deal with Harry Klein with respect to a building in South Holland, and is later upset when he believes that the employee and not Ryan has told Klein that a deal has been struck.).  Although the jury was not required to find that the State overpaid for the contracts and leases that were entered into, *United States v. Fernandez*, 282 F.3d 500, 507 (7th Cir. 2002), the jury could reasonably have concluded that Ryan's intervention on his friends' behalf had a negative impact on the State.  *See, e.g.*, Tr. at 11045–46 (Norusis) (testifying that the State overpaid for the Joliet and Bellwood leases); Tr. at

8635–37 (Covert) (testifying that the changes to contract specifications, which Ryan asked him to pull back quietly, would have fostered "open competition").

Ryan asserts that his alleged co-conspirators—in particular, Fawell, Swanson, Juliano and Udstuen—did not tell Ryan what they were doing, and suggests there is no basis for concluding that he joined a conspiracy with them. Ryan Rule 29 Mot. at 3. Based upon the evidence that Ryan personally steered contracts and leases to his friends and associates, the jury could reasonably conclude that Ryan knowingly embraced the conspiracy's common purpose, even if he did not "participate in every aspect of the conspiracy." *United States v. Magana*, 118 F.3d 1173, 1186 (7th Cir. 1997) (internal quotations and citation omitted); *cf.* Tr. at 5381–82 (Fawell) (testifying that Fawell, not Ryan, oversaw the use of state employees for political purposes). This evidence was bolstered by evidence that Ryan attempted to conceal the benefits he conferred upon, and received from, Warner and others. *See, e.g.*, Gov't Exs. 28-012, 28-024 (Ryan did not report gifts and benefits he received from Klein and others on his annual Statements of Economic Interest); Tr. at 8145 (Covert) (testifying that Ryan told him to withdraw changes to contract specifications disadvantageous to Warner "without drawing a lot of attention to it"); Tr. at 3551–52, 3580, 3584–85 (Fawell), 14546–49 (Sonneveld) (Ryan approves Fawell's recommendation to dismantle Inspector General's office). There was sufficient circumstantial evidence in the record for the jury to conclude that Ryan knew of and intended to join the conspiracy, even if his co-conspirators did not divulge everything they were doing to further the conspiracy's interests.

### 2. The Record Supports the Jury's Finding of a Single RICO Conspiracy

"Multiple conspiracies exist when there are separate agreements to effectuate distinct purposes." *United States v. Ceballos*, 302 F.3d 679, 688 (7th Cir. 2002). By contrast, a single conspiracy exists when "the evidence, viewed in the light most favorable to the government, establishes that the co-conspirators joined to effectuate a common design or purpose." *Id.* If the government demonstrates that the "co-conspirators embraced a common criminal objective, a

single conspiracy exists, even if the parties do not participate in every aspect of the scheme." *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). Both Ryan and Warner contend that the evidence at trial was insufficient to prove a single RICO conspiracy.

As charged in the Indictment, the conspiracy's overall objective was to use state resources for the personal benefit of Ryan and his associates. *See* Indict. Count I, ¶¶ 9–17. In his Rule 29 motion, Ryan divides the co-conspirators into two categories: (1) those who were concerned with political objectives (Fawell and Juliano); and (2) those who were concerned with their own financial interests (Warner, Udstuen, Swanson, Drazek and Tom Ryan). Ryan Rule 29 Mot. at 3–4. Viewing the evidence in the light most favorable to the government, as the court is required to do, these purportedly competing goals do not, as Ryan contends, indicate multiple conspiracies. Rather, they were integral to the conspiracy's overall objective to use state resources for personal benefit. Fawell and Juliano furthered the interests of the conspiracy by helping to conceal the improper use of state resources. *See, e.g.*, Gov. Ex. 01-019 (December 1994 Fawell memo to Ryan regarding the Inspector General's office); Tr. at 7039–40 (Juliano). Their actions benefitted Ryan politically, certainly, but they also allowed the conspirators to continue perpetrating their schemes. Indeed, the two interests went hand-in-hand: without continued access to the offices of government, there were no contracts, leases, or other benefits to share. And while Fawell did testify that he reigned in Warner's influence early in Ryan's first term as Secretary of State's Office, he also testified that he (Fawell) advised Warner to "get a couple of clients -- a couple of clients for the office, which is normal, and, you know, don't get involved in a lot of smaller stuff. " Tr. at 2768. Although Fawell believed that this was "normal" political behavior, it was a key component of the Indictment against Defendant Warner. *See* Indict. ¶¶ 4(B); 14–88.

Warner, for his part, contends that the "abundance of evidence" presented unrelated to Warner belies the Government's theory that Warner participated in a single conspiracy with his alleged co-conspirators. Warner Rule 29 Mot. at 2. As discussed, the government was not

required to prove that Warner participated in every aspect of the alleged scheme, so the fact that the government put on evidence that did not pertain to Warner does not mean, or even suggest, that there were multiple conspiracies. The court concludes that the evidence was sufficient to prove a single objective.

**B.    The Evidence Was Sufficient to Support the Jury's Finding of a Single RICO Enterprise**

Defendant Ryan argues that the evidence at trial failed to show that Ryan conducted the affairs of the State of Illinois, the enterprise identified in the Indictment, through a pattern of racketeering activity. Instead, Ryan contends that he acted through two distinct governmental offices, the Secretary of State and the Governor, which constitute distinct enterprises. Ryan Rule 29 Mot. at 5. To the extent that this argument is directed to the viability of the State as an enterprise, generally, this court previously addressed this issue at some length and concluded that the State of Illinois may serve as a RICO enterprise. *See United States v. Warner*, No. 02 CR 506, 2004 WL 1794476, at *13–16 (N.D. Ill. Aug. 11, 2004). Nothing in the evidence at trial persuades the court to revisit that conclusion.

Nor is the court persuaded that the evidence necessitates finding multiple enterprises. Although the majority of the schemes alleged in the Indictment originated during Ryan's tenure as Secretary of State, the performance of several of those schemes spanned Ryan's terms as both Secretary of State and Governor. *See, e.g.*, Count II, ¶¶ 89–97 (allegations concerning benefits received by Ryan from Harry Klein from 1993 through 2002); Count II, ¶¶ 98–115 (allegations concerning benefits received by Ryan from Ron Swanson from the mid-1990s through 2002). Moreover, money continued to flow from leases and contracts that Ryan steered to Warner during his years as Secretary of State even after Ryan took office as Governor. *See* Count II, ¶ 23 (stickers contract); ¶ 82 (Bellwood lease); ¶ 88 (Joliet lease). Likewise, the false statement Counts (Counts Eleven through Thirteen) pertain to false statements then-Governor Ryan made to federal

investigators about conduct that occurred during his tenure as Secretary of State. Consequently, the substance of the allegations in the Indictment and the evidence presented at trial do not lend themselves to being parsed in the manner advanced by Defendant Ryan. The court reaffirms its previous conclusion that the State of Illinois may, as a matter of law, serve as a RICO enterprise, and concludes that the evidence presented at trial was sufficient to support the jury's finding that the government proved a single enterprise.

## II.    Mail Fraud Counts

At the heart of the government's case against Defendants Ryan and Warner is a massive, unitary scheme "to defraud the people of the State of Illinois, and the State of Illinois, of money, property and the intangible right to the honest services of defendant Ryan and other officials and employees of the State of Illinois." Indict., Count II, ¶ 3. The Indictment sets out a scheme spanning from 1990 to 2002 that included the award of state contracts and leases, the provision of non-public information and participatory status in government decisionmaking, and the grant of low-digit license plates to Ryan's friends and supporters, including Warner, in exchange for monetary and non-monetary benefits to Ryan and those close to Ryan, all of which was concealed by various false statements, nondisclosures, and structured behavior. *Id.* at ¶¶ 4-6. Although the entirety of the scheme is set out in Count Two, mailings related to particular sequences appear as separate counts.

The jury convicted Ryan and Warner on each count alleged against them. Ryan and Warner challenge this verdict as insufficiently supported by the evidence. Namely, Ryan argues that "there has been *no showing* that Ryan took official action 'in return' for cash, gifts or some other compensation." Ryan's Rule 29 Mot. at 8. Warner argues that the government never demonstrated his access to material nonpublic information or that he made material false statements. Warner's Rule 29 Mot. at 3–5. Warner also argues that the mailing in Count Two was not in furtherance of the scheme. Warner's Post-Trial Mot. at 24–25. In addition, both Defendants argue that there was

a prejudicial variance between the single scheme charged in the indictment and the multiple schemes proved at trial. Ryan's Post-trial Mot. at 66; Warner's Rule 29 Mot. at 2. The defendants also challenge the verdict on strictly legal grounds. Ryan asserts that these counts were unconstitutionally vague. Ryan's Rule 29 Mot. at 18. Warner asserts that the court erred in referencing state law in instructing the jury on these counts. Warner's Post-Trial Mot. at 22.

As noted, in considering the sufficiency of the evidence, the court must view the evidence "'in the light most favorable to the prosecution, and as long as any rational jury could have returned a guilty verdict, the verdict must stand.'" *United States v. Hausmann*, 345 F.3d 952, 955 (7th Cir. 2003) (quoting *Jones*, 222 F.3d at 352)). In *United States v. Henningsen,* the Seventh Circuit stated:

> The mail fraud statute prohibits devising a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," and executing that scheme by use of the mails. 18 U.S.C. § 1341. A conviction must satisfy three elements: (1) the defendant's participation in a scheme to defraud; (2) the defendant's intent to defraud; and (3) the defendant's use of the mails in furtherance of the fraudulent scheme.

387 F.3d 585, 589 (7th Cir. 2004). Under the mail fraud statute, a "scheme or artifice to defraud" includes a scheme to deprive a person or persons (in this case, the citizens of Illinois) of their intangible right to honest services. 18 U.S.C. § 1346. "As direct evidence of a defendant's fraudulent intent is typically unavailable, 'specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself that demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension.'" *United States v. Owens*, 301 F.3d 521, 528 (7th Cir. 2002) (quoting *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000)).

Ryan notes that no government witness ever testified that he saw Ryan take a "corrupt dollar" and no one ever testified that Ryan took an official action with regard to any of the contracts or leases at issue in return for a gift or some benefit. Ryan's Rule 29 Mot. at 8–9. Without such

testimony, Ryan argues, the evidence is not sufficient to support his conviction of mail fraud.  To the extent that Ryan is arguing that he had to personally benefit from the scheme in order to be convicted, Ryan's Rule 29 Mot. at 9, that argument was foreclosed, as this court held prior to trial, by the Seventh Circuit's decision in *United States v. Spano,* 421 F.3d 599, 603 (7th Cir. 2005); *United States v. Warner*, No. 02 CR 506, 2005 WL 2367769, at *2 (N.D. Ill Sept. 23, 2005).  The *Spano* court observed, "A participant in a scheme to defraud is guilty even if he is an altruist and all the benefits of the fraud accrue to other participants . . . .  In the case of a successful scheme, the public is deprived of its servants' honest services no matter who receives the proceeds." *Spano*, 421 F.3d at 603.  The series of checks mentioned above and introduced into evidence demonstrate that even if the government did not prove that Ryan benefitted from the charged scheme, Warner, Udstuen, Swanson, and Klein benefitted in the form of lobbying and rental fees.  Similarly, the court is not persuaded to revisit its determination that the government was not required to prove a strict *quid pro quo*—a particular payment or benefit for a specific official act. *Warner*, 2005 WL 2367769, at *4.  What the government was required to show, however, was that Ryan "accepted gifts or other consideration with the understanding that he would perform or not perform acts in his official capacity in return."  *Id.*

The government introduced a great deal of evidence of Ryan's acceptance of gifts and benefits.  Gov't Resp. at 10–11.  For example, Warner provided favorable construction and insurance benefits to members of Ryan's family, Gov. Ex. 08-056, Tr. at 17090 (Fairman); invested in Ryan's son's business, Gov. Ex. 08-087, 08-088; and provided favorable financial treatment to Comguard, a company associated with Ryan's brother.  Gov. Ex. 09-001, 09-002; *see* Gov't Resp. at 14–15.  Ron Swanson paid for Disney World accommodations for Ryan's daughter, Gov. Ex. 28-009, and gave the Ryans numerous gifts, Gov. Ex. 16-040, 16-045, 16-029.  While there was no evidence of Ryan directly accepting cash, there was evidence that Ryan gambled regularly and carried substantial amounts of cash, despite having withdrawn comparatively little from his bank

accounts from 1993 to 2002.  *See* Tr. at 15279 (McAvoy), Tr. at 7844, 7860 (Borisy); Tr. at 2979 (Fawell); Gov. Ex. 16-089, 33-501.

Ryan argues that the evidence was insufficient to prove that he had the requisite intent to violate the mail fraud statute.  Specifically, Ryan contends that he was not aware of, or otherwise involved in, "many of the alleged suspect transactions."  Ryan Rule 29 Mot. at 9–16.  The court will address each of the mail fraud counts in turn.

### A.    The Evidence Was Sufficient to Support the Jury's Verdict on Count Two

Count Two of the Indictment charged Ryan and Warner with mail fraud in connection with a contract awarded to ADM by the Secretary of State's office.  The SOS office sometimes contracted with outside vendors for products and services.  Tr. at 8032 (Covert).  Vehicle registration stickers, which help law enforcement determine whether drivers are driving with valid license plates, are one such product.  Id. at 8033.  Each department within the SOS office was responsible for establishing contract specifications that vendors were required to meet in order to be awarded a contract to provide services to the State.  *Id.* at 8034.  James Covert, the director of the SOS Office's vehicle-services department during Ryan's tenure as SOS, testified that the department had established procedures for determining contract specifications and awarding contracts.  *Id.* at 8035–36.  In early 1991, Covert had a meeting with Larry Warner in which Warner informed Covert that he had "authority to speak for Secretary Ryan."  *Id.* at 8053.  At this same meeting, Warner told Covert that the SOS Office should "continue doing business with American Decal," a company that produced validation stickers and was one of Warner's lobbying clients.  *Id.* Warner further asked Covert not to do business with an American Decal competitor, 3-M.  *Id.* at 8054.  Thereafter, Warner and Covert had weekly meetings, and, Covert testified, he generally did what Warner asked him to do.  *Id.* at 8056, 8060.

As American Decal already had the vehicle services contract, it necessarily satisfied the existing contract specifications.  Other companies, however, had difficulty satisfying those

requirements. *Id.* at 8064. The issue came to a head in 1993, when Mr. Covert learned that a number of companies claimed to be capable of manufacturing superior products that did not comply with contract specifications at that time. *Id.* at 8119. Covert and another SOS employee convened a committee to review the specifications, and the committee recommended changing the specifications in a way that would have opened the contract for other bidders. *Id.* at 8120, 8126, 8135–36. Mr. Covert agreed to implement the changes, but soon afterwards, he received an angry call from Warner, in which Warner claimed that Covert was going to put him out of business and that Warner would "take care of it." *Id.* at 8140, 8144. The next day, Covert received a stern call from then-Secretary Ryan in which Ryan told Covert to withdraw the changed specifications "without drawing a lot of attention to it." *Id.* at 8145. Covert complied with this direction despite his belief that the changes to the specifications were in the State's best interests. *Id.* at 8146.

At trial, Ryan pointed that ADM's contract with the SOS Office was entered into before Ryan became SOS, and that there were sound law-enforcement rationales for keeping the contract specifications as they were. As the government contended, however, though the contract did not originate during Ryan's tenure as SOS, his actions ensured that the contract would remain in place, to Warner's benefit. Moreover, the jury was entitled to reject the defense's theory that Ryan was motivated by law-enforcement interests and not his own interests and those of his friends in making his decision regarding the sticker contract specifications. Ryan's direct intervention on Warner's behalf, and his attempt to conceal his intervention by directing Covert to withdraw the specifications quietly, amply support the jury's verdict with respect to Count Two.

Warner also challenges Count Two on the grounds that the mailing identified in the indictment and introduced at trial was not in furtherance of the license plate registration sticker/ADM lobbying contract scheme. Warner Post-Trial Mot. at 24–25. Warner notes that this mailing occurred in 2000, but that the evidence at trial demonstrated that his association with ADM had ended several years prior. A mailing is considered in furtherance of a scheme to defraud even

where it is incidental to an essential part of the scheme. *United States v. Fernandez*, 282 F.3d 500, 508 (7th Cir. 2002); *see also United States v. Koen*, 982 F.2d 1101, 1107 (7th Cir. 1992) (reading "in furtherance" broadly). Aristoteles Mpougas testified that the 2000 payment related to a one-year 1998 contract for license plate registration stickers with the Secretary of State's Office entered into while Ryan still held that office. A dispute arose concerning payments on that contract and the State of Illinois only paid American Decal for the shipment of stickers related to this contract when the dispute was resolved in 2000. As the government notes, the indictment specifically refers to payments from the Secretary of State's Office to ADM from 1991 until 2000. (Indict., Count II, ¶ 23). Payment on a contract Warner originally used his influence and access to Ryan to help secure was an essential part of the scheme. Gov't Resp. at 32. The 2000 mailing was thus in furtherance of the scheme.

### B.    The Evidence Was Sufficient to Support the Jury's Verdict on Count Three

Count Three of the Indictment charged Ryan and Warner with mail fraud in connection with the lease of an SOS facility in Joliet. In late 1994, SOS considered finding a new location for driver and administration facilities it leased in Hinsdale. Tr. at 2802-03 (Fawell); Tr. at 10462 (Sherman). At that time, Leonard Sherman was director of the department of administrative hearings for SOS. Tr. at 10452 (Sherman). Scott Fawell testified that in the course of multiple conversations about finding an alternative location to the Hinsdale site, Defendant Ryan told Fawell he (Ryan) had "hooked up" Sherman with Defendant Warner. Tr. at 2804–05 (Fawell). For his part, Sherman testified that Ryan called him and said he had heard that Sherman was looking for a new site, and that Sherman should contact Warner for help finding a site. Tr. at 10463 (Sherman). Todd Borisy, a member of Ryan's security detail, overheard Ryan and Warner talking about Warner buying property in Joliet. Tr. at 7822–24 (Borisy). After Sherman and Warner inspected a building in Joliet, SOS leased and moved into that building in January 1995. Tr. at 10471, 10479 (Sherman). The owner of record on the lease was an LLC, Tr. at 10484 (Sherman), but Warner was the true

owner, having bought the property in October 1994. In short, the government alleged, Warner bought the Joliet building and concealed his ownership interest, while Ryan steered Sherman into locating the SOS offices there.

Defendant Ryan asks for a judgment of acquittal on all the mail fraud courts, but he has not specifically addressed the sufficiency of the government's evidence as to the Joliet lease; rather, Ryan generally argues that "with regard to many of the alleged suspect transactions, Ryan had no involvement." Ryan Rule 29 Mot. at 9. If this is the extent of his attack on the sufficiency of the evidence on Count Three, it necessarily fails. As noted above, Fawell, Sherman, and Borisy all testified as to Ryan's (and Warner's) direct involvement. Ryan put Sherman in contact with Warner to look for a new site, and the jury could reasonably infer from Borisy's testimony that Ryan knew Warner owned the Joliet building at the time. The evidence supports the jury's verdict on Count Three.

### C.    The Evidence Was Sufficient to Support the Jury's Verdict on Count Four

Count Four of the Indictment charged Ryan and Warner with mail fraud in connection with contracts awarded to IBM, another Warner lobbying client, by the SOS Office. As of early 1991, Honeywell/Bull ("Honeywell") held the existing mainframe computer system contract with the SOS Office. Tr. at 11665 (Udstuen); Tr. at 12532 (Cavallaro). The SOS Office was, however, seeking to upgrade its computer system, Tr. at 11665 (Udstuen), and both Honeywell and IBM were interested in obtaining the contract for that upgrade. Tr. at 5850 (Cook). Warner and Udstuen learned about the SOS Office's intentions, Tr. at 122245–46, and attempted to profit from that knowledge, and from their relationship with Ryan, by arranging a deal with Honeywell: in exchange for a large sum of money (the precise amount was disputed) or a percentage of the contract, Warner and Udstuen would see to it that Honeywell received the prospective mainframe upgrade contract. Tr. at 5548–49, 5552–53 (Wuttke); Tr. at 5876–77 (Cook). Warner and Udstuen later retracted their offer, saying that it would be a conflict of interest, but suggested that Honeywell

13

retain Ron Swanson.  Tr. at 5557 (Wuttke).  Swanson offered to secure the contract for Honeywell in exchange for $750,000, an offer that Honeywell rejected.  Tr. at 5561.

Robert Cook, Honeywell's lobbyist at that time, told Ryan about the episode with Warner and Udstuen in a meeting on September 24, 1991. Tr. at 5875–5890 at (Cook); Gov. Ex. 04-003.  Although Cook's account differed in some respects from Wuttke's recollection, in both accounts Warner and Udstuen promised to deliver Honeywell the mainframe upgrade contract.  Ryan acknowledged that Warner and Udstuen were his advisors, stated that he did not approve of what they had done, and assured Cook he would "get to the bottom of it."  *Id.*  at 5886.  When Ryan contacted Cook the next day, however, he simply told Cook that Udstuen had a different recollection of the meeting with Honeywell and that, as far Ryan was concerned, the matter was "settled."  *Id.* at 5889.

Despite being aware of Warner's and Udstuen's scheme to shakedown Honeywell, Ryan authorized Warner and Udstuen to assist in the process of hiring a new Director of the Information Services Department in late 1991.  Tr. at 12526 (Cavallaro).   Among the Director's responsibilities was assisting in the selection of the mainframe computer upgrade contract.  *Id.* at 12532.  Warner and Udstuen interviewed a candidate for the Director position, Frank Cavallaro, and ascertained that Cavallaro would be supportive of selecting IBM for the mainframe computer upgrade contract.  Tr. at 12528–29 (Cavallaro).  Warner and Udstuen recommended Cavallaro to Ryan, who then hired Cavallaro as Director of Information Services.  Over time, Cavallaro, believing that Warner was acting with Ryan's authority, performed official actions that benefitted Warner.  *Id.* at 12557 (testifying that he temporarily "held up" IBM projects at Warner's request because Warner was Secretary Ryan's "[g]ood friend.").  Around this same time in early 1991, an IBM representative approached Udstuen for a lobbyist referral, as IBM was interested in doing business with the SOS Office. Tr. at 11642–45. Udstuen referred IBM to Warner.  *Id.*

In approximately March 1993, Warner entered into a written contract with IBM, retroactive

for services beginning in July 1, 1992, and under which IBM agreed to pay Warner a percentage of all revenues, up to $1 million, that were received in connection with SOS contracts. Although this deal was very lucrative for Warner, Mr. Cavallaro testified that he was not aware that Warner did anything to lobby the SOS Office. Indeed, the government put into evidence a letter from Warner to IBM from August 1993 in which Warner discusses the mainframe contract as if it had been a foregone conclusion, and the basis for lobbying payments under the contract, two years before Ryan formally awarded the mainframe computer upgrade contract to IBM. Tr. at 11666 (Udstuen); Gov. Ex. 04-021.

At trial, Ryan argued that IBM was the most suitable company to replace the mainframe computer, and that Ryan acted according to what his advisors recommended. The government did not dispute IBM's merits, or its suitability for the mainframe project. The issue, according to the government, was whether Warner was permitted to profit from IBM with Ryan's tacit approval. The jury could have reasonably concluded that Warner's IBM proceeds were a direct result of the access that to the SOS Office that Ryan gave Warner. When Ryan learned that Udstuen and Warner had attempted to shakedown Honeywell, Ryan excused their conduct and then gave them even greater access to the SOS Office. Ryan authorized Udstuen and Warner to select Cavallaro as the Director of the Information Services Department after ascertaining Cavallaro's preference for IBM. Having affixed a pro-IBM employee in a key SOS position, Warner parlayed his knowledge of the SOS Office's intentions into a profitable deal with IBM. Udstuen, in turn, benefitted through an arrangement with Warner whereby Udstuen received a portion of the money that Warner received from ADM and IBM. According to Udstuen, Ryan blessed this arrangement. The evidence supports Count Four.

### D. The Evidence Was Sufficient to Support the Jury's Verdict on Count Five

Count Five of the Indictment charged Ryan and Warner with mail fraud in connection with Warner's money-laundering arrangement with Udstuen and co-schemer Alan Drazek. As discussed

15

in more detail *infra*, Warner arranged, with Ryan's blessing, for Udstuen to receive one third of the proceeds arising from Warner's lobbying arrangements with ADM and IBM. These same contracts, as previously discussed, were attributable to Warner's relationship with Ryan and the access to the SOS Office that this relationship afforded. As charged in this count, Warner caused a check to be written on an account controlled by his company, Omega Consulting Group. Warner deposited the proceeds of his IBM lobbying arrangement into Omega's account. The Omega check was then made out to American Management Resources ("AMR"), a company controlled by co-schemer Alan Drazek. Warner caused the Omega/AMR checks to be sent to Udstuen, who would, in turn, send the checks to Drazek. Drazek cashed the checks, keeping a portion for his troubles and delivering the balance, in cash, to Udstuen. This arrangement served no purpose other than to disguise the provenance of the proceeds. Viewing the evidence in the light most favorable to the government, the court concludes that the jury could have reasonably concluded that the flow of State benefits to Ryan's associates, and the effort to conceal that flow, support the conclusion that the Defendants acted with the requisite fraudulent intent.

### E.        The Evidence Was Sufficient to Support the Jury's Verdict on Count Six

Count Six of the Indictment charged Ryan and Warner with mail fraud in connection with the lease of a building in South Holland, Illinois. In early 1997, Ryan proposed leasing from his friend Harry Klein a building that Klein owned in South Holland, Illinois. Tr. at 9475 (Klein). Klein expressed interest, and Ryan told Mike Chamness, Director of Drivers' Services, to contact Klein. Tr. at 6636 (Chamness). During his phone conversation with Chamness, Ryan told Chamness that he (Ryan) wanted to tell Klein personally when there was a deal. *Id.* at 6636. An SOS employee, James Esslinger, was dispatched to inspect the property and determine whether it was suitable as a commercial-drivers-license ("CDL") facility. Tr. at 6266 (Esslinger). Esslinger, the head of the SOS's property management division, in fact concluded that the building was not ideally suited for a CDL facility, but it was the only site that the property-management division considered because,

he testified, it was the only property that were told to consider.  Id. at 6263, 6266–67.  Esslinger further testified that he was directed by his superior, Mr. Chamness, to prepare an inaccurately favorable assessment of the property.  The contract was executed with little negotiation, and on terms that were very favorable to Klein.  Tr. at 9488 (Klein); Tr. at 6280–82 (Esslinger).  Indeed, Chamness, who had already received an angry phone call from Ryan after he mistakenly concluded that Chamness had told Klein that the deal was done, decided that the best course was to defer to his superiors on any remaining deal points.  Tr. at 6654–65.  With respect to two such issues, the contract's termination clause and the timing of "build-out" payments to Klein, Ryan told Chamness to do what Klein wanted.  Tr. at 6660–64 (Chamness).  The lease was not signed by "autopen," as was often the case with such contracts, but instead by Ryan in his own hand.  Tr. at 6289–91 (Esslinger).

There was ample evidence in the record to support the government's position that this lease was foisted on SOS staff because Ryan wanted to do his friend a favor.  Ryan's personal intervention on Klein's behalf initiated the transaction, and Ryan remained involved thereafter. Ryan maintains that Chamness and Esslinger "recommended" the lease, Ryan Post-Trial Mot. at 14, but it is clear from their testimony that they were doing nothing more than acquiescing in the decision made by Ryan.  In the end, the State was saddled with a property that was, in the estimation of at least two SOS employees, suboptimal from the standpoint of price and suitability.

### F.    The Evidence Was Sufficient to Support the Jury's Verdict on Count Seven

In Count Seven, the government charged both Defendants with mail fraud in connection with a $18,902.79 from Viisage Technologies to National Consulting Company, a firm controlled by Warner.  Viisage was the successful bidder on a contract to provide technology that would enable the SOS to switch from drivers' licenses produced with film to digital drivers' licenses, which use digital images capable of being stored in the SOS computer system.  In fact, Viisage was originally the only bidder in response to the request for proposal ("RFP") issued by SOS; the office declined

to accept that bid and instead reissued the RFP in an effort to generate more competition. Viisage bid again on the project; its proposal to provide the technology for $1.113 per card was significantly lower than the proposal made by the only other bidder, Unisys. Michael Chamness, the Director of Driver's Services, testified that Viisage was the best choice for the contract, and the government has not argued that the choice of Viisage was inappropriate. *See* Tr. At 6813–14 (Chamness).

Instead, the evidence establishes that Defendant Warner, who attended an SOS meeting in 1995 where the concept of digital licensing was first proposed, was able to use his access to that information for personal gain. He initially solicited the vendor that provided film licenses, but that vendor declined to pay Warner, who was not at time a registered lobbyist, his requested "lobbying" fee. Soon after an August 1, 1996 meeting at which Viisage and Unisys made presentations to SOS officials, including Ryan and Fawell, Warner telephoned Chamness and learned that Chamness viewed Viisage as the likely vendor. Three weeks later, Warner met with a Viisage vice president and offered to help Viisage win the contract in exchange for a 5% commission on Viisage's revenues. A few weeks after that, Viisage signed a lobbying agreement that made no mention of Warner himself, and Warner never registered as a lobbyist for Viisage.

Fawell testified that he discussed Warner's role as Viisage's lobbyist with Ryan. In addition, the government presented evidence that, some time in 1996, Ryan met with a Unisys lobbyist and communicated to Unisys through him that Unisys was "on the wrong horse" in working with its co-venturer, NBS, on the digital licensing proposal. At Ryan's suggestion, a Unisys official spoke to Warner; Warner arranged a conference call with the Unisys official and a Viisage representative in an unsuccessful effort to establish a joint venture between Unisys and Viisage.

Even before the contract was awarded, Warner was confident enough that Viisage would win it that he guaranteed Ryan friend Ron Swanson a $36,000 share of the lobbying fee. Warner and his friend Larry Stern purchased shares of Viisage prior to the announcement that Viisage had won the state contract. After the contract award was publicly announced, Viisage's registered

18

lobbyist signed an agreement assigning its rights under the lobbying contract to National Consulting Company, a firm controlled by Warner.

From this evidence, the jury could reasonably have found that, by virtue of his relationship with Ryan, Warner obtained access to information about the digital licensing contract and secured a share of the profits for himself, and that Warner attempted to conceal his role. The fact that Warner's call to Chamness occurred soon after the August 1, 1996 Viisage presentation; Fawell's testimony that he discussed Warner's role with Ryan; and Ryan's communications with Unisys, all support the finding that Ryan knew of and blessed the arrangement. The evidence supports the jury's verdict on Count Seven.

### G.     The Evidence Was Sufficient to Support the Jury's Verdict on Count Eight

Count Eight of the Indictment charged Ryan and Warner with mail fraud in connection with a building that Warner leased to the SOS Office in Bellwood, Illinois. In 1992, Warner learned that the SOS Office was seeking office space for the SOS Department of Police. Tr. at 2772 (Fawell). In discussing the possibility of leasing a building owned by Warner to the SOS Office, Fawell told Warner that he (Fawell) was concerned about possible political ramifications for Ryan if the press discovered Warner's interest in the property. Tr. at 2773 (Fawell). Warner assured Fawell, in Ryan's presence, that no one would discover his interest because he was "buried in the paperwork." *Id.* at 2774, 3010. Several days later, Ryan directed Fawell to put Warner in touch with Alex Nelson, the Director of Physical Services. *Id.* at 2777, 5106. Mr. Nelson testified that Warner told him that "[w]e found a place for the cops," and he gave Nelson the name and number of a real estate company to call. Tr. at 10163 (Nelson). Fifteen minutes later, Nelson received a call from Ryan informing him about a property in Bellwood and giving Nelson the name and number of the same real estate company. *Id.* at 10164. Nelson inspected the property, found it suitable, and a lease was executed. *Id.* at 10167. The executed lease does not disclose Warner's interest in the property, Tr. at 3010 (Fawell), nor was Nelson aware that Warner owned the property at that

time. Tr. at 10167–68 (Nelson). When Ryan was interviewed by the FBI about this lease, he stated that he did not know that Warner had an interest in the Bellwood property. Tr. at 8157 (Ruebenson).

At trial, Ryan argued that the lease had been vetted by his subordinates and found suitable. But there was sufficient evidence from which the jury could have concluded that Ryan steered the lease to Warner, in a top-down fashion, and that the approval of his subordinate was a mere formality. Moreover, the layers of deception surrounding the transaction support the jury's finding that the Defendants acted with the requisite intent.

### H.     The Evidence Was Insufficient to Support the Jury's Verdict on Count Nine

Count Nine of the Indictment charged Ryan and Warner with mail fraud in connection with a commission contract that Warner executed relating to property at 17 North State Street. The Indictment describes an incident in mid-1991 in which Warner directs an SOS Official ("SOS Official F") to contact the owner of the building at 17 North State, in which Warner has a non-disclosed financial interest. Indict., ¶ 73. Warner and Ryan then cause the SOS Office to execute a six-year lease of the building, and Warner profits handsomely. *Id.* But the evidence of this incident, which would have made this sequence analogous to South Holland and other schemes, did not materialize. In closing argument, the government argued that Warner, by virtue of his position as a member of Ryan's transition team, learned that the SOS Office was seeking to relocate certain facilities then located at 188 W. Randolph Street in Chicago. Tr. at 10151, 10154 (Nelson). What this evidence does not show is that Warner was privy to, and acted upon, information that was not publicly available. Warner did execute a leasing agency agreement with the property's owner pursuant to which he received a 6% commission when the SOS office executed a lease there. Gov. Ex. 05-005. But unlike South Holland and Joliet, there is no evidence that Ryan steered this contract to Warner. The government also asserted in closing argument that the lease was in the name of one of Warner's companies, National Consulting Company ("NCC"), and executed by an

individual, Adolph Ottaviani, who was not affiliated with NCC.  But absent evidence that Warner

obtained the contract improperly, the court his hard-pressed to distinguish this contract from any

other in which the real party in interest is acting through an agent.  The court concludes that the

evidence was insufficient for the jury to conclude beyond a reasonable doubt that either defendant

acted with the requisite intent.  The court therefore grants the Defendants' motions for a judgment

of acquittal on Count Nine.

### I.    The Evidence Was Insufficient to Support the Jury's Verdict on Count Ten

Count Ten of the Indictment charged Ryan alone with mail fraud in connection with the

Governor's Office's selection of Grayville, Illinois for a maximum security prison.  Around January

2001, the Illinois Department of Corrections ("IDOC") announced that three locations had been

selected as finalists for the site of the prison.  Tr. at 13599–600 (Bettenhausen).  At a meeting

involving high-ranking officials from the Governor's Office and the IDOC, Defendant Ryan selected

Grayville as the prison site, though the participants at the meeting agreed that the decision would

not be made public at that time. Tr. at 13602–04.  Immediately after the meeting, however, Ryan

did in fact leak this confidential information to his friend Ron Swanson in the presence of Matthew

Bettenhausen, who was present at the meeting in his capacity as deputy governor for criminal

justice and public safety.  *Id.* at 13598, 13604.  Mr. Bettenausen testified that after the meeting

broke up, Ryan bumped into Swanson in the receiving area outside the then-Governor Ryan's

office. *Id.* at 13604.  Indeed, Swanson spent a lot of time in and around the Governor's office.  *See,*

*e.g., id.* at 13661–62; 13829–30, 13832 (Wright).  According to Bettenhausen, when Ryan told

Swanson that Grayville had been selected, Bettenhausen interjected that the information was

confidential.   Swanson stated that he understood, but asked to be present at the public

announcement of Grayville's selection.  Ryan directed Bettenhausen to see to it that he (Swanson)

was notified.  *Id.* at 13605–06.

Soon after the meeting at which Grayville was selected as the site for the new prison,

Swanson marketed his services as a lobbyist to a business association affiliated with Grayville. The Grayville association entered into an agreement pursuant to which Swanson would lobby for the selection of Grayville as the site for the proposed prison in exchange for a lobbying fee of $50,000. Tr. at 14028 (Williams). (The $50,000 cashiers check that Swanson received from this business association is the mailing charged in Count Ten). After accepting the money, Swanson falsely assured his primary liaison with the business association, Dr. Clyde Wilson, and others affiliated with the group, that he was actively lobbying on their behalf. *Id.* at 14040. Of course, he was doing no such thing. On the morning that Ryan was to make the official announcement of the selection of Grayville, Bettenhausen again ran into Swanson in the Governor's offices, and Swanson asked Bettenhausen to deliver a message to Ryan. Tr. at 13615 (Bettenhausen). Swanson asked that, in his public announcement, Ryan thank Dr. Wilson particularly as a supporter of Grayville's efforts to obtain the prison. *Id.* At a public ceremony in Grayville on April 12, 2001, Ryan formally announced his selection of Grayville and did thank Dr. Wilson as Swanson had requested. *Id.* at 13616.

The government stipulated that the process by which Grayville was selected was not influenced by Swanson or anyone else, Tr. at 13646–47 (Bettenhausen), and the merits of the choice of Grayville as a prison site are undisputed. Ryan contends that in disclosing that choice to Swanson, he acted negligently at worst. Ryan Rule 29 Mot. at 15. Bettenhausen testified that, from his perspective, Ryan bumped into Swanson by chance after the meeting about Grayville. Tr. at 13651 (Bettenhausen). The information was conveyed to Swanson in the presence of others, and Bettenhausen told Swanson, in Ryan's presence, that the information was to remain confidential. No witness testified that Ryan was aware that Swanson had entered into the sham lobbying contract, or put into evidence circumstances from which the jury could infer such awareness.

In support of Ryan's conviction on this count, the government relies chiefly on Ryan's

disclosure of material, confidential information to his good friend within minutes of Grayville's selection. *Id.* at 13667. This, according to the government, proves that the disclosure was not inadvertent. The government also relies on the fact that Ryan acceded to Swanson's request, communicated to him by Bettenhausen on the trip down to Grayville, to thank Dr. Wilson. Even viewing this evidence in the light most favorable to the verdict, however, the court is not satisfied that these circumstances establish Ryan's guilt in connection with the Grayville lobbying contract. Although Ryan should not have disclosed confidential information to his friend, he heard Matthew Bettenhausen warn Swanson that the selection of Grayville was confidential. Perhaps Ryan could infer from Swanson's request that he publicly acknowledge Dr. Wilson that Swanson had pretended to have influenced the Grayville choice; but the court is unwilling to sustain a conviction by "piling inference upon inference." *United States v. Harris*, 942 F.2d 1125, 1129 (7th Cir. 1991) (citation and internal quotation marks omitted). The fact that a short time elapsed between the end of the meeting and Ryan's disclosing the information to Swanson is equally consistent with the inference that the disclosure was inadvertent as it is with the inference that it was purposeful. *Id.* at 1129–30 ("[W]here the evidence as to an element of a crime is equally consistent with a theory of innocence as a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt.") (quoting *United States v. Delay*, 440 F.2d 566, 568 (7th Cir. 1971)). And while Swanson's request to thank Dr. Wilson might appear unusual, Ryan was not in a position to clarify the matter on his way down to the Grayville ceremony with Bettenhausen. The court concludes that the evidence was insufficient to support Defendant Ryan's conviction on Count Ten.

### J.    The Evidence at Trial Demonstrated a Single Scheme to Defraud

Ryan and Warner challenge their mail fraud convictions on the ground that while the Indictment set out a single scheme to defraud, the government's evidence at trial established disconnected schemes, and this variance prejudiced the defense. Ryan points to three aspects of the purported scheme: (1) the Secretary of State's Office's leases of Warner's property; (2) the

23

termination of the Inspector General's investigation; and (3) Ryan's leak of confidential information about the placement of the prison in Grayville. According to Ryan, "[t]hese allegations alone concern schemes of three very different natures. The evidence showed *different* participants, acting at *different* times, on different matters. The government failed to prove the interrelationship between these separate schemes necessary to prove a unitary scheme to defraud." Ryan's Post-Trial Mot. at 66. Warner sets out a laundry list of evidence admitted against Ryan alone in his renewed motion for severance as evidence of a prejudicial variance. Warner's Rule 29 Mot. at 2-4. The government characterizes the Defendants' challenge as an argument that the concept of a single scheme is irreconcilable with the notion that Ryan held two separate offices, that of the Secretary of State and Governor. Gov't. Resp. at 28.

Defendants' "variance" argument, too, is a challenge to the sufficiency of the evidence. *See United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir.1991) ("a conspiracy variance claim amounts to a challenge to the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy.") Where a defendant asserts a variance claim, a reviewing court reviews the evidence in the light most favorable to the government. *United States v. Wilson*, 134 F.3d 855, 865 (7th Cir. 1998). The fact that the evidence introduced at trial might also be consistent with an alternate theory is irrelevant. *Townsend*, 924 F.2d at 1389. Thus, "[e]ven if the evidence arguably establishe[s] multiple conspiracies, there is no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment." *United States v. Williams*, 272 F.3d 845, 862 (7th Cir. 2001) (citations omitted).[1] Furthermore, a defendant must show prejudice from the variance. *United States v. Hewlett*, 453 F.3d 876, 879 (7th

---

[1]    Courts have found that many of the principles governing variance in conspiracy cases apply to multi-defendant mail fraud prosecutions as well. *See United States v. Horton,* 847 F.2d 313, 317 (6th Cir. 1988); *United States v. Camiel*, 689 F.2d 31, 35 (3d Cir. 1982).

Cir. 2006).

Ryan argues that the government offered "no proof of a unitary agreement to act through a single enterprise pursuant to an overall objective," in part because the alleged conspiracies at the SOS and the governor's office were "wholly distinct." Ryan Post-Trial Mot. at 65. As discussed, the court is not persuaded by Ryan's characterization of the two Illinois offices as such separate and distinct enterprises that no conspiracy could carry over from one to the other; indeed, several of the schemes alleged in the indictment spanned Ryan's occupancy in both positions. *See supra* I.B. Moreover, Ryan's assertion that the government must show proof of a "unitary agreement" is incorrect, for the element of agreement, while necessary for a conspiracy offense, is not a prerequisite to a conviction for mail fraud. *See United States v. Adeniji*, 221 F.3d 1020, 1026 (7th Cir. 2000). Ryan's variance claim will thus be defeated if the jury could reasonably have found the existence of a scheme with a common unifying objective. In *United States v. Polichemi*, for example, the Seventh Circuit rejected the defendants' variance argument in finding a single wire fraud scheme in a plan to market phony financial instruments to investors. 219 F.3d 698, 706 (7th Cir. 2000). The defendants defrauded about 30 different investors, in factually different transactions, and the same people did not participate in every "subscheme." *Id.* Nonetheless, the court, noting the defendants' "common design and purpose to defraud investors," concluded that the jury could have found a single scheme despite the fact that each defendant's role varied somewhat from transaction to transaction. *Id.*; *cf. United States v. Camiel*, 689 F.2d 31, 36-37 (3d Cir. 1982) (holding that the jury could not have found a single unified scheme where the indictment charged a single ghost payroll scheme among Democratic Party loyalists, but where the evidence showed at least two warring factions in the Party).

The government notes that the nature of the scheme was that Ryan would give his co-schemers access to nonpublic information and government decisionmaking from which the co-schemers could secure lucrative lobbying contracts and leases in exchange for benefits directed

by the co-schemers to Ryan and third parties close to Ryan. Gov't Resp. at 29. The government also notes that sequences that do not immediately fit this pattern often played the role of protecting the aforementioned arrangements. *Id.* at 29. Thus, in order for Ryan and his cronies to continue turning confidential information into lucrative contracts and leases, the IG office had be dismantled, Ryan as Governor had to cover his misdeeds as Secretary of State with false statements to the FBI and IRS, and Warner had to avoid filing as a lobbyist for Viisage. Although Ryan is correct to say that these sequences took place at different times and often involved different people, the jury could have reasonably concluded all are directed toward the fraud scheme or toward efforts to conceal that scheme and prevent its discovery.

Finally, while Warner was not involved in every transaction—he was not part of the South Holland lease, for example—this fact alone does not establish a variance. Warner's lack of participation in any individual episode does not necessarily negate the existence of a single scheme. *United States v. Lanas*, 324 F.3d 894, 899 (7th Cir. 2003); *Polichemi*, 219 F.3d at 706 (finding a single scheme despite the fact that one defendant did not even meet the others until the scheme was well underway).

### K.     The Court is Not Persuaded by Defendants' Constitutional Challenges

Both Defendants raise constitutional arguments as well. Ryan argues somewhat summarily that the mail fraud charges are vague because the United States Code does not define the phrase "intangible right to honest services." Ryan Rule 29 Mot. at 16–17. Thus, contends Ryan, there is "confusion" over what kind of conduct is prohibited. *Id.* at 17. Ryan cites this court's statement in *United States v. Fawell*, No. 02 CR 310, 2003 WL 21544239, at *3 (N.D. Ill. July 9, 2003) that "'the line should have been clear to Mr. Fawell when he crossed it' by diverting state resources for personal and political use," arguing that the line was not clear for Ryan. Ryan Rule 29 Mot. at 17. The court is not persuaded. First, although the term "intangible right to honest services" may not be defined by statute, the term has been addressed by the courts, both before and after section

1346 was enacted in 1988. *See, e.g.*, *United States v. Bloom*, 149 F.3d 649, 656-57 (7th Cir. 1998) ("An employee deprives his employer of his honest services only if he misuses his position (or the information he obtained in it) for personal gain."); *United States v. Isaacs*, 493 F.2d 1124, 1150 (7th Cir. 1974) (upholding the conviction of an Illinois governor for defrauding the citizens of Illinois of his "honest and faithful services"). Second, the evidence at trial established that both Defendants[2] took great pains to conceal their activities. Ryan lied to the IRS and FBI. Warner structured his behavior, buried his name in leases, and omitted his name entirely from lobbying forms. These actions provide a strong inference that the Defendants were aware of the boundary between legal and illegal conduct.

More serious is Warner's argument that the court erred in citing state law while instructing the jury on mail fraud. Warner's Post-Trial Mot. at 22. The court instructed the jury that the "scheme to defraud" element of section 1341 could be defined as a scheme to "deprive the people of the State of Illinois of their intangible right to the honest services of their public officials or employees." Final Jury Instr. at 76; *see* 18 U.S.C. § 1346 ("'scheme or artifice to defraud'" includes a scheme or artifice to deprive another of the intangible right of honest services."). The court then referred to provisions of the Illinois Constitution and Illinois statutes that were applicable to state officials during the relevant time. Final Jury Instr. at 88. Both before and after these references to Illinois law, the court instructed the jury that "[n]ot every instance of misconduct or violation of a state statute by a public official or employee constitutes a mail fraud violation." *Id.* at 88, 93.

In his post-trial motion, Defendant Warner argues that the court's references to Illinois law were improper because they allowed the jury to convict on federal mail fraud, RICO, and money

---

[2]    Warner generally "assail[s] the application and constitutionality of the mail fraud statute to this case," and joins Ryan's arguments on the issue. Warner Post-Trial Mot. at 22.

laundering charges based on the jury's determination that Defendants violated state law.[3]  Warner

Post-Trial Mot. at 22-23.  This appears to be an extension of his argument at the close of the

government's case that state law cannot provide a foundation for an "honest services" mail fraud

charge.  Warner Rule 29 Mot. at 6.  The court declines to decide the extent to which a federal mail

fraud conviction can be based on state law violations because, in the court's opinion, the jury

instructions sufficiently precluded the possibility that the jury returned federal convictions based on

violation of Illinois law.

As a preliminary matter, the court acknowledges that Warner's argument applies to both

defendants, even though Warner was not a public official.[4]  The court instructed the jury that the

government did not allege that Warner was a public official, and that only Ryan owed a duty of

honest services to the people of Illinois.  Final Jury Instr. at 82-83.  But the court also instructed the

jury that only one participant in a scheme need be a public official.  *Id.* at 79.  Thus, although the

court referred to Illinois law in the context of Ryan's duty of honest services, Warner was implicated

as an alleged participant in a scheme with Ryan.

Warner, citing *Bloom*, 149 F.3d 649, and *United States v. Martin*, 195 F.3d 961 (7th Cir.

---

[3]     Although Warner makes his argument as to all three offenses, his argument is clearly without merit as to the RICO and money laundering convictions.  The court made no reference to Illinois law in its instructions for the money laundering count, and in any event, the federal money laundering statute on its face allows conviction based on a defendant's violation of state law.  *See* 18 U.S.C. § 1956(a)(1)(B)(ii) (proscribing the avoidance of a transaction reporting requirement under either state or federal law).  As for RICO, a defendant's violation of state law can constitute a predicate act of racketeering activity.  *See* 18 U.S.C. § 1961(1) (defining "racketeering activity" as certain crimes, including bribery, which are "chargeable under State law and punishable by imprisonment for more than one year.").  Thus, the court only addresses Warner's argument as to the mail fraud offense.

Defendant Ryan does not raise this argument in his post-trial motion, but joined in the argument during the jury instructions conference.  Tr. at 22088 (02/28/06).  The government does not appear to have responded to this argument.

[4]     In response to an earlier indictment of Defendant Warner, this court held that Warner was a private citizen who owed no fiduciary duties to the citizens of Illinois.  *United States v. Warner*, 292 F. Supp. 2d 1051, 1063 (N.D. Ill. 2003).

1999), argues that "the Seventh Circuit has rejected the proposition that State law may provide a foundation for an 'honest services' mail fraud charge." Defendant Warner's Motion For Judgment Of Acquittal And Motion To Dismiss Or Strike, at 6. This is incorrect. *Bloom* held that a defendant's breach of fiduciary duty, standing alone and absent misuse of a public position, is insufficient to support an honest services mail fraud charge; rather, the test is whether a public official breaches that duty by misusing his position for personal gain. 149 F.3d at 655-57; *see also Hausmann*, 345 F.3d at 956 (expressing doubt that an intangible rights theory of mail fraud applies to cases of breach of fiduciary duty "with nothing more," but nonetheless affirming defendant's conviction because he misused his fiduciary relationship, at the expense of the party to whom to the duty was owed, for personal gain). Indeed, the court in *Bloom* emphasized that the defendant was not charged as a public official, nor with violating state law. 149 F.3d at 654-55. In *Martin*, the Seventh Circuit declined to address whether a fiduciary duty of honest services should be defined by state law or by federal common law because the parties did not properly develop the issue on appeal. 195 F.3d at 967. But the court "for now" declined to impose a requirement that this fiduciary duty *must* be grounded in state law. *Id.* Thus, the Seventh Circuit does not mandate that a fiduciary duty of honest services be defined only by reference to state law; however, the Seventh Circuit does not appear to prohibit any consideration of state law in determining the nature of that duty.

In any event, the court need not decide the issue because in instructing the jury in this case, the court did not tell the jury to determine whether Ryan breached his duty to provide honest services by determining whether Ryan violated Illinois law, or that any violation of an Illinois law related to public service resulted in a per se violation of the duty to provide honest services. The court merely instructed the jury that certain provisions of Illinois law were "applicable" during the relevant time period, and then described these provisions. Final Jury Instr. at 89-92. Before doing so, the court cautioned the jury that not every violation of state law gave rise to a mail fraud violation. *Id.* at 88. The court reiterated this instruction afterwards. *Id.* at 93. Moreover, the court

gave a general instruction as to the role of state law in this case: "[I]t is not enough to find that one or both of the defendants violated Illinois law, but instead you must consider Illinois law along with all of the elements of law that I instruct you on. Your job is to decide whether the government has proved, beyond a reasonable doubt, every element of each particular *federal* offense you are considering." *Id.* at 32 (emphasis added).

These references to Illinois law were designed to aid the jury in ascertaining the nature and scope of Ryan's duty to provide honest services as an Illinois public official. Indeed, given that Ryan was an Illinois official, with duties defined by Illinois statutes and the Illinois Constitution, it is difficult to imagine how one could conceive of Ryan's duty to provide honest services to the people of Illinois, without any reference to the standards of conduct prescribed by the people of Illinois. The court did not, however, require that the jury find a state law violation in order to find mail fraud. Indeed, after describing the applicable Illinois law, and (again) cautioning that not every state law violation constitutes mail fraud, the court reiterated the test the jury must use in determining whether a public official defrauded the public of honest services: whether the official "misuse[d] his position . . . for private gain for himself or another." Final Jury Instr. at 93. This instruction tracks the Seventh Circuit's holdings in *Bloom* and *Hausmann*, and in the court's opinion accurately states the law in this circuit.

In his post-trial motion, Warner cites Supreme Court cases holding that state law does not control the definition of federal criminal offenses. Warner Post-Trial Mot. at 23. *See, e.g., Taylor v. United States*, 495 U.S. 575, 590-91 (1990) (holding that the definition of "burglary" in a federal gun law did not depend on state law definitions). The court finds this authority inapplicable here because the court never instructed the jury to adopt any state law definition when considering the mail fraud charges. Warner also argues that principles of federalism are violated when the mail fraud statute is used to criminalize, on a federal level, conduct traditionally dealt with by state law. Warner Post-Trial Mot. at 23-24. The court is mindful of these federalism concerns, but finds this

contention inapplicable to this case as well. The jury did not convict Defendants of using the mails to violate state law; rather, the jury found that Ryan used the mails in breaching his federal duty, created by the mail fraud statute, to provide honest services. The references to Illinois law, as discussed above, merely assisted the jury in determining the nature of that federally-created duty.[5]

Of the remaining cases cited by Warner, the most relevant is *United States v. Sawyer*, 85 F.3d 713, 728 (1st Cir. 1996), which noted that the mail fraud statute does not create a federal felony upon "every transgression of state governmental obligations." The court does not disagree, which is why the court reminded the jury (twice) of that very point. Final Jury Instr. at 88, 93. The court thus concludes that the references to Illinois law in the mail fraud jury instructions were not improper.

### III. The Evidence Was Sufficient to Support the Jury's Verdict on the Tax Counts

Defendant Ryan was convicted of one count of corruptly endeavoring to obstruct the due administration of the federal tax laws in violation of 26 U.S.C. § 7212, and four counts of willfully making false statements in connection with his income tax returns in violation of 26 U.S.C. § 7206(1). *See* Indict., Counts XVIII–XXII. Ryan contends that the evidence presented at trial was insufficient to support the jury's finding that he willfully filed false tax returns. Ryan Rule 29 at 18.[6] The government was required to prove that "the law imposed a duty on the defendant, that defendant knew of this duty and that he voluntarily and intentionally violated that duty." *United*

---

[5]    The cases Warner cites in support of his federalism argument, while containing sympathetic language, do not specifically address federalism concerns in the "honest services" mail fraud context and thus do not control here. *Cleveland v. United States*, 531 U.S. 12, 20 (2000) was not an intangible rights case, and dealt only with whether a government-issued license is "property" under section 1341. *Kann v. United States*, 323 U.S. 88, 95 (1944), held that mail fraud requires use of the mails as a part of the execution of the fraud, rather than "incidental and collateral" use of the mails. *McNally v. United States*, 483 U.S. 350, 360 (1987) concluded that section 1341 did not support "intangible rights" such as the right to honest services, but Congress reversed that holding by enacting section 1346. *See Bloom*, 149 F.3d at 655.

[6]    Ryan does not specifically challenge the jury's verdict with respect to Count Eighteen (obstructing the IRS).

*States v. Hilgeford*, 7 F.3d 1340, 1344 (7th Cir. 1993) (quoting *Cheek v. United States*, 498 U.S. 192, 201 (1991)). A defendant's good-faith belief that he is acting within the law, even if objectively unreasonable, negates the willfulness element. *Cheek*, 498 U.S. at 203; *see also United States v. Benson*, 941 F.2d 598, 614 (7th Cir. 1991) ("[T]he reasonableness of a belief is a factor for the jury to consider in determining whether a defendant actually believed and acted on it."). The defendant's intent to violate a known duty under the tax laws may be demonstrated by circumstantial evidence. *United States v. Ytem*, 255 F.3d 394, 396 (7th Cir. 2001).[7]

Much of the tax evidence concerned Ryan's use of CFR funds to pay for personal expenses. At the time that Ryan served as Secretary of State, Illinois law permitted individuals to use campaign funds for personal expenses, but federal law required that the amount of such funds be reported as personal income. Tr. at 17396–97 (Schindler). Ryan relies on the testimony of Shari Schindler, the government's tax expert, for the proposition that the tax regulation governing the use of campaign funds for personal expenses is obscure, and that the distinction between "campaign" and "personal" is a "gray area." Ryan Rule 29 Mot. at 19 (quoting Tr. at 17735 (Schindler)). There is evidence in the record, however, that Ryan received written memoranda from Roger Bickel, who served as General Counsel during Ryan's tenure as Secretary of State, which disclosed Ryan's obligation to pay income tax on CFR funds used to pay for personal expenses. *See* Tr. at 16287 (Montague). This evidence is sufficient to support the jury's conclusion that Ryan was aware of the obligation to report personal expenses paid with CFR money on his tax return.

In any event, although the distinction between campaign-related and personal expenses may be a "gray area," the distinction was rarely at issue with respect to the items that the government charged Ryan with deliberately omitting from his income tax returns. Among those

---

[7]     Accordingly, it is not dispositive that there was no evidence in the record that Ryan told his tax-preparers or other assistants to omit particular items from his tax returns. *See, e.g.*, Tr. at 17691 (Schindler).

items were charges for various "pleasure trips" taken by George Ryan during the years 1995 through 1998. Gov't Resp. at 40. With respect to the majority of those trips, Ryan reported some but not all of the charges that were incurred during those trips. *See, e.g.*, Tr. at 17690, 17692, 17696 (Schindler). The jury could, therefore, readily have concluded Ryan was never genuinely confused about whether those trips were personal rather than campaign-related. What this pattern of reporting may suggest, however, is that these charges were omitted inadvertently, particularly as the reported charges were often greater than the charges that Ryan failed to report. For example, in connection with a 1995 trip to Jamaica, Ryan reported as personal income $758 of CFR funds used to pay for airfare, but omitted $236 in charges for a one-night stay at an airport hotel prior to the trip. Tr. at 17678–79 (Schindler).

The government suggested that these items were omitted because the system that Ryan put into place for documenting personal and campaign expenses was flawed. A pattern of omitting some charges, but not other, larger charges relating to the same event, arguably undermines the government's theory that this system was deliberately put into place to avoid taxes and support Ryan's lifestyle. *Cf.* Tr. at 23118 (Gov't Closing). The fact that Ryan could or should have played a more active role in ensuring that all charges were properly identified, standing alone, might not be sufficient circumstantial evidence that he willfully omitted income from his tax returns. *Cf. United States v. Stokes*, 998 F.2d 279, 281 (5th Cir. 1993) ("[E]vidence of a consistent pattern of under reporting large amounts of income will support the necessary inference of willfulness.").

There was, however, stronger circumstantial evidence of willfulness with respect to other unreported income for each of the tax years for which Ryan was charged with filing false returns (1995–98):

### A.    Gramm Campaign Funds (1995–96)

In 1995, Ryan agreed to endorse Phil Gramm in his bid for the Republican nomination for president and to serve as Gramm's campaign chairman in Illinois. Tr. at 8914–15 (Gramm).

Included in the campaign's Illinois budget was a line item for "consulting" services to be paid by the campaign to American Management Resources ("AMR"). Tr. at 8762–63 (Weaver). Unbeknownst to Gramm or to his national field director, *see* Tr. at 8922–24 (Gramm) and Tr. at 8773–74 (Weaver), Ryan, Fawell and Juliano were the beneficiaries of those consulting payments. Ryan directed that his portion of the Gramm money be paid to his daughters, even though they did not perform any significant work on the campaign. *See* Tr. at 10857 (Meyer). The jury could have reasonably concluded that by using AMR as a conduit for the Gramm money (an arrangement that Ryan at least acquiesced in), and then funneling that money to his daughters, Ryan was attempting to preclude discovery of this arrangement by anyone—including the IRS. *See Spies v. United States*, 317 U.S. 492, 499 (1943) (Tax evasion "may be inferred from conduct such as . . . concealment of assets or covering up sources of income . . . and any conduct, the likely effect of which would be to mislead or to conceal.").

After a tax investigation was launched, Tr. at 17811 (Schindler), Ryan amended his 1995 and 1996 tax returns to include income connected with the work he performed for the Gramm campaign. Tr. at 10853–54 (Meyer). In a statement attached to his amended returns, Ryan claimed that he had not expected payment for his work on the Gramm campaign, but was told by some unidentified person "that the national campaign did intend to pay me for my work." Gov. Exs. 25-003, 25-006 and 25-007. This statement was contradicted by Gramm's and Weaver's testimony that they did not intend to pay Ryan, and were unaware that Ryan was in fact receiving payments through AMR. Ryan further claimed in his statement to the IRS that he was not aware that he was required to pay income tax for his work because his daughters (and not Ryan) received the money. *Id.* The jury was entitled to disbelieve this statement, *see United States v. Agostino*, 132 F.3d 1183, 1193 (7th Cir. 1997), and could have reasonably concluded that the pattern of deception surrounding these payments indicated that Ryan willfully chose not to report the payments for work that he performed. *See Spies*, 317 U.S. at 499.

## B. CFR Payments to Michael Fairman (1996–97)

In 1996 and 1997, Ryan directed payments of CFR money totaling approximately $55,000 to his son-in-law, Michael Fairman. Tr. at 17070 (Fairman). At that time, the Fairmans were experiencing financial difficulties, and Ryan's daughter, Lynda Fairman, asked her father for assistance. Ryan responded by putting Michael Fairman on the CFR payroll as a consultant, Tr. at 16664 (L. Fairman Stip.), even though Mr. Fairman never performed any consulting services for Ryan or CFR and understood the money to be a gift. Tr. at 17076, 17079 1785–86 (Fairman). To comply with federal tax law, Ryan was required to pay taxes on this gift. He did not do so until amending his 1996 and 1997 tax returns in 2002, by which time an investigation into Ryan's tax returns had already been launched. *See* Tr. at 17811 (Schindler). As he had done with respect to the Gramm payments, Ryan included a statement with his amended returns claiming that he did not believe he was required to pay taxes on the payments so long as Fairman paid taxes on the amounts he received. Tr. at 10857 (Meyer).[8] As previously discussed, however, Mr. Bickel's memoranda explained that Ryan was obligated to report as income his personal use of campaign funds, Tr. at 16287 (Montague), and there can be no question that these payments to Mr. Fairman were personal expenses. And in contrast to the charges associated with personal trips that were omitted from Ryan's tax returns, Ryan was personally involved in the decision to label the large sums of money Mr. Fairman received as payments for "consulting." The jury could have reasonably concluded that Ryan deliberately chose to characterize the payments as "consulting" fees to avoid paying income taxes on those payments. There was sufficient evidence to support the jury's finding that Ryan did not believe his tax return for that year was "true and correct as to every material matter." 26 U.S.C. § 7206(1).

## C. CFR Payments to Nancy Smith (1998)

---

[8] This statement does not mention Ryan's decision to identify Fairman as a consultant when, in fact, he served no such role.

In 1998, Ryan directed CFR payments totaling $6,000 to Nancy Smith, the care-taker of Ryan's mother-in-law. Tr. at 13575 (Smith). Ms. Smith testified that she did not work directly for the campaign in any respect, *id.*, and on that basis Agent Schindler concluded that this was a personal and not a campaign expense that should have been included on Ryan's income tax return. Tr. at 17430 (Schindler). At trial, Ryan argued that this was a campaign expense, on the theory (propounded by Mr. Fawell) that Ms. Smith's services enabled Lura Lynn, Ryan's wife, to assist him on the campaign trail. Tr. at 23460 (Ryan Closing); *see also* Tr. at 4581 (Fawell). The jury was entitled to reject this explanation, and, moreover, could have found that Ryan contradicted this theory in statements he made to a reporter on February 14, 2001, in which he stated that Ms. Smith was paid for campaign work she performed. Tr. at 17865 (Olsen Stip.). Accordingly, the jury could have reasonably concluded both that the expense was personal and that Ryan believed it to be personal. Moreover, the expense was large enough and sufficiently outside the ordinary course that the jury could infer that Ryan was aware that the expense was not on the list of personal expenses that Bickel had prepared for that tax season. There was sufficient evidence, therefore, to support the jury's conclusion that the tax return Ryan filed for 1998 was willfully false.

## IV. There Was Sufficient Evidence to Support Defendant Warner's Conviction for Money Laundering

Defendant Warner was convicted of two counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).[9] The mail fraud and extortion charges in Count Two relating to the

---

[9]     The statute provides in pertinent part as follows:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of the specified unlawful activity–

    (B)    knowing that the transaction is deigned in whole or in part–

        (i) to conceal or disguise the nature, the location, the source, the

(continued...)

validation stickers contract and computer systems contract provided the predicate "unlawful activity" for the money laundering charges in Counts Fifteen and Sixteen. Warner contends that the evidence was insufficient to support the jury's conclusion that Warner concealed or attempted to conceal the proceeds of those activities. *See* Warner Post-Trial Mot. at 8. Warner also challenges the viability of the money laundering counts as charged, arguing, *inter alia*, that the sources of the allegedly laundered proceeds were not the alleged victims of the predicate acts. *Id.* at 9–10.

## A. Proceeds of Honest Services Fraud

As a threshold matter, the court notes that the Seventh Circuit's recent decision in *United States v. Boscarino* refutes Warner's argument that honest-services mail fraud cannot constitute the predicate "unlawful activity" for a money-laundering conviction. 437 F.3d 634, 636 (7th Cir. 2006). The court must, therefore, decline Warner's invitation to rule otherwise. Warner Post-Trial Mot. at 25.

*Boscarino* likewise requires the court to reject Warner's argument that Counts Fifteen and Sixteen are defective because the "proceeds" of the mail fraud charge were derived from American Decal and IBM, not from the State of Illinois—the alleged victim of the mail-fraud charges in Count Two. In *Boscarino*, a manager of an insurance brokerage firm, Aulenta, caused the firm to write a check to a corporation that the defendant, Boscarino, controlled—ostensibly as a referral fee for Boscarino's efforts to persuade the City of Rosemont to do business with the firm. 437 F.3d at 635. Boscarino endorsed the checks to Aulenta, who then split the proceeds with Boscarino and covered the firm's missing funds by overbilling Rosemont. *Id.* at 635–36. Boscarino was charged with mail

---

[9](...continued)

> ownership, or the control of the proceeds of specified unlawful activity . . . .

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

fraud, and because Aulenta owed his employer a duty of loyalty, "one aspect of the scheme was to defraud ABI/Acordia of Aulenta's honest services." *Id.* at 636. After rejecting the defendant's statutory argument that honest-services mail fraud cannot serve as the predicate offense for a money-laundering charge, the court addressed the defendant's contention that depriving an employer of "honest services" does not necessarily yield "proceeds." *Id.* The court concluded that this truism did not preclude application of the money-laundering statute in a case of to honest-services mail fraud that *does* create proceeds. *Id.* By way of example, the *Boscarino* court stated that a judge who accepted bribes and deprived the public of his honest services could be convicted of money-laundering: the bribes are the "proceeds" of the fraud, even if "he did not take the money from the public coffers." *Id.* (citing *United States v. Murphy*, 768 F.2d 1518 (7th Cir. 1985)).

Warner was charged with laundering the proceeds of the alleged schemes involving the validation-stickers contract (Count Fifteen) and the computer-systems contract (Count Sixteen). Money that Warner received from American Decal in connection with the validation-stickers contract was deposited into the checking account of a company (National Consulting Company ("NCC")) that Warner controlled. Tr. at 16901 (Schindler); Gov. Ex. 02-500. Warner caused NCC to issue checks payable to AMR, a company controlled by alleged co-conspirator Alan Drazek, amounting to one third of the proceeds Warner received from American Decal. Tr. at 16910 (Schindler); Gov. Ex. 02-501. Warner sent these checks to Mr. Udstuen, who in turn sent them to AMR. Tr. at 11650–51 (Udstuen). Drazek would then cash the checks, keeping some money for himself and delivering the balance in cash to Udstuen. Tr. at 11663 (Udstuen).

Warner and Udstuen used a similar process for checks Warner received from IBM in connection with the computer-services contract. The IBM payments were placed in the bank account of another company that Warner controlled, Omega Consulting Group Ltd. ("Omega"); Warner caused Omega to issue checks payable to AMR; and Drazek cashed the checks, keeping some money for himself and delivering the rest to Udstuen. Tr. at 16916 (Schindler); Tr. at 11663

38

(Udstuen); Gov. Exs. 04-500, 04-501. The money that Warner received from American Decal and IBM constituted the "proceeds" of the alleged scheme to award public contracts to Warner's lobbying clients while Warner and others provided gifts and other benefits intended to influence Ryan in the performance of his official acts. *See* Indict. Count II. The jury could fairly conclude that disguising the origins of these proceeds amounted to money laundering. *See Boscarino*, 437 F.3d at 636.

Warner also contends that the government failed to establish that the payments to AMR were the net rather than the gross proceeds of Warner's misconduct, citing *United States v. Scialabba*, 282 F.3d 475 (7th Cir. 2002). Warner Rule 29 Mot. at 9. This court previously rejected this argument in response to Warner's motion to dismiss Counts Fifteen and Sixteen of the Indictment. *See United States v. Warner*, 292 F. Supp. 1051, 1066 (N.D. Ill. 2003). As this court previously discussed, *Scialabba's* holding was predicated on the nature of the underlying crime, (gambling), which made it difficult to distinguish the crime itself from the proceeds of the crime. *Scialabba*, 282 F.3d at 475 ("We conclude that, at least when the crime entails voluntary, business-like operations, 'proceeds' must be net income; otherwise the predicate crime merges into the money laundering . . . ."). In *Scialabba*, the government charged the defendants with violating § 1956(a)(1) by using the money they received from video-poker machines to pay for the expenses of their business, such as "leasing the video poker machines and obtaining amusement licenses for them from the state." *Id.* at 476. The Seventh Circuit likened this argument "to saying that every drug dealer commits money laundering by using the receipts from the sales to purchase more stock in trade." *Id.* By contrast, the NCC and Omega payments to AMR were not the costs of doing business. According to the Indictment, Warner directed NCC and Omega to issue checks payable to AMR so that Udstuen would receive a portion of the money without being publicly linked to Warner. AMR served no discernable function in this series of transactions other than to disguise the provenance of the proceeds. Accordingly, there is no difficulty distinguishing the underlying

39

crime from the subsequent transactions in the proceeds of the crime.

**B.    Sufficiency of the Evidence of Concealment**

To convict Warner under 18 U.S.C. § 1956(a)(1)(B)(i), the government was required to prove that Warner "conducted a financial transaction knowing that the property involved in the transaction was illegally derived and knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds." *United States v. Esterman*, 324 F.3d 565, 569 (7th Cir. 2003). The Seventh Circuit has articulated two broad principles governing § 1956 liability. *Id.* at 570. First, the focus is on the "transaction in proceeds, not the transaction that creates the proceeds." *United States v. Mankarious*, 151 F.2d 694, 705 (7th Cir. 1998); *see also Esterman*, 324 F.3d at 573 ("[I]t is important, even if difficult at times, to ensure that the money laundering statute not turn into a money spending statute.") (citation and internal quotation marks omitted). Second, the defendant must do more than simply transfer, then spend, the proceeds at issue. *Esterman*, 324 F.3d at 570. Rather, the defendant's transactions with the proceeds of unlawful activity must be "specifically designed 'to hide the provenance of the funds involved.'" *Id.* (quoting *United States v. Jackson*, 935 F.2d 832, 843 (7th Cir. 1991)).

Warner argues that the AMR/Udstuen transactions do not demonstrate an intent to conceal the proceeds of unlawful activity, as the two companies transferring money to AMR (NCC and Omega) were legitimate companies with undisguised ties to Warner. Warner Rule 29 Mot. at 8 Using sham companies to transact business using the proceeds of unlawful activity is one way the government may demonstrate an intent to conceal. *See, e.g.*, *Esterman*, 324 F.3d at 573 (listing types of circumstantial evidence that may show an intent to conceal). But it is not the only way. Mr. Udstuen testified that Warner offered to give him a portion of the money that he (Warner) received from contracts with the Secretary of State's Office. Tr. at 11621–22 (Udstuen). Udstuen was concerned, however, that accepting money directly from Warner would jeopardize Udstuen's

position at the Illinois State Medical Society. Tr. at 11628 (Udstuen). In order to conceal the fact that he was receiving money from Warner, Udsteun proposed using AMR as a conduit for Udstuen's portion of the American Decal and IBM money, and Warner agreed to this arrangement. Tr. at 11629, 11646 (Udstuen). AMR's only function in this series of transactions was to disguise the source of the money that Udstuen was receiving. *See Esterman*, 324 F.3d at 573 (intent to conceal may be shown by the "use of third parties to conceal the real owner, or engaging in unusual financial moves culminating in a transaction."). *Cf. United States v. Blankenship*, 382 F.3d 1110, 1129 (11th Cir. 2004) (defendant offered uncontradicted testimony that he used a separate, "dba" bank account to deposit proceeds because his bank would not permit him to deposit the checks into his personal account). This record stands in sharp contrast to the cases Warner cites where the defendant did little more than spend or transfer (more or less conspicuously) the proceeds of his or her unlawful behavior.[10] The court concludes that the evidence was sufficient to support Warner's money-laundering convictions.

Warner makes one further, technical challenge to the Indictment: He contends that the reference in Count Fifteen to the extortion statute is inappropriate because there is no allegation that IBM was an extortion victim. Warner Rule 29 Mot. at 10; *cf.* Indict. Count XIV (charging Warner with extortion in connection with the validation stickers contract). Assuming the reference in Count Fifteen to § 1951 was inappropriate, the error is harmless as the mail fraud charges referenced in the same Count formed a sufficient basis on which to conclude that the government satisfied the "unlawful activity" element of the money-laundering statute.

## V.     There Was Sufficient Evidence to Support Defendant Warner's Conviction for Illegal

---

[10]     *Cf. Esterman*, 324 F.3d at 571; *United States v. Corchado-Peralta*, 318 F.3d 255, 259 (1st Cir. 2003)*; United States v. Olaniyi-Oke*, 199 F.3d 767, 770–71 (5th Cir. 1999); *United States v. Herron*, 97 F.3d 234, 237 (8th Cir. 1996)("[T]he money-laundering statute should not be used as a money-spending statute.") (citation and internal quotation omitted); *United States v. Rockelman*, 49 F.3d 418, 422 (8th Cir. 1995); *United States v. Dimeck*, 24 F.3d 1239, 1246 (10th Cir. 1994); *United States v. Sanders*, 928 F.2d 940, 945 (10th Cir. 1991).

**Structuring**

Defendant Warner was convicted of one count of purposefully structuring transactions to avoid CTR requirements in violation of 31 U.S.C. § 5324(a)(3). On July 31, 1997, Warner caused two checks to be written—one for $9,000 and one for $5,000—on Omega Consulting's bank account, the account into which Warner placed money he received from IBM. Tr. at 12495–96 (Karcazes); Gov. Ex. 08-039; Tr. at 16916 (Schindler). Warner later cashed these checks on August 4, 1997 and August 5, 1997 at two different North Community Bank branches. Tr. at 12495–96 (Karcazes); Gov. Ex. 08-039. Warner contends that the evidence was insufficient to support the jury's finding that he acted purposefully to avoid CTR requirements. Warner Rule 29 Mot. at 12; Post-Trial Mot. at 25–26. Specifically, Warner argues that the fact of structuring transactions cannot be used to infer an intent to violate the statute. Warner Rule 29 Mot. at 12.

Warner relies exclusively on cases applying the "willfulness" requirement before Congress amended the anti-structuring statute in response to *Ratzlaf v. United States*, 510 U.S. 135 (1994). *See, e.g.*, *United States v. Vasquez*, 53 F.3d 1216, 1222 (11th Cir. 1995). In *Ratzlaf*, the Supreme Court held that Congress' use of the word "willfully" in 18 U.S.C. §§ 5322(a) & 5324(a)(3) required the government to prove that the defendant knew that his conduct was unlawful, not simply that he acted to avoid the financial institution's reporting requirement. 510 U.S. 135, 146–48 (1994); *see also United States v. Obiechie*, 38 F.3d 309, 313 (7th Cir. 1994). Congress subsequently amended the statute to eliminate the reference to "willfulness." *United States v. Griffith*, 84 F.3d 912, 923 n.7 (7th Cir. 1996). The statute now requires the government to prove that the defendant acted purposefully to evade the bank's CTR requirement, not that the defendant knew that such conduct was unlawful. *United States v. Pang*, 362 F.3d 1187, 1193 (9th Cir. 2004). Under the amended anti-structuring statute, the fact of structuring may well support the inference that the defendant acted purposefully to avoid the bank's CTR obligations. *See, e.g., United States v. Cassano*, 372 F.3d 868, 879 (7th Cir. 2004) (*vacated on other grounds by Cassano v. United States*, 543 U.S.

42

1109 (2005)) (inferring knowledge of an intent to avoid CTR obligations from, among other evidence, a large number of transactions under $10,000); *United States v. MacPherson*, 424 F.3d 183, 192 (2d Cir. 2005).[11]

Warner served on North Community Bank's Board of Directors from 1998 to 2002. Tr. at 12483 (Karcazes). Warner's co-member on the Board, George Karcazes, testified that North Community maintained and regularly updated a "Bank Secrecy Policy" which discussed the bank's obligation to file CTR's for transactions in excess of $10,000 cash. Tr. at 12488 (Karcazes). Policy updates were approved by the Board of Directors, including Warner. Tr. at 12490–93 (Karcazes). In light of his many years as a North Community Director, and the fact that the CTR requirement was discussed in the Bank Secrecy Policy that Warner approved, the jury could have reasonably concluded that Warner was aware of the bank's reporting obligation. Moreover, the nature of Warner's transactions support the inference that he intended to avoid the bank's disclosure obligation. Warner caused two checks to be written on the same day in amounts under the $10,000 threshold.[12] Warner subsequently cashed the checks on consecutive days at two separate North

---

[11]    *See also United States v. Ismail*, 97 F.3d 50, 56 (4th Cir. 1996) (Applying pre-amendment statute, but inferring knowledge of bank's reporting obligations and intent to avoid CTR's from circumstantial evidence that defendants knew of the obligation and multiple transactions "just under $10,000"); *United States v. Wynn*, 61 F.3d 921, 927–28 (D.C. Cir. 1995) (Applying pre-amendment statute, but noting that using multiple checks under $10,000 to satisfy a single debt "created an inference that [the defendant] was motivated to avoid the reporting requirement.").

[12]    The government speculates that Warner may have used the cash withdrawals to "take care of Ryan." Gov't Resp. at 48. Neither the source of the proceeds nor the purpose for which they were withdrawn, however, is material to § 5324 liability. It is enough to sustain a conviction under the anti-structuring statute that defendant purposefully structured a transaction to avoid the reporting requirement, whatever ultimate purpose the defendant hoped to accomplish by not drawing unwanted attention to the transaction. *See United States v. Gabel*, 85 F.3d 1217, 1223 (7th Cir. 1996) ("The reporting requirement is central to this offense; it would make no difference to the Treasury if someone illegally structured a transaction to avoid reporting an exceptionally generous gift that fell above the $10,000 threshold, or if she wanted to avoid reporting the receipt of illegal proceeds."); *United States v. Gibbons*, 968 F.2d 639, 645 (8th Cir. 1992) ("The focus of the statute is on the structuring person's conduct, not on the reason why he did not want the
(continued...)

Community bank locations within one week of causing the checks to be written. The evidence further established that during 1997 Warner made numerous large withdrawals without ever exceeding the $10,000 threshold. Gov. Ex. 08-510; Tr. at 17232–33 (Schindler); *see MacPherson*, 424 F.3d at 191–92. Together with the circumstantial evidence that Warner was aware of the CTR requirement, the jury could have reasonably inferred from this pattern of behavior that Warner acted purposefully to avoid triggering the bank's disclosure obligation.

## VI. Defendant Warner's Trial Was Properly Joined with Defendant Ryan's

Defendant Warner requests a new trial on the grounds that the court should have granted his request for severance. Warner Post-Trial Mot. at 1, 8. Warner made numerous motions for severance both before and during the trial, beginning in January 2004 when counsel for the newly-indicted and joined Ryan requested that Warner's original trial date of February 23, 2004, be reset, allowing the Ryan defense team time to prepare. *United States v. Warner*, No. 02 CR 506, 2004 WL 144125, at *1 (N.D. Ill. Jan. 16, 2004). This court denied Warner's implied request for a severance, finding at that time that Warner could show neither evidentiary or substantive prejudice from a delay and that trying Ryan and Warner separately would tax both the government's and the court's resources significantly. *Id.* at *5.

Prior to trial in February 2004, Warner again moved for severance. *Warner*, 2004 WL 1794476, at *23. He noted that Ryan was named as the sole defendant in nine of the indictment's twenty-two counts. *Id.* at *24. Of these, the court observed that Counts Six and Ten, related to the South Holland lease and Grayville prison mail-fraud sequences, were sufficiently similar to Counts Two, Three, Four, Five, Seven, Eight, and Nine—mail-fraud sequences with which Warner was allegedly involved—so as not to require severance. *Id.* Further, the court concluded that any

---

[12](...continued)
transaction report filed.").

prejudice to Warner arising from the court joining these counts could be addressed through limiting instructions to the jury. *Id.* With respect to the remaining seven false statement and tax counts levied against Ryan alone, the court noted that severance remained inappropriate so long as the evidence related to these counts was relatively brief and presented at the end of the government's case. *Id.* In the alternative, the court said it would consider bifurcating these counts and trying them to the same jury after it had returned a verdict on the mail fraud and RICO counts. *Id.* Such a procedure would alleviate Warner's confrontation concerns arising from the introduction of Ryan's purportedly false statements that he appointed Warner to the McPier Board on the recommendation of another member; that he never discussed the Joliet lease or SOS Office leases with Warner or had any personal knowledge that Warner profited from those leases; and that he had no personal financial relationship with Warner. *Id.* On the other hand, the court also noted that none of Ryan's statements pertaining to Warner were in fact inculpatory. *Id.* Finally, the court did not believe that a Warner-only trial would mean that his trial would be free of hardships, including extensive press coverage, attributable to co-defendant Ryan's notoriety. *Id.* & n.16.

Warner again requested severance or bifurcation of the Ryan-only counts in 2005. *United States v. Warner*, 396 F. Supp. 2d 924, 933 (N.D. Ill. 2005). With respect to the court's ruling on Counts Six and Ten, Warner argued that the similarity between the Ryan-only mail fraud counts and the mail-fraud counts involving both Defendants exacerbated rather than alleviated the possibility of juror confusion. *Id.* The court stood by its earlier ruling, observing that there was no reason to believe that the jury would disregard an instruction to consider the evidence related to each count separately. *Id.* at 935-36. The court, however, reserved a ruling on Warner's request for bifurcation of the Ryan-only tax and false-statement counts, pending clarification from the government on how much evidence it intended to introduce to prove those charges. *Id.* at 936.

Warner renewed his motion to sever and re-raised these arguments several more times during the course of the trial. Def. Warner's Mot. to Bar Proof at the Joint Trial and Renewed Mot.

for Severance, 01/9/06, at 1; Def. Warner's Renewed Motion for Severance at the Close of the Government's Case, 02/02/06, at 1; Def. Warner's Renewed Motion for Severance at the Close of the Defendant's Case, 02/23/06, at 1. Ultimately, this court did not grant Warner severance or bifurcation; however, the court addresses the arguments raised in these briefs to the extent that they remain relevant.

Warner argues that this court erred in denying his requests for severance or bifurcation. He contends, first, that joinder was impermissible because "[t]he indictment does not show, nor has the government established, the existence of a single overarching conspiracy involving both defendants." Def. Warner's Renewed Motion for Severance at the Close of the Government's Case, 02/2/06, at 5. Second, Warner argues that he was prejudiced by the abundance of evidence that was admitted solely against Ryan that would not have been admitted against him alone. *Id.* at 1. Third, Warner argues that the evidence the government introduced against Ryan on the false-claims counts violated Warner's constitutional right to confrontation. *Id.* at 5.[13]

Defendants may be joined in a single indictment where they are "alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." FED. R. CRIM. P. 8(b). The propriety of joinder is assessed from the face of the indictment and not based on the evidence actually adduced at trial.[14] *Lanas*, 324 F.3d at 899.

---

[13]     Because Warner was tried with a public official, Warner also contends that, in addition to sorting out what evidence applied to which Defendant, the jury was also tasked with making the difficult determination of which legal duties applied to which Defendant. Def. Warner's Renewed Motion for Severance at the Close of the Government's Case, 02/2/06, at 4. Although the court did instruct the jury on these matters, Warner contends that these jurors proved themselves incapable of following such instructions. Warner Post-Trial Mot. at 9. The court will address this argument in the section on juror-related issues. *See infra* Part IX.G.

[14]     It is possible that Warner's reference to the evidence adduced at trial is an invocation of a claim of "retroactive misjoinder," a circumstance in which the government alleges a link between charges or defendants in the indictment, but never actually introduces any evidence to substantiate that allegation, and the defendant is prejudiced as a result. *See United States v. Velasquez*, 772 F.2d 1348, 1354-55 (7th Cir. 1985). The court's determination that the evidence
(continued...)

Thus, Warner's first argument is without merit. The court determined that the Second Superseding Indictment charged Warner and Ryan with a single overarching conspiracy and a single scheme to defraud, *Warner*, 2004 WL 144125 at *1, and stands by its original determination that joining Warner and Ryan accords with the Federal Rules.

The Rules do authorize severance where the court determines that, nonetheless, "joinder . . . of defendants in an indictment . . . or . . . for trial appears to prejudice a defendant . . . ." FED. R. CRIM. P. 14(a). The Supreme Court in *Zafiro v. United States* explained that "when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." 506 U.S. 534, 539 (1993). Furthermore, "[b]ecause Rule 14 assigns to the district court the task of balancing the cost of multiple trials against the possible prejudice inherent in a single trial . . . [i]n order to prevail on this issue, a defendant must demonstrate that the denial of severance caused him actual prejudice that deprived him of his right to a fair trial; it is insufficient that separate trials would have given a defendant a better opportunity for an acquittal." *United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002) (internal quotation marks and citations omitted).

Having presided over the lengthy trial in this case, the court is not persuaded that Defendant Warner was prejudiced by the "abundance of evidence that was admitted solely against Co-defendant Ryan." Def. Warner's Renewed Motion for Severance at the Close of the Government's Case, 02/2/06, at 1. Warner's brief includes a two-and-a-half page list of evidence he urges would not have been admissible had he been tried without Ryan. *Id.* at 2-4. The government responds by observing that this lengthy trial involved the testimony of more than 100 witnesses and the

---

[14](...continued)
adduced at trial provided a reasonable basis for jury to convict on Count One and discern a single scheme to defraud the State of Illinois defeats any such argument here.

introduction of more than 1,000 exhibits, the majority of which pertained to both Defendants. Gov't Reply at 57. Even if this were not the case, that the evidence against Ryan was proportionally greater the evidence against Warner, standing alone, would not be a ground for severance. *Diaz*, 876 F.2d at 1344, 1357.

Moreover, Warner's list of Ryan-only evidence overstates the potential prejudice. In both mail fraud and conspiracy cases, evidence of one defendant's acts in furtherance of the scheme or conspiracy are admissible against any other participant in the scheme or conspiracy, even if such a participant did not specifically know what his co-defendant was doing. *Adeniji*, 221 F.3d at 1027. Thus, where evidence pertaining to counts in which Ryan alone was named also dealt with the single conspiracy set out in Count One or the overarching conspiracy laid out in Counts Two through Ten, that evidence would also have been admissible against Warner even in a separate trial. The government also correctly notes that Ryan's tax and false statement charges flowed from the overarching conspiracy and scheme to defraud and that the evidence introduced against Ryan only to support those counts was not inflammatory or otherwise obviously prejudicial to Warner. Gov't Resp. at 57. The court is sympathetic to Warner's position that he should not be found guilty by association. Warner Post-Trial Mot. at 12. Under the law of conspiracy, Warner is in fact accountable for the acts of his associates.

Warner also suggests that the intense media coverage and notoriety attendant with sharing a courtroom with a prominent public official would not have developed, had the court granted Warner's request for severance. Warner Post-Trial Mot. at 13. Respectfully, the court suggests that recent experiences—including the criminal prosecutions of Scott Fawell, a few years ago, and, more recently, Robert Sorich—suggest otherwise, and dispel the notion that the absence of the prominent public official popularly associated with a particular defendant would dim the media spotlight or dull the public's interest.

Finally, Warner argues that the denial of severance compromised his right to confrontation. Warner Post-Trial Mot. at 11. Warner notes that the government proved its false statements charges against Ryan in part by introducing out-of-court statements Ryan made about Warner, and argues that the court's instructions to the jury not to consider those statements as evidence against Warner were inadequate under *Bruton v. United States*, 391 U.S. 123 (1968) ("holding that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant."). Warner further argues that the Supreme Court's recent decision in *Davis v. Washington*, 126 S. Ct. 2266 (2006) controls because Ryan's statements to the FBI and the U.S. Attorney constitute "testimonial evidence" that should have been barred absent the opportunity to cross-examine. Warner Reply at 5; *see Crawford v. Washington*, 541 U.S. 36, 53-54 (2004) (holding that the Sixth Amendment bars the admission of testimonial statements of a nontestifying witness unless the witness is unavailable and the defendant had a prior opportunity for cross-examination).

In this case, the court carefully excluded all of Ryan's out-of-court statements referring to Warner except uncontested background statements and statements deemed noninculpatory. Tr. at 17903-05 (01/25/06). Because the statements that were admitted were not inculpatory, they do not raise Confrontation Clause issues. *See Richardson v. Marsh*, 481 U.S. 200, 207-08 (1987) (distinguishing *Bruton* as applying only when a codefendant's out-of-court statement is so expressly and powerfully incriminating on its face that an "overwhelming probability" exists that the jury cannot disregard the incriminating reference). Moreover, the statements were not introduced for the truth of the matter asserted; to the contrary, the government contended Ryan's statements were untruthful. Thus, as to Warner, the statements are not hearsay and do not implicate the Confrontation Clause. *See Crawford*, 541 U.S. at 59 n.9 ("The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter

asserted.") (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).

Because Ryan's out-of-court statements admitted into evidence are neither inculpatory nor hearsay, the court need not reach Warner's argument that the statements should have been barred because they were "testimonial" under *Davis*. Warner Reply at 5. In *Davis*, the Court explained that only the "testimonial statements" of a hearsay declarant implicate *Crawford*. 126 S. Ct. at 2273 (quoting *Crawford*, 541 U.S. at 53-54). The Court defined "testimonial" as statements made in response to a police interrogation, the primary purpose of which "is to establish or prove past events potentially relevant to later criminal prosecution" rather than assist police in dealing with an ongoing emergency. *Id.* at 2273-74; *see United States v. Tolliver*, 454 F.3d 660, 665 (7th Cir. 2006) (defining "testimonial" statements as those a declarant makes "in anticipation of or with an eye toward a criminal prosecution."). Warner argues that Ryan's statements to the FBI and the U.S. Attorney clearly fall within that definition. Warner Reply at 5. But whatever its merits, his argument is inapplicable here, where the statements were not offered for their truth. Neither *Davis* nor *Crawford* applies to bar non-hearsay evidence. *See Tolliver*, 454 F.3d at 666 (discussing *Davis* and emphasizing that the testimonial versus nontestimonial issue was irrelevant, and *Crawford* not implicated, where out-of-court statements were offered for context and not for their truth; admission of such statements "does not offend the Confrontation Clause because the declarant is not a witness against the accused."). The court thus concludes that the Confrontation Clause is not implicated here.

## VII.    Jury Instruction Challenges

### A.    The Court Properly Gave the Jury a *Pinkerton* Instruction

Defendant Ryan argues that the court erred in giving the jurors, a so-called *Pinkerton* instruction. The disputed instruction stated, in part, as follows:

A conspirator is a person who knowingly and intentionally agrees with one or more

persons to accomplish an unlawful purpose. A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of and as a foreseeable consequence of the conspiracy.

Final Jury Instr. at 73. The instruction went on to direct the jurors, if they found Ryan guilty of the conspiracy charged in Count One, to find him guilty of each of the mail fraud counts applicable to Ryan, provided that the government also proved that the offense was committed: "(a) by his fellow conspirators in furtherance, and as a foreseeable consequence, of the conspiracy charged in Count 1, (b) while defendant Ryan was a member of the conspiracy charged in Count 1." *Id.* A separate paragraph gives the same instruction with respect to Warner. Ryan does not contend that this instruction misstates the law; rather, he argues that *Pinkerton* instructions are inappropriate in RICO cases and that the instruction in this case was confusing because neither the indictment nor the proof in the case was premised on vicarious conspiratorial liability. Ryan Post-Trial Mot. at 52–53.

The RICO statute does not preclude the use of *Pinkerton* instructions, and the Seventh Circuit has stated that the use of such instructions in RICO cases is not "wrong or improper." *Neopolitan*, 791 F.2d at 504 n.7; *see also United States v. Campione*, 942 F.2d 429, 437–38 (7th Cir. 1991). The *Pinkerton* instruction given to the jury in this case closely tracked the Seventh Circuit's pattern instruction, and accurately states the law with respect to co-conspirator liability. There is, therefore, no basis for requiring a new trial in the substance of the instruction itself, nor in the fact that it was given in the context of a case containing a RICO conspiracy charge.

Nevertheless, Ryan contends that the jury received mixed signals about whether the government was pursuing a direct or vicarious liability theory. As Ryan points out, the Indictment does not charge Ryan with conduct in which only Warner participated directly (e.g., extortion, money laundering and illegal structuring), and vice versa. Moreover, the court instructed the jury throughout the trial that particular evidence pertained only to Ryan, not Warner. *See, e.g.*, Tr. at

14564 (01/04/06). Ryan assumes that the jury took from the Indictment and the limiting instructions a broad rejection of vicarious liability, which the *Pinkerton* instruction confusingly contradicted.

The court believes that this argument is speculative and overstates the impact of the limiting instructions, which were necessarily narrow and fact-specific. There is no reason to conclude that the jury inferred from one or more of these instructions that vicarious liability did or did not apply to the case as a whole. Ryan's argument is further undercut by the fact that the *Pinkerton* instruction concerns a theory of liability, not a substantive crime or defense. So, while Ryan is correct that the government's arguments at trial tended to emphasize Ryan's personal participation in the alleged schemes, a vicarious-liability theory was not incompatible with the evidence presented at trial. *Cf. Humphry v. Staszak*, 148 F.3d 719, 723–24 (7th Cir. 1998) (trial judge committed reversible error by instructing the jury regarding an entrapment defense that had not been pursued by the § 1983 plaintiff and for which there was no evidence in the record). Under the rule established in *Pinkerton*, the government could have placed greater emphasis on Ryan's liability for the actions of his co-conspirators, but chose not to. The court does not believe that that decision confused the jury or prejudiced Ryan.

The jury did state at one point during deliberations that they found the *Pinkerton* instruction "ambiguous." Tr. at 24022–23 (03/16/06). The jury's confusion appears to have arisen from the language of the instruction itself, which, as previously discussed, closely tracks the Seventh Circuit's pattern instruction, and not with the concept of vicarious liability generally, or how that concept relates to the limiting instructions that the jury received regarding particular evidence. This court's response fully addressed the specific question that the jurors posed, that is, whether they could "skip" Counts Two through Nine. The answer was "no."[15] Ryan points out that the

_____

[15] This court's full response to the jurors' question was as follows:

(continued...)

reconstituted jury did not pose this question again, and speculates that the jury must have either remained confused about the instruction or improperly discussed the court's response to the previous note. This is pure speculation, as the course of the reconstituted jury's deliberations could have proceeded in any number of directions such that the question never arose. As with the many other instructions that the reconstituted jury did not specifically inquire about, the court presumes that the jury understood the instruction. *See United States v. O'Neill*, 116 F.3d 245, 249 (7th Cir. 1997) ("We presume that juries understand and follow jury instructions."). Certainly, the court has no basis to abandon that presumption in this case. The court concludes that the *Pinkerton* instruction was both an accurate statement of the law and appropriate under the circumstances of this case.[16]

### B.      The Court Properly Gave the Jury a Partial "Ostrich" Instruction

At the government's request, the court gave an "ostrich" instruction but limited the instruction to the charge relating to the diversion of state resources. With respect to that charge only, the jury was instructed that it could "infer knowledge from a combination of suspicion and indifference to truth." Final Jury Instr. at 27. Defendant Ryan argues that it was error to give any "ostrich" instruction at all, and further contends that the jury could not have performed the "mental gymnastics" required to apply the instruction to some matters but not others. Ryan Post-Trial Mot. at 55–58. An ostrich instruction is appropriate "when a defendant claims a lack of guilty knowledge

---

[15](...continued)
You are to consider the evidence as to each count separately and reach a verdict as to each count separately. Thus, whether you find a defendant guilty or not guilty of Count 1, you must still consider the evidence and reach a verdict as to each of Counts 2 through 10. I remind you to consider all of the instructions you have been given.

Letter from Court to Jurors of 3/20/06.

[16]      Accordingly, the court does not reach the government's argument that Warner waived, and Ryan forfeited, their objections to the *Pinkerton* instruction. Gov't Resp. at 68.

and where there are facts and evidence which support an inference of deliberate ignorance." *United States v. Lennartz*, 948 F.2d 363, 369 (7th Cir. 1991) (internal quotation marks omitted); *see also United States v. Carrillo*, 435 F.3d 767, 780 (7th Cir. 2006). The focus is on the defendant's state of mind, not on what an objectively reasonable person might do in the same context. *Carrillo*, 435 F.3d at 781 ("[T]he focus is on what the defendant knew and whether the defendant knew enough to support an inference that he or she remained deliberately ignorant of facts constituting criminal knowledge.").

While the government did present evidence and make arguments concerning Ryan's direct knowledge and participation in diverting state resources for personal and political ends, there was also evidence in the record Ryan deliberately avoided obtaining that knowledge. *See United States v. Carrillo*, 269 F.3d 761, 769 (7th Cir. 2001) ("The government is not precluded from presenting evidence of both an actual knowledge theory and a conscious avoidance theory."). In 1992, Mr. Fawell directed state employees to perform work on Bruce Clark's campaign for state representative. Tr. at 3167 (Fawell). One of those employees, Brad Roseberry, was summoned to a meeting with Fawell, Ryan and others. Tr. at 14273 (Roseberry). When another state employee, Scott Wiseman, suggested that Roseberry take a "leave of absence" from his state employment while working on the Clark campaign, Roseberry testified that Fawell said "[n]o, we are not going to do that." Tr. at 14274 (Roseberry). Ryan said nothing. *Id.* at 14274. In each of the years 1994–1998, Fawell oversaw the diversion of state resources to various political campaigns. Tr. at 3180, 3184, 3190 (Fawell). Ryan's attorneys argued at trial that Mr. Fawell was responsible for diverting these state employees for political purposes, and that he acted without Ryan's knowledge and contrary to Ryan's 1993 directive to state employees prohibiting them from doing political work on state time. Tr. at 23403–04, 23408 (Ryan Closing). Yet there was evidence in the record that when these issues percolated up to Ryan, he chose to look the other way while Fawell—the person who, in December 1994, proposed installing someone in the IG department

who "won't ask about FR (fundraising) tickets"— handled it.  Gov. Ex. 01-019.  So, for example, when Fawell told Ryan that he had arranged for some Secretary of State employees to be paid for work they did in connection with 1996 House campaigns, Ryan told Fawell that he "[did not] want to hear about it."  Tr. at 3193 (Fawell).  Fawell also testified that when a Secretary of State employee, Glen Bower, complained to Ryan in 1998 about state employees working for CFR, Ryan asked Fawell to "[j]ust work it out, will you?"  Tr. at 3326 (Fawell).  In response to Ryan's request, and after receiving complaints from other state employees about Bower, Fawell held a meeting with Bower and other state and campaign employees intended to make Bower stop nosing around with respect to the use of state employees for campaign work.  Tr. at 3355 (Fawell).  In light of these acts of deliberate avoidance, the court concludes that the ostrich instruction was appropriate.

Nor is the court persuaded that its decision to limit that instruction to the diversion of state resources prejudiced either Defendant.  This court chose to limit the application of the ostrich instruction because it believed that, with respect to other factual sequences in this case (for example, tax issues), "the facts and evidence [did not] support an inference of deliberate ignorance."  *Carrillo*, 435 F.3d at 782.  As previously discussed, jurors are presumed to understand and to follow instructions, and there is no basis in the record to conclude that the jury did not do so in this instance.  The Defendants were further protected from the possibility that the jury convicted them for mere negligence by the additional instruction that "[a] defendant's association with alleged conspirators or persons involved in a criminal enterprise is not itself sufficient to prove his participation or membership in a conspiracy or criminal enterprise."  Final Jury Instr. at 31; *see Carrillo*, 269 F.3d at 770 (concluding that any harm resulting from an ostrich instruction was lessened by a "mere association" instruction).

C.    **The Court Properly Denied Defendant Ryan's Requested Special Verdict Form**

The jurors in this case returned a verdict form that asked the jurors whether each Defendant

did or did not commit a particular offense, or whether each Defendant was guilty or not guilty of a particular count in the indictment. Defendant Ryan argues that this verdict form was inadequate to assure that the jury was unanimous with respect to each element of each offense.[17] Ryan Post-Trial Mot. at 58. Before closing arguments, Ryan submitted a proposed special verdict form that asked the jurors to make numerous specific factual findings for many counts. Ryan's Proposed Verdict Form. The court declined to use Ryan's proffered verdict form. 3/6/06 Order. Ryan contends that without the use of a specific verdict form, "there is no way of knowing" if the jury unanimously agreed as to which particular conduct gave rise to criminal liability. Ryan Post-Trial Mot. at 58.

Although permitted, special interrogatories or verdicts are "generally not favored in criminal cases." *United States v. Smith*, 938 F.2d 69, 70 (7th Cir. 1991). Ryan argues that in "complex" criminal cases, special verdict forms are not disfavored and "may even be required." Ryan Reply at 25. He cites several cases–none from the Seventh Circuit–in which other courts of appeal found no error in the use of special verdict forms. *See United States v. Stonefish*, 402 F.3d 691, 698 (6th Cir. 2005); *United States v. Palmeri*, 630 F.2d 192, 203 (3d Cir. 1980); *United States v. Huber*, 603 F.2d 387, 394 (2d Cir. 1979). These courts did not, however, hold that a district court erred by *not* using a special verdict form; rather, there was no prejudice to criminal defendants where such forms were used. *See Stonefish*, 402 F.3d at 698 (finding juror unanimity satisfied despite the special verdict form, not because of it); *Palmeri*, 630 F.2d at 203 (holding that the trial court did not err in giving the jury special interrogatories because defendants were not prejudiced by their use); *Huber*, 603 F.2d at 394 (noting in passing that the special verdict form helped show that jurors were undivided).[18]

---

[17]     Defendant Warner does not object to the verdict form.

[18]     Other cases cited by Ryan are inapplicable. In *United States v. Beros*, 833 F.2d 455, (continued...)

Contrary to Ryan's position, there is no requirement that a district court use a defendant's proffered special verdict form, even in complex cases. *See United States v. Sababu,* 891 F.2d 1308, 1325 (7th Cir. 1989); *Smith,* 938 F.2d at 70; *see also United States v. Ogando,* 968 F.2d 146, 149 (2d Cir. 1992) (noting the benefits of special interrogatories in "particularly complex criminal cases," but finding their use within the "broad discretion of the district court" and affirming the district court's decision not to use special interrogatories submitted by the defendants). In *Sababu,* a conspiracy case, the Seventh Circuit rejected the defendants' argument that special verdict forms were needed to ensure juror unanimity as to which conduct constituted the defendants' conspiracy: "The defendants provide us with no cases or other authority–and we can find none on our own–that require a district court to provide a jury with proffered special verdict forms." 891 F.2d at 1325. The court there found the unanimity requirement satisfied by an instruction that the jurors unanimously agree that the defendants were part of the conspiracy, and as to the objects of the conspiracy. *Id.* at 1326.

This court acknowledges that special verdict forms may be beneficial in certain complex criminal cases, and, as noted, the court was not opposed in principle to using such a form in this case. The court, however, found Ryan's proffered 68-page verdict form "cumbersome, overly detailed, and potentially confusing." 3/6/06 Order. Indeed, many of the factual findings that Ryan asked the jury to make had no apparent purpose. In light of the general disfavor of special verdict forms in this circuit, and given the lack of any requirement to use such forms, the court concluded that the potential for harm from Ryan's proffered form far outweighed any benefit from its use.

---

[18](...continued)
460-63 (3d Cir. 1987), the court concluded that a particularly complex case "warranted more specific instructions regarding jury unanimity," but did not address whether a special rather than a general verdict form should have been used. In *United States v. Ham,* 58 F.3d 78, 85 (4th Cir. 1985), the court expressed no opinion at all as to the district court's use of a special verdict form.

The court is satisfied that the general verdict forms returned by the jury adequately protected Ryan's right to a unanimous verdict. At the jury instructions conference, the court directed the government to modify its proposed general verdict form to include some factual detail as to each count of the indictment, to help the jurors identify the counts and to avoid confusion. The court accepted the government's revised version. In addition, as in *Sababu*, the court gave specific instructions on unanimity in addition to the customary instructions that the verdict be unanimous and that every element of every offense be proved beyond a reasonable doubt. For example, for Counts Eleven and Twelve, alleging false, fictitious or fraudulent statements by defendant Ryan, the court instructed the jury that it must unanimously agree on which statement was false, fictitious, fraudulent. Final Jury Instr. at 109. In light of the additional information on the general verdict forms and the instructions on unanimity, the general verdict forms were sufficient.

### D.     The Court Properly Instructed the Jury With Respect to the RICO Conspiracy Offense

Defendant Ryan also argues that he was deprived of his right to unanimous juror agreement on every element of every offense because the court did not instruct the jurors that they must unanimously agree on which conduct constituted the predicate racketeering acts implicated in the RICO conspiracy charge (Count 1). Ryan Post-Trial Mot. at 60-61. The court disagrees.

Jury instructions, when viewed as a whole, must treat the issues fairly and accurately. *United States v. O'Malley*, 796 F.2d 891, 897 (7th Cir. 1986). In this case, the court utilized the Seventh Circuit pattern jury instructions for the section 1963(d) RICO conspiracy charge, which do not include any direction that jurors unanimously agree on which predicate acts gave rise to a pattern of racketeering activity. Fed. Crim. Jury Instr. 7th Cir. § 1962(d). The pattern instructions include  unanimity instructions only for a substantive RICO charge under section 1963(c): "[Y]ou must unanimously agree as to which two or more racketeering acts the defendant committed [or

caused to be committed] in order to find the defendant guilty of that count. . . . [Y]ou must unanimously agree upon which of the different offenses alleged within a racketeering act the defendant committed." Fed. Crim. Jury Instr. 7th Cir. § 1963(c). There is a reason for the difference: a conspiracy charge under section 1962(d) focuses on the act of a defendant's agreement to engage in racketeering activity, rather than on the racketeering acts themselves. *United States v. Geicer*, 923 F.2d 496, 500 (7th Cir. 1991) ("Section 1962(d), like all conspiracy provisions, has as its target the act of agreement–here, the agreement to engage in activity that implicates section 1962(c)."). Thus, in *Geicer*, the Seventh Circuit held that specific predicate acts need not be alleged nor proved for a section 1962(d) charge. *Id.* Similarly, the Supreme Court in *United States v. Salinas*, 522 U.S. 52, 63-65 (1997) held that a defendant need not have actually committed nor even agreed to commit the two or more predicate racketeering acts required by section 1962(c) in order to be punished under section 1962(d); rather, all that is required is that the defendant "adopt the goal of furthering or facilitating the criminal endeavor." It would be anomalous to require jurors to unanimously agree on which predicate acts constituted the pattern of racketeering activity which was the object of the conspiracy, when the prosecution is not required to prove or even identify those predicate acts.

Ryan acknowledges that there is no Seventh Circuit authority that requires a unanimity instruction for a section 1962(d) charge. Ryan Post-Trial Mot. at 60. On the other hand, the Seventh Circuit has not squarely held that such an instruction is *not* required. The Seventh Circuit has, however, upheld the use of juror instructions that lack an instruction requiring the jurors to unanimously agree on and identify particular predicate acts for a section 1962(d) charge. *See United States v. Campione*, 942 F.2d 429, 437 (7th Cir. 1991) (finding an instruction sufficient that defined "pattern of racketeering" as "at least two of the acts alleged" in 30 other counts of the

indictment).[19]  Moreover, as discussed above, the distinction between the substantive charge of section 1962(c) and the conspiracy charge of section 1962(d), recognized by both the Seventh Circuit in *Geicer* and the Supreme Court in *Salinas*, obviates the need for an instruction of unanimous juror agreement as to particular predicate acts under the conspiracy charge, even where, as in the pattern instructions, it might be given for the substantive offense.

Ryan relies on several cases from other circuits in which courts found no error when a unanimity instruction was given for a section 1962(d) charge.  Ryan Post-Trial Mot. at 60--61. None of these cases, however, holds that such an instruction is required, and none holds that it should have been given when it was not.  In *United States v. Shenburg*, 89 F.3d 1461, 1472 (11th Cir. 1996), the court held that the district court did not abuse its discretion in declining defendants' request for a special verdict on a RICO conspiracy count.  The court noted that the judge gave a unanimity instruction in addition to using a general verdict, but did not hold that such an instruction was required; moreover, nowhere did the court state that the use of a predicate unanimity instruction is a prerequisite when a general verdict form is used.  *Id.*  Similarly, the court in *United States v. Smith*, 413 F.3d 1253, 1277 (10th Cir. 2005) noted that the district court instructed the jurors to agree on two of the same racketeering acts, but again the precise issue was whether the judge should have used a special verdict form naming each predicate act.  And in *United States v. Merlino*, 310 F.3d 137, 139–140 (3d Cir. 2002), the district court gave a specific unanimity instruction, but the court never addressed the propriety of that instruction; rather, the issue was

---

[19]     The government cites *Campione* for the proposition that requiring a unanimity instruction would be "contrary to the law of the Seventh Circuit." (Gov't Resp. at 74.)  As this court reads that case, however, *Campione* does not reach so far; indeed, the decision does not specifically address juror unanimity.  Rather, at issue in *Campione* was whether the judge should have instructed the jury that members of the *conspiracy*–not the jurors–had to agree on which predicate acts the defendants intended to commit.  942 F.2d at 436.  The case is thus relevant to the juror agreement issue not through a specific holding, but as precedent where the Seventh Circuit upheld jury instructions that lacked any direction that the jury identify and unanimously agree on specific racketeering acts.

whether the jurors' failure to agree that a particular predicate act was proved constituted an "acquittal" that barred subsequent prosecution based on that act. Moreover, both *Shenburg* and *Merlino* contained a substantive section 1962(c) RICO charge in addition to the conspiracy charge. *See Shenburg*, 89 F.3d at 1469; *Merlino*, 310 F.3d at 139. In this case, of course, Defendants were not charged with the substantive offense. The court thus finds the cases cited by Ryan unpersuasive, especially in light of the Seventh Circuit and Supreme Court authority discussed above.

Ryan further argues that in declining to dismiss the RICO charge in 2004, this court "relied" on the government's representation that it would seek a predicate unanimity instruction, and that the court was thus bound to give such an instruction. Ryan Reply at 26. The court did not, however, refuse to dismiss the RICO charge solely on the basis of the government's intent to seek a predicate unanimity instruction. The court rejected Defendant Warner's contention that the indictment failed to adequately identify specific predicate racketeering acts because the rule in the Seventh Circuit is that such specificity is not required. 8/11/04 Order at 32-33; *see Glecier*, 923 F.2d at 501 (holding that a RICO conspiracy charge indictment need not identify specific predicate acts in which the defendant was involved). Whether the government's decision not to later seek the instruction was "patently unfair," as Ryan claims, Ryan Reply at 26, is irrelevant to the sufficiency of the indictment. The indictment was either legally sufficient or it was not, and in concluding that it was sufficient, the court did not obligate itself to give any particular jury instruction. Just as the sufficiency of the indictment was evaluated on its merits, so too is the issue of whether a unanimity instruction is required; the two are not necessarily intertwined.

The court concludes that the jury instructions given for the RICO conspiracy charge fairly and accurately state the law. In any event, even if the law indeed requires a unanimity instruction for predicate racketeering acts under section 1962(d), the lack of such an instruction in this case

was harmless. Where a defendant is charged with substantive offensives that are also alleged as RICO predicate racketeering acts, a finding of guilt on two or more of the substantive offenses is sufficient to support a RICO conviction. *United States v. Anderson*, 809 F.2d 1281, 1284 (7th Cir. 1987). *Anderson*, cited by neither the government nor Defendants, appears directly on point. There, the alleged RICO predicate acts also formed the basis for three Hobbs Act counts and one mail fraud count, on all four of which the defendants were convicted. *Id.* at 1283. One defendant argued, as does Ryan, that the RICO conviction could not stand because it was impossible to tell which of the four offenses the jury viewed as predicate acts. *Id.* at 1284. Affirming the conviction, the court held that because the jury had unanimously found the defendants guilty of each of the four acts, it was irrelevant on which of the acts the jury relied: "[T]he jury could property rely on any two or more of the four substantively charged offenses as a matter of law." *Id.* at 1284.

Here, the jurors unanimously found Defendants Ryan and Warner guilty on multiple counts of mail fraud, each of which constitutes a distinct predicate racketeering act. *See* 28 U.S.C. § 1961(1) (any violation of the federal statutes related to mail fraud amounts to a racketeering act under RICO). Defendants' concern over juror unanimity is thus misplaced, as there is no question that the jury unanimously found that Defendants committed two or more racketeering acts that constitute the required pattern of racketeering activity under RICO.

## VIII. THE COURT PROPERLY EXCLUDED CERTAIN EVIDENCE OF RYAN'S GOOD FAITH

Defendant Ryan argues that "[t]he [c]ourt excluded evidence directly relevant to Ryan's good-faith defense, but freely admitted the same type of evidence when the government offered it to prove Ryan's bad faith." Ryan Reply at 27. This evidence relates to the decisions of other secretaries of state to increase fees chargeable by currency exchanges, as well as the renewal of certain leases and contracts negotiated by Ryan. Ryan also objects to the exclusion of his policy decisions on such remote issues as the death penalty, gay rights, gun control, organ donation, and

drunk driving.  Ryan Post Trial Mot. at 61–64.

Mail fraud is a specific intent crime, *United States v. Henningsen*, 387 F.3d 585, 590-91 (7th Cir. 2004), for which the absence of an intent to defraud is a complete defense.  *United States v. Ashman*, 979 F.2d 469, 480 (7th Cir. 1992).  As such, Ryan was most certainly entitled to introduce evidence of his good faith, *United States v. Martin-Trigona*, 684 F.2d 485, 492 (7th Cir. 1982) ("The defendant is entitled to present evidence concerning his beliefs, motives, and intentions regarding the various transactions and mailings in the alleged scheme to defraud."), but circuit precedent does "not require that any evidence, no matter how tangential, irrelevant or otherwise inadmissible, must be admitted simply because the defendant claims that it establishes his good faith."  *United States v. Longfellow*, 43 F.3d 318, 321-22 (7th Cir. 1994).

To begin, Ryan takes issue with this court's decision to allow the jury to hear evidence that Ryan approved a currency exchange rate increase in 1995, Tr. at 2852–53 (09/29/05), but to deny the introduction of evidence of larger and more frequent increases in that rate by previous and subsequent secretaries of state.  Order of 10/31/05 at 8.  The government notes that the court did allow Ryan to introduce evidence that Ryan *actually considered* his predecessor, then-Secretary of State Jim Edgar's 1982 and 1985 rate increases, in Ryan's own 1995 decision.  *Id.* at 6.  Moreover, Ryan availed himself of this decision, putting such evidence before the jury in the form of Georgia Marsh's 1992 memo to Ryan, for instance.  That memo reflected that the last rate increase took place some seven years prior; that Edgar had approved, but never enacted, a subsequent increase; that the currency exchange industry was economically important; and that a rate increase prior to the 1994 election might be politically difficult.  Tr. at 4762-65 (10/19/05).  The government portrayed Ryan's single 1995 decision to raise rates during his eight years as Secretary of State as highly unusual and suspicious in spite of this evidence, Tr. at 23085 (03/07/06), but inviting the jurors to give greater weight to some evidence and lesser weight to other

evidence is well within the bounds of a fair prosecution.

Ryan's intentions and beliefs with regard to the 1995 exchange rate increase are of course relevant because the Indictment alleges that Ryan approved the rate increase in exchange for resort packages in Jamaica as part of a scheme to defraud the State of Illinois. That said, the naked act of some other official, whether he preceded or followed Ryan in office, does not shed any light on what Ryan himself intended when he took that same act, absent evidence that Ryan actually considered the other official's act. The decisions of Ryan's successor, Secretary of State Jesse White, could not have influenced Ryan in 1995 as all White's acts necessarily post-date Ryan's tenure.[20]

Finally, this court excluded evidence regarding Ryan's moratorium on the death penalty among other policy positions. Tr. at 14197 (01/03/06); Tr. at 19396 (02/08/06). The court found Ryan's substantive political positions to be completely unrelated to the leases and contracts at issue in the Indictment. That Ryan occupied his day with political decisions other than those charged in the Indictment, making it less likely that he had time to participate in a conspiracy or scheme to defraud the state, is relevant to his defense in a manner that the underlying merits of those political decisions is not. Ryan wanted to introduce his policy decisions on other issues of the day in order to convey to the jury that the portrait painted by the indictment was inconsistent with a man who took such courageous positions, but "'[e]vidence of other . . . acts is not admissible to prove the character of a person in order to show action in conformity therewith.'" *Warner*, 396 F. Supp. 2d at 940 (citing Fed. R. Evid. 404(b)).

## IX.    JUROR ISSUES

---

[20]      Much the same can be said for Ryan's contention that the court improperly excluded evidence of Secretary White's renewal of the facilities Ryan leased during his tenure in that office. Tr. at 11062-67 (12/05/05). The decision to renew a lease is, moreover, one influenced by many factors other than the decision to enter into a lease in the first place.

Defendants contend that significant juror misconduct before trial, during trial, and during deliberations deprived them of their right to an impartial jury. The court concludes that both Defendants significantly overstate the degree of juror misconduct in this case. This also undermines their contention that, taken together, individual incidents of juror misconduct or plain bad judgment lead to the conclusion that the twelve jurors who deliberated to verdict in this case were incapable of following this court's instructions. On the contrary, this court concludes that, in spite of the difficulties generated by this very lengthy, high-profile trial, these jurors were diligent and impartial. For the reasons discussed below, the court denies Defendants' motions for new trials based upon the conduct of the jurors in this case.

## A.    Alleged Juror Misconduct During *Voir Dire*

The parties in this case developed a written juror questionnaire containing 110 numbered questions. Under a section entitled "Criminal Justice Experience," prospective jurors were asked whether they, or their family members or close friends, had been involved in prior criminal proceedings. Question 82 asked whether the prospective juror or a close friend or relative had "ever been charged with or accused of a crime." Question 84 asked whether the prospective juror had ever "had to appear in court, or been involved in any lawsuit or court proceeding as a plaintiff, defendant, victim, or witness." After the case was submitted to the jury, the court discovered that a number of jurors had failed to disclose certain criminal matters on their juror questionnaires.

Background checks of Jurors Pavlick and Ezell, ordered by this court after it became aware that a local newspaper was investigating these jurors, Tr. at 24223, 24237 (03/23/06), disclosed a number of troubling arrests and convictions. Juror Pavlick was convicted of multiple DUI offenses, culminating in a felony DUI conviction, and a misdemeanor weapons conviction. Tr. at 24288–89 (03/24/06). Mr. Pavlick's DUI conviction occurred while Defendant Ryan was Secretary of State, raising the specter of bias. *Id.* at 24290, 24293. Juror Ezell's background check revealed

several criminal arrests, including arrests for assault, battery and possession with intent to deliver cocaine, and an outstanding warrant for driving on a suspended license. *Id.* at 24276–77, 24306. At least one of Ms. Ezell's arrests was under the name of an alias. *Id.* at 24303–05. The court also discovered that Ms. Ezell's daughter had a number of arrests and convictions. *Id.* at 24273. Neither juror disclosed these incidents on their juror questionnaires, and the court questioned both jurors about these omissions. Although neither juror admitted to deliberately omitting their criminal backgrounds from the questionnaire, the court concluded that their responses were not credible in certain respects, and that truthful answers to the questions would have supported excusing them for cause. *See* Tr. at 24296, 24479–80 (03/27/06). Both Mr. Pavlick and Ms. Ezell were excused from the jury.

The revelations concerning Jurors Pavlick and Ezell prompted defense counsel to request additional background checks of the remaining jurors and alternates. Tr. at 24286 (03/24/06). Warner argues that information revealed by these background checks indicated that Jurors Chambers, Svymbersky, Casino and Rein, all of whom deliberated to verdict, were biased. Warner Post-Trial Mot. at 16, 18.[21] Defendant Ryan contends that this court applied "arbitrary criteria" to determine which jurors to retain and which to dismiss when irregularities in their questionnaire responses came to light. Ryan Post-Trial Mot. at 22.

The Supreme Court has articulated a two-part test to determine whether, after the jury has reached a verdict, a juror's response to *voir dire* questions requires a new trial: "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause."

---

[21] Juror Gomilla had neglected to disclose a bankruptcy proceeding, but her explanation was fully satisfying to the court. Because Juror Talbot had in fact disclosed certain additional information, not recorded in his questionnaire, during voir dire, the court found no colorable basis for questioning his qualifications to continue service on the jury. The court chose not to seat alternate Juror Masri on the reconstituted jury.

*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).[22] The focus of the inquiry is whether the juror's dishonest answer demonstrates actual or implied bias, *United States v. Polichemi*, 219 F.3d 698 (7th Cir. 2000), because whatever motivated the juror's misrepresentations, "only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 555–56. The court believes that the circumstances surrounding each of the challenged jurors warranted different treatment than either Mr. Pavlick or Ms. Ezell. With respect to each of the retained jurors, the count concluded that they did not answer the juror questionnaire dishonestly, and even if they had, a "correct answer" to the questions at issue would not provide "a valid basis for a challenge for cause." *Id.* at 556.

### 1. Juror Chambers

Question #84, in the section of the questionnaire entitled "Criminal Justice Experience," asked whether the jurors had ever had to appear in court or been involved in any lawsuit or court proceeding "as a plaintiff, defendant, victim, or witness." Juror Chambers answered "no," although she and her husband initiated divorce proceedings in 2004 and both she and her husband had moved for orders of protection. Ryan points out that potential jurors "included an assortment of legal matters," including divorce, in their responses to Question #84. *See* Ryan Group Exhibit C; Ryan Post-Trial Mot. at 41 n.20. But as the government points out, the question elicited a wide variety of answers indicating multiple interpretations. Gov't Resp. at 89. Juror questionnaires were completed by 301 prospective jurors, and 46 disclosed that they were divorced. *See* Ex. 8 to Gov't Resp; *see also* Juror Questionnaire, Question #7 (asking prospective jurors about their marital status). Of those 46 prospective jurors, only six listed their divorce proceedings in response to

---

[22] Accordingly, Defendant Warner's argument that the jurors' "conceal[ment]" prevented him from intelligently exercising his peremptory challenges would not, even if it accurately characterized the jurors' conduct, warrant a new trial. Warner Post-Trial Mot. at 16; *see McDonough*

question #84. *See* Ex. 9 to Gov't Resp. Juror Chambers was, it appears, in good company in believing that question #84 was not asking about divorce actions.[23] When asked by the court prior to the jury returning its verdict why she did not disclose either her divorce proceedings or the orders of protection, she stated that she believed the question referred to experience in criminal proceedings only. Tr. at 25407–08 (04/17/06). This court credited her response, *id.* at 25418–19, and is not persuaded by the Defendants to revisit its credibility determination, particularly in light of the variety of responses that question #84 elicited from other prospective jurors.

The government points out, further, that eight of those potential jurors who did not list their divorce actions in response to question #84 were questioned by both parties during *voir dire.* Gov't Resp. at 90. Defense counsel did not investigate this purported discrepancy with any of those eight jurors, much less argue that it was a basis to remove those jurors for cause. Yet the aspersions that the Defendants cast on Juror Chambers and the other jurors who deliberated to verdict in this case—that they were untruthful, that they were looking for their 15 minutes of fame—would apply equally to these other potential jurors under Defendants' theory. More importantly, the court is not persuaded that a "correct answer" to question #84, disclosing all of Juror Chambers' court experience stemming from her marital difficulties, would have been a sufficient basis for a cause challenge. Absent some nexus with the particular Defendants in this case, divorce proceedings do not rise to the level of presumed or actual bias. Again, this conclusion is borne out by the way that the Defendants conducted *voir dire.* Many potential jurors disclosed their divorced status, yet Defendants' counsel did not ask whether their experiences affected their impression of the justice system or otherwise investigate potential bias.

---

[23] Defendant Ryan refers to the government's analysis as a "tortured exegesis of the juror questionnaire," but does not dispute the accuracy of the government's review. Ryan Reply at 20. Moreover, Ryan himself took the position that the responses of other jurors should be compared with those of Ms. Chambers to determine her credibility. Ryan Post-Trial Mot. at 41 n.20.

## 2. Juror Svymbersky

Juror Svymbersky failed to disclose a 23-year-old misdemeanor charge for purchasing a stolen bicycle, even though it was relevant to questions #82 ("[h]ave you . . . ever been charged with or accused of a crime?") and #84.  When Mr. Svymbersky was brought into chambers to discuss the omission, he volunteered that the incident had occurred and described what had happened.  Tr. at 24543 (03/27/2006).  When asked why he had not listed the incident in response to question #82, Juror Svymbersky at first stated that he thought the charges had been "dropped," and that they would "not show up on any records."  Tr. at 24545, 24559 (03/27/2006).  He later clarified that this was not a contemporaneous rationale for leaving it off his questionnaire: the incident had not occurred to him at all as he was completing the questionnaire.  *Id.* at 24559–60.  Only later, when he learned from someone at work that jurors were being investigated, did he recall the incident.  *Id.*  Defense counsel maintained at the time, and Warner continues to maintain, that Juror Svymbersky equivocated.  *Id.* at 24568; Warner Post-Trial Mot. at 3.  This court initially expressed some doubt about Juror Svymbersky's explanation, as well (*see* Tr. at 24572 (03/27/2006), but ultimately found his responses to be credible.  *Id.* at 24759.  The incident was minor and occurred when Juror Svymbersky was very young, only 18 or 19 years old.  The court believed then, as it believes now, that Juror Svymbersky honestly did not think about the misdemeanor when confronted with question #82, and did not deliberately omit the incident when he completed his questionnaire.  Accordingly, the first prong of *McDonough* has not been met.  *See McDonough*, 464 U.S. at 555 ("To invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give.").  Even assuming that he had answered dishonestly, the court does not believe that a 23-year-old misdemeanor charge would have supported dismissing Mr. Svymbersky for cause.  The notion, advanced by Defendant Ryan, that this charge is indistinguishable from Mr. Pavlick's felony DUI conviction (occurring, no less, during George

Ryan's tenure as Secretary of State), or Ms. Ezell's numerous more-recent arrests for very serious crimes, is unpersuasive.

### 3.     Juror Casino

Juror Casino was arrested three times in the early to mid-1960s for carrying a concealed weapon (1961), a DUI misdemeanor (1962), and misdemeanor assault (1965).  Tr. at 24648 (03/28/2006).  So far as the available records indicate, only the DUI misdemeanor resulted in a conviction.  *Id.*  When asked by this court why he did not disclose these arrests on his questionnaire, Mr. Casino stated that he had forgotten that they had ever occurred.  *Id.* at 24649, 24743–44.  This court concluded that Mr. Casino's explanation was credible, exceedingly so.  *Id.* at 24745.  Nothing in the Defendants' post-trial briefs persuades the court otherwise.  Moreover, the court would be hard-pressed to conclude three misdemeanor arrests (and one conviction), each more than 40 years old, would bias Mr. Casino against the Defendants in any respect.

### 4.     Juror Rein

In 1980, Mr. Rein was arrested for assaulting his sister, who, unbeknownst to Rein, was at that time three-months pregnant.  Tr. at 24626, 24628 (03/27/2006).  Mr. Rein did appear in court in connection with this incident, though he believed the matter had been expunged.  *Id.* at 24630–31.[24]  When asked why he did not disclose this incident on his questionnaire, Mr. Rein explained: "I really don't think I even thought of it.  I wasn't even thinking about the fact that it was

---

[24]     Mr. Rein first stated that he did not "have to go to court" as a result of his assault arrest, stating that it "[n]ever got that far."  Tr. at 24629–30.  He later stated during the same *voir dire* that he met with a judge in the DuPage County courthouse while the judge was eating lunch.  Tr. at 24630.  Defendant Ryan seizes upon this apparent discrepancy, Ryan Post-Trial Mot. at 23, but it appears to the court that Mr. Rein distinguished "going to court," which may very well indicate a full trial or hearing to a layperson, from the informal meeting he recalls having with the judge.  Defendant Ryan also points out that Rein acknowledged that his failure to include the assault arrest on his questionnaire was "untruthful."  *Id.* It is clear to the court, however, that Rein meant that his questionnaire response was "inaccurate," not that he deliberately omitted an item he knew to be responsive.

even supposed to be on the record." *Id.* at 24631. This court concluded that Mr. Rein's explanation was credible, *id.* at 24742, and is not now persuaded that he was dishonest. Nor is the court persuaded that a two-decades old assault arrest, standing alone, would support a challenge for cause. Ryan greatly, and, the court believes, irresponsibly, exaggerates the severity of the incident in his post-trial brief. Ryan Post-Trial Mot. at 23. Certainly, there is no indication that the domestic dispute Mr. Rein described in any way indicated that Rein could not deliberate impartially in this case.

### B.    Alleged Juror Misconduct Prior to Deliberations

#### 1.    *Jurors did not prematurely discuss the evidence*

Defendant Ryan contends that the jurors improperly discussed evidence during the pendency of the trial. On December 21, 2005, Juror Jones alerted the court that she overheard Juror Pavlick comment that Nancy Smith, Ryan's mother-in-law's caretaker and a government witness, "wasn't paid nearly enough for her service, she's a home caregiver and which those people are, you know, have a history of being underpaid." Tr. at 13988–89 (12/22/05). The court questioned some of the jurors in chambers and learned that Juror Pavlick's comment led to a discussion of "home health care workers" which Jurors DiMartino, Ezell and Svymbersky either participated in or overheard. Juror Jones and Juror DiMartino asked these jurors to stop talking as they believed the conversation was not appropriate and "could have led somewhere else." *Id.* at 13989 (12/22/05). Although their recollections of the discussion varied, all of the jurors questioned stated that the incident would not affect their ability to decide the case impartially. *Id.* at 13993–94, 14000, 14143, 14153. The amount Ms. Smith was paid, whether it was a lot or a little in proportion to the services that she rendered, was not an issue in this case. After thoroughly investigating the matter, this court again admonished the jurors not to discuss the evidence, Tr. at 4163–64 (12/22/05), and the court is not aware of any circumstances indicating that the jurors failed to follow

71

that instruction thereafter. The court does not believe that this isolated and innocuous incident prejudiced the Defendants.

Defendant Ryan also asserts that Juror Rein must have engaged in premature deliberations, because "he had formed an opinion about another juror's views in comparison with his already-formed opinion and interpretation of the evidence." Ryan Post-Trial Mot. at 43. This argument is predicated on an untenable interpretation of Juror Rein's statements to the court concerning another juror's attentiveness. The fact that Mr. Rein thought about the *process* of deliberations during the trial is no indication that he had prematurely reached conclusions about the evidence or formed opinions about how his fellow jurors might rule. The court is cognizant of the dangers of premature deliberation outlined by Defendant Ryan, Ryan Post-Trial Mot. at 44 (citing *United States v. Resko*, 3 F.3d 684, 689 (3d Cir. 1993)), but has no difficulty concluding that they were not implicated in this case.

### 2. The court properly dismissed Juror McFadden

Defendant Warner contends that this court improperly removed Juror McFadden. On numerous occasions over the course of the trial, individuals, including this court and counsel for both parties, observed Ms. McFadden nodding off or fully asleep. *See, e.g.*, Tr. at 15082, 15237 (01/09/06) (Two jurors report, consistent with the court's own observations, that Ms. McFadden is "nodding off a great deal;" they also report that "sometimes she actually snored"); Tr. at 17285 (01/23/06) (observed nodding off); Tr. at 19589 (02/09/06) (jurors request instruction about not sleeping; court notes observing Ms. McFadden "completely asleep"); Tr. at 20045–47 (02/14/06) (government and Ryan's defense team observe McFadden asleep); *id.* at 20047 (court observes McFadden asleep for five minutes). On February 21, 2006, the court, with counsel for both side present, spoke with Ms. McFadden about the problem, and discovered that in December 2005–months after the trial began–Ms. McFadden was diagnosed with diabetes. As of February

21, McFadden was not taking any medication for the condition (she explained that her doctor expected to address that possibility at a forthcoming appointment), and she acknowledged that fluctuations in her blood sugar rendered her drowsy from time to time. Tr. at 21009–10 (02/21/06). Ms. McFadden's inability to remain attentive during the trial, though no fault of her own, led this court to dismiss her from jury service.

Contrary to Warner's argument, the Seventh Circuit's decision in *United States v. Freitag*, 230 F.3d 1019 (7th Cir. 2000) did not obligate this court to retain Ms. McFadden. On the contrary, the trial court "has considerable discretion in deciding how to handle a sleeping juror." *Id.* at 1023. Based in part on its own observations of Ms. McFadden, and based on her medical condition, this court concluded that it was impossible for her to perform her duties. *Id.* *Freitag* differs from the instant case in that, here, defense counsel wanted to retain this inattentive juror. *See, e.g.*, Tr. at 19877 (02/13/06). This court does not require defense counsel's consent to remove an inattentive or otherwise incompetent juror prior to deliberations. *See, e.g.*, *United States v. Upshaw*, 114 Fed. Appx. 692, 711 (6th Cir. 2004) (*vacated on other grounds* by *United States v. Booker*, 543 U.S. 220 (2005)) ("It is within the trial court's prerogative to substitute for reasonable cause any juror with an alternate, even without consent of either party to the case."); *United States v. Mullins*, 992 F.2d 1472, 1478 (9th Cir. 1993) ("So long as the substitution takes place prior to deliberations, it is within the prerogative of the trial court and does not require the consent of any party.") (citation and internal quotation marks omitted). The court concludes that it properly removed Ms. McFadden.

One other circumstance surrounding Ms. McFadden's dismissal requires comment. On January 23, 2006, Juror Rein notified the court that he and some of his fellow jurors observed Ms. McFadden reading a novel during testimony. Tr. at 17284 (01/23/06); *see also* Tr. at 9384 (11/22/05) (same juror observing Ms. McFadden doing a crossword puzzle during the trial). With counsel present in chambers, Mr. Rein reported his observation to the court, and made the

following comment:

> I mean I would just think, knowing the times that she's nodded off and then just wondering how much she's been paying attention if -- and assuming we'd both be on the final jury and in deliberations, I know that I'm supposed to respect her opinion, but how can I, you know, it would be awfully hard to -- I mean I remember the interviews before the trial, you know, if it's 11 to 1, can you hold off?

> Well, if she was that one, I think I'd be so angry because we'd be, like, what are you basing your opinion on? You just get the feeling she hasn't really paid as much attention as the rest of the people.

Tr. at 17285–86 (01/23/06). Defendant Ryan contends that this statement, together with statements Juror Rein made to the media after the trial, are evidence that he was unwilling to deliberate "with jurors of different, dissenting viewpoints." Ryan Post-Trial Mot. at 41. Mr. Rein's post-verdict statements to the media are not competent evidence, *see* FED. R. EVID. 606(b), and the court is not persuaded by Ryan's strained interpretation of Rein's statement. Ryan contends that the phrase "11 to 1" somehow conveyed Mr. Rein's or Ms. McFadden's leanings prior to the close of evidence. The plain import of Mr. Rein's statement is that he believed that one of his fellow jurors was not paying close attention, and further believed that this was affecting the morale of the other jurors, himself included. Tr. at 17285 (01/23/06). Rein's concern about the possibility of a holdout juror (likely generated by questions posed by defense counsel during *voir dire*) was plainly hypothetical. There is no reasonable basis to conclude that this statement indicates that Juror Rein prematurely deliberated, or was unwilling or unable to fairly deliberate.

## C.     Alleged Juror Misconduct During Deliberations

### 1.     *Extraneous documents consulted by the jurors during deliberations did not prejudice Defendants*

#### (a)     Background

Several days after deliberations began, the court was alerted to a conflict among the jurors.

On September 20, 2006, the court received a note from one of the jurors, Evelyn Ezell, stating that the other jurors had been insulting her "for the last couple of days." Tr. at 24053 (03/20/06). In a brief written response, the court admonished the jurors to treat one another with "dignity and respect," despite their disagreements. *Id.* at 24055. Two days later, the court received a note drafted by Juror Losacco and signed by eight other jurors. Tr. at 24074–76 (03/22/06). Ms. Losacco and the other signatories to the letter claimed that Ms. Ezell refused to deliberate or consider the evidence, and further that she was verbally and physically aggressive. *Id.* In response to this note, the court reiterated that the jurors must treat each other with dignity and respect, and instructed them in writing that they deliberate together, and only in the jury room. Letter from Court to Jurors of 3/23/06. Each of the twelve jurors received an identical copy of this letter.

As previously discussed, Jurors Ezell and Pavlick were removed from the jury for reasons wholly unrelated to this conflict on March 27, 2006, shortly after the court received Ms. Losacco's note. The reconstituted jury was convened and instructed the following day, and returned a verdict on April 17, 2006. Approximately one week after the verdict was announced, Ms. Ezell alleged in a television interview that another juror, later identified as Ms. Peterson, had brought into the jury room extraneous materials that Ms. Ezell referred to as "case and law." *See* NBC Television Broadcast, Ex. 1 to Ryan's Post-Trial Mot. Defense counsel brought Ms. Ezell's statements to the court's attention the next day, and the court held an informal evidentiary hearing on May 5, 2005 to investigate Ms. Ezell's claims. At that hearing, Ms. Ezell testified by telephone that during the original jury's second week of deliberations, Juror Peterson had, in the presence of all the other jurors, read to Ms. Ezell from a sheet of paper words to the effect that a juror could be dismissed if he or she failed to deliberate in good faith. Tr. at 10–12 (05/05/06). According to Ms. Ezell, Ms. Peterson referenced "section" numbers as she read aloud, but Ms. Ezell could not recall specifics. *Id.* at 12. She further testified that when Ms. Peterson finished reading, Juror Losacco told Peterson to "read the one to her [Ms. Ezell] on bribery, because George Ryan was taking bribes

and so are you. Because the only way you can vote the way you're voting is you've got to be getting paid." *Id.* By that time, according to Ms. Ezell, she and Juror Davis were crying, and when Ms. Ezell attempted to leave the jury room, Juror Cwick stood in the doorway to prevent her from exiting. *Id.* at 13. Mr. Davis also reportedly told Ms. Ezell to "watch [her] back." *Id.* at 12.

The court had some concern about the credibility of this allegation, which surfaced for the first time weeks after the episode allegedly took place, but concluded that at least brief investigation was appropriate. With counsel present, the court contacted Ms. Peterson by telephone and obtained from her the two documents that she acknowledged having brought into the jury room. In a telephone conference, Ms. Peterson testified that on March 20, 2006, the day prior to the confrontation that Ms. Ezell described, Ms. Peterson had brought into the jury room a two-page document from the American Judicature Society ("AJS"), entitled "Use of alternate jurors," that she obtained from an Internet search on March 17, 2006. *Id.* at 77. The first page of the document is largely devoted to juror-substitution mechanics; the last paragraph on the second page discusses dismissing jurors who are "unwilling or unable to meaningfully deliberate." AJS Article, Ex. 2 to Ryan Post-Trial Mot. Ms. Peterson showed the full document to "a few people" that day—she was certain that she showed it to Jurors Talbot and Pavlick, and less certain that she had shown it to Jurors Losacco, Cwick and Gomilla. *Id.* at 82. That evening, she cut out a portion of the document with pinking shears and brought it with her the next morning to the jury room. *Id.* at 80–81. On March 21, 2006, Ms. Peterson testified that she read the AJS excerpt to Ms. Ezell in the presence of the other jurors. *Id.* at 77–78. The excerpted paragraph states as follows:

> . . . personal hardship. But other bases for substitution raise serious issues about the sanctity of the deliberative process, primarily allegations by some jurors that another juror is unwilling or unable to meaningfully deliberate, or is unwilling to follow the law. Such an allegation requires a hearing where the judge must decide the tricky question whether the juror is truly unfit to serve, or is merely expressing an alternate viewpoint that will likely result in a hung jury. Only if the judge

concludes that the challenged juror is truly unfit to serve, will the judge be authorized to dismiss that juror and substitute an alternate juror.

AJS Excerpt, Ex. 2 to Ryan Post-Trial Mot. The second document that Ms. Peterson brought into the jury room was a handwritten statement that Ms. Peterson herself wrote in pencil on a piece of paper that she had torn out of a paperback novel she had been reading on the commuter train. *Id.* at 78. Ms. Peterson's handwritten note stated as follows:

> You have the right to speak your opinion but you have responsibility [sic] to use the facts the testimony [sic] to seriously consider. If you don't use evidence and testimony to support your opinion your [sic] not being responsibly [sic].

Handwritten Note, Ex. 2 to Ryan Post-Trial Mot. Ms. Peterson's attorneys, who also participated in the May 5 hearing, represented that the handwritten note contained "her thoughts" about Ms. Ezell's responsibility as a juror. Tr. at 62, 66 (05/05/06). Ms. Peterson testified that she read this note to Ms. Ezell "maybe two or three times." *Id.* at 79. Consistent with Ms. Losacco's earlier note, Peterson testified that Ms. Ezell stated repeatedly that she was not required to deliberate or consider the evidence. *Id.* at 78–79. On two or three of those occasions, Peterson read her handwritten note to Ms. Ezell—only once did she read from the American Judicature Society article. *Id.* In contrast to Ms. Ezell's version of events, however, Ms. Peterson testified that Ms. Losacco did not tell her to "read the one about bribery," *id.* at 83, although Peterson did recall a "couple people" asking Ms. Ezell on other occasions questions to the effect of: "[a]re you taking a bribe?" *Id.* at 84, 88–89. Ms. Peterson adamantly denied that there was any emotional reaction on the part of any jurors to her reading these materials to Ms. Ezell.

### (b)     Extraneous influence does not require a new trial

The Defendants contend that their right to an impartial jury was violated when Ms. Peterson read from the AJS article and her handwritten note during deliberations. Ryan Post-Trial Mot. at 3; Warner Post-Trial Mot. at 6–7, 19. Ryan further asserts that his right to have counsel present

77

"at every 'critical stage' of the proceedings" was violated by the handwritten "instruction" that Juror Peterson crafted and read aloud to the Ms. Ezell.  Ryan Post-Trial Mot. at 3 (citing *Iowa v. Tovar*, 541 U.S. 77, 87 (1955); *United States v. Neff*, 10 F.3d 1321, 1324 (7th Cir. 1993)).

A new trial "is not automatically required whenever a jury is exposed to material not properly in evidence."  *United States v. Sababu*, 891 F.2d 1308, 1333 (7th Cir. 1989).  The question is whether there is a "reasonable possibility" that extraneous documents may have affected the verdict.  *United States v. Bruscino*, 687 F.2d 938, 940 (7th Cir. 1982).  This inquiry is "objective" and "fact-driven," *United States v. Genova*, 187 F. Supp. 2d 1015 (N.D. Ill. 2002), *aff'd in part and rev'd in part on other grounds*, 333 F.3d 750 (7th Cir. 2003) (citation and internal quotation marks omitted), and in making its determination this court may rely on its "familiarity with the proceedings when deciding whether the verdict was affected by outside information."  *United States v. Sanders*, 962 F.2d 660, 668 (7th Cir. 1992).  Prejudice to the defendants is presumed, *Remmer*, 347 U.S. at 229, but is rebutted if there is "no 'reasonable possibility' that the verdict was affected by the contact."  *Sanders*, 962 F.2d at 668.[25]

Although Defendant Ryan insists that, without interviewing every juror, the government cannot meet its burden, Ryan Post-Trial Mot. at 14–15, such a requirement is contrary to the objective nature of the court's inquiry.  Interviewing additional jurors about the "emotional impact" of the extraneous materials, Ryan Post-Trial Mot. at 15, 46, or the confrontation with Ms. Ezell, is neither required nor appropriate.  *See United States v. Paneras*, 222 F.3d 406, 411 n.1 (7th Cir. 2000); *Haugh v. Jones & Laughlin Steel Corp.*, 949 F.2d 914, 917 (7th Cir. 1991).  In *United States v. Rutherford*, 371 F.3d 634 (9th Cir. 2004), a tax prosecution, a juror testified that IRS agents had

---

[25]    In his opening brief, Ryan states that the government is required to prove that the extraneous influence on the jury was harmless "beyond a reasonable doubt."  Ryan Post-Trial Mot. at 9, 46.  Although *Remmer* describes the government's burden as "heav[y]," 347 U.S. at 229, the Seventh Circuit has not interpreted that case to require the government rebut the presumption by any particular "quantum of proof."  *Evans v. Young*, 854 F.2d 1081 (7th Cir. 1988).

glared and stared at jurors during the trial. In concluding that these circumstances warranted investigation of the impact this conduct had on the jurors, the Court of Appeals emphasized "the perceived, as well as actual, power that government actors have at their disposal and the positions of authority that they occupy." *Id.* at 643. In this case, in contrast, the "extraneous" influence came from a fellow juror; no conduct of any government agents is at issue here.

Moreover, the court is satisfied that its May 5, 2006 evidentiary hearing sufficiently revealed the factual circumstances surrounding Ms. Ezell's post-verdict allegations. 05/04/06 Order at 2–3; *see Evans*, 854 F.2d at 1084 ("The trial courts retain wide latitude over how to conduct such hearings. . . ."). At that hearing, Ms. Ezell testified that Ms. Peterson read aloud from a sheet of paper, although she only recalled portions of what Ms. Peterson read: "when a juror refuses to deliberate" and "a juror could be dismissed for not deliberating in good faith." Tr. at 11–12 (05/05/06). Ms. Peterson confirmed that she brought extraneous documents into the jury room and read them to Ms. Ezell. She in fact retained the originals of these materials and furnished them to the court. The court is satisfied that Ms. Peterson has provided the court with all the materials that she consulted, and that any references to or allegations of bribery during deliberations were not made in connection with extraneous materials.[26]

Ryan insists that the nature of Internet searches is such that Ms. Peterson necessarily would have been exposed to other materials online. Ryan Reply at 3. But it is clear from Ms. Peterson's testimony that only the AJS article, indeed only a portion of that article, was relevant

---

[26] Defendant Ryan filed a supplement to his post-trial brief attaching a newspaper article, dated June 2, 2006, in which Ms. Ezell claims to have discovered a document on the Internet that she believes is the document Ms. Peterson read aloud to the jurors. Ex. 1 to Supplement to Ryan's Motions for Judgment of Acquittal, New Trial, and Arrest of Judgment. According to the article, this document contains "section" references, consistent with Ms. Ezell's recollection. The court is not persuaded that this latest article warrants any further investigation of Ms. Ezell or any other juror. Ms. Ezell's speculation, surfacing almost a month after the court and counsel for both sides interviewed Ms. Ezell and Ms. Peterson, is insufficient grounds to reopen an inquiry into events that have already been fully investigated.

from her perspective. *See* Tr. at 80–81 (05/05/06). She further stated at the hearing that she avoided publicity about the case, and that she did not believe that the AJS article was "about" the case. *Id.* at 81. Significantly, even though defense counsel were present and were permitted to pose questions to Ms. Peterson during the May 5 hearing, counsel chose not ask about what other materials Ms. Peterson may have seen in her Internet search. *Id.* at 93. In any event, the court does not believe that Ms. Peterson was exposed to any other materials relevant to the court's inquiry, and the court proceeds to assess whether the materials Ms. Peterson brought into the jury room prejudiced the Defendants.

As a threshold matter, this court rejects Defendant Ryan's repeated attempts to characterize Ms. Peterson's handwritten note as an extraneous legal "instruction." *See* Ryan Post-Trial Mot. at 8, 10, 13. This document is not a "technical exposition on a juror's good faith obligation to deliberate," nor was it somehow beyond the ability of a "substitute kindergarten teacher" (Ms. Peterson works as a substitute teacher) to produce without the aid of outside research. Ryan Reply at 7. Even before Ms. Peterson did her "homework," Tr. at 80 (05/05/06), the jurors were clearly under the defensible impression that deliberation entailed discussion of the evidence. *See* Final Jury Instr. at 148 ("You should make every reasonable effort to reach a verdict. In doing so, you should consult with one another, express your own views, and listen to the opinions of your fellow jurors."). Indeed, according to Ms. Peterson, that was what precipitated her Internet research. Tr. at 80 (05/05/06). The court believes that what Ms. Peterson gleaned from the AJS article was not that jurors were always required to support their views with the evidence—the article takes no such position—but that a juror could be removed for failing to "deliberate," as these jurors, Ms. Peterson in particular, understood that term. *See id.* at 83. The fact that Ms. Peterson committed her "thoughts" to paper, *id.* at 62, 66, is of no moment.[27]

---

[27]     This is not a case where the juror's "personal experiences" constitute extrinsic
(continued...)

80

Accordingly, the court concludes that neither Ryan's right to have counsel present at every "critical stage" of the proceedings, nor his right to an impartial jury, were violated or even implicated by Ms. Peterson's note. Ryan Post-Trial Mot. at 3.

The AJS article, by contrast, was improperly consulted during deliberations. But whether viewed in its entirety, or specifically with reference to the portion that Ms. Peterson read aloud, it did not pertain to any substantive issue in the Defendants' trial. It concerned only the process of deliberation, and the substance of the article did not contradict any instruction that this court gave the jurors. *Cf. Genova*, 187 F. Supp. at 1024 (jurors looked up the definition of bribery in a dictionary after being explicitly instructed to consult the jury instructions, only). Moreover, the article correctly points out that the decision whether to remove a juror who is refusing to "meaningfully deliberate" is vested with the court, not the jurors. *See* AJS Excerpt ("Only if the judge concludes that the challenged juror is truly unfit to serve, will the judge be authorized to dismiss that juror and substitute an alternate juror."). The most troublesome interpretation of Ms. Peterson's comments would suggest that she believed this document was some sort of trump card in an ongoing dispute with Ms. Ezell. Tr. at 79 (05/05/06). Objectively, of course, it was no such thing, and as far as the record discloses, it did not sway the course of deliberations in the short period of time after it was brought into the jury room and Ms. Ezell was removed for failing to disclose her criminal history. *Id.* ("[A]fter I read that pinking shear one about having to deliberate, she still refused to cooperate or do anything or even look at the evidence, wouldn't even look at the screen when we were showing things."). More importantly, it did not play any role in the reconstituted jury's deliberations. Ms. Peterson testified, credibly in this court's estimation, that she did not discuss this document with the substituted jurors or otherwise refer to it during

---

[27](...continued)
evidence. Ryan Reply at 8. Ms. Peterson's thoughts about proper deliberation are not "personal knowledge regarding the parties or the issues involved in the litigation that might affect the verdict." *United States v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991).

deliberations after Ms. Ezell and Mr. Pavlick were removed. *Id.* at 89–90. Even if she had, the court does not believe that, objectively, there is a "reasonable possibility" that this document affected the verdict in this case.

Both Defendants cite persuasive authority from the Ninth Circuit for the proposition that "[j]urors cannot fairly determine the outcome of a case if they believe they will face 'trouble' for a conclusion they reach as jurors." *See* Ryan Post-Trial Mot. at 9; Warner Post-Trial Mot. at 19–20 (citing *United States v. Rosenthal*, 445 F.3d 1239, 1245 (9th Cir. 2006)(superseded by *United States v. Rosenthal*, 454 F.3d 943 (9th Cir. 2006)).[28] Even if this court were bound by the decision in *Rosenthal*, it is distinguishable from the facts of this case. The defendant in *Rosenthal* was convicted of, among other offenses, manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1), despite the fact that the defendant operated as an agent of a cooperative that the City of Oakland had designated "an official medical-cannabis-provider association." *Rosenthal*, 454 F.3d at 945–46. The trial court became aware that one of the jurors, on the eve of rendering a verdict, asked an attorney-friend whether she "had to follow the Judge's instructions, or if [she] had any leeway at all for independent thought." *Id.* at 948, 950. The attorney told the juror that she was required to follow the court's instructions, and that the juror "could get into trouble if [she] tried to do something outside those instructions." *Id.* at 950. The clear import of the juror's question was whether the juror was free to conclude, contrary to the federal statutes at issue, that the defendant was acting within the law.

The focus of the Ninth Circuit's prejudice analysis was the potentially coercive effect of the attorney's warning on the juror's decision to "acquit or convict." *Id.* By contrast, this court does not believe that the AJS article, even though it raised the specter of juror dismissal, would lead a

---

[28] After the parties filed their post-trial briefs, the Ninth Circuit amended its earlier decision. Although this court will cite the superseding opinion, it is, in all respects pertinent to this decision, identical to the earlier decision.

reasonable juror to "change his or her *determination*" for fear of punishment. *Id.* (emphasis added). The jurors in this case were instructed to "deliberate," and to "consult with one another, express [their] own views, and listen to the opinions of [their] fellow jurors." Final Jury Instr. at 148. The jurors may have reasonably believed, even without consulting extraneous material, that they could be removed if they refused to "deliberate." Tr. at 79 ("[Ms. Ezell] refused to deliberate, and she'd state over and over, 'I don't need to deliberate.'"). Accordingly, this court does not believe that the AJS article would coerce a reasonable juror into changing his or her ultimate determination, or abandoning his or her "honest beliefs." Final Jury Instr. at 148. This factor also distinguishes this case from those cases, cited by Defendant Ryan, in which a jury is admonished by someone other than the judge (typically a bailiff) that they must reach a decision. *See, e.g., United States ex rel. Tobe v. Bensinger*, 492 F.2d 232, 238 (7th Cir. 1974) (coercive statement by bailiff, "You must reach a decision," prejudicial). The AJS article does not state or imply that jurors must reach any decision, unanimous or otherwise, at the expense of their honestly held beliefs. Indeed, it suggests just the opposite. *See* AJS Excerpt (stating that juror cannot be removed if he or she "is merely expressing an alternative viewpoint that will likely result in a hung jury").

The court's conclusion is bolstered by its continued confidence that Ms. Peterson's decision to bring extraneous materials into the jury room was an honest mistake of judgment. Tr. at 94 (05/05/06). According to Ms. Peterson and other jurors, Ms. Ezell's behavior during deliberations caused significant discord in the jury room. Indeed, in addition to the AJS article, Ms. Peterson also obtained from the Internet an article entitled "Dealing with Difficult People". *Id.* at 61. Ms. Peterson believed, incorrectly though in good faith, that these materials did not violate the court's order about consulting extraneous materials because they were unrelated to the trial itself. *Id.* at 81.[29] The court is not persuaded by the notion, advanced on numerous occasions by Ryan's

---

[29]     Although instructed not to consult the Internet, this court's admonitions were, as the
(continued...)

counsel, that a cadre of jurors sought to silence dissenting views of the evidence, and that Ms. Peterson's research is another facet of their scheme. On the contrary, the court believes that the jurors who deliberated to verdict in this case were diligent and impartial. *See Bruscino*, 687 F.2d at 941 (trial judge's experience with jury during trial is relevant to court's analysis of possible prejudice). They sat attentively through nearly six months of evidence and deliberated 10 days before reaching their verdict. The court believes that these jurors made every effort to be fair, even amid extraordinary public scrutiny. With respect to the AJS article in particular, the court concludes that there is no reasonable possibility that any juror was persuaded to vote contrary to what his/her conscience and understanding of the evidence would otherwise dictate.

### 2. *Impact of dismissing jurors in the midst of contentious deliberations*

As previously discussed, *see supra* Part IX.A, this court removed Ms. Ezell from the jury, without objection by defense counsel, because she failed to disclose her criminal history on her juror questionnaire. Tr. at 24483, 24485 (03/27/06). Coincidentally, she was removed on the heels of the contentious deliberations just discussed. After she was dismissed, Ms. Ezell made a number of statements to the media in which she claimed that she was the only member of the jury who believed Ryan was innocent of some of the charges. Ryan contends that the other jurors may have believed that Ms. Ezell's removal "bore some relationship to her support for Ryan," and that her dismissal chilled the free expression of pro-defense opinions in the jury room. Ryan Post-Trial Mot. at 24.

Although this court had no knowledge of Ms. Ezell's views of the evidence, the court was nevertheless sensitive to defense counsel's concern that the remaining jurors might believe her

---

[29](...continued)
government points out, couched in terms of avoiding trial publicity. *See* Tr. at 2426–28 (09/28/05); Tr. at 7695 (11/09/06). This does not excuse Ms. Peterson's conduct, but does give the court further comfort that its assessment of Ms. Peterson's credibility was sound.

dismissal was related to their difficulties during the first week of deliberations. Accordingly, after Ms. Ezell and Mr. Pavlick were dismissed, the court instructed the reconstituted jury as follows:

> A word to my jurors. You have heard by now that two of the original jurors in this case were excused from further jury service. I want you to know, as I've told some of you already, that the circumstances that brought about the fact that these two jurors were excused, those circumstances were not prompted by any of the lawyers or by the parties in this case, nor by your previous deliberations, those of you who were here. Rather, the inquiry was generated by members of the media. It is not related to the lawyers in this case. I want you to know that in attempting to reach verdicts in this case you are answerable only to your own conscious [sic]. It is your job, and your job alone, to find the facts in this case and to apply the law that I have given you.

Tr. at 24804–05 (03/28/06). The court then reread the jury instructions to the reconstituted jury. *Id.* at 24806–90. After it was alleged that Juror Chambers had discussed the case with a third party (*see infra*), and that this individual had mentioned Ms. Ezell's dismissal, this court again admonished the jury by letter:

> As you know, two jurors were excused from further service on this case. The reasons they were excused have nothing to do with the views they expressed in early deliberations nor with any communications with me concerning those earlier deliberations.

Letter from Court to Jurors of 04/03/06; Tr. at 24972 (04/03/06).

Defendant Ryan contends that the court's instructions were insufficient because they did not disclose precisely why Ms. Ezell and Mr. Pavlick were removed. Ryan Post-Trial Mot. at 25. Ryan also points out that even if the jury knew why these two jurors were removed, other jurors with undisclosed arrests (Jurors Rein, Casino and Svymbersky) remained on the jury. *Id.* This, according to Defendant Ryan, created a "significant risk" that the reconstituted jury may have believed that the court sanctioned the removal of a pro-defendant juror, and/or that a "faction" of jurors had succeeded in ousting another juror *Id.* The court believes that Mr. Ryan's concerns are unfounded. This court rejected the prior request to remove Ms. Ezell in no uncertain terms. Letter

from Court to Jurors of 3/23/06. If the jurors had any lingering doubts about the court's position, its March 28 and April 3 instructions dispelled those doubts. Accordingly, the court believes that it effectively refuted any suggestion that some jurors had successfully ousted one of their own.

Mr. Ryan's second concern, that jurors may have believed that Ms. Ezell was removed for her views of the evidence, is likewise unfounded. First, it necessarily implicates the court. After all, the court removed the Ms. Ezell and Mr. Pavlick and communicated that decision to the jurors. Besides explicit instructions, *see* Final Jury Instr. at 2, 148, the court communicates its impartiality to jurors in numerous ways over the course of a trial (e.g., ruling on objections). Accordingly, there is no reasonable basis to suppose that these jurors inferred that the court removed a juror because of his or her view of the evidence. Even assuming that the court's March 28, 2006 instruction left the door open for such an inference, it was closed by this court's April 3, 2006 instruction, which disavowed any connection between Ms. Ezell's and Mr. Pavlick's views of the evidence and their dismissal. The court rejects Defendant Ryan's contention that Ms. Ezell's removal chilled free expression of pro-defense opinions.

### 3. *Impact of juror investigations during deliberations*

Both Defendants contend that their right to an impartial jury was impaired by investigations into the jurors' backgrounds during deliberations. Ryan Post-Trial Mot. at 26; Warner Post-Trial Mot. at 19. As a threshold matter, there would not have been, contrary to Ryan's contention, any confusion about who prompted the investigations. Ryan Post-Trial Mot. at 26. This court explicitly told the jurors that neither defense nor prosecution counsel initiated the investigation. Tr. at 24804–05 (03/28/06) ("[T]he inquiry was generated by members of the media. It is not related to the lawyers in this case."); *see also* Tr. at 24516–17, 24542 (03/27/06); Tr. at 24643–44 (03/28/06). Nor is the court persuaded by Ryan's more general argument that the jurors might want to curry favor with the prosecution if they believed they were being investigated. Ryan quotes several news

reports published during deliberations that state that a juror could be subject to prosecution for lying on his or her juror questionnaire. *See* Exs. 7–9 to Ryan Post-Trial Mot. Ryan speculates that it is possible the jurors saw these statements, based on statements by two of the alternate jurors (one of whom, Mr. Masri, did not deliberate) that they were aware, based on headlines they had seen, that the media was reporting "juror problems." Ryan Post-Trial Mot. at 27.

Several jurors were questioned about omissions from their juror questionnaires, and yet were retained to deliberate with the reconstituted jury. Although, as Ryan points out, only Ms. Gomilla was explicitly told that she was not in any trouble, Tr. at 24502 (03/27/06), it is implausible that the retained jurors would harbor any fear of prosecution. As for the remaining jurors, who were not specifically questioned about their questionnaires, they would have no reason to conclude that they were the targets of any investigation. With respect to the news reports, there is no indication in the record that any jurors saw more than headlines in connection with this matter. Nor is the court prepared to assume that the jurors ignored this court's many explicit instructions to avoid such media coverage.[30] Finally, the court instructed the reconstituted jury that the *voir dire* process initiated in the wake of the allegations concerning Ms. Ezell and Mr. Pavlick, was "complete, and I do not anticipate any further questioning of jurors. In any event, none of my questions should be considered in any way as you deliberate in this case." Tr. at 24789 (03/28/06). Accordingly, the court believes that it dispelled any speculative fear the jurors may have had about being investigated.

*Remmer*, which Ryan cites in his reply brief, is inapposite. *Remmer*, 347 U.S. at 229; Ryan Reply at 14. In that case, a juror reported to the court an incident of apparent jury tampering, and the court—without consulting or informing defense counsel—enlisted the prosecution and the F.B.I.

---

[30] Defendant Warner's argument that even seeing these headlines violated this court's order is incorrect. Warner Post-Trial Mot. at 5–6.

to investigate. *Remmer*, 347 U.S. at 228. Indeed, the defense did not learn about the episode until reading about it in a newspaper after the verdict. *Id.* So, not only was the alleged act of jury tampering potentially prejudicial, but so too was the government's "unauthorized invasion." *Id.* at 229. In this case, the investigation took place with the parties' consent and, as previously discussed, the proper precautions. In sum, the court is not persuaded that there is any reasonable possibility that jurors failed to vote their conscience for fear of prosecution.

### 4. Alleged ex parte communications

This court instructed the jury on numerous occasions not to discuss the case with third parties. Defendant Ryan maintains that Juror Chambers violated those instructions, and that her improper *ex parte* communications are presumptively prejudicial. Ryan Post-Trial Mot. at 39–40 (citing *Remmer v. United States,* 347 U.S. 227, 229 (1954). On March 28, 2006, an individual (Dennis McLaughlin) phoned a local radio show to describe a conversation he claimed to have had with a juror in this case. *See* Transcript of 3/28/06 WLS-AM (ABC) Radio Broadcast, Ex. 14 to Ryan Post-Trial Mot. Mr. McLaughlin, who owns a small coffee stand in a commuter rail station where he says the conversation with Ms. Chambers took place, was subsequently subpoenaed and questioned by this court concerning the substance of the conversation. Tr. at 25112 at (04/10/06). Mr. McLaughlin identified Juror Chambers as the person he had spoken with, and recounted that she had told him, in response to his question about whether they were going restart deliberations after Jurors Ezell and Pavlick were excused, that the jurors had not started deliberations proper, as they were "still dealing 148 pages of rules." Tr. at 25129 (04/11/06); *cf. id.* at 25137 (suggesting that he (Mr. McLaughlin) may have made the reference to "148 pages," as it had appeared "in the paper."). Mr. McLaughlin stated that he also told Ms. Chambers about a statement Ms. Ezell's son had made in an television interview to the effect that none of the remaining jurors, after Ms. Ezell's departure, were on Ryan's side. *Id.* Ms. Chambers' response, according to Mr. McLaughlin, was

that "maybe that was why she was off the case." *Id.* For her part, Ms. Chambers stated that the conversation never took place. *Id.* at 25206–07.

There are, the parties agree, two issues: (1) whether the *ex parte* communication occurred in the manner described by Mr. McLaughlin; and (2) whether the Defendants were prejudiced by the communication. This court has expressed misgivings about Mr. McLaughlin's account, *see id.* at 25236–37, and its experience with Ms. Chambers over the course of *voir dire* and an long trial has left the court with a positive impression of her candor. Defendant Ryan argues that post-verdict statements by jurors in this case corroborate Mr. McLaughlin's story, Ryan Post-Trial Mot. at 38–39, but those statements do not foreclose the possibility that Mr. McLaughlin gleaned information about the progress of deliberations from one or more of the many media reports that were circulating at that time.

Even if Ms. Chambers did have a conversation with Mr. McLaughlin, the court does not believe that there is a reasonable possibility that that conversation prejudiced the Defendants. Ryan contends that prejudice must be presumed, citing *United States v. Remmer*, 347 U.S. 227, 229 (1954). As previously discussed, *Remmer* dealt with suspected jury tampering—an unknown third party contacted a juror and "remarked to him that he could profit by bringing in a verdict favorable to the petitioner." *Id.* at 450–51. The Seventh Circuit has noted that it is unclear whether *Remmer's* presumption of prejudice applies to *ex parte* communications not involving jury tampering. *Whitehead v. Cowan*, 263 F.3d 708, 724 (7th Cir. 2001). Irrespective of whether the presumption ever applies to such communications, the court noted that the nature of some *ex parte* communications do not warrant the presumption. *Id.* The defendant in *Whitehead* was accused of aggravated kidnaping and murder. *Id.* at 714. After the victim's mother took the stand to testify, the judge inexplicably retired to chambers with counsel and the court reporter, leaving the witness, the defendant and the jury in court. *Id.* at 723. While the judge was absent, the witness began

89

shouting at the defendant, asking at one point why the defendant killed her daughter. *Id.* When the judge returned and discovered that the communication had taken place, he admonished the jury to disregard her comments. *Id.* The Seventh Circuit held that the *Remmer* presumption did not apply, noting that the mother's comments were directed to the accused, not the jury, and that the "mother did not attempt to persuade the jury, nor did she provide them with any extraneous information about the facts of the case." *Id.*

If the court were to adopt Mr. McLaughlin's version of events, there would have been, unlike *Whitehead*, a communication between a third party and a juror. But like the comment in *Whitehead*, the communication in this case was "innocuous," *id.* at 724–25; much more so in fact: In the communication at issue in this case, it was the juror who allegedly provided information to a third party, not an effort by a third party to influence the juror. Mr. McLaughlin explicitly stated that he did not attempt to persuade Ms. Chambers or do anything that might affect the trial. Tr. at 25131 (04/11/06). The only piece of information Mr. McLaughlin is alleged to have communicated to Ms. Chambers was the fact that Ms. Ezell's son had made comments to the media concerning the attitude of the deliberating jurors towards Defendant Ryan. *Id.* at 25129. Ms. Chambers' alleged response, to the effect that "maybe" that was why Ms. Ezell was removed from the jury, is at best ambiguous and may, as this court has previously suggested, been an attempt to extricate herself from an uncomfortable situation. *Id.* at 25148–50. Even if the court accepted the Defendants' highly speculative suggestion that this was a window into the jurors' understanding of Ms. Ezell's removal, this court instructed the reconstituted jury that the Jurors Ezell and Pavlick were not removed because of what had occurred during their prior deliberations. Tr. at 24804–05 (03/28/06); Tr. at 24972 (04/03/06). The court concludes that the alleged conversation between Ms. Chambers and Mr. McLaughlin "would not affect a reasonable juror's deliberation as to whether or not" the Defendants committed the crimes they were charged with. *Whitehead*, 263 F.3d at 725.

###### 5. *Juror exposure to trial publicity*

Defendants Warner and Ryan contend that Jurors Svymbersky and Rein violated the court's repeated instructions to avoid media coverage of the trial. The Defendants' trial was well-publicized, and the court was sensitive to the fact that undue media exposure could prejudice the Defendants. Accordingly, this court instructed the jurors to avoid newspaper accounts by removing articles about the case before they read the paper, and to walk out of the room if the television news featured a story about the trial. Tr. at 2427 (09/28/05). At the same time, this court also acknowledged that short of sequestering the jury—a step that would have entailed an even greater intrusion into the lives of these jurors than they were already subjected to—the jurors' most diligent attempts to avoid media coverage would not be completely successful. *See, e.g.*, Tr. at 2427 (09/28/05); Tr. at 25044 (04/06/06). So, the fact that Jurors Rein and Svymbersky were exposed to headlines and pictures related to the case is not surprising, nor was it prejudicial in this case. Although both jurors stated that they read newspapers, which was not contrary to the court's instructions, *see* Tr. at 17646 (12/05/05), they further stated that they attempted to avoid stories regarding the trial. Tr. at 24547 (03/27/06) (Svymbersky: "If I saw a headline, I would just pass it. I wouldn't read anything about it."); Tr. at 24639–40 (Rein threw away the "Metro" section of the paper). Svymbersky stated that he read a front-page headline that quoted rhetoric from the government's closing argument ("12 Years of Christmas"), but Svymbersky was, of course, present for the closing argument and heard the original statement in person. While the court would have preferred that jurors not be exposed to such rhetoric outside the courtroom, the court does not believe that it affected the course of deliberations or otherwise prejudiced the Defendants. Nor is the court troubled that these jurors did not bring these matters to the court's attention on their own, rather than in response to specific questioning. *See* Warner Post-Trial Mot. at 5. Although the court did ask the jurors to tell the court if they had been exposed to trial publicity, the jurors could have reasonably inferred that court did not require them to report *de minimis* or fleeting exposure.

*See, e.g.*, Tr. at 2427 (09/28/05) ("I know that you are going to see some things that pass through your consciousness."). In any event, the court is confident that the jurors who deliberated to verdict in this case were not prejudiced by any inadvertent exposure to media coverage.

### D. Juror Substitution Pursuant to Rule 24(c)

When the case initially was submitted to the jury, the court excused the remaining alternates, but directed them to continue to abide by instructions that they not discuss the case with anyone or consider any media attention, pending a verdict. On March 28, 2006, eight days after deliberations began, this court seated two alternate jurors pursuant to FED. R. CRIM. P. 24(c). Rule 24(c)(3) provides as follows:

> The court may retain alternate jurors after the jury retires to deliberate. The court must ensure that the retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged. If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.

FED. R. CRIM. P. 24(c). Before Rule 24 was amended in 1999, a district court that replaced a deliberating juror with an alternate, instead of proceeding with 11 jurors or declaring a mistrial, committed reversible error. *See, e.g.*, *United States v. Beard*, 161 F.3d 1190, 1194 (9th Cir. 1998) (finding decision to replace two deliberating jurors with alternates an abuse of discretion under the pre-1999 version of Rule 24). The concern, in such cases, was that the substituted juror was at a disadvantage during deliberations, "and as a result the defendant may not really be getting the jury of 12 to which he is entitled." *United States v. Josefik*, 753 F.2d 585, 587 (7th Cir. 1985). Nevertheless, trial courts were loathe to toss out lengthy trials based upon last-minute juror misconduct, especially when alternates were available, and those appellate courts that did not reverse the trial court for violating the letter of Rule 24, created elaborate justifications for their failure to do so. *See, e.g.*, *United States v. Virgen-Moreno*, 265 F.3d 276, 289 (5th Cir. 2001) (setting out a four-factor test to determine whether the defendant was actually prejudiced by

substituting jurors post-submission).  After the 1999 amendments, such machinations are no longer necessary.

Although the Seventh Circuit has yet to directly address this issue, it has given every indication that the amended rule reverses the prior presumption that a late-arriving juror is incapable of deliberating fairly with jurors who have already begun deliberations.  In *United States v. Johnson*, a juror who had served during the guilt phase of a capital-punishment trial failed to appear for the penalty phase and was replaced with an alternate.  223 F.3d 665, 669 (7th Cir. 2000).  When the defendant argued that this late-substitution violated 18 U.S.C. § 3593(b)(1), (requiring that a death penalty sentencing hearing be conducted "before the jury that determined the defendant's guilt"), the Seventh Circuit turned to the amended Rule 24(c) for guidance.  *Id.* at 670.  Citing the portion of *Josefik* that Ryan relies on, *see* Ryan Post-Trial Mot. at 32, the court observed: "[T]he fact that the alternate missed some of the deliberations is no longer regarded as a fatal objection, or indeed as any objection, to his participating in the jury's decision."  *Johnson*, 223 F.3d at 670.  Significantly, the Defendants rely exclusively on case law interpreting pre-amendment Rule 24.[31]  The plain language of Rule 24(c) and the Seventh Circuit's discussion in *Johnson* refute the notion, advanced in the pre-amendment cases Ryan cites,[32] that substituted jurors are at an insurmountable disadvantage in deliberations.

Nevertheless, Defendant Ryan contends that seating two alternates in this case prevented meaningful deliberations.  Ryan Post-Trial Mot. at 29.  Ryan contends that the jurors did not, indeed could not, heed this court's admonition to begin deliberations anew.  *Id.* at 29–30.  The original jury

---

[31]     *Cf. United States v. Bradley*, 79 Fed. Appx. 335 (9th Cir. 2003) (Caselaw interpreting pre-amendment Rule 24 is superseded "by the plain language of the new rule.").

[32]     *See People v. Burnette*, 775 P.2d 583, 588 (Colo. 1989); *State v. Lehman*, 321 N.W.2d 212, 220 (Wis. 1982); *cf. United States v. Register*, 182 F.3d 820, 843 n.36 (11th Cir. 1999) (finding no prejudice to defendant in violation of pre-amendment Rule 24 before quoting the then-proposed amendment and observing: "This rule, announced by the Supreme Court, intimates that such a procedure does not deprive defendants of any rights.").

deliberated for eight days, although, as this court observed at the time, they were not "full" or "long days." Tr. at 24603–04 (03/28/06). In any event, according to Ryan, the jurors who participated in both the original and the reconstituted juries' deliberations could not have put their prior deliberations out of their minds. Ryan further argues that the substituted jurors were exposed to improper outside influences. *Id.* at 28–29. While the court does not believe that Rule 24(c) permits the court to substitute jurors during deliberations in all circumstances, the court is convinced that substitution in this case preserved the "essential feature" of the jury. *Henderson v. Lane*, 613 F.2d 175, 177 (7th Cir. 1980).

Consistent with Rule 24(c), this court took a number of precautions to ensure that the reconstituted jury began deliberations anew. FED. R. CRIM. P. 24(c)(3) ("If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew."). As noted, when the alternates were initially excused, the court directed that they not consider media attention until they learned that a verdict was returned. When the alternates were called back, the court confirmed on the record that Jurors Svymbersky and DiMartino had not in fact been unduly exposed to trial publicity or to the comments of other third parties. Tr. at 24539–43 (03/27/06). Both jurors explained that they had adhered to that direction, cutting off any person who attempted to speak with them about the case. Tr. at 24539–40, 24547 (03/27/06). Of course, these jurors were not completely shielded from information concerning the trial, but the court satisfied itself that both jurors' exposure was inadvertent and innocuous. Tr. at 25044–45 (04/06/06); *see Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation.").

With respect to the jurors who had participated in the first week of deliberations, the court interviewed each of them individually and received assurances that they were capable and willing to "start all over today and completely disregard any of the discussions that have happened before." Tr. at 24759–78 (03/28/06). Once the decision to proceed with the alternate jurors was made, the

court instructed the entire jury that they must "completely put out of your prior deliberations out of your mind . . . . You also should not discuss or mention any statements or comments made during the prior deliberations when you begin these new deliberations." *Id.* at 24805. The court then reinstructed the reconstituted jury. *Id.* at 24804–91. Case law from other jurisdictions interpreting pre-1999 Rule 24 support the conclusion that, in this case, such precautions obviated any prejudice to the Defendants. *See, e.g., United States v. Hillard*, 701 F.2d 1052, 1056–57 (2d Cir. 1983); *United States v. Kopituk*, 690 F.2d 1289, 1307–08 (11th Cir. 1982). More importantly, the current version of Rule 24 presumes that post-submission substitution, when accompanied by instructions to begin deliberations anew, is *not* prejudicial. FED. R. CRIM. P. 24(c)(3); *Johnson*, 223 F.3d at 670. The court has no basis to conclude that the presumption has been rebutted in this case.

The Defendants argue that because of the "extensive juror misconduct" in this case, the court cannot assume that these jurors followed the court's instructions to begin deliberations anew. Ryan Reply at 16. As previously discussed, the court believes that the Defendants have significantly overstated the degree of juror "misconduct" in this case. *See supra* Part IX.C. The jurors who deliberated to verdict in this case were attentive and conscientious, a conclusion the court believes is further bolstered by the fact that they deliberated for ten days after they were reconstituted. *See Kopituk*, 690 F.2d at 1311 (individual assurances from jury that they would begin deliberations anew, plus the fact that they deliberated for "a full week" after being reconstituted, sufficiently indicated that they followed instructions to begin anew); *Cf. United States v. Lamb*, 529 F.2d 1153, 1156 (9th Cir. 1975) (overturning guilty verdict rendered by jury that deliberated for 29 minutes after they were reconstituted). In *Lamb*, the original jury had already returned a guilty verdict that the court rejected, a circumstance lending further support for the court's conclusion that the reconstituted jury did not heed the trial court's instruction to "begin and the beginning." *Lamb*, 529 F.2d at 1155. According to Defendant Ryan, the present case is somewhat analogous insofar as "we now know that the jury deliberated to verdict on some counts." Ryan Reply at 16. Ryan

asserts that the jurors had reached verdicts on two counts based on post-verdict statements that some jurors made to the media. Ryan Post-Trial Mot. at 38–39 n.16. First, the court notes that Ryan's assertions about the first jury's progress vary as it suits his purposes. *Compare* Ryan Post-Trial Mot. at 31 (stating the jurors had deliberated to verdict on two counts); *with id.* at 39 (citing newspaper articles that purportedly corroborate Mr. McLaughlin's recollection of his conversation with Juror Chambers to the effect that the jury was still "working through the instructions"). Second, and more importantly, these statements are not competent evidence. *See* FED. R. EVID. 606(b).

Ryan also relies on post-verdict comments to the media for the proposition that the reconstituted jury did not, in fact, follow the court's instruction. *Id.* at 29–30. Leaving to one side the fact that these statements cannot be used to impeach the verdict, the substance of the juror's post-verdict comments actually confirms that they did endeavor to begin anew. The jury, as a whole, appears to have allowed the substituted jurors to set the agenda for the entire group "so the original jurors 'would not try to sway [them], or give [them] an opinion." 04/18/2006 Article, Ex. 12 to Ryan Post-Trial Mot. Ryan's suggestion that these and similar statements indicate that the jurors did not deliberate as a group is, at best, unconvincing. "[H]anding the reins" to the alternate jurors was a sensible procedure for following the court's instructions, not an indication that they flouted those instructions.

In sum, court concludes that substituted two jurors after deliberations began did not violate either Rule 24(c) or the Sixth Amendment.

### E.    Seating Additional Alternates

This court seated eight alternates, two more than is contemplated by Rule 24(c)(1). This fact was brought to the court's attention by the prosecution before opening statements were completed. Tr. at 2499 (09/28/05). Indeed, the government explicitly asked whether defense counsel objected. *Id.* ("[I] assume there's no objection by anybody to that?"). Defense counsel for Warner stated expressly that he did not object, *id.*, a claim that Warner does not dispute in his post-

trial motion. The record does not reveal any response from Ryan's counsel. The government contends that Ryan waived the objection; Ryan contends that, at most, he merely forfeited the objection.

Waiver is the "intentional relinquishment or abandonment of a known right." *United States v. Williams*, 272 F.3d 845, 854–55 (7th Cir. 2002) (citations and internal quotation marks omitted). Forfeiture "is simply the failure to make a timely assertion of a right." *Id.* Waiver can be implied "where an intention to relinquish the right, although not expressed, can be inferred," although "implied waiver" is often difficult to distinguish from "forfeiture." *Johnson*, 223 F.3d at 668. Consistent with its previous ruling, (Tr. at 24367 (03/27/06)), the court concludes that Ryan implicitly waived the objection. The court's deviation from the letter of Rule 24(c) was explicitly called to defense counsel's attention by the prosecution, and yet counsel for Ryan said nothing. There were, of course, daily reminders over the course of an almost six-month trial that there were 20 jurors in the jury box. It is implausible that Ryan's counsel simply forgot to object, or was waiting for the right opportunity. Moreover, Ryan's argument that the court "represented that [the additional alternates] would not be seated" is frivolous. Ryan Post-Trial Mot. at 35 n. 14. The court stated that the "worst case scenario" was that the additional alternates would hear all of the evidence but never deliberate, not that the court would not seat these alternates. Defense counsel cannot seriously contend that the court would require two citizens to sit through a very long trial as spectators. Moreover, as the government points out, defense counsel never articulated this rationale despite multiple opportunities to do so as the parties discussed what to do in the wake of dismissing Jurors Pavlick and Ezell. Accordingly, the court concludes that Ryan waived his objection to the Rule 24 violation.

### F.  The Court Properly Denied Defendants' Request to Interview Jurors

Defendant Ryan also argues that the court improperly relied on Federal Rule 606(b) and *Tanner v. United States*, 483 U.S. 107 (1987), in denying his motion to interview Jurors Ezell and

McFadden.  In *Tanner*, the Supreme Court held that the defendant's Sixth Amendment rights were not violated when, pursuant to Rule 606(b), the trial court declined to hold an evidentiary hearing at which jurors would testify after allegations surfaced that some jurors were impaired by alcohol and drugs during portions of the trial.  *Tanner*, 483 U.S. at 127.  Ryan argues that since he requested only an opportunity to interview jurors informally, *Tanner* and Rule 606(b) are not implicated.  This court has discretion under Local Criminal Rule 31.1 to deny counsel's request to interview jurors.  In exercising that discretion, the likelihood that juror interviews will yield admissible evidence is certainly a factor.  *See, e.g., United States v. Moten*, 582 F.2d 654, 665 (2d Cir. 1978).

At the time that the Defendants sought to interview Ms. Ezell and Ms. McFadden, there were no allegations that improper external influence had been brought to bear on any juror.  Only after this court denied Defendants' motion did Ms. Ezell allege that another juror brought extraneous material into the jury room.  Ryan Post-Trial Mot. at 47 n.21.  The court then conducted a thorough hearing on the matter, during which defense counsel was permitted to pose questions.  But at the time the court ruled on the request to interview jurors, the Defendants were relying on statements to the press made by Ezell and McFadden that amounted to little more than name-calling.  There was certainly no indication that the interviews would yield information that could be used to impeach the verdict.  This was especially true with respect to Ms. McFadden, who was removed from the jury for reasons that have nothing to do with the alleged misconduct of other jurors, and who played no part in either the first or the second round of deliberations in this case.  Even though these jurors may have wanted to speak with defense counsel, interviews with either or both jurors about what went on in the jury room would necessarily entail further intrusion into the lives of the other jurors, who would feel compelled to respond to any actual or perceived inaccuracies in Ezell's and McFadden's statements.  The fact that some of these jurors have chosen to speak with the media on their own terms does not persuade the court that they have invited or would welcome the additional attention that interviews would entail.  There are also powerful institutional interests in

98

respecting the finality of verdicts that caution against any further intrusion into the jurors' deliberations. The court reaffirms its decision to deny juror interviews.

### G. Juror Problems, Viewed as a Whole, Do Not Rebut the Presumption that Jurors Followed Instructions to Assess Warner's Culpability Independently

As Warner points out, a critical issue with respect to his numerous motions for severance is whether the jury was able to sort out the evidence among the defendants. *United States v. Thompson*, 286 F.3d 950, 968 (7th Cir. 2002). To ensure that the jury would draw the necessary distinctions between the Defendants, this court gave numerous limiting instructions both during and at the end of the trial. Jurors are presumed to follow such instructions, *Thompson*, 286 F.3d at 968, but Warner contends that a host of juror-related issues already described rebut that presumption. Warner Post-Trial Mot. at 2.

As previously discussed, the court rejects Warner's contention that jurors who deliberated to verdict in this case lied on their juror questionnaires. *See supra* Part IX.A. The court has likewise rejected Warner's argument that jurors violated this court's numerous admonitions to avoid trial publicity. *See supra* Part IX.C.5. Warner adds to the list of perceived juror misconduct the decision of Jurors Svymbersky and James to remove their notebooks from the jury room after being discharged. Warner Post-Trial Mot. at 8. As to Juror Svymbersky, the court concluded that it was an innocent mistake, Tr. at 24448–50 (03/27/06).[33] In any event, the court does not agree that two jurors' removal of their notebooks conclusively establishes the entire jury's inability to follow instructions. So, as a threshold matter, the court rejects the underlying factual premise for Warner's theory that "[i]f the jurors could not follow simple instructions on these topics, then they could not follow more-difficult instructions regarding the compartmentalization of evidence, [etc.]." Warner Post-Trial Mot. at 9.

---

[33] The court advised the jurors to leave their notebooks in the jury room during the course of the trial but did not repeat the admonition, nor did it explicitly prohibit them from removing their notebooks at the conclusion of the trial.

Moreover, the two cases Warner cites in support of his argument that juror misconduct in this case rebuts the presumption that jurors follow instructions are plainly distinguishable. *See Dyer v. Calderon*, 151 F.3d 970, 983 (9th Cir. 1998) ("If a juror treats with contempt the court's admonition to answer voir dire questions truthfully, she can be expected to treat her responsibilities as a juror---to listen to the evidence, not to consider extrinsic facts, to follow the judge's instructions---with equal scorn."); *United States v. Colombo*, 869 F.2d 149 (2d Cir. 1989). In *Dyer*, a juror in a death penalty case failed to disclose at *voir dire* that her brother was the victim of a murder performed in a manner similar to the *Dyer* defendant's alleged crime. 151 F.3d at 976-77. Furthermore, the *Dyer* prosecutor had prosecuted the juror's brother's killer. *Id.* When given the opportunity to correct her initial omission, rather than doing so, the juror told the trial judge that she believed that her brother's death was an accident. *Id.* The facts surrounding the juror's brother's death, however, plainly bespoke foul play---facts known to the juror in her capacity as the plaintiff in her brother's wrongful death suit. *Id.* In a further bizarre twist, after the conviction of the *Dyer* defendant, the juror went on to take a job as a guard on death row in San Quentin where the *Dyer* defendant awaited execution. *Id.* at 982 n. 18. The Ninth Circuit concluded that the juror lied and that her lies gave rise to an inference of implied bias against the defendant because the subject matter of what she concealed and the repetition of her lies indicated that she had lied to protect her position on the jury. *Id.* at 982. *Colombo* involved a juror who deliberately concealed her relationship with a government lawyer. 869 F.2d at 150. The *Colombo* court did not have to guess at this juror's intentions: the juror involved actually stated to another juror that she had lied in order to obtain a seat on the jury. *Id.* The *Colombo* court observed:

> Knowingly lying during the *voir dire* violated, *inter alia,* 18 U.S.C. § 1621 (1982), and subjected the juror to possible criminal contempt pursuant to 18 U.S.C. § 401 (1982), as well as to possible substantial restitution claims by the government. . . . It exhibited a personal interest in this particular case that was so powerful as to cause the juror to commit a serious crime. Such an interest not only suggests a view on the merits and/or knowledge of evidentiary facts but is also quite inconsistent with an expectation that a prospective juror will give truthful answers concerning her

or his ability to weigh the evidence fairly and obey the instructions of the court.

869 F.2d at 151-52 (citations omitted).

The jurors' deliberate and outrageous misrepresentations in *Dyer* and *Colombo* are in no way analogous to the honest mistakes that the jurors in this case made. Nevertheless, Warner argues that the court should infer from individual juror's honest mistakes with regards to particular instructions that the jury as a whole was unable to follow the court's limiting instructions. The court finds this inference suspect on at least two grounds. First, as *Dyer* and *Colombo* demonstrate, courts draw a distinction between honest mistakes and purposeful deceptions. Drawing this distinction is sensible. For all but the theoretically least competent juror, the possibility of misinterpreting an instruction from the court will be less than the certainty that the instruction will be disregarded by a juror who purposefully intends to do so. Second, the court does not find a compelling connection between evidence that individual jurors occasionally made individual mistakes implementing the court's instructions, and the assumption that these same jurors would make much graver mistakes when acting together. Unlike the mistakes the jurors made alone, the possibility that one juror would think some piece of evidence admitted only against Ryan was also applicable to Warner must be balanced against the likelihood that his or her eleven peers on the jury would recognize the juror's error and correct him or her.

For the same reason, the court is unwilling to assume that the jurors were incapable of following its instruction that Defendant Ryan as a public official had a duty of honest services while Warner, as a private citizen, did not. The court instructed the jurors to this effect. Final Jury Instr. at 70, 82. Warner draws sinister meaning from the fact that the jury unanimously convicted both Defendants of all counts. Warner Post-Trial Mot. at 10. While it is true that a court can bolster its presumption that a jury has followed its instruction by reference to the fact the jury did acquit some of the defendants on some counts, *see, e.g.*, *Thompson*, 286 F.3d at 968, a split verdict is not a necessary condition for the ordinary presumption that the court's instructions were effective.

Warner also contends that the juror issues in this case would have caused the court to declare a mistrial in a shorter trial, citing this court's recent decision declaring a mistrial in a wholly unrelated matter. *See* Warner Post-Trial Mot. at 20. The length of a trial, or more accurately, the amounts of judicial, prosecutorial, and private resources expended over the course of a long trial, are relevant and appropriate considerations. *See, e.g., McDonough*, 464 U.S. at 555 ("To invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give."); Fed. R. Crim. P. 24(c).

For all these reasons, the court finds that it did not err in denying Warner's repeated motion for severance and does not find that the interests of justice require it to grant Warner a new trial on this basis now.

## CONCLUSION

Ryan's motion for judgment of acquittal is granted with respect to Counts Nine and Ten and otherwise denied. Ryan's motions to dismiss, for new trial, and for arrest of judgment (686, 721-1,2, 778, 817-1,2,3) are denied. Warner's motion for acquittal is granted with respect to Count Nine and otherwise denied. His motions for severance (260-1,2, 584, 674, 829) are denied. Warner's motions to dismiss, for new trial, and arrest of judgment (673, 818, 830-1,2) are denied.

ENTER:

Dated: September 7, 2006

_____
REBECCA R. PALLMEYER
United States District Judge